PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD. <br>         Plaintiff, <br><br> TRINA SOLAR ENERGY CO., LTD., JA SOLAR <br> TECHNOLOGY YANGZHOU CO., LTD., ET <br> AL., <br>         Consolidated Plaintiffs, <br><br>    and <br><br> SHANGHAI BYD CO., LTD., ET AL., <br>         Plaintiff-Intervenors, <br>   v. <br><br> UNITED STATES, <br>         Defendant, <br><br>    and <br><br> SUNPOWER MANUFACTURING <br> OREGON, LLC, <br>         Defendant-Intervenor. | **PUBLIC VERSION** <br><br> Consol. Court No. 20-3743 |

## PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

<div style="text-align:right">

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

</div>

Dated: April 29, 2021

PUBLIC VERSION

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ........................................................................ 1

    A.    Administrative Determination Subject to Appeal ........................... 1

    B.    Issues Presented ................................................................................ 1

II.    STATEMENT OF FACTS ..................................................................... 2

III.   STANDARDS OF REVIEW ................................................................. 5

IV.   ARGUMENT ......................................................................................... 8

    A.    The Department's Determination to Rely Upon the Malaysian Silver Paste Import Value Is Not Supported by Substantial Evidence ............................ 8

        1.   The Department Improperly Failed to Consider the Commercial Reality of Solar Cell and Panel Manufacturing in Relying on the Malaysian Import Value .................................................................... 9

        2.   The Malaysian Import Value is Aberrant Compared to the Other Import Values on the Record .................................................... 15

        3.   The Historical Malaysian Import Values for HTS 7115.90 were Improperly Placed on the Record by the Department and Do Not Support the Reliance on the Import Value ................................ 18

        4.   The Department was Obligated to Consider the Benchmarking data from Other Countries Placed on the Record ........................ 20

        5.   The Department Must Consider All Information on the Record in Determining whether the Malaysian Import Price is a Reliable, Non-Aberrant Surrogate Value for Silver Paste ........................... 23

        6.   The Department failed to Consider the Lack of Specificity of HTS 7115.90.10 in its Analysis of the Malaysian Import Value ................... 25

    B.    The Department's Surrogate Financial Ratio Calculation was Not Supported by Substantial Evidence and Resulted in Double-Counting Energy and labor Expenses ................................ 28

    C.    The Department's surrogate value HTS classification for Backsheet and EVA film inputs is Not Supported by Substantial Evidence ...................... 32

i

D.      The Department's Selection of Malaysia instead of Bulgaria as the
        Primary Surrogate Country is Not Supported by Substantial Evidence...35

E.      The Department's Application of Adverse Facts Available to Risen's
        Unreported FOPs is Not Supported by Substantial Evidence and Contrary
        to Substantial Court Precedent.......................................................40

V.   Conclusion and Prayer for Relief ...........................................................47

## TABLE OF AUTHORITIES

**CASES**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316 (Fed. Cir. 2010) .............39

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006)...............................6

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)..................... 5, 20-21

*Blue Field (Sichuan)*, 949 F. Supp. 2d at 1317, SLIP OP. 2013-142)...........................................21

*Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Intl. Trade LEXIS 152 (December 3, 2019) ...................................................................................................................................... 45-46

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019)....... 45-46

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ..............................................................................................................................................46

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003) .......................................6

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)...........................................7

*Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326 (March 22, 2018) .......20

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983)...........................................6

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)................................. 6-7, 27

*DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338 (Ct Int'l Trade 2014) .......32

*Fuwei Films (Shandong) Co., Ltd. v. United States*, 837 F. Supp. 2d 1347 (2012) .....................18

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)..........................9

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006) ..............................................................................................................................................6

*Holmes Products Corp. v. United States*, 795 F. Supp. 1205, 1207-08 (Ct. Int'l Trade 1992) .....32

*Itochu Bldg. Prods. Co. v. United States*, 2017 Ct. Intl. Trade LEXIS 74 (Ct. Int'l Trade June 22, 2017)................................................................................................................................24

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (Ct. Int'l Trade April 19, 2018) .......21

*Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) .......20

*Juancheng Kangtai Chem. Co., Ltd. v. United States*, SLIP OP. 2015-93, Slip Op. 15-93,

2015 WL 4999476 (CIT Aug. 21, 2015) .................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...........................

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ................. 42-46

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ...................................9

*Nippon Steel Corp. & United States*, 337 F.3d 1373 (Fed. Cir. 2003) .........................................42

*Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) .................................................................................................................................21

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) .....................39

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011).........................................19

*Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354 (Ct. Int'l Trade 1999).................................................................................16

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)..........................................7

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018).....................................19

*Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)................26

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) .................................................. 5-6

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, Slip Op. 2013-30 (CIT 2013)........21

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..............9

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015)........32

*Zhengzhou Harmoni Spice Co., Ltd., et. al. v. United States*, 617 F. Supp. 2d 1281 (Ct. Int'l Trade 2009)..................................................................................................................9

## STATUTES & REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................ 5

19 U.S.C. § 1677e .................................................................................................. 41-46

## ADMINISTRATIVE DECISIONS

*1,1,1,2-Tetrafluroethane From the People's Republic of China: Antidumping Duty Investigation, Preliminary Determination of Sales at Less Than Fair Value, Affirmative*

iv

*Preliminary Determination of Critical Circumstances, in Part, and Postponement of Final Determination*, 79 Fed. Reg. 30,817 (2014) ................................................................31

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent to Rescind the Review, in Part, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 23,947 (April 30, 2020) ...............................................................................................................................29

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 51,607 (November 7, 2017) ...............................................................................................................................25

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 21,195 (May 5, 2017).......26

*Certain Quartz Surface Products From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 58,540 (November 20, 2018).................................................................29

*Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 1167 (January 11, 2016) .............28

*Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 16,838 (Dep't of Commerce 2009).................................................................................................................31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination; 2018-2019*, 86 Fed. Reg. 21,277 (April 22, 2021) ..............5

*Crystalline Silicon Photovoltaic Cells Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 36,886 (July 30, 2019) ...................................................................................... 18-19, 24, 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assemble, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments, 2016-2017; 83 Fed. Reg.67,222  (December 28, 2018) .......................................................................................... 16-17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (July 27, 2018)........................... 18-19, 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg. 29033 (June 27, 2017)........................... 18-19, 33

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 Fed. Reg. 39905 (June 20, 2016) ........................................... 18-19, 33

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances*, in Part, 77 Fed. Reg. 63,791 (October 17, 2012) ...................... 18-19, 33

*Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) ............................................................... 39

*Fresh Garlic from the People's Republic of China: Preliminary Results, Preliminary Rescission, and Final Rescission, In Part, of the 24th Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,400 (January 15, 2020) ........................................................ 36

*Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission of Review in Part; 2012-2013*, 80 Fed. Reg. 33,246 (2015) ...................................................................................... 31

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews*, 63 Fed. Reg. 16,758, 16761 (Dep't Comm. Apr. 6, 1998) ................................................................ 16

*Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 78,333 (Dec. 26, 2013) ..................................................................................................... 20

*Steel Propane Cylinders From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 84 FR 29161 (June 21, 2019) ...................................................... 25

PUBLIC VERSION

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff Risen Energy Co., Ltd. ("Risen"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published the contested final results in the Federal Register on October 2, 2020. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 62,275 (October 2, 2020), **PR478**, *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR468**; *see also Amended Final Results* (December 9, 2020), **PR508**.  Risen was assigned a weighted average dumping margin of 100.79% *ad valorem* in the Final Results.

### B.    Issues Presented

1.    <u>Issue One</u>:  Whether the Department relied upon the best available information to value silver paste?  Related to this issue, whether the Department's supplementing the record with silver paste information while refusing to place other surrogate value information on the record that it deemed was missing was arbitrary and capricious?

2.    <u>Issue Two</u>: Whether the Department's surrogate financial ratio calculation was supported by substantial evidence?  Not only were the re-allocations of costs from the denominator of the financial ratios to the numerator unreasonable, the calculation also resulted in double-counting labor and energy expenses.

3.    <u>Issue Three</u>: Whether the Department relied upon the best available information to value Risen's backsheet and EVA film inputs?

4.      Issue Four: Whether the Department's selection of Malaysia instead of Bulgaria as the surrogate country is supported by substantial evidence?  Further, as part of this analysis, whether the Department's determination that Bulgaria is not at the same level of economic comparability is arbitrary and capricious?

5.      Issue Five: Whether the Department's application of adverse facts available ("AFA") with respect to unreported factors of production of unaffiliated cell and module suppliers was supported by substantial evidence and otherwise in accordance with law?

6.      Risen notes that it is not pursuing Count VII concerning certain ministerial errors. Subsequent to filing the complaint, the Department issued a revised Final Results.  The Department corrected both ministerial errors raised in Count VII.  Therefore, this count is moot.

## II.     STATEMENT OF FACTS

On March 14, 2019, the Department initiated the sixth administrative review of the antidumping duty order on Solar Cells from China.  *Initiation Notice*, 84 Fed. Reg. 9,297.  Based on responses to quantity and value questionnaires, the Department selected Risen and Changzhou Trina Solar Energy Co., Ltd. ("Trina"), the two companies accounting for the largest volume of entries, as mandatory respondents.  *See* Respondent Selection Memo (May 7, 2019), **CR31 PR101**.

Because this review involves a nonmarket economy order, the Department does not use respondents' actual cost records to value its inputs, home market sales, and financial statements for the purposes of calculating the normal value.  Rather, the Department selects surrogate values from a surrogate country and applies them to the inputs to production to arrive at a cost of production for normal value purposes.

In the investigation and first through fifth administrative reviews, the Department relied

upon Thailand as the primary surrogate country.  In this sixth review, the Department no longer considered Thailand to be economically comparable to China, and therefore Thailand was not listed as a potential surrogate country.  Rather, based on 2017 GNI data, the Department's surrogate country list consisted of Romania, Malaysia, Russia, Mexico, Brazil, and Kazakhstan. *See* Dep't SC Letter; **PR166**.  As explained further below in the surrogate country analysis, Risen also timely submitted that Bulgaria is at the same level of economic development as well because its 2017 GNI fell within the range of these countries.  *See* Risen GNI List Comments (August 12, 2019); **PR172**.  Parties ultimately argued that Malaysia or Bulgaria should be relied upon.

Because Thailand had been a consistent cost basis for the review of this case until this review, this case presents several surrogate value issues that were not issues in the prior reviews of this case.  The silver paste surrogate value became the most critical issue affecting the margin. While silver paste has not been a driver of the margin in past reviews and is also not the main raw material cost in the respondents' own production experience, or authoritative industry report of the solar industry, the very high import price under HTS 7115.90.10.00 (an HTS that includes silver paste as well as other silver and gold articles) in Malaysia, had the most significant impact of the various surrogate values on the margin.  Risen and Trina were both mandatory respondents in prior reviews and received low AD margins in those segments.  Indeed, the recent history of reviews all had low AD margins and single-digit margins on appeal:

| Exporter | margin | After Court Appeal |
|---|---|---|
| **POR 2 (2013-14); 81 FR 39905 (June 20, 2016)** | | **84 FR 1053 (February 1, 2019) (Timken)** |
| Yingli Energy | 12.19% | 0.00% |
| Changzhou Trina Solar | 6.12% | 6.55% |
| SRA (including Risen) | 8.52% | 3.96% |
| | | |
| **POR 3 (2014-15); 82 FR 40560 (August 25, 2017)** | | **85 FR 39520 (July 1, 2020) (Timken)** |
| Canadian Solar | 13.07% | 3.19% |
| Changzhou Trina Solar | 5.82% | 0.00% |
| SRA (including Risen) | 7.82% | 3.19% |
| | | |
| | | **Remand Results CIT 18-176 (April 5, 2021) pending Court decision** |
| **POR 4 (2015-16); 83 FR 35616 (July 27, 2018)** | | |
| Changzhou Trina Solar | 15.85% | 5.08% |
| SRA (including Risen) | 15.85% | 5.08% |
| | | |
| | | **Remand Results CIT 19-153 (Jan. 27, 2021) pending Court decision** |
| **POR 5 (2016-17); 84 FR 36886 (July 30, 2019)** | | |
| Chint Solar | 2.67% | |
| Risen Energy | 4.79% | 3.63% |
| SRA | 4.06% | 3.30% |
| | | |
| **POR 6 (2017-18); 85 FR 79165 (December 9, 2020)** | | |
| Trina Solar | 92.52% | |
| Risen Energy | 100.79% | |
| SRA | 95.50% | |

The consistently low margins stand in stark contrast to the triple-digit margins assigned in this review. Risen Energy was the mandatory respondent in the immediate prior review and only received a 4.79% margin currently on appeal, which has been lowered to 3.63% on appeal (the remand is not contested and therefore Risen anticipates that it is likely to be upheld as is). Nothing in Risen's own business experience or in the fair market pricing of raw materials has changed so dramatically from one review to the next to offer any commercially reasonable justification for such drastic change in margins. Rather, the very high margins in this review are a direct result of the Department's unreasonable surrogate value determinations that are not supported by substantial evidence or are arbitrary and capricious. Most critically, the

Department's reliance on an extremely aberrant surrogate value for silver paste is the cause.
Further, in the subsequent review, the Department recently released its Preliminary Results
assigning Risen a margin of 0.00% and Jinko a margin of 13.89%.  *Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of
China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary
Determination; 2018-2019*, 86 Fed. Reg. 21,277 (April 22, 2021).  In that review, the
Department continued to rely upon Malaysia but relied upon a reasonable silver paste value from
a secondary surrogate country, Turkey.  These recent Preliminary Results further underscore the
outlier nature of this review on appeal and the extraordinarily high margins driven by
unreasonable surrogate value determinations.

## III.   STANDARDS OF REVIEW

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by
substantial evidence on the record or otherwise not in accordance with law."[1]  Different
standards of review are applicable to the issues in this case.

### A.  Substantial Evidence Standard for Non-Market Economy Cases

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as
a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial
evidence" must be measured by a review of the record as a whole, "including whatever fairly
detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's
decision when the court 'cannot conscientiously find that the evidence supporting that decision is

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i).
[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).
[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

PUBLIC VERSION

substantial, when viewed in the light that the record in its entirety furnishes, including the body

of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of

review precludes the court from determining whether Department's choice of surrogate value

was the best available on an absolute scale, the court may determine the reasonableness of

Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad

discretion to determine the 'best available information' in a reasonable manner on a case-by-case

basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. §

1677b(c)]; to obtain the most accurate dumping margins possible.[6]  "'This objective is achieved

only when Commerce's choice of what constitutes the best available information evidences a

rational and reasonable relationship to the factor of production it represents.'"[7]

The courts have elaborated on the meaning of "best available" in the NME normal value

statute.  The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires
> Commerce to select, from the information before it the best data for calculating an
> accurate dumping margin.  The term "best" means "excelling all others."  II
> Oxford English Dictionary 139 (2d 1989); Webster's II new Riverside University
> Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or
> quality").

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) *citing Guandong*

*Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006).  The *Dorbest*

Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the

information Commerce used was the best available, but rather whether a reasonable mind could

---

[4] *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).
[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).
[6] *Id. at* 365, n.12 (citations omitted).
[7] *Id.* (citations omitted).

PUBLIC VERSION

conclude that Commerce chose the best available information.'" *Dorbest* at 1269 (citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation." *Dorbest* at 1269 (citation omitted). The *Dorbest* Court further cautioned that "{i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria." *Id.*, citing *Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (2006). Finally, *Dorbest* warned: "Commerce's findings or conclusions rendered in equations or numeric form are not beyond scrutiny." *Id.*

### B. Arbitrary & Capricious Standard

This Court will hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted). Thus, when the

administering agency's actions are internally inconsistent and self-contradictory, and the agency treats similarly situated parties differently or fails to consider an important aspect of a problem, the agency's decisions are arbitrary and capricious and subject to reversal.

## IV.   ARGUMENT

### A.   The Department's Determination to Rely Upon the Malaysian Silver Paste Import Value Is Not Supported by Substantial Evidence.

The Department valued Risen's silver paste input using the Malaysian import value under HTS 7115.90.10.00 with an AUV of 33,168.35 MYR/KG or 8,216.60 USD/KG.  Final SV Memo at Attachment 1; **PR419**.  This value is highly aberrant compared to the other listed surrogate countries' import values, the historical AUVs used by the Department for this input, the respondents' ME purchases of silver paste, and other record information on the cost of silver paste in the production of solar cells.  The value led to a highly abnormal result that the silver paste cost calculated by the Department accounted for almost half of Risen's normal value module cost, which is contrary to the commercial reality of the solar industry and was in direct contradiction to the solar industry study report issued by the U.S. Department of Energy placed on this record.  Further, the Department's backfill attempt to corroborate the Malaysian import value for silver paste with historical Malaysian import values is procedurally unfair, contrary to the normal assignment of burdens of building the record to the parties.  The Malaysian import value is aberrant or, at a minimum, cannot be specific to silver paste.  Despite extensive argumentation on this input in the case briefs, the Department continued to attempt to justify its selection of this Malaysian import value as the "best available information" to value silver paste.

Specifically, the Department raises three justifications 1) the Malaysian price is comparable to Russia's import price; 2) while higher than the other listed surrogate country's import prices, Malaysia had the second highest quantity of imports; and 3) the price is similar to

historical Malaysian import values. IDM at 21-22.  The Department also impermissibly

dismissed other benchmark data placed on the record by respondents.  IDM at 23.  The

Department concluded the Malaysian import value is not aberrant, but only focused on its rigid

analysis of comparing the AUVs and quantity of the imports into the listed surrogate countries

and the historical values in Malaysia.

> **1.    The Department Improperly Failed to Consider the Commercial Reality of
>         Solar Cell and Panel Manufacturing in Relying on the Malaysian Import
>         Value.**

As an initial matter, before considering the aberrancy arguments discussed below, Risen

submits that the Court should understand the commercial reality of the cost of silver paste in the

production of solar modules.  The Department failed to consider the overall logic of the cost of

the production of solar cells given this highly aberrant surrogate value, elaborated further below.

While the Department is not required to perfectly match a respondent's own production

experience, the goal of the "best available information" is to locate a value as analogous to the

NME market as is feasible. *See*, *e.g.*, *Nation Ford Chemical v. United States*, 166 F. 3d 1373,

1377 (Fed. Cir. 1999); *Zhengzhou Harmoni Spice Co., Ltd., et. al. v. United States*, 617 F. Supp.

2d 1281, 1308 (Ct. Int'l Trade 2009).  The Department is mandated to calculate accurate margin

and accordingly must pay attention to "commercial reality" when calculating the antidumping

duty margins of respondents.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716

F.3d 1370, 1380 (Fed. Cir. 2013) (the rate assigned "was required to reflect commercial reality

and thus, to be 'a reasonably accurate estimate' of actual dumping rates… Commerce may not

select unreasonably high rates having no relationship to the respondent's actual dumping

margin.") (*quoting Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed.

Cir. 2010)).  By relying on such a high silver paste value, the Department is defying the

PUBLIC VERSION

commercial logic and cost structure of the production of solar cells.

Silver paste, along with aluminum paste, is used during only one stage of cell production, the metallization stage.  The silver paste is used for screen printing.  Cell production has numerous other stages of production and then the module production likewise has several productions steps—none of which consume silver paste.  *See* Risen Sec D at Exhibit D-4 (Risen Production Flowchart); **PR160 CR134**.

While silver paste is a relatively expensive input, it is not the primary cost driver of producing solar cells.  The respondents' production information on this record and the Department of Commerce's experience through six reviews and an investigation of solar cells demonstrate that silver paste is not the critical input that determines the cost of producing a solar cell or panel.  However, due to the aberrantly high price of the Malaysian silver paste surrogate value, in the Final Results, the silver paste alone accounted for [        ]% of Risen's total cost of module manufacturing and [        ]% of Risen's total direct material costs for module.  *See* **Attachment 1** (analysis of silver paste and Risen's normal value).  This defies commercial reality.  This one small quantity input only used in one stage of cell production is accounting for almost half of the cost of manufacturing the <u>entire module</u>.  All of the other vast number of inputs in the cell production stage and module assembly stage together are only roughly equal to the cost of silver paste that the Department relied upon.  This is utterly contrary to Risen's and the Department's industry knowledge.  This is evidence that the use of the aberrant Malaysian import value did not result in accurate dumping margins as otherwise required under the statute.

Moreover, the record also contains information on solar production costs around the world, which further reveal the absurdity of the silver paste's impact on the cost of production in the Department's Final Results.  The record contains a study solely funded by the U.S.

PUBLIC VERSION

Department of Energy entitled Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing: 1 H 2018 Benchmark and Cost Reduction Road Map.  *See* Trina Rebuttal SVs (September 26, 2019) at Exhibit 2; **PR244**.  The report includes module cost analysis of six different solar cells.  *Id*. at pg 37.  The report did not list the cost of silver paste alone, but did list the cost of metallization pastes together, which the report clearly described as silver and aluminum paste costs.  *Id*. at 24 & 26.  Silver and aluminum pastes are both used in the production of solar cells, and Risen uses both.  According to this report, the cost of both of these inputs together should be consistently lower and represent a significantly smaller percentage of the total solar cells costs than the surrogate value the Department used for silver paste alone.  In other words, the cost analysis below is a conservative comparison.

According to this U.S. Energy report, the 2018 cost per watt for the metallization pastes, which again includes aluminum and silver paste, ranged from $0.013 to $0.049, visually (in green in the table) far less than approximately half of total cost:



**Figure 25. 1H 2018 benchmark module costs and MSPs by cell technology**

*Id.* at 37.

The costs at the top of the chart ($0.37 to $0.41 per watt) are the calculated minimum sustainable price for blended spot and contract sales. The total manufacturing costs for these six modules is represented by the costs up through the orange line (research and development, SG&A). Comparing these benchmark costs to Risen's costs demonstrates how absurd the silver paste cost is in Risen's normal value buildup:

| module | 2018 USD per Watt | | | |
| | metalization paste cost | total cost of manufacturing | | % |
|---|---|---|---|---|
| Standard Al BSF (285 W) | $0.016 | $ | 0.338 | 4.73% |
| PERC (310 W) | $0.015 | $ | 0.320 | 4.69% |
| Multi PERC (295 W) | $0.016 | $ | 0.317 | 5.05% |
| Bifacial PERT (295 W) | $0.018 | $ | 0.355 | 5.07% |
| Bifacial SJJ(325 W) | $0.013 | $ | 0.346 | 3.76% |
| *average* | $0.016 | $ | 0.335 | 4.65% |
| *median* | $0.016 | $ | 0.338 | 4.73% |
| | POR USD per Watt | | | |
| average | silver paste cost | total cost of manufacturing | | % |
| RISEN | [ | $ | ][ | ]% |
| RISEN -weight average for modules (see Attachment 1) | | | [ | ]% |

Risen does not use IBC cells, therefore that module has been excluded from this comparison. *See* Risen Section C (CONNUM Field 3.4 "Cell Technology" included "07" for IBC cells; **CR104 PR151**. None of Risen's sales indicated "07"; therefore, Risen does not use this type of cell). Based on the total cost of production per watt of the five modules, the metallization pastes accounted for an average of 4.65% of the cost. For the five modules, the metallization pastes accounted for only 3.76%-5.07% of the cost. *Id.* In contrast, the silver paste value used in the Final Results has made it a hugely disproportionate cost in the production. The Malaysian silver paste value represents [      ]% of the total cost of manufacturing and [      ]% of Risen's direct material costs. *See* **Attachment 1** (analysis of silver paste and Risen's normal value). That is, the Malaysian silver paste import value has caused the silver paste <u>alone</u> to account for an average of **[              ]%** more of the cost of manufacturing than the U.S. Department of Energy's own benchmarking for metallization pastes (which would also include aluminum paste costs) as a percentage of the cost of producing a module. Accounting for the total metallization paste costs in the Department's Final Results (aluminum paste and silver

13

PUBLIC VERSION

paste) slightly raises these figures with metallization pastes together accounting for [          ]% of

Risen's total cost of manufacturing and [          ]% of Risen's direct material costs.  *Id*.  Therefore,

with the aberrant Malaysian silver paste cost, the metallization pastes together also accounted for

[                    ]% more of Risen's cost of manufacturing than the U.S. Department of Energy's

contemporaneous benchmarking for those inputs[8].  Unsurprisingly, this percentage is similar to

the comparisons discussed above that the Malaysian import value is at least 1,000% higher than

other record values and historical values for this input.  The Malaysian import value under HTS

7115.90 and HTS 7115.90.10.00 defies commercial reality compared to the other listed surrogate

country import values, the historical AUVs relied upon by the Department in the history of this

case, the ME purchases of silver paste on the record, and the normal cost structure of solar

module production.

    This survey is by a government agency of the United States, which is an authoritative,

widely representative and impartial reflection of the commercial reality of the solar industry.

The Department did not question the correctness and reasonableness of the report of the U.S.

Department of Energy. Indeed, it would be wholly unreasonable for the Department to question

this report issued by a U.S. agency whose responsibility is the energy sector.  However, instead

of considering this data, the Department simply disregarded the relevance of the survey to the

silver paste cost analysis. The Department claimed this survey was not useful, stating it did not

specify the cost of silver paste but grouped silver paste costs with "many other costs."  IDM at

23.  This reasoning is wholly ungrounded and against basic logic.  As explained by Risen above,

---

[8] The global production of cells and modules has been standardized and is relatively mature technology. For example, the AFA applied for Risen's unaffiliated cell providers has been minimal in AR 5 and AR 6 because there is only a small variation between Risen's highest cost (used for AFA) and Risen's standard average costs.

using the metallization pastes costs data and their ratio among total module costs is a conservative comparison because it includes silver paste costs and some additional costs. The silver paste cost alone would obviously be of lesser value and lesser percentage of the total module costs than the metallization pastes costs together, and would only further support the utter aberrancy of the silver paste cost relied upon by the Department. The Department's refusal to confront this highly relevant and authoritative data is unsupportable. The Department must confront all data on the record.

> **2. The Malaysian Import Value is Aberrant Compared to the Other Import Values on the Record.**

Even using the Department's normal aberrancy metrics, the record establishes that the Malaysian import value is aberrant. The import value into Malaysia was 8,465.31 USD/KG under HTS 7115.90 and 8,216.60 USD/KG under HTS 7115.90.10.00. This price is **6,305% higher** than the weighted average import price into the other potential surrogate countries:

| 711590 - UN Comtrade Import Data | | | | | | |
|---|---|---|---|---|---|---|
| **Country** | | **Trade Value** | | **total Import Qty** | | **AUV (USD/KG)** |
| Mexico | $ | 42,909,979.00 | | 320,755 | $ | 133.78 |
| Malaysia | $ | 478,950,097.00 | | 56,578 | $ | 8,465.31 |
| Brazil | $ | 336,519.00 | | 6,179 | $ | 54.46 |
| Kazakhstan | $ | 76,862.00 | | 347 | $ | 221.50 |
| Russia | $ | 632,695.00 | | 106 | $ | 5,968.82 |
| Romania | | | no import quantity | | | |
| Bulgaria* | $ | 3,966,308.00 | | 10,163 | $ | 390.27 |
| Turkey* | $ | 4,540,978.00 | | 21,144 | $ | 214.76 |
| total listed SC excluding Malaysia | $ | 43,956,055.00 | $ | 327,387.00 | **$** | **134.26** |
| total of all* excluding Malaysia | $ | 52,463,341.00 | $ | 358,694.00 | **$** | **146.26** |
| *Bulgaria and Turkey are on the 2018 GNI SC List | | | | | | |

*See* Risen Rebuttal SVs (September 26, 2019) at Exhibit 2; **PR242-243**. The record also contains the more specific HTS import values for Bulgaria and Mexico, which, like the import

value into Malaysia is the same or almost the same as the 6-digit import values.  *See* Risen

Prelim. SVs at Exhibit 2 (detailed Bulgarian import data); **PR213**; Risen Final SVs at Exhibit 6

(Mexican silver paste import value covering "Other articles of metal, Other, of silver and gold"

with an AUV of $144.60/kg); **PR363**.

      In consideration of this data, the Department relied on the Russia import value to justify

its reliance on the Malaysia import value. However, the Russian import AUV is also highly

aberrant compared to the other import AUVs and is based on a mere 106 kilograms of imports

and even smaller monthly import quantities.  17 of the monthly import quantities per exporting

country into Russia during the POR were shipments of 1 kg.  *See* Risen Rebuttal at Exhibit 2;

**PR242-243**.  The majority of the total POR imports, 48 kg, into Russia were from the United

States during one month, December 2017, which also had a much lower AUV than the Russian

total AUV.  *Id*.  The presence of one other country with an aberrant import value simply does not

indicate that the Malaysian import value is not aberrant considering the other record information

and the small quantity of the Russian imports.

      The Department has often found that more than one import value can be aberrant under

such circumstances. *See Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v.

United States*, 59 F. Supp. 2d 1354, 1360 (Ct. Int'l Trade 1999) (remanding to Commerce to

follow its administrative practice concerning aberrant data and disregard the Indian steel figures

which had the highest value after Indonesia, which was also clearly aberrant) *quoting Heavy

Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's

Republic of China; Final Results of Antidumping Duty Administrative Reviews*, 63 Fed. Reg.

16,758, 16761 (Dep't Comm. Apr. 6, 1998); *see also Crystalline Silicon Photovoltaic Cells,

Whether or Not Assemble, From the People's Republic of China: Preliminary Results of*

PUBLIC VERSION

*Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*, *2016-2017*; 83 Fed. Reg.67,222 (December 28, 2018) and accompanying Prelim. SV Memo at 4 (unchanged in final) (finding the Thai import value for nitrogen was aberrant even when the import values in South Africa and Mexico were even higher).  The Russian import price is not a reasonable justification that the Malaysian import price is reasonable, particularly in light of other record information to the contrary.

The Department also attempted to justify its reliance on Malaysia because the import quantity is the second highest among the listed surrogate countries.  Again, in light of additional information concerning the aberrancy of this price as a value for silver paste, this does not justify the selection.  However, it must also be noted how much greater the quantity into Mexico is—the country with the highest imports.  Mexico imported over 320,755 kg at an AUV of $133.78/kg. Malaysia imported only 56,578 kg at an AUV of $8,465.31/kg.  Mexico imported five times as much under this HTS and had an AUV that is much lower and in line with the other countries' AUVs and other data on silver paste prices.  In fact, Mexico is the only country that imported quantities of this input that are large enough to sustain an industry.  The Risen companies alone purchased almost 85,000 kilograms of silver paste during the POI and Trina purchased approximately [       ] kilograms of silver paste.  *See* Risen Section D at Exhibit D-7; **PR160 CR134**; *see also* Trina Section D at Exhibit D-7; **PR157 CR112**;  *Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import statistics is not something in the abstract, they must be reflective of, if not 'exactly' reflecting,

such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible."); *Fuwei Films (Shandong) Co., Ltd. v. United States*, 837 F. Supp. 2d 1347, 1355 (2012) (noting Commerce's reason for rejecting import statistics in that case was because they "contained an insignificant quantity of imports not representative of the DuPont Group's PET chip purchase volume or consumption experience"). Therefore, the Mexican import price must be given particular weight in considering the relative aberrancy of the Malaysian import statistics.

>    **3.    The Historical Malaysian Import Values for HTS 7115.90 were Improperly Placed on the Record by the Department and Do Not Support the Reliance on the Import Value.**

The Department also attempts to justify its reliance on the Malaysian import value by comparing it to the historical import values for the same HTS into Malaysia.  Malaysia historically has had import values under HTS 7115.90 that were as high as the import values in this POR.  However, that does not mean the Department can ignore the other record evidence discussed above that show all import values under this HTS in Malaysia are aberrant or, at a minimum, are not comparable to the price of the input in question: silver paste.  Indeed, the Department found the import value for nitrogen into Thailand was aberrant for multiple reviews in a row. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (July 27, 2018) and accompanying IDM at Comment 9 & *Crystalline Silicon Photovoltaic Cells Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 36,886 (July 30, 2019) and accompanying IDM at Comment 13.  The presence of historical data with a high AUV does not entail that the AUV is not aberrant—particularly when, as in this case, all other evidence

overwhelmingly demonstrates the aberrancy of the Malaysian import value as a surrogate value for silver paste.  The Department must evaluate all benchmark information on the record in evaluating the Malaysian silver paste price.

Notably, the Department itself placed this historical import data on the record in conjunction with the Preliminary Results.  Prelim. SV Memo at Attachment Silver; **PR419**.  It is procedurally unfair and contrary to the burdens of building the record for the Department to have placed this information on the record itself where petitioner failed to do so in a timely manner despite multiple opportunities.  It is well established that "'[T]he burden of creating an adequate record lies with interested parties and not with Commerce.'" *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) (quoting *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  For this additional reason, the Department should have disregarded the silver paste surrogate value information it placed on the record at the issuance of the Preliminary Results.

The petitioner alone argued that Malaysia should be selected as the primary surrogate country.  Respondents argued that Bulgaria should be selected as the primary surrogate country and placed information on the record to support the selection of Bulgaria over Malaysia, including placing information to show the aberrancy of the Malaysian import value for silver paste.  Petitioner placed no information on the record other than the POR import value for HTS 7115.90.  Respondents properly bore the burden of establishing a record to support their surrogate value arguments.

But the Department itself weighed in on this process and supported Petitioner's choice of surrogate country by placing information on historical Malaysian silver paste values on the record sua sponte.  While Risen argues even with this additional information the Malaysian

silver paste is unusable, the Department has still unfairly and arbitrarily (i.e., contrary to policy) took upon itself the Petitioner's burden in bolstering the Malaysian record with this information. *See also Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326, 1337 (March 22, 2018) ("the burden is on the respondent to create clarify for the record"); *Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (Ct. Int'l Trade 2017) ("It is the parties to a proceeding that bear the burden of building an adequate record."); *Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 78,333 (Dec. 26, 2013) and accompanying Prelim. Decision Memo ("Any party advocating a specific surrogate country has the burden of creating an adequate record to support its selection.").  Equity must either result in the Department removing this information from the record or provide parties with the opportunity to also place additional surrogate value information on the record concerning silver paste.  This arbitrary treatment of adding supporting information to the record should also be considered by the Court in light of the information properly placed on the record by respondents that the Department refused to consider and that may undermine its reliance on the Malaysian import statistics.

### 4. The Department was Obligated to Consider the Benchmarking data from Other Countries Placed on the Record.

The Department rejected considering several other metrics that the parties placed on the record, including Thai, Bulgarian, and Turkish import prices, Trina's market economy purchases of silver paste, and cost information in the U.S. Energy report.  IDM at 23.  The Department's reasoning for not considering this information falls short.  The Department is obligated to support its determination based on the record as a whole, including whatever "fairly detracts" or is "evidenced opposed to its view."  *Atlantic Sugar, Ltd.*, 744 F.2d at 1562; *Diversified Products*,

572 F. Supp. at 888.  Indeed, the Court has criticized the Department for not considering benchmark data on the record merely because it was not the type of information the Department prefers to consider.  *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1365 (Ct. Int'l Trade April 19, 2018) ("[T]he court has regularly rejected Commerce's conclusory dismissal of benchmarking data for lack of economic comparability*.") citing Calgon Carbon*, 190 F. Supp. 3d at 1234, SLIP OP. 2016-107; *Blue Field (Sichuan)*, 949 F. Supp. 2d at 1317, SLIP OP. 2013-142); *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, Slip Op. 2013-30, 2013 WL 920276, at *6 (CIT 2013) (rejecting Commerce's argument that export data from non-economically comparable countries were inappropriate benchmarks; although "the prices might not satisfy the requirements for surrogate values, they are sufficient to call into question the reliability of the [import] data"); *Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1372 (2011) (rejecting the Government's argument that U.S. data was unhelpful for benchmarking purposes and noting that it corroborated information from economically comparable countries that also suggested the selected value was  aberrational).

The Court has specifically criticized the Department for failing to consider evidence of pricing from non-economically comparable countries, which failing was precisely the Department's justification for not considering the Thai, Bulgaria, or Turkish import prices for silver paste on the record.  IDM at 23.  Therefore, the Department is not justified in its failure to consider the data from these countries.  Further, the Department's surrogate country list for this review was based on 2017 GNI and Bulgaria had a 2017 GNI within the GNI band of that surrogate country list (as further elaborated below).  And both Bulgaria and Turkey were on the Department's surrogate country list based on 2018 GNI, which overlaps with *the majority* of the

POR[9].  Therefore, Bulgaria and Turkey should not be considered non-economically comparable

countries either way.  Ironically, the Department relies heavily on the pre-POR annual data in

Malaysia for its preferred gold/silver HTS, including from a time when Malaysia was not

economically comparable to China.  This is the essence of arbitrary and capricious decision-

making.  *SKF*, 263 F.3d at 1382 ("An agency action is arbitrary when the agency offers

insufficient reasons for treating similar situations differently.")

The Thai historical data should also be considered probative for a different reason.  Risen

submitted the Thai historical data as a demonstration of the Department's historical values for

this input in all the past reviews.  The Malaysian import value was also **1,322% higher** than the

average historical surrogate values that the Department has relied upon to value this input:

| DOC Historical SV Values for Silver Paste | | | | | |
|---|---|---|---|---|---|
| Input | HTS | Source | POR | AUV (TH/KG) | convert to USD/KG |
| Silver paste | 71159010000 | GTA Thailand | 12/1/16 -11/30/17 | 28044.44 | $      792.84 |
| Silver Paste | 71159010000 | GTA Thailand | 12/1/15 -11/30/16 | 18963.13 | $      515.61 |
| Silver Paste | 71159010000 | GTA Thailand | 12/1/14 -11/30/15 | 23752.19 | $      665.72 |
| Silver Paste | 71159010000 | GTA Thailand | 12/1/13 -11/30/14 | 22880.31 | $      676.11 |
| Silver Paste | 71159010000 | GTA Thailand | 6/1/2012 - 11/30/13 | 17695.91 | $      552.53 |

*See* Risen Final SVs at Exhibit 6; **PR363**.  Moreover, the Thai HTS relied upon in past reviews is

the exact HTS description as used in Malaysia in the Preliminary Results.  Both countries use the

same ASEAN tariff schedule.  *Id.* at Exhibit 4 (excerpt from Malaysian tariff schedule showing it

is the ASEAN schedule).  No record evidence suggests that the market price for silver paste has

dramatically increased as to explain or justify the higher Malaysian import value.

---

[9] As elaborated below in Risen's surrogate country argument section, the 2018 GNI surrogate country list
came out a few months after the initial surrogate country and GNI deadlines in this review.  However, in
such situations in the past the Department has considered countries on both the 2018 and 2017 GNI list to
be economically comparable for reviews that overlap both years.

**5.   The Department Must Consider All Information on the Record in Determining whether the Malaysian Import Price is a Reliable, Non-Aberrant Surrogate Value for Silver Paste.**

The record also contains information on ME purchases of silver paste by Trina during the POR.  Trina purchased [        ] KG of silver paste from a [          ] supplier at [       ] USD/KG.  *See* Trina Section D Response at Exhibit D-6; **PR157 CR112**.  This ME price for the exact input (i.e., specific to silver paste as opposed to other articles or catalysts of gold or silver like the import value), is [        ] lower than the Malaysian import value relied upon to value this input.  Notably, Trina's ME purchase is sourced from [        ].  90% of the import quantity into Malaysia under HTS 7115.90.10.00 during the POI were exported from Singapore. *See* Prelim. SV Memo at Excel Attachment (26,104.37KG from Singapore/28,957 KG total); **PR419**.  The average AUV into Malaysia from Singapore was $6,466.68/KG.  *Id*.  That is [        ] more expensive than the actual silver paste value from the [            ] during the same time period.  This further demonstrates that the Malaysian import value is aberrant, or at a minimum, whatever is being imported under this HTS from [          ] is <u>not</u> silver paste and not similarly priced to silver paste.  The Department was dismissive of Trina's ME purchase, finding it was not a country-wide broadly available or public price.  IDM at 23.  While indeed such concerns may be a basis not to rely upon what a company purchases as a surrogate value, it does not entail that the purchase has no probative value as a benchmark for the price of silver paste, particularly when the purchase was specific to silver paste (unlike HTS 7115.90.10) and sourced from the same country as Malaysia sources imports.

By any reasonable measure, the Malaysian import value for silver paste is <u>highly</u> aberrant.  *See Peer Bearing*, 752 F. Supp. 2d at 1353 (finding that substantial evidence did not support relying upon a value 60% higher than other record sources, including countries that were

less economically comparable); *Itochu Bldg. Prods. Co. v. United States*, 2017 Ct. Intl. Trade

LEXIS 74, *20-23 (Ct. Int'l Trade June 22, 2017) ("the nine other data points fall within the

narrow range of $0.68 to $0.78 per kilogram.  These data, therefore, corroborate the Steelworld

India value of $0.68 per kilogram and the JPC India value of $0.78 per kilogram.  At the same

time, the data call into question the GTA India import value of $1.68 per kilogram, which is

more than double the highest value in the aforementioned range.").  In those two cases, the Court

found an input was aberrant when it was 60% to 200% higher than the other record values for the

input.  The Department cannot rely upon a value 1,000%-6,000% higher than the average and

historical prices for this input as the best available information to value this input.

    Indeed, the Department has found that an import value is aberrant based on similar and

even far fewer degrees of aberrancy than present in this review for this input.  In the last review

under this very Order, the Department selected Thailand as the primary surrogate country but

determined that the import value for nitrogen into Thailand was aberrant because it was

$10.05/kg while the other surrogate countries import values were less than $1.00/kg.  *Solar Cells*

*2016-2017 Prelim* and accompanying Prelim. SV Memo at 4 (unchanged in final).  In other

words, the Thai import value was at least 1000% higher than the import values into the other

listed countries.  Notably, South Africa and Mexico had even higher AUVs than Thailand, but

still the Department determined, based on the other record import values, that the Thai import

value was not the best available information because it was not clear that the Thai import price

correctly reflected a broad market average price for the input.  *Id*.  The Department relied upon

the Bulgarian import value instead because the import data from Bulgaria for nitrogen was the

largest quantity of imports among the potential surrogate countries.  *Id*.

In *Activated Carbon from China*, the Department determined that the Thai import value of anthracite coal was aberrant because it was 350% to 600% different than the record import values from the other listed surrogate countries. *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 51,607 (November 7, 2017) and accompanying IDM at Comment 3. In the recent investigation of *Steel Propane Cylinders* from China, the Department agreed that the import value into the primary surrogate country, Malaysia, was aberrant because it was 1,535% higher than the average AUV of imports into the other listed surrogate countries. S*teel Propane Cylinders From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 84 FR 29161 (June 21, 2019) and accompanying IDM at Comment 3A. Under established Department practice, the Malaysian import value is aberrant and must be disregarded.

> **6.   The Department failed to Consider the Lack of Specificity of HTS 7115.90.10 in its Analysis of the Malaysian Import Value.**

While Risen submits that a full view of the record does establish that the Malaysian import value under HTS 7115.90.10.00 is aberrant, the Department also ignored the argument concerning the specificity of HTS 7115.90.10.00. HTS 7115.90 at the six-digit level, thus harmonized across all countries, covers "Other, Other articles of precious metal or of metal clad with precious metal." *See* Prelim SV Memo at Attachment VI; **PR419**. Precious Metals are further defined in the notes as silver, gold, or platinum. As HTS 7115.10 covers catalysts in the form of wire cloth or grill, of platinum, HTS 7115.90 covers "Other", or silver and gold articles. Risen also notes that the Malaysian HTS 7115.90.10.00 relied upon by the Department was only put on the record by the Department itself, no party put this HTS on the record. Malaysian HTS 7115.90.10.00 covers "Other, of gold or silver."

PUBLIC VERSION

In sum, this HTS covers other articles or catalysts of gold or silver.  The HTS is not specific to silver paste, but would include silver paste.  The Department has relied upon the same HTS in the prior reviews, but as elaborated farther below, this HTS never presented such extremely high pricing that would have merited comment by the parties.  Therefore, even if the Court agrees with the Department that the Malaysian import value under HTS 7115.90.10.00 is not aberrant, the Court should find that the other benchmark information specific to silver paste demonstrates that this import value into Malaysia is not the best available information to value silver paste.  In particular, Trina's ME purchases of silver paste specifically and the information discussed further below concerning the commercial reality that silver paste is not a primary raw material for solar cells demonstrate the Malaysian import value is not a reliable surrogate value for silver paste.

The Malaysian import value for this broader category of products, other articles or catalysts of gold or silver, is not a reasonable price to value silver paste.  The Department failed entirely to address this argument, focusing only on its narrowed perspective on aberrancy.  *See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011) (upholding the policy approach: "in sum, 'product specificity' logically must be the primary consideration in determining 'best available information.' If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1."); s*ee also Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 21,195 (May 5, 2017) (relying on an import value from another country to value coal tar because record evidence suggested the import value into Thailand under the HTS was not specific to coal tar).

For all of these reasons, a reasonable mind cannot conclude that the Malaysian import value for silver paste is a usable surrogate value for this input, much less the best available information. *Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006); *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) (the statutory objective to rely upon the best available information "is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.").  Risen argued before the agency that the Mexican and Bulgarian surrogate values are reliable alternatives.  Under such circumstances when an import value is aberrant, the Department has a practice of instead relying on the import value of the listed surrogate country that is a significant producer of comparable merchandise with the largest import volume of the input in question.  Mexico is a significant producer of comparable merchandise and is by far the largest importer of silver paste.  *Solar Cells 2016-2017 Prelim.* and accompanying Prelim. SV Memo at 4 (discussing Department practice of relying on the AUV from the country with the largest import volume of the input being valued) (citing *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 1167 (January 11, 2016) and accompanying Issues and Decision Memorandum at Comment 1).  Alternatively, Risen also submits that the Department could rely upon the import value into Bulgaria; although the import quantity was smaller, the AUV is corroborated by other prices on the record and there is definitive evidence that Bulgaria produces comparable and identical merchandise.  Lastly, while the Department may prefer not to rely upon a company's specific purchases as a surrogate value, Trina's ME purchase of silver paste is the only specific value to the input in question and is a fair market

value that the Department could rely upon as a surrogate value, or a cap on the price of this input.

The Court should find the Department's reliance on the Malaysian import value for HTS 7115.90.10 is not supported by substantial evidence and order the Department to rely upon an alternative, reliable surrogate value for silver paste that is corroborated by the other benchmarking data on the record for silver paste.

**B. The Department's Surrogate Financial Ratio Calculation was Not Supported by Substantial Evidence and Resulted in Double-Counting Energy and Labor Expenses.**

The Department relied solely upon the Malaysian financial statement from Hanwha Q Cells in the Preliminary and Final Results. However, in the Final Results the Department adjusted its calculation of Hanwha's financial ratios. Final SV Memo at Attachment III; **PR473**; compared Risen Final SVs at Exhibit 8 (Ratio calculation the Department relied upon in Preliminary Results); **PR363**. As is typical of financial ratio calculations, the calculation took the "Cost of Sales" line item from the Profit & Loss statement and subtracted various detailed costs from the notes of the financial statement that would be included as a "Cost of Sales." After subtracting such costs, there is a remaining amount of "Cost of Sales" that must then be allocated to a type of expense. Usually the majority of the "Cost of Sales" consists of raw materials costs, but it also includes costs such as labor and energy that are consumed in the manufacturing of the goods they produce and sell. In the Preliminary Results, this remaining "Cost of Sales" line item was allocated to the "MLE" expenses[10], that is to raw materials, labor, and energy. Together these MLE expenses are in the denominator of the Overhead ratio, and additional expenses are

[10] Risen notes that in its calculation of the ratios relied upon in the Preliminary Results, Risen placed the remaining costs under "raw materials." However, what was intended by this placement is that the remaining costs would be in the MLE denominator generally, understanding that the remaining costs would include raw materials and energy expenses, at a minimum.

added for the SG&A and Profit ratios.  In other words, all expenses allocated to materials, labor, and energy columns in the ratios are summed together in the denominator.  Given MLE expenses are the overwhelming majority of the "Cost of Sales," the Department normally allocates any remaining "Cost of Sales" costs to the MLE denominator.   *See*, e.g., *Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent to Rescind the Review, in Part, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 23,947 (April 30, 2020) and accompanying SV Memo at 10 (specifically noting that energy and labor were not double-counted because the cost of sales was assigned to the MLE denominator) (unchanged calculation in Final); *Certain Quartz Surface Products From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 58,540 (November 20, 2018) and accompanying SV Memo at Attachment 7 (allocating remaining Cost of Sales to MLE denominator) (unchanged in Final).

However, in the Final Results, the Department allocated the remaining "Cost of Sales" to the overhead costs.  This allocation is contrary to Department's practice and contrary to the notes of the statement.  Hanwha Profit & Loss Statement has a line item of 2,000,338 RM for the total "Cost of Sales".  The Department allocated 1,648,000 RM for the "Cost of Raw Materials" to the raw materials columns, which will be part of the MLE denominator.  The Department allocated 6,767 RM and 93,326 RM for depreciation of property and depreciation of plant and equipment to the overhead column, which will be part of the overhead numerator in accordance with standard practice.  Then the Department subtracted these three expenses from the 2,000,338 RM Cost of Sales, and calculated a remaining 257,063 Cost of Sales Remaining.  Rather than

allocating this to the MLE denominator, with the assumption it covered energy or labor expenses nowhere else enumerated, the Department allocated that remainder to overhead in the numerator.

However, it is wholly illogical that the Cost of Sales remaining would primarily or entirely consist of manufacturing overhead expenses. The primary costs that are generally allocated to Overhead are the depreciation of property, plant, and equipment, which have *already* been delineated and allocated to the Overhead. There are no major missing allocation line items to the Overhead in the Hanwha financial statement. In contrast, the Department's calculation has allocated no items to energy or labor, contrary to its preferred practice. Hanwha definitely had to have consumed energy and labor in the production of merchandise; in other words, the "Cost of Sales" line item must include expenses for energy and labor. Therefore, after subtracting raw material costs and depreciation from the "Cost of Sales," the remaining Cost of Sales must consist of energy and labor costs. Otherwise, the MLE denominator, which stands for Materials, Labor, and Energy, has no energy or labor costs allocated to it. Accordingly, the only reasonable allocation of the remaining 257,063 RM from Cost of Sales is to the MLE denominator, as the Department sensibly did in the Preliminary Results.

Alternatively, if the Court upholds the Department's ratio calculation, the Court must order the Department to adjust its methodology as not to double count labor and energy expenses. When energy or manufacturing labor expenses are not specifically broken out in the financial ratios and assigned to the MLE denominator, the Department properly understands that the costs of these inputs are necessarily captured in the overhead of the financial ratios. As a result, to avoid double-counting, the Department then does not separately value these inputs. For example, in *Citric Acid from China*, the Department explained:

> PT Budi's financial statement does not include a separate line item for energy in the reported cost of manufacturing, thus the Department has concluded that energy is

PUBLIC VERSION

recorded as part of PT Budi's factory overhead. Therefore, the calculated overhead ratio for the Preliminary Determination included the surrogate company's energy costs. Because we also calculated a separate energy cost for each of the respondents, we inadvertently double counted their energy costs. Accordingly, for the final determination, we have excluded respondents' energy expenses in the calculation of normal value to avoid double-counting energy expenses.

*Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 16,838 (Dep't of Commerce 2009) and accompanying IDM at Comment 2; *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Rescission of Review in Part; 2012-2013*, 80 Fed. Reg. 33,246 (2015) and accompanying IDM at Comment 4 (It is the Department's practice to set energy factors of production (FOPs) inputs to zero if there is not a separate line item for energy factors on the financial Statements."); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (Dep't of Commerce 2018) and accompanying IDM at Comment 10("If Commerce valued a respondent's FOPs, including energy, and calculated financial ratios using energy costs (because they could not be removed from the surrogate company's expenses), it would be double counting energy expenses.");

*1,1,1,2-Tetrafluroethane From the People's Republic of China: Antidumping Duty Investigation, Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, in Part, and Postponement of Final Determination*, 79 Fed. Reg. 30,817 (2014) ("Here, we will not disregard energy or labor in the normal value calculation because, except for depreciation, all of Thai-Japan's cost of sales is treated as material, labor and energy in the surrogate financial ratio calculation, therefore, we are not

double counting these expenses when we include energy and labor in our normal value calculation.")

Accordingly, the Department has a consistent understanding that when energy and manufacturing labor are not included in the MLE denominator of the financial ratios the Department would be improperly double-counting these expenses by also including them in the normal value calculation build-up of factors of production. *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1333 (Ct. Int'l Trade 2015) ("The caselaw holds that, as a general rule, double counting is not permitted in antidumping margin calculations, because it is distortive, rendering margins less accurate."); *Citing DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1345-46 (Ct Int'l Trade 2014) (ruling that "double counting should be avoided, as it does not provide a fair price comparison"); *Holmes Products Corp. v. United States*, 795 F. Supp. 1205, 1207-08 (Ct. Int'l Trade 1992) (holding that "[d]ouble-counting is to be avoided").  The Department's consistent practice under such circumstances is to exclude energy and labor from such build-up.  The Department therefore is double-counting labor and energy by valuing Risen's labor and energy expenses in the FOPs <u>and</u> in the financial statement's factory overhead ratio.  The Court should order the Department to adjust its financial ratios calculation in the first instance because methodologically it is the more reasonable option on the record; or, at a minimum, the Court should instruct the Department not to value labor and energy in normal value so as not to double-count these expenses.

**C.    The Department's Surrogate Value HTS Classification for Backsheet and EVA Film Inputs is Not Supported by Substantial Evidence.**

The Department relied upon the incorrect Malaysian HTS classifications to value Risen's backsheet and EVA film input.  The Department's sole basis for its classification of both of these inputs is an unsubstantiated difference between the flexibility of a "film" or a "sheet."  The

Department's classification is not supported by the record and is contrary to the Department's classification of these inputs in the past.

As noted by the Department, a "backsheet serves to protect the solar cells in a solar module." IDM at Comment 10. Because the input is called back<u>sheet</u> and protects a solar cell, the Department has made the assumption that it is a rigid product that should be classified under HTS 3920.62.10.00 which covers "plates and sheets of polycarbonates." However, the record establishes that Risen's backsheet is a flexible, thin film that protects the cells. Risen's specifications of its backsheet shows it is sold in rolls, demonstrating it is flexible. Risen Section D at Exhibit D-36; **PR160 CR134**. The specification sheets also show the thickness is only [     ] um, which is equal to [     ] mm. *Id*. By the Department's own definition, discussed below concerning EVA, a film is under 0.5mm thick. Therefore, the backsheet input is a film by the Department's own understanding. The backsheet is a flexible, film and would not be considered a plate or sheet of polycarbonates. Therefore, the appropriate HTS classification is HTS 3920.62.90.00, which covers "Other" – i.e., not plates or sheets. *See* Risen Final SVs at Exhibit 3, **PR363**.

Further, the Department has a history of classifying backsheet used in the production of solar cells under a comparable HTS as that suggested by Risen. *Id*. at Exhibit 7 (also containing the AR4 SV Summary sheet relying upon the same HTS); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 Fed. Reg. 29033 (June 27, 2017) and accompanying IDM at Comment 11 (relying on HTS 3920.62.00090 to value backsheet. The Thai schedule changed at this time but this HTS definition is the same "Other", i.e., not plate or sheet as those were covered earlier in the HT schedule); *Crystalline*

*Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 Fed. Reg. 39905 (June 20, 2016) and accompanying IDM at Comment 14 (valuing backsheet made of PET using HTS 3920.62.000.90); *Crystalline Silicon Photovoltaic Cells Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2012-2013*, 80 Fed. Reg. 40998 (July 14, 2015) and accompanying IDM at Comment 24 (using several Thai HTS to value backsheet depending on the specific plastic material); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances*, in Part, 77 Fed. Reg. 63,791 (October 17, 2012) and accompanying IDM at Comment 26 (valuing Trina's PET backsheet, which was considered a "film" under 3920.62.10.090 which covered PET film ). Risen's backsheet input has not changed from the prior review. Nor is there any evidence that Risen's backsheet is different from all other respondents in past reviews. The evidence on the record establishes that Risen's backsheet is a flexible film. Accordingly, the Court should find that the Department's classification for this input is not supported by substantial evidence.

Similarly, the Department classified Risen's EVA input using Malaysia HTS 3920.10.1900, which covers "Polymers Of Ethylene: Plates And Sheets: Other Than Rigid." The Department argued because Risen's EVA input is over 0.5mm thick, the EVA input is a sheet and not a film. IDM at Comment 11. However, the Department cites to no support for this proposition. The tariff schedule does not delineate that 0.5mm is the difference between a film and a sheet. Moreover, the specification sheets of Risen's EVA purchases show that the EVA is not a plate or sheet, but is in flexible films. *See* Risen Final SVs Part II at Exhibit SV2-12 (EVA

specifications); **CR412 PR374**.  The name of the product purchased by Risen is specifically

described as "EVA film." *Id*.  Therefore, the most specific HTS to classify this input would be

HTS 3920.10.90, which covers "other" than sheets or plates.  Further, the Department has also

relied upon HTS 3920.10.00.090, covering "Other" for this input in the past.  *Id*. at Exhibit 7

(AR5 and AR4 SV Summary sheets).  Accordingly, HTS 3920.10.90 is the correct and most

specific HTS to value this input.  The Department's classification and surrogate value are not

supported by substantial evidence and this issue should be remanded for redetermination.

> ### D.   The Department's Selection of Malaysia instead of Bulgaria as the Primary Surrogate Country is Not Supported by Substantial Evidence.

On July 31, 2019, the Department issued a memorandum requesting surrogate country

and surrogate value comments, including comments on economic comparability and the

surrogate country list.  The Department's surrogate country list is merely a selection of countries

with closest *per capita* GNI to China that the Department purports are most likely to have good

data and availability.  These countries were Romania, Malaysia, Russia, Mexico, Brazil, and

Kazakhstan.  The Department specifically provided parties with the opportunity to "propose for

consideration other countries that are at a level of economic development comparable to China."

Risen timely filed comments on economic comparability arguing that Bulgaria should be

considered at the same level of economic development and considered alongside the listed

surrogate countries.  *See* Risen GNI List Comments; **PR172**.

Risen explained that the Department's surrogate country list included a country (i.e.,

Romania) with a per capita GNI difference with China of $1280.  Bulgaria's per capita GNI was

only $930 different than China's GNI.  Risen GNI List Comments at 2-3.  Therefore, if the

implied GNI band of countries comparable to China is equally applied above and below China's

GNI, Bulgaria is at the same level of economic comparability.  There is no logical reason why a

country with a GNI difference of $1280 above China is economically comparable but a country

with a GNI difference of $930 below China is not.  Further, during the course of the review,

2018 GNI data also became available and the Department Office of Policy issued a new

surrogate country list with Bulgaria on the list.  11-months of the 12-month POR overlap with

2018, making the 2018 GNI list even more relevant to this proceeding.  For both of these

reasons, the Department should have found Bulgaria to be at the same level of economic

comparability and considered it as a potential surrogate country.  Indeed, in a contemporaneous

review where the Department likewise issued the surrogate country list based on the 2017 GNI,

the Department nevertheless found in the Preliminary Results that countries on the 2018 and

2017 GNI list would <u>both</u> be considered at the same level of economic development as China in

the review because it overlapped both 2017 and 2018:

> As enumerated above, Commerce identified Brazil, Mexico, Romania, Bulgaria,
> Turkey, Russia, Malaysia, and Kazakhstan, as countries with per capita GNI that
> are at the same level of economic development as China during the POR. We
> consider all eight countries identified on the 2017 Surrogate Country List and
> 2018 Surrogate Country List as having met this prong of the surrogate country
> selection criteria.
> Countries on the segment record that are at the same level of economic
> development as China are given equal consideration for the purposes of selecting
> a surrogate country.

*Fresh Garlic from the People's Republic of China: Preliminary Results, Preliminary Rescission,*

*and Final Rescission, In Part, of the 24th Antidumping Duty Administrative Review; 2017-2018*,

85 Fed. Reg. 2,400 (January 15, 2020) and accompanying Prelim. Decision Memo at 28.

However, in the Preliminary and Final Results, the Department maintained that Bulgaria

is not at the same level of economic development as China and did not consider it as a potential

surrogate country.  Prelim IDM at 16.  This determination is arbitrary and the Court should direct

the Department to consider Bulgaria as a potential surrogate country, equally economically

PUBLIC VERSION

comparable to China.  Despite repeating that it does not consider Bulgaria at the same level of

economic comparability in the Final Results, the Department gave some consideration to Risen's

arguments that the Department should rely upon Bulgaria as the primary surrogate country.

Specifically, the Department found that there is no evidence that Bulgaria specifically produced

solar cells or modules.  IDM at 31-32.

However, the Bulgarian financial statement on the record demonstrates that Bulgaria has

production of solar cells.  The record contains the 2018 financial statement from New Energy

Systems ("NES").  Trina Prelim. SVs at Exhibit 14; **PR220**.  The company lists "photovoltaic

plant" and "photovoltaic systems" among its products.  The Department focused on the fact that

NES's financial statements states that its produces "water heaters, boilers, collectors, and trade in

heating goods."  IDM at 32.  However, NES's webpage materials make clear that the company

produces "solar thermal products" and is a market leader in Bulgaria for this industry.  Trina

Prelim. SVs at Exhibit 14; **PR220**.  Therefore, these heated products are related to solar products

as well.  NES operates using the Burnit Sunsystem name and its webpage lists two solar panels

among its products.  *Id*.  The record establishes that NES does produce subject merchandise.

Therefore, not only does Bulgaria have production of subject merchandise, but the record

contains a Bulgarian financial statement from a company that produces identical merchandise.

Moreover, the NES statement has detailed notes that breakout energy and labor costs.  Further,

Bulgaria provides superior surrogate data for silver paste, solar glass, and other inputs.

As already discussed above, Malaysia does not have a usable value for silver paste.  In

contrast, the Bulgarian surrogate value of silver paste is in range with all of the other non-

aberrant values on the record.  The Bulgarian value for silver paste is in range with the other

surrogate country import values, in range with the historical prices the Department has relied

upon for this input, and results in a logical percentage of Risen's COM.

Bulgaria also sources the most specific import value for solar glass.  In the Final Results, the Department agreed that Bulgaria and Romania provide the best available information to value this critical input: "Bulgaria and Romania HTS 7007.19.80 covers tempered glass used in solar panels; the specific type of glass used by solar panel producers.  In contrast, Malaysia HTS 7007.19.9000 is broader, covering all types of tempered glass other than automotive glass." IDM at 26.  Further, the Department found "Bulgaria and Romania HTS 7007.19.80 is not only more specific to the type of glass used by solar panel producers than Malaysia HTS 7007.19.9000, but the quantities of imports under this HTS category are reported by weight, which is how respondents reported their consumption of glass, while the quantities of Malaysia tempered glass imports are reported in square meters." *Id*. at 27.  For this reason, in the Final Results, the Department relied on the Romanian HTS 7007.19.80 rather than Bulgaria because Romania was on its surrogate country list.  However, as discussed above, there is no logical distinction in economic comparability to China between Bulgaria and Romania.  And the Department already found that the Bulgarian and Romanian glass HTS (from the same source European Union system) is the most specific HTS of record for this important input.  Therefore, the Department already agrees that Bulgaria provides superior data for this critical input than Malaysia.

Lastly, for several other inputs, Bulgaria provides a more reliable unit of measurement. In the Final Results, the Department agreed that this made the Bulgarian and Romania surrogate value for glass superior to Malaysia.   Malaysia also reports several other factors on a different quantity unit basis than Risen, thereby requiring additional <u>less accurate</u> conversions.  The Malaysian imports for frosted glass, diode, resin board, wood board, wooden case, wood corner,

and wood pallet are reported on an M2 or piece basis.  *See* Pet. Comments on Conversion

Factors (December 10, 2019); **PR346**.  Therefore, along with the two types of tempered solar

glass, Malaysia provides less reliable import values for *nine* of Risen's inputs.  The Department

had to make assumptions about the weight and dimensions of these import values; therefore,

these values are inherently less precise than using Bulgarian import values that are already

reported on a KG basis—the same basis that Risen reported these inputs. Risen has provided the

best available conversion factors for these inputs.  *See* Risen Final SVs at Exhibit 13; **CR412**

**PR374**.  However, even reliance on those conversion factors is far less precise than relying on

import values that require no conversion.

  The Department prefers specificity, particular for a major raw material such as solar

glass.  While the Department considers several factors in its analysis, specificity is clearly the

most critical component.  The Court has upheld this policy approach: "in sum, 'product

specificity' logically must be the primary consideration in determining 'best available

information.' If a set of data is not sufficiently 'product specific,' it is of no relevance whether or

not the data satisfy the other criteria set forth in Policy Bulletin 04.1."  *See Taian*, 783 F. Supp.

2d at 1330, *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed.

Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as

"more important factor" than other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United*

*States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as

"best available information"); *see also Certain Steel Threaded Rod Final Results of Antidumping*

*Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) and

accompanying IDM at 8 (Relying on Bulgaria as the primary surrogate country because it has

greater specificity for diameter of the steel inputs).  Following this well-established preference

for specificity, Bulgaria sources the best available surrogate value information for several inputs.

    In sum, Bulgaria is economically comparable to China.  Bulgaria provides surrogate

values for all inputs.  Bulgaria has a financial statement from a producer of identical

merchandise.  Bulgaria provides a reliable silver paste value, while the Malaysian import value is

aberrant and unusable.  Bulgaria provides highly specific import value for solar glass, while

Malaysia only provides a general HTS that is not specific to Risen's input and is inherently

imprecise because it is reported on an M2 basis with a wide dissimilar range of thickness.

Lastly, Malaysia also only provides several other inputs on a piece or M2 basis that must be

converted to KG.  These import values are therefore also less accurate than the Bulgarian import

values that are reported on an M2 basis.  The Court should order the Department to find Bulgaria

is economically comparable to China and therefore the Department must also reconsider

Bulgaria as a potential surrogate country.

> **E.     The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Substantial Court Precedent.**

    The Department applied adverse facts available with respect to certain unreported factors

of production ("FOPs"), namely for certain unaffiliated solar cell and module suppliers to Risen

in the POR.  *See* Final IDM at Comment 1; *see also* Risen Unreported Factors Memorandum

(January 31, 2020); **CR460 PR438**.

    The Department resorts to facts available when information is missing from the record.

*See* 19 U.S.C. § 1677e(a).  In this case, the factors of production ("FOPs") for certain solar cells

and solar modules that *unaffiliated* suppliers sold to Risen during the POR are missing from the

administrative record.  Risen contacted all of its suppliers on at least two different occasions

requesting that the companies provide their FOP information.  *See* Risen Section D at Exhibit D-21 (providing documentation on two rounds of attempts to obtain FOP data from each supplier). In this communication, Risen explained the data required, how the data would be used, and also put forth great effort to induce cooperation:

> In addition, if you have concerns about the expenses for collecting and compiling these data, or have any questions as to how the data should be compiled based on the system of your company, we would be happy to provide you with our lawyers and accountants to assist…
> Since the non-cooperation from your company would lead to result that is very adverse to Risen, it is crucial for your company to understand that if your company refuse to cooperate by providing the requested data, Risen would be forced to refuse to purchase any products from your company and purchase the products from those companies who would cooperate with us in such situation, so that the interests of Risen could be safeguarded.

*Id*.

Nonetheless, Risen's suppliers did not provide the information to Risen.  The Department issued FOP questionnaires to five of Risen's unaffiliated cell suppliers and five of Risen's unaffiliated module suppliers.  Risen sent the questionnaires to each of these suppliers and contacted each of these suppliers on multiple occasions.  *See* Risen Supplier Section D Qre Response (December 3, 2019) at UFOP-1 (documentation of communication with suppliers), **PR160 CR134**.  The suppliers still did not provide the information.  Risen explained to the Department that it exercised its best efforts to obtain the requested information, but Risen has no control over these unaffiliated suppliers in a large competitive market where Risen is not in a particular competitive situation to leverage cooperation.  *Id*. at 2.

Risen does not dispute that information is missing from the record for the unaffiliated suppliers nor does Risen dispute that resort to facts available is justified.  Rather, Risen challenges the Department's decision to resort to *adverse* inferences, whether in accordance with 19 U.S.C. § 1677e(b) or 19 U.S.C. § 1677e(a).

The Department has the general discretion to draw adverse inferences in filling gaps in the record when the party responsible for providing the information does not provide all of it, but the Department must establish "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). However, As explained by the Federal Circuit in *Nippon Steel*, "{b}efore making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. . . . ." *Nippon Steel Corp. & United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Risen provided all of its *own* FOP data and records that the Department requested, which was a very substantial amount of data. Risen had three affiliated producers of solar cells and three affiliated producers of modules that all cooperated completely. Rather than failing to diligently maintain a production record of its *own* (*i.e.,* like Nippon Steel's simple single weight conversion factor), this case is about whether, in context, Risen's efforts to obtain the *unaffiliated* supplier FOPs, the sensitive cost records of unrelated suppliers, were reasonable such that Risen cooperated to the best of its ability. The Department has not identified any shortcoming in Risen's efforts to comply with the Department's requests for information, and the Department did not overtly apply an adverse inference against Risen. Indeed, the Department stated in its final issues and decisions memorandum that it was only acting "primarily" under 19 U.S.C. § 1677e(a) in calculating Risen's dumping margin. Final IDM at Cmt. 1. Hereby, the Department relied on "guidance" of the CAFC in *Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ("*Mueller*").

In *Mueller*, the CAFC considered a case where a Mexican respondent had two suppliers and was able to obtain product-specific costs from only one of the suppliers. *Mueller* at 1230.

PUBLIC VERSION

The uncooperative supplier, Ternium, was itself a mandatory respondent in the review and refused to participate. The Department applied an AFA dumping margin to Ternium and also applied an adverse inference to calculate Mueller's dumping margin to fill the gap of Ternium's missing costs of production. *Id*. at 1230 and 1236. In Mueller's case, as in Risen's, the Department relied "primarily" on 19 U.S.C. § 1677e(a). *Id.* at 1232-1234.

The CAFC rejected the Department's argument that this calculation was more accurate. *Id.* at 1232. On the other hand, the CAFC found that under 19 U.S.C. § 1677e(a), the Department could justifiably rely on policy considerations to calculate the dumping margin of a cooperating party like Mueller "as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account as well." *Id*. at 1233. This is the legal maxim from *Mueller* that the Department applied in Risen's case. *See* IDM at 10-11.

The Department's policy considerations that it found significant in Risen's case were (1) duty evasion and (2) deterrence of non-cooperation. The problem with the Department's policy analysis, however, is that it ignores the CAFC's caveat that the inclusion of policy concerns in an adverse inference must be reasonable in light of the particular facts of the case. The Department's policy analysis concerning Risen remains purely theoretical and does not properly consider Risen's particular situation. Further, the Department hardly even gave lip-service to the CAFC's admonition that "Commerce must have as its primary objective the calculation of an accurate rate . . .." *Mueller* at 1235.

In consideration of possible duty evasion in Risen's case, the Department observed only generally that the non-cooperating solar cell and module suppliers could use Risen's separate rate to avoid the high China-wide dumping rate of 238.95% if the suppliers were to export their

own subject merchandise to the United States.  Yet, the record of this case shows that the

likelihood of any of Risen's suppliers having an interest in exporting to the United States is

minimal given none of Risen's suppliers were named as Chinese exporters in the review.  *See*

Commerce Initiation *compare with* Risen Section A at Exhibit A-14 (for unaffiliated solar cell

suppliers) and Exhibit A-15 (for unaffiliated solar module suppliers); **CR54 PR130**.  In contrast,

the Department provides no record evidence that any one of Risen's suppliers has any interest in

exporting the subject merchandise to the United States.  The Department's duty evasion rationale

is pure conjecture.  Even in *Mueller*, where the non-cooperative supplier was itself one of the

two largest exporters of subject merchandise to the United States, the CAFC refused to presume

that the facts of the case compelled an adverse inference in calculating Mueller's dumping

margin was reasonable.  *Mueller* at 1236.

      In addition, most of Risen's unaffiliated suppliers with unreported FOPs supply <u>solar</u>

<u>cells</u>.  Risen did not export solar cells to the United States.  Risen purchased cells from these

unaffiliated suppliers to be used in Risen's production of solar modules, regardless of the

destination market for the finished <u>solar modules</u>.  When these cell suppliers sold their solar cells

to Risen, they did not know and did not care which modules Risen produced with their cells

would be sold to which market. This is a clear indication that the unaffiliated cell suppliers are

not, and have no interest in, evading duties "through" Risen to export their solar cells to the

United States.

      Further, the record of this review demonstrates that Risen is the "exporter" of the subject

merchandise to the United States, regardless of whether the exported subject merchandise was

self-produced or purchased from unaffiliated suppliers. The unaffiliated suppliers are not

involved in the sales process for the export of the subject merchandise to the United States, and

there is no record evidence to the contrary.  Not one unaffiliated supplier exported its products

"through" Risen to the United States to evade the dumping deposit rate. The record is clear that

in Risen's case, no allegation of duty evasion can be substantiated.

Similarly, the Department's second policy consideration – deterrence of non-cooperation

– is based on mere speculation: "enhanced duties" could "*potentially* induce the cooperation of

the suppliers."  IDM at 14-15.  The Department appears to believe that by harming Risen, the

company will be "incentivized" to source from and conduct business with cooperative suppliers.

*Id*. at 15.  First, in light of Risen's efforts to induce cooperation from its suppliers over the course

of several reviews, including threatening to cease business with them, the record indicates that

even if Risen terminates its business with its suppliers, Risen will have no better luck inducing

cooperation with the next suppliers.  The record gives no indication that the Department's

attempt at incentivizing Rising will result in the suppliers' cooperation.

More importantly, the Court has emphasized that it is unfair and contrary to law for the

Department to employ an adverse inference when the cooperating party has no control over the

non-cooperating supplier.  *See Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Int'l Trade

LEXIS 152 (Dec. 3, 2019) at 13.  Both this Court and the CAFC are adamant that "there is no

justification for an AFA rate based in deterrence where the rate would affect only the

cooperating party."  *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l

Trade 2019) ("*Canadian Solar I*"), citing to *Changzhou Wujin Fine Chem. Factory Co., Ltd. v.

United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012).  In Risen's case, the Department admits

that it is harming Risen to "incentivize" the respondent to choose different suppliers, without any

substantiation that the newly-chosen suppliers will be willing or able to cooperate and provide

their own production cost data.  In fact, the sheer number of small suppliers that Risen has used

PUBLIC VERSION

during this POR indicates that solar cell and module sales and purchases are more opportunistic

for both sides rather than long-term trusted relationships.  On average, each supplier represents

an extremely small and insignificant amount of Risen's production data.  Finally, as seen by

Risen's extensive but largely unsuccessful attempts to garner cost data from these suppliers,

Risen ultimately had no control over the non-cooperating suppliers.

      The Court has evaluated this same situation in several appeals of the same Order.  *See*

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020); see *also*

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019);

*Canadian Solar I*.  In the same manner as this review, the Department applied AFA to Risen's

missing FOPs in the prior review.  The Court found the Department's justification of applying

AFA to the cooperating Risen wholly unreasonable and unsupported by the statute and caselaw:

> Commerce's determination is unsupported by substantial evidence. The evidence
> that Commerce cites does not support its claim that using partial AFA furthers its
> policy objectives. Regarding the threat of duty evasion, unlike the supplier at
> issue in Mueller, the unaffiliated suppliers in this case are not mandatory
> respondents refusing to participate in the review, *see Mueller*, 753 F.3d at 1229-
> 30, 1235, and Commerce does not point to substantial evidence to otherwise
> support its concern that the unaffiliated suppliers intend to evade their own
> potential duties by exporting subject merchandise into the U.S. through Risen.
> *See id*. Moreover, regarding Commerce's aim of deterring non-cooperation,
> Commerce cites no evidence of a mechanism or relationship that Risen could use
> to induce the cooperation of their unaffiliated suppliers. *Compare id*., 753 F.3d at
> 1234-35 (explaining how Commerce's policy objective of inducing cooperation
> may be advanced where there is an existing relationship between the mandatory
> respondent and uncooperative supplier) with Final Decision Memo at 13
> (determining that a plausible threat that the mandatory respondent may refuse to
> purchase subject merchandise from the suppliers is sufficient to induce
> cooperation).  Commerce observes that Risen is a large producer that may refuse
> to purchase subject merchandise from the non-cooperating, unaffiliated suppliers,
> see id. at 12, but such observations do not demonstrate that Risen had leverage
> over its unaffiliated suppliers under a more searching § 1677e(a) analysis.
>
> Commerce also fails to adhere to Mueller's emphasis on accuracy above all else.
> *See Mueller*, 753 F.3d at 1233… Commerce does not cite record evidence that
> using the highest FOP consumption rates on the record result in accurate dumping
> margins for Risen. *See Mueller*, 753 F.3d at 1232-33.

*Risen Energy*, 477 F. Supp. 3d 1343-44.

*Mueller* requires the Department to demonstrate that use of adverse facts under §

1677e(a) would lead to an accurate rate and is supported by the policy considerations of avoiding

non-cooperation and duty evasion.  As the Court has found in several cases now, applying AFA

to the unreported FOPs in this situation does not lead to a more accurate rate and there is no

justification of policy considerations for the particular circumstances of unaffiliated suppliers.

The Department's determination is therefore contrary to law as well as unsupported by

substantial evidence in light of the specific context of the unaffiliated suppliers.

## V.      Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court

remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
Date: April 29, 2021                     *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar
members pursuant to D.C. Bar Rule 49(c)(8).

ATTACHMENT 1

EXHIBIT NOT SUSCEPTIBLE TO
PUBLIC SUMMARY

PUBLIC VERSION

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **13,985** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*