## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RISEN ENERGY CO., LTD., ) | |
|         Plaintiff, ) | |

RISEN ENERGY CO., LTD.,
     Plaintiff,

TRINA SOLAR ENERGY CO., LTD., JA SOLAR
TECHNOLOGY YANGZHOU CO., LTD., ET AL.,
     Consolidated Plaintiffs,

    and

SHANGHAI BYD CO., LTD., ET AL.,
     Plaintiffs-Intervenors,

v.

UNITED STATES,
     Defendant,

    and

SUNPOWER MANUFACTURING OREGON, LLC
     Defendant-Intervenor

PUBLIC VERSION

Before: Claire R. Kelly, Judge
Consol. Court No. 20-3743

## MEMORANDUM IN SUPPORT OF MOTION OF TRINA
## FOR JUDGMENT UPON THE AGENCY RECORD

Robert G. Gosselink
Jonathan M. Freed
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Consolidated Plaintiffs, Trina Solar Co.,
Ltd., Trina Solar (Changzhou) Science &
Technology Co., Ltd., Yancheng Trina Guoneng
Photovoltaic Technology Co., Ltd., Turpan Trina
Solar Energy Co., Ltd., Hubei Trina Solar Energy
Co., Ltd., Trina Solar (Hefei) Science &
Technology Co., Ltd., and Changzhou Trina
Hezhong Photoelectric Co., Ltd,.

Dated:  April 29, 2021

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.      STATEMENT PURSUANT TO RULE 56.2(c) ............................................... 1

        A.      The Administrative Determination Under Review ................................. 1

        B.      Issues Presented ..................................................................................... 2

        C.      Standard of Review................................................................................. 2

II.     STATEMENT OF THE CASE.......................................................................... 3

III.    ARGUMENT ................................................................................................... 5

        A.      Commerce's Adverse Inference When Determining The Facts Available For The Factors Of Production For Trina's Unaffiliated Suppliers Of Solar Cells And Solar Modules Is Not Supported By Substantial Evidence And Not In Accordance With Law……………………………………………………………………5

        B.      Commerce's Surrogate Value For Silver Paste Is Not Supported By Substantial Evidence.…………………………………………………………………18

        C.      Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Not Supported By Substantial Evidence .................................................... 25

        D.      Commerce's Calculation Of The Surrogate Financial Ratios For Hanwha Was Not Supported By Substantial Evidence .…………………………………………38

IV.     CONCLUSION.............................................................................................. 39

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................2, 19

19 U.S.C. § 1677b(c) ......................................................................................18, 25

19 U.S.C. § 1677e ......................................................................................9, 10, 12

**Judicial Decisions**

Allied Pacific Food (Dalian) Co. Ltd. v. United States, 587 F. Supp. 2d 1330 (CIT 2008) .........19

Asociacion Columbiana de Exportadores de Flores v. United States, 6 F. Supp. 2d 865 (1998) ...3

Association of Am. School Paper Suppliers v. United States, 716 F. Supp. 2d 1329 (CIT 2010) ....................................................................................................................19

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) .............................................2

Canadian Solar, Inc. v. United States, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ......... 8, 12-13

Canadian Solar Inc. v. United States, 415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) ...................16

CITIC Trading Co. v. United States, 27 CIT 356, Slip Op. 03-23 (Mar. 4, 2003) ......................19

Consolidated Edison Co. v. NLRB, 305 U.S. 197 (1938) ...............................................................2

Consolo v. FMC, 282 U.S. 607 (1966) ...........................................................................................2

Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262 (CIT 2006) ................................................19

F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027 (Fed. Cir. 2000) .........................................................................................................................14

Fujitsu General. Ltd. v. United States, 88 F.3d 1034 (Fed. Cir. 1996) ..........................................2

Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442 (Fed. Cir. 1994) ..................................18

Mittal Steel Galati S.A. v. United States, 502 F. Supp. 2d 1295 (CIT 2007) ..............................19

Mueller Commercial de Mexico, S. de R.L. De C.V. v. United states, 753 F.3d 1227 1232-36 (Fed. Cir. 2014) ......................................................................................8-10, 14-15

Nation Ford Chern. Co. v. United States, 166 F.3d 1373 (Fed. Cir. 1999) ..................................19

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003) .........................................11

NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed. Cir. 1995) .............................................3

Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ...................................3

PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009) .....................................................2

Rhone-Poulenc, Inc. United States, 20 CIT 573, 927 F. Supp. 451 (1996) ...................................3

Risen Energy Co. Ltd., v. United States, CIT Slip Op. 20-152 ................................................10, 15

Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States, 268 F.3d 1376 (Fed. Cir. 2001)…………………………………………………………………………………..18

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ......................................................3

**Administrative Determinations**

Antidumping Duties, Countervailing Duties: Final Rule, 62 Fed. Reg. 27296 (May 19, 1997) ..19

Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 40,485 (July 15, 2008)………………...36

Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014, 81 Fed. Reg. 23272 (April 20, 2016)…………………………………………………………………………………………..33

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014, 81 Fed. Reg. 39905 (June 20, 2016) ........ .7-8

Crystalline Silicon Photovoltaic Cells, whether or Not Assembled Into Modules, form the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015, 82 Fed. Reg. 29033 (Dep't Commerce June 27, 2017) ....................................................................................................................................8

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Final Results of Antidumping Duty  Administrative Review and Final Determination of No Shipments; 2015-2016, 83 Fed. Reg. 35,616 (July 27, 2018) .......8, 33

Crystalline Silicon Photovoltaic Cells, whether or Not Assembled Into Modules, form the People's Republic of China: Final Results of Antidumping Duty Administrative Review and

Final Determination of No Shipments; 2016-2017, 84 Fed. Reg. 36886 (Dep't Commerce July 30, 2019) ....................................................................................................................8, 10

Folding Metal Tables and Chairs From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, 77 Fed. Reg. 13539 (March 7, 2012)……………..33

Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part, 84 Fed. Reg. 56,761 (Oct. 23, 2019) ………………………………………………………………..36

Steel Wire Garment Hangers From the People's Republic of China, 78 Fed. Reg. 28,803 (May 16, 2013)……………………………………………………………………………………33

Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2014-2015, 82 Fed. Reg. 18115 (April 17, 2017)………………33

Wooden Bedroom Furniture from the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729 (August 11, 2011) …………………………………..36

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

## I.      STATEMENT PURSUANT TO RULE 56.2(c)

Consolidated Plaintiffs, Trina Solar Co., Ltd., Trina Solar (Changzhou) Science &

Technology Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Turpan

Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science &

Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd,., (hereinafter

"Trina"), submit this brief in support of their Motion for Judgment upon the Agency Record

pursuant to USCIT Rule 56.2.

### A.      The Administrative Determination Under Review

This action is an appeal from the U.S. Commerce Department's final results of

administrative review in Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the People's Republic of China: Final Results of Antidumping Duty

Administrative Review and Final Determination of No Shipments; 2017-2018, 85 Fed. Reg.

62275 (October 2, 2020) ("Final Results"), and accompanying Issues and Decision

Memorandum for Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into

Modules, From the People's Republic of China (July 11, 2018), available at

https://enforcement.trade.gov/frn/summary/prc/2020-21823-1.pdf ("IDM").  The Final Results

were subsequently amended in the Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From the People's Republic of China: Notice of Correction to the Final

Results of the 2017-2018 Antidumping Duty Administrative Review, 85 Fed. Reg. 79165

(December 9, 2020) ("Amended Final Results"),

**B.     Issues Presented**

Consolidated-Plaintiffs seek judgment on the agency record with respect to four issues.[1]

1.    Whether Commerce's adverse inference when selecting the facts available to determine the factors of production of Trina's unaffiliated solar cell and solar module suppliers was supported by substantial evidence and in accordance with law.

2.    Whether the surrogate value that Commerce selected to value Trina's silver paste was unreliable, aberrant, or otherwise unsupported by substantial evidence.

3.    Whether Commerce's selection of Malaysia as the primary surrogate country was supported by substantial evidence.

4.    Whether Commerce's calculation of the surrogate financial ratios using the financial statement of Hanwha QCells to determine the overhead, SG&A, and profit components of normal value was supported by substantial evidence.

**C.     Standard of Review**

When evaluating factual determinations contained in the final results of an antidumping duty administrative review, the Court must sustain Commerce's final results, unless they are "unsupported by substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); see also Fujitsu General. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolo v. FMC, 282 U.S. 607, 619-20 (1966) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made."  Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168

---

[1] After additional review of the administrative record, Trina has decided not to seek judicial review of Count Three and Six of its Complaint filed on Oct. 14, 2020, ECF No.6 filed in Court No. 20-03757.  Therefore, Trina is no longer pursing this aspect of its appeal.  To the extent that the surrogate financial ratio issue in Count 4 does not relate to the surrogate country issue in Count 1, Trina is no longer pursing this aspect of its appeal.

(1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).

Additionally, "{t}he substantiality of evidence must take into account whatever in the record

fairly detracts from its weight," including "contradictory evidence or evidence from which

conflicting inferences could be drawn." Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-

488 (1951).

This Court has found Commerce's determinations unlawful "where Commerce has relied

on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions."

Rhone-Poulenc, Inc. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also

Asociacion Columbiana de Exportadores de Flores v. United States, 6 F. Supp. 2d 865, 880

(1998).  Even where Commerce has acted in conformity with its statutory and regulatory

obligations, the resulting dumping margin must be examined for its accuracy and fairness.  See

NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

## II.    STATEMENT OF THE CASE

Pursuant to a request from Trina, Commerce initiated an administrative review of Trina's

U.S. sales for the December 1, 2017, through November 30, 2018, period of review ("POR").[2]

On February 10, 2020, Commerce published its preliminary results of review, in which it

calculated a preliminary margin for Trina of 46.64 percent.  Crystalline Silicon Photovoltaic

Products, Whether or Not Assembled into Modules, From the People's Republic of China:

Preliminary Results of Antidumping Duty Administrative Review and Preliminary

Determination of No Shipments; 2017-2018, 85 Fed. Reg. 7531 (Dep't Commerce, Feb. 10,

2020) ("Preliminary Results").  Thereafter, Trina submitted a case brief to Commerce arguing,

---

[2] Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9297
(March 14, 2019). ("Initiation Notice").

among other points, that Commerce should not have used an adverse inference when determining the facts available for the factors of production for Trina's unaffiliated suppliers of solar cells and solar modules and that Commerce's application of adverse facts available ("AFA") was not supported by substantial evidence and not in accordance with law.[3]  Trina also argued that Commerce's selection of Malaysia as the primary surrogate country was not supported by substantial evidence considering that either Bulgaria or Romania offered more accurate information with which to value Trina's factors of production in the determination of normal value. Finally, Trina also maintained that Commerce's valuation of silver paste was not supported by substantial evidence.[4]

On October 2, 2020, Commerce published the final results of the administrative review in which it calculated a final margin to Trina of 50.33 percent.[5]  As it had in the Preliminary Results, Commerce in the Final Results continued to apply use and adverse inference when selecting the facts available for the factors of production for Trina's unaffiliated suppliers of solar cells and solar modules.[6]  Commerce also continued to rely on Malaysia as the primary surrogate country.[7] In addition, Commerce continued to rely on the same Malaysian surrogate value for silver paste that it used in the Preliminary Results.[8]

---

[3] Trina's Case Brief, Mar. 13, 2020, CD 462-463.

[4] *Id.*

[5] Final Results, 85 Fed. Reg. 62275.

[6] IDM, at Comment 1.

[7] Id., at Comment 4.

[8] Id., at Comment 2.

On October 6, 2020, Trina alleged that Commerce's <u>Final Results</u> included a ministerial error with respect to the surrogate value for solar glass.  On December 9, 2020, Commerce published the <u>Amended Final Results</u> and calculated an antidumping duty rate of 92.52 percent for Trina.[9]  Therein, Commerce agreed that it had made a clerical error with respect to the surrogate value for Trina's solar glass. But, in addition, Commerce amended the antidumping calculation for Trina to include silver paste consumption data reported by Trina that Commerce mistakenly excluded from the <u>Preliminary Results</u> and from the <u>Final Results</u>.[10] Commerce made this change even though no party submitted case briefs or any ministerial error allegation regarding the inclusion of Trina's silver paste consumption in the calculation of Trina's normal value. Trina does not challenge Commerce's discretion to correct this mistake *sua sponte*, but as discussed in more detail below, the change highlights even more forcefully than at the time of briefing before the agency the aberrational and unreliable nature of the surrogate value upon which Commerce relied to value the silver paste factor of production.

## III.    ARGUMENT

### A.    COMMERCE'S ADVERSE INFERENCE WHEN DETERMINING THE FACTS AVAILABLE FOR THE FACTORS OF PRODUCTION FOR TRINA'S UNAFFILIATED SUPPLIERS OF SOLAR CELLS AND SOLAR MODULES IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

The record does not support Commerce's application of adverse facts available ("AFA") with respect to Trina—which fully cooperated with Commerce's efforts to obtain factor of production ("FOP") usage data for purchased solar cells and solar modules—where Trina's

---

[9] <u>Amended Final Results</u>, at 79166.

[10] <u>Id.</u>

unaffiliated suppliers did not provide certain FOP data.   For the following reasons, the Court should remand this issue to Commerce.

### 1. Additional Factual Background

In its Section D questionnaire response, Trina reported that, during the POR, it: (1) purchased the services of unaffiliated tollers of certain inputs used to produce subject merchandise (the tollers partially processed solar modules, solar cells, wafers, bricks, ingots, and purified silicon); and (2) purchased finished solar cells and modules from unaffiliate suppliers. Trina explained that it requested FOP data from all of its tollers and solar cell and solar module suppliers, and it informed them of the critical need for their full cooperation.  See Letter from Trade Pacific PLLC, "Section D Questionnaire Response," at D-3, D-4, Exhibit DA-10, and Exhibit D-2, CD 112–132 (July 1, 2019) ("Trina's Sec. D Resp.").  Specifically, in May 2019, Trina made formal written requests to its unaffiliated solar cells and modules producers for them to provide FOPs related to its produced inputs.  Subsequently, in June 2019, Trina reiterated its request to these unaffiliated companies to provide the requested information.  Trina then sent two formal letters to each of the companies and also telephoned each and discussed the crucial need for each company to fully cooperate.  Trina provided letters and emails of its efforts to request cooperation from such companies at Exhibit D-2 of its initial Section D questionnaire response. See id. at Exhibit D-2.

In December 2019, Trina once again sought out cooperation from unaffiliated solar cell and module suppliers.  Trina provided documentation of its efforts to encourage cooperation at Exhibit S-1 of its Supplemental Sections A-D questionnaire response.  See Letter from Trade Pacific PLLC, "Sections A-D Supplemental Questionnaire Response," at Exhibit S-1, CD 408–410 (Dec. 2, 2019).  Trina also confirmed that the missing FOP data accounted for only [      ]%

of Trina's total POR quantity for produced, tolled, and purchased solar cells; and [          ]% of Trina's total POR quantity of produced tolled, and purchased solar modules.  Id. at pp. 2.

Despite its numerous and persistent efforts to seek cooperation from unaffiliated suppliers, Commerce applied AFA for Trina's unaffiliated solar cell and module suppliers FOPs in advance of the preliminary determination.  See Memo re: "Unreported Factors of Production: Trina Solar Co., Ltd." at 5, CD 459 (Jan. 31, 2020) ("Trina's FOP Memo").  Commerce chose to apply the highest consumption rates of the same inputs used by Trian in producing solar cells and solar modules for CONNUMs sold in the United States during the POR.

Similarly, in the Final Results, Commerce continued to apply AFA to Trina for the missing FOPs of unaffiliated solar cell and module suppliers.  See IDM at cmt. 1.  Commerce asserted that the "record evidence" in support of applying AFA to Trina is the fact that Trina has been "active" respondents in solar cell reviews since the investigation.  See IDM at 11.  Accordingly, Commerce reasoned that Trina "could have predicted that these suppliers would ultimately refuse to cooperate with the information requests."  Id.  Commerce also explained other steps that Trina should have taken to act to the "best of its ability:"

> [I]t is not unreasonable for us to expect a respondent in Risen and Trina's situation to take a number of steps to ensure that it could obtain the FOP information, including, but not limited to: securing the cooperation of the supplier, or obtaining the requested information, at the time Risen and Trina agreed to purchase the solar cells and solar panels; removing that supplier from its list of suppliers for failing to provide the requested information; and/or increasing its production of subject merchandise inputs, to avoid the issue of obtaining the suppliers' COP information.

IDM at 12.

Commerce further cited Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014, 81 Fed. Reg.

39905 (June 20, 2016) ("Solar AR2 Final"), and subsequent solar reviews[11] in support for its

application of AFA in calculating weighted-average margins of respondents who failed to

provide FOPs of their unaffiliated suppliers.

    In defending its application of AFA, Commerce asserted that its decision was consistent

with the CAFC's decision in Mueller.  See Mueller Commercial de Mexico, S. de R.L. De C.V.

v. United states, 753 F.3d 1227 1232-36 (Fed. Cir. 2014) ("Mueller").  In Mueller, the Court

found that Commerce may only incorporate an adverse inference in calculating a cooperate

respondent's margin if doing so will yield an accurate rate, promote cooperation, and thwart duty

evasion and that under analysis under section 776(a of the Act, Commerce's predominant

concern must be accuracy.  Id.

    With regard to duty evasion, Commerce explained that "there exists a real possibility that

the parties involved count obtain a more favorable result by not cooperating because the

uncooperative suppliers' consumption rate could be higher than Risen and Trina's rates."  See

IDM at 13.  For deterrence of non-cooperation, Commerce found that AFA was appropriate

because "both Risen and Trina are significant producers in the solar market with significant sales

during the POR."  Accordingly, Commerce found that exposing Trina to higher antidumping

---

[11] See also Crystalline Silicon Photovoltaic Cells, whether or Not Assembled Into Modules, form the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015, 82 Fed. Reg. 29033 (Dep't Commerce June 27, 2017) ("Solar AR3 Final") and accompanying IDM at Comments 1 and 3; Crystalline Silicon Photovoltaic Cells, whether or Not Assembled Into Modules, form the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016, 83 Fed. Reg. 35616 (Dep't Commerce July 27, 2018) ("Solar AR4 Final") and accompanying IDM at Comment 1; Crystalline Silicon Photovoltaic Cells, whether or Not Assembled Into Modules, form the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017, 84 Fed. Reg. 36886 (Dep't Commerce July 30, 2019) ("Solar AR5 Final") and accompanying IDM at Comment 1.

duties could potentially induce the cooperation of suppliers." Id. at 14 (emphasis in original).

Finally, Commerce justified its application of AFA under Mueller as being accurate because the

missing information for both respondents is "significant in size and Commerce has no way of

knowing what these FOPs are." Id. at 15.

### 2.  Statement Of Law

Where information necessary to calculate a respondent's dumping margin is not available

on the record, Commerce applies "facts otherwise available" in place of the missing information.

19 U.S.C. § 1677e(a).  Commerce may apply an adverse inference in selecting from facts

available if Commerce "finds that an interested party has failed to cooperate by not acting to the

best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b).  However, if

Commerce "finds that an interested party has failed to cooperate by not acting to the best of its

ability to comply with a request for information," Commerce may apply "an inference that is

adverse to the interests of that party in selecting among the facts otherwise available." Id.

(emphasis added); see also Canadian Solar, Inc. v. United States, 378 F. Supp. 3d 1292, 1318

(Ct. Int'l Trade 2019) ("Canadian Solar I") (concluding that section 1677e(b), when read

together with Mueller, "reveals that application of an inference adverse to the interests of a

cooperating respondent under subsection (b) is not contemplated by the statute or the Court of

Appeals' decision in Mueller).  Commerce cannot apply an adverse inference against a

respondent under Section 1677e(b) based on the theory that the respondent failed to induce

compliance by a non-cooperating supplier where the record lacks information to support that the

respondent had the sort of relationship with its suppliers that would give it leverage in the

marketplace.  See id. (holding that Commerce's application of an adverse inference under

subsection 1677e(b) upon a respondent based on the suppliers' lack of cooperation to calculate

the respondent's rate is contrary to law).

      This Court again addressed this precise issue wherein Commerce applied AFA to a

mandatory respondent in Solar AR5 Final for its unaffiliated supplier's lack of cooperation.  See

Risen Energy Co. Ltd., v. United States, CIT Slip Op. 20-152 ("Risen").  The CIT found that

Commerce (1) did not point to substantial evidence to otherwise support its concern that the

unaffiliated suppliers intended to evade their own potential duties by exporting subject

merchandise into the United States through Risen; (2) Commerce failed to demonstrate that

Risen could have potentially induced its uncooperative suppliers to cooperate; (3) Commerce

failed to demonstrate that Risen possesses leverage over its suppliers to induce their cooperation;

and (4) Commerce failed to provide the accuracy analysis required by Mueller.  Id.  On remand,

Commerce reversed course and declined to apply AFA to the missing FOPs, and rather, using

neutral facts available, applied the average consumption rates reported by Risen for the relevant

control numbers in place of the unreported FOP consumption rates.  See Risen Energy Co. Ltd.,

V. United States, Redetermination Pursuant to Court Remand Order (Jan. 27, 2021).  In the

administrative review underlying Trina's appeal here, Commerce repeated its same reasoning

from Solar AR5 Final that was just overturned in Risen.

      Moreover, the Court of Appeals for the Federal Circuit has defined the "best of its ability

standard" as requiring Commerce to make two showings: (1) an objective showing that a

reasonable and responsible importer would have known the requested information was required

to be kept and maintained under the applicable statutes, rules and regulations; and (2) a

subjective showing that the failure to respond resulted from the respondent's lack of cooperation

in either: (a) failing to keep and maintain all required records; or (b) failing to put forth its

maximum efforts to investigate and obtain the requested information from its records.  Nippon

Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  In other words, Commerce

may only apply an adverse inference where it is reasonable to expect more forthcoming

responses to have been made.  Id.

### 3.  Commerce's Application of AFA to Trina Is Unsupported By The Record And Otherwise Not In Accordance With Law

Commerce unlawfully applied, as AFA, the highest consumption rates for solar cells and

solar modules for which Trina's unaffiliated suppliers did not provide consumption figures of the

same inputs used by Trina in producing solar cells and solar modules for CONNUMS sold in the

United States during the POR because Commerce improperly imputed responsibility on Trina for

its suppliers' non-cooperation where the record does not support that Trina had leverage over its

suppliers that could have induced their cooperation.

Further, Commerce attempts to balance non-cooperation and duty evasion with its

responsibility to arrive at a reasonably accurate estimate of Trina's actual antidumping rate fail

fall short in justifying application of AFA.  Commerce's analysis fails to explain why using facts

available would not better promote accuracy particularly where there is no record evidence to

support that Trina had any control over its suppliers or to otherwise explain why it is reasonable

to rely on a deterrence rationale where there is no need or justification for deterrence.  For all of

these reasons, Commerce's application of AFA to Trina is contrary to law.

### A.  Record Evidence Does Not Support Commerce's Finding of Non-Cooperation

First, Commerce improperly imputes non-cooperation to Trina on the grounds that Trina

should have refused to do business with suppliers that would not cooperate.  Specifically,

Commerce concluded that Trina itself withheld missing FOP data from Commerce and failed to

cooperate to the best of its ability by choosing to do business with suppliers that would not

cooperate.  See IDM at 12.  In reviewing Commerce's determination in the third antidumping administrative review of Solar Cells from the People's Republic of China, the U.S. Court of International Trade concluded that Commerce's determination to select "Canadian Solar's highest consumption rates for FOPS for solar cells and modules sold in the United States"—invoking 1677e(b) based on the suppliers' lack of cooperation—is contrary to law where the record does not demonstrate the respondent had the type of long-standing relationships with its suppliers that would give it leverage in the marketplace.  See Canadian Solar I, 378 F. Supp 3d at 1319–20.

Commerce improperly attempts to impute non-cooperation to Trina based on its suppliers' non-cooperation on the theory that Trina could have ensured that it purchased only from suppliers that agreed to provide the requested information.  The same conduct (i.e., non-cooperation by the suppliers) is giving rise to Commerce's adverse inference.  Trina exhibited the same level of cooperation by requesting that its suppliers respond to Commerce's requests as Canadian Solar in the third administrative review of Solar Cells from the People's Republic of China.  See Trina's Sec. D Resp. at 10–11, Ex. D-2, DA-18 (including examples of letters and e-mails Trina sent to each of its unaffiliated and all correspondence with tollers and cell suppliers requesting they provide information and stating that Trina telephone each toller and supplier to discuss the critical need for each company to fully cooperate).  The only thing that has changed in Commerce's analysis from Solar Cells is that, rather than concluding that Trina itself was cooperative and applying an adverse inference against Trina for its supplier's non-cooperation, Commerce charges Trina with non-cooperation based on its failure to require its supplier's cooperation as a condition of purchasing from the supplier.

If Commerce could not reasonably apply AFA to a respondent for its suppliers' lack of

cooperation without evidence that it had leverage over those suppliers, Commerce cannot

reasonably conclude that Trina failed to cooperate based on its suppliers' conduct based on

precisely the same factual circumstances.  In Canadian Solar I, the Court held that Commerce

could not apply AFA to a respondent based on its suppliers' failure to report requested

information without a reasonable basis to conclude that the respondent could have induced

cooperation by its supplier.  See Canadian Solar I, 378 F. Supp. 3d at 1320 (holding that without

facts that reasonably indicate the presence of a long-term relationship that created leverage that

would indicate that the respondent party could have impacted the behavior of the supplier).  The

Court further concluded that facts such as the existence of supplier-specific accounts in the

respondents' accounting system and corporate divisions dedicated to purchasing solar cells were

insufficient to make a conclusion that the respondent was in a position to induce cooperation.

Id., 378 F. Supp. 3d. at 1321.  Moreover, the Court found that Commerce's qualitative

assessments of the respondents' sales during the POR or position in the solar marketplace,

without more, are insufficient to establish leverage over suppliers.  Id.  If Commerce's

determination to apply AFA to Canadian Solar based on the notion that it could have induced

cooperation by its supplier was unreasonable and unsupported by the record, then so too is

Commerce's conclusion that Trina failed to cooperate to the best of its ability by failing to

induce its suppliers' cooperation or otherwise ensuring that it purchased only from suppliers that

it knew agreed to cooperate with Commerce's requests.  Commerce points to no specific record

evidence that Trina would have had the leverage to restrict its purchases to suppliers it knew

would provide the requested information.

20-3743– Trina's 56.2 Brief                          Public Version

Second, Commerce's reasoning essentially charges Trina with knowledge that its suppliers would not cooperate in the future where no record evidence supports such a determination. Specifically, Commerce states that "[b]y choosing to do business with suppliers that would not cooperate, Trina has withheld missing FOP data from Commerce and failed to cooperate to the best of its ability." See IDM at 12. But, Commerce's logic presumes, without basis in the record, that Trina had reason to believe that its suppliers would not comply with Commerce's future requests for information. This conclusion further relies on the implicit assumption that Trina's solar cell and solar modules suppliers were the same suppliers that had failed to provide the requested information in prior reviews.

### 4. Commerce Fails To Adhere To <u>Mueller</u>'s Emphasis On Accuracy Above All Else

Commerce's application of AFA to Trina for its suppliers' failure to report FOP usage data is likewise contrary to law because Commerce focused exclusively on inducement of cooperation without any consideration of whether it was employing such a rationale reasonably in light of accuracy concerns. In addition, Commerce's Mueller analysis failed to cite any record evidence.

Where Commerce applies an adverse inference against a non-cooperating party, Commerce is required to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000); see also Mueller, 753 F.3d at 1234. While the statute may allow Commerce to consider deterrence of non-cooperation and thwarting duty evasion to support its use of an adverse inference, the balancing of policy considerations required under the statute could nonetheless render it unfair to employ an adverse inference against a party that had no control over a non-cooperating supplier. Mueller, 753 F.3d at 1235. Nonetheless, the Court of Appeals for the

14

Federal Circuit held that the statute requires that, where Commerce relies on a respondent's existing relationship with a supplier and the potential for that relationship to induce a supplier's cooperation, Commerce must reasonably conclude that inducement and avoidance of duty evasion are a concern, balance those concerns against accuracy concerns, and reasonably take into account whether Commerce's weighing might ultimately discourage cooperation.  Id. at 1236.

Similarly, in Risen, the Court found that Commerce did not adhere to Mueller.  See Risen, at Slip Op pp. 18–19.  The Court determined that Commerce did not cite record evidence that using the highest FOP consumption rates on the record result in accurate dumping margins for Risen.  Id.  Accordingly, the Court remanded to Commerce for further reconsideration.  Id.

Here, Commerce's arguments in support of the inducement and evasion policies are conclusory, copied verbatim from prior overturned solar reviews, and entirely unsupported by the record.  Specifically, Commerce does not cite to any evidence that supports its concern that the unaffiliated suppliers intend to evade their own potential duties by exporting subject merchandise into the U.S. through Trina.  Moreover, the unaffiliated suppliers in this case are not mandatory respondents refusing to participate in the review.

Second, Commerce entirely failed to consider whether selecting the highest consumption rates for solar cells and solar modules for which Trina's unaffiliated suppliers did not provide consumption figures of the same inputs used by Trina in producing solar cells and solar modules for CONNUMS sold in the United States during the POR promotes accuracy.  Commerce failed to consider any indicia of Trina's relationship with its suppliers to support its implicit assumption that Trina must have leverage over those suppliers and the ability to require compliance as a condition of that supply.  In fact, the record, including the number of exporters included in the

CBP data placed on the record and the number of entities that are subject to this review, unequivocally demonstrates that the solar energy market is robust and dynamic, with many producers and exporters.  Many of the respondents, and many other market participants, may purchase cells and modules from Trina and its suppliers.

Commerce did not cite evidence regarding the relative size and the nature of the relationships between Trina and its suppliers.  While the record may demonstrate that Trina purchases a substantial quantity of cells and modules from its various suppliers, this does not demonstrate that it represents a substantial share of those suppliers' business.  The fact that Trina purchases substantial quantities of cells and modules from its suppliers only demonstrates its reliance on those suppliers, not that those suppliers rely on Trina.  Finally, The mere existence of supplier relationships does not equate to Trina's ability to induce compliance or that Trina has leverage of its suppliers.

While Commerce states that it applies AFA only in situations where there are missing consumption figures for certain supplier's inputs, the Court in <u>Canadian Solar</u> explicitly held that this analysis is insufficient to satisfy Commerce's obligation to consider whether the data applied promotes accurate calculation of Trina's dumping margin.  <u>Canadian Solar Inc. v. United States</u>, 415 F. Supp. 3d 1326, 1334 (Ct. Int'l Trade 2019) ("<u>Canadian Solar II</u>") (concluding that the accuracy analysis required by the statute in applying AFA was missing where Commerce states only that it only applies the adverse inference for the missing data without consideration of whether applying the adverse inference promotes accuracy).  In fact, where, as here, Commerce failed to explain why alternative data would not better promote accuracy, and instead relied exclusively on policy considerations of duty evasions and deterrence to support the use of AFA, the Court held that Commerce's view that those policy considerations support use of AFA is

unsupported by the record.  Id.  The Court further noted that evidence of suppliers' potential

stake in a respondent to which they sell having a lower dumping margin does not demonstrate a

threat of duty evasion.  Id.

Commerce's analysis contains no consideration or explanation of the potential for Trina's

suppliers to avoid a higher antidumping duty rate by failing to supply the requested information.

Here, there is no applicable antidumping rate that Trina's suppliers would need to evade; and

there is simply no evidence that these suppliers export, or that individual margins (calculated

based on AFA or otherwise) have been assigned to Trina's suppliers.  Therefore, any reliance on

evasion or inducement policy rationales is simply unsupported by the record and speculative.

### 5.  Commerce Should Use Trina's Reported Fop Data For Tolled And Purchased Solar Cells And Modules On Remand

For the reasons discussed in the preceding sections, Commerce's application of AFA to

select the highest consumption rates for solar cells and solar modules for which Trina's

unaffiliated suppliers did not provide consumption figures of the same inputs used by Trina in

producing solar cells and solar modules for CONNUMS sold in the United States during the

POR is contrary to law and otherwise unsupported by the record.  Commerce found that it is

missing FOPs for [          ] percent of Trina's total POR quantity of produced, tolled, and

purchased solar cells and [        ] percent of Trina's total POR quantity of produced, tolled, and

purchased solar modules.  See Trina's FOP Memo, at 5.  However, Trina's FOP data has already

substituted Trina consumption rates producing identical modules in place of the consumption

rates for the unaffiliated suppliers which use a very similar production process.  Trina's Sec. D

Resp. at D-5.  Accordingly, the Court should remand this issue to Commerce for reconsideration

so that Commerce may use Trina's FOP data for its own self-produced solar cells and solar

modules as facts available for the missing suppliers' and tollers' FOP usage data.

### B.   COMMERCE'S SURROGATE VALUE FOR SILVER PASTE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In antidumping cases where the subject merchandise is exported from a non-market economy country, Commerce determines the normal value for the subject merchandise by valuing the factors of production utilized in producing the merchandise and such "valuation of the factors of production shall be based on the best available information."  See 19 U.S.C. § 1677b(c)(1). Commerce values the factors of production of respondents in nonmarket countries using information from market economy countries that are: "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

Commerce's methodology for selecting the best available information for valuing factors of production evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability. See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited April 28, 2021) ("Policy Bulletin 04.1").

The Court of Appeals for the Federal Circuit has explained that "{i}n determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible."  Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Lasko Metal Prods., Inc. v. United States,

43 F.3d 1442, 1446 (Fed. Cir. 1994).  Under the statute, "Commerce is vested with considerable discretion in selecting the best available information."  <u>Allied Pacific Food (Dalian) Co. Ltd. v. United States</u>, 587 F. Supp. 2d 1330, 1342 (CIT 2008).  But Commerce's selection of surrogate values still must be supported by substantial evidence in the administrative record.  19 U.S.C. § 1516a(b)(1)(B)(i).  Therefore, while "the standard of review precludes the court from determining whether Commerce's choice of surrogate value was the best available information on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."  <u>CITIC Trading Co. v. United States</u>, 27 CIT 356, Slip Op. 03-23 at 16 (Mar. 4, 2003).

> In determining which surrogate value constitutes the best available information:

> {T}he statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping {rate} . . . This "best" choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.

> <u>Association of Am. School Paper Suppliers v. United States</u>, 716 F. Supp. 2d 1329, 1334 (CIT 2010) (citations omitted).  In this respect, the Court of Appeals for the Federal Circuit has made clear that Commerce should "avoid the use of distorted surrogate prices."  <u>Nation Ford Chern. Co. v. United States</u>, 166 F.3d 1373, 1378 (Fed. Cir. 1999).  Moreover, Commerce itself, in the preamble to its current regulations, recognizes that it does not use surrogate country data that is "aberrational."  <u>Antidumping Duties, Countervailing Duties</u>, 62 Fed. Reg. 27296, 27366 (May 19, 1997) (Final Rule).  Thus, when "confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive."  <u>Mittal Steel Galati S.A. v. United States</u>, 502 F. Supp. 2d 1295, 1308 (CIT 2007); <u>Dorbest Ltd. v. United States</u>, 462 F. Supp. 2d 1262, 1277-78 (CIT 2006).

In the <u>Final Results</u>, Commerce continued to value respondents' silver paste consumption using the average unit value ("AUV") of Malaysian imports under HTS 7115.9010.  <u>See</u> <u>IDM</u>, at Comment 2.  In its case brief before the agency, Risen Energy Co., Ltd ("Risen"), Risen presented abundant record evidence demonstrating that Commerce's surrogate value for silver paste was aberrant and unreliable.  <u>See</u> Risen Case Brief, at 2-17 (March 13, 2020), CD 464, PD 446.  Trina also argued that the silver paste surrogate value was aberrational and unreliable.  <u>See</u> Trina Case Brief, at 16-17 and 23-24 (March 13, 2020), CD 464-463, PD 444.  The Risen Case Brief provided a more comprehensive demonstration of the unreliable nature of the Malaysia AUV for silver paste and the distortive effect on the antidumping calculation.  As explained above, Commerce had mistakenly excluded Trina's consumption of silver paste in Trina's calculation in the <u>Preliminary Results</u>.  Thus, Trina's Case Brief did not include detailed analysis of the enormously distortive effect of Commerce's silver paste value to Trina's calculation.

Trina will not recite all of the record evidence presented by Risen that Commerce ignored or disregarded in its <u>Final Results</u> and incorporates those arguments by reference to the Rule 56.2 motion and supporting memorandum filed by plaintiff, Risen.

In the <u>Preliminary Results</u> and the <u>Final Results</u>, where Commerce had inadvertently excluded entirely Trina's silver paste consumption from the calculation of the direct material portion of normal value, Trina's antidumping duty rate was  46.64 percent and 50.33 percent, respectively.  In the <u>Amended Final Results</u>, Commerce calculated an antidumping duty rate of 92.52 percent after including Trina's silver paste consumption in the direct material cost component of normal value.  Had Commerce not corrected the silver paste consumption mistake and only corrected the ministerial error with respect to the surrogate value for solar glass, Trina's antidumping duty rate would have been 44.55 percent.  **Attachment 1** contains the antidumping

duty margin summary page from the SAS Output from Trina's Amended Final Results calculation memorandum after counsel excluded again the silver paste consumption. See Amended Final Analysis Memorandum-Trina, at Attach I Results, (Dec. 2, 2020), CD 494-496, PD 502.[12]

Thus, the inclusion of Trina's consumption of silver paste with the application of Commerce's surrogate value for silver paste increased Trina's antidumping rate from 44.55 percent to 92.52 percent, or 47.97 absolute percentage points, or more than doubling the overall antidumping duty margin.

The record establishes that silver paste cannot possibly account for such a large share of the cost of manufacturing the solar module. During the course of the review, Trina submitted a study by the NREL, the National Renewable Energy Laboratory of the U.S. Department of Energy. See Trina's Rebuttal to Petitioner's Comments on Selection of Surrogate Values (September 26, 2019), Exhibit 2, PD 244.   This report, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing: 1H 2018 Benchmark and Cost Reduction Road Map*, ("*NREL Solar Cost Report*"), was solely funded by the U.S. Department of Energy and studied solar production costs around the world.  Id.

Silver paste is not an insignificant portion of the cell conversion costs but is a small portion of the overall module cost.  The *NREL Solar Cost Report* explains that "metallization (screen-printing of silver and aluminum pastes) is the single largest direct cost for cell conversion, at 24%".  *NREL Solar Cost Report*, at 26, PD 244.  NREL explained that using "2018 silver and aluminum pricing (LME 2018a, 2018b) and the composition of these pastes

---

[12] Since the Amended Final Results included two changes from the Final Results, **Attachment 1** is provided by Trina to isolate the impact of the silver paste cost determined by Commerce on Trina's overall antidumping margin.

including additives, we calculate total metallization paste materials costs of $0.015 ± $0.002/W."

Id.  This fact is contrasted starkly by the finding of Commerce.  The table below shows that

Commerce calculated a silver paste per watt cost of $0.20/watt for Trina.

| Log Line No.* | Output Page No. ** | CONNUM 210560109050615050101 | | | |
|---|---|---|---|---|---|
| Line 2540 | 155 | C_SILVER_PASTE_IN | [ | | ] a |
| Line 2386 | | NON AFA for CELL FOPS | [ | | ] b |
| Line 2694 | 170 | C_SILVER_PASTE_IN_AFA | [ | | ] c |
| Line 2543 | | AFA for CELL FOPS | [ | | ] d |
| | | Total SILVER_PASTE Cost/watt | | $ 0.200 | e = (a*b) + (c*d) |

See  Amended Final Analysis Memorandum-Trina, (Dec. 2, 2020), CD 494-496, PD 502 (* the SAS Log is found at CD 495; ** the SAS Output is at CD 496).

Commerce's silver paste cost per watt using the Malaysian AUV is nearly **1200 percent**

higher than the highest combined cost per watt for silver and aluminum pastes determined by

NREL.  In summary, the U.S. Department of Energy experts on renewable energy found that

total metallization costs were between $0.013 - $0.017 per watt, but Commerce found it

reasonable to assign a surrogate value resulting in a $0.20 per watt cost for silver paste alone.

Risen argued that the *NREL Solar Cost Report* provided benchmark costs with which to

compare to Commerce's chosen surrogate value for silver paste.  See Risen Case Brief, at 12-14,

CD 464, PD 446.  Commerce did not address these arguments other than to claim that the *NREL

Solar Cost Report* "does not specify the cost of silver paste, but instead groups the silver paste

costs with many different costs.  Therefore, we do not find this survey useful for the purposes of

determining the reasonableness of the Malaysia AUV."  IDM, Comment 2, at 23.

Commerce's conclusion that the NREL silver paste costs are grouped with many different

costs is contradicted by the record and cannot form a basis for Commerce to disregard the *NREL

Solar Cost Report*.  First, the report clearly identifies the grouping as "metallization (screen-

printing of silver and aluminum pastes)." See *NREL Solar Cost Report*, at 26, PD 244.  Thus, rather than "many different costs" being grouped with silver paste cost, those NREL silver paste costs were grouped with **one** additional cost, aluminum paste.  Id.  Furthermore, the comparison of the NREL metallization costs to Trina and Risen's silver paste cost per watt understates the extent to which the Malaysia AUV is drastically out of line with the NREL data because the NREL metallization cost per watt also includes aluminum paste cost per watt.  Thus, Commerce's reason for disregarding the *NREL Solar Cost Report* is contradicted by the record and Commerce should have considered the *NREL Solar Cost Report* for purposes of evaluating the reliability of the Malaysian silver paste AUV.  Commerce's failure to do so renders its decision lacking a basis in substantial evidence.

Other comparisons in the *NREL Solar Cost Report* demonstrate further the unreasonableness of relying on the Malaysian AUV for silver paste.  The *NREL Solar Cost Report* at Figure 25 provided a breakdown of solar module production costs.  See *NREL Solar Cost Report*, at 37, PD 244.  The "Metallization Pastes for Screen-Printing" in Figure 25 for a module using a standard cell technology is $0.016/watt.  Id. The table below summarizes the material cost portions of the solar module using standard cells in Figure 25 at page 37 of the *NREL Solar Cost Report*.

| NREL - Figure 25 - Standard Al BSF (285 W) | | | Share of Material |
|---|---|---|---|
| BOM Materials (glass, backsheets,, j-box etc) | $ | 0.115 | 65% |
| Metallization Pastes for Screen Printing | $ | 0.016 | 9% |
| Silicon | $ | 0.047 | 26% |
| Total Materials | $ | 0.178 | |

In comparison, Trina provides below an example of the share of silver paste cost per watt as a share of the total direct material costs calculated by Commerce in the <u>Amended Final Results</u>.

| Log Line No.* | Output Page No. ** | CONNUM 210560109050615050101[13] | | | |
|---|---|---|---|---|---|
| Line 2383 | 173 | DIRECT  MATERIAL = | [ | | ] f |
| | | Total SILVER_PASTE COST/watt | | $   0.200 | e |
| | | Silver Paste Share of Material Cost | [ | | ] g=e/f |

<u>See</u> Amended Final Analysis Memorandum-Trina, (Dec. 2, 2020), CD 494-496, PD 502 (* the SAS Log is found at CD 495; ** the SAS Output is at CD 496).

As demonstrated above, using Commerce's Malaysia AUV to value silver paste, silver paste comprises a third of all material costs in the calculation of the module normal value while the *NREL Solar Cost Report* estimates that all metallization, including silver and aluminum pastes, should comprise around 9 percent of the total material costs.  This comparison to the total Direct Material using Malaysian surrogate values understates the distortive effect of the Malaysia AUV for silver paste due to overarching inaccuracy of the Malaysia surrogate value information as addressed in the section below explaining why substantial evidence did not support selecting Malaysia as the primary surrogate county.  Nevertheless, considering that the cost per watt of silver paste is more than a thousand percent higher than the total metallization cost per watt determined by the NREL and that Commerce ignored this record evidence, Commerce's reliance on the Malaysia AUV for silver paste cannot be sustained as supported by substantial evidence.

Commerce should value silver paste using the import value into Mexico, the country among the economically comparable countries with the largest quantity of imports of silver paste

---

[13] CONNUM 210560109050615050101 represents a module using standard cell technology (FORMU 2=module , CELLTEKU 01=standard).  <u>See</u> Trina Section C Response, at C-6 through C-10 (June 20, 2019) PD 150.

during the POR.[14]  Because the import value for silver paste into Malaysia is unreliable and

aberrational when compared to every comparison on the record, Commerce must look outside of

Malaysia to value silver paste.  Commerce's practice is to rely on the volume of imports among

the potential surrogate countries and rely on the country showing the largest volume of

imports.[15]  Thus, Commerce should rely on the import value for silver paste into Mexico.[16]

### C.     COMMERCE'S SELECTION OF MALAYSIA AS THE PRIMARY SURROGATE COUNTRY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In non-market economy antidumping cases, Commerce determines normal value by

valuing the factors of production of respondents in nonmarket countries using information from

market economy countries that are: "(A) at a level of economic development comparable to that

of the nonmarket economy country, and (B) significant producers of comparable merchandise."

19 U.S.C. § 1677b(c)(4).  Commerce's selection of Malaysia rather than Bulgaria or Romania as

the primary surrogate country rested primarily on its conclusion that "Malaysia is the only

country that is a producer of solar cells and solar modules and it is the only country for which we

have financial statements from a solar cell and solar module producer."  IDM, Comment 4, at 31.

---

[14] Risen Rebuttal SV, Exhibit 2 (Sep. 26, 2019), PD 244.

[15] See e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017, 84 Fed. Reg., 36,886 (July 30, 2019), Issues and Decision Memorandum, Comment 13, (explaining and citing Chlor Isos 2013-2014, Chlor Isos 2012-2013, Activated Carbon China 2015-2016, and Activated Carbon China 2014-2015, where Commerce ranked the alternate surrogate countries by volume of imports for the particular input, and selected the country with the largest volume of imports as the appropriate SV source. In the Solar1-AD fourth administrative review, Commerce followed this same methodology and selected the Mexican import AUV to value the respondents' nitrogen inputs.)

[16] Risen Rebuttal SV, Exhibit 2 (Sep. 26, 2019), PD 244.

As explained in more detail below, while Hanwha QCells, the Malaysian solar cell and solar module producer, is a significant producer of identical merchandise, other factors make Hanwha QCells surrogate financial ratios unreliable.  Even where a potential surrogate country is a producer of identical merchandise, data unreliability or difficulties allow Commerce to consider "countries that produce a broader category of reasonably comparable merchandise."  Policy Bulletin, 4.1.  Commerce also noted in its decision that the International Energy Association (IEA) survey indicating that in 2017 Malaysia accounted for 7 percent of global solar cell production and 6 percent of global solar module production and that Bulgaria and Romania were not identified in this survey.  IDM, at 32.  However, the "statute does not require that the Department use a surrogate country …...that is the most significant producer of comparable merchandise."  Policy Bulletin, 4.1.  Even though Malaysia clearly is a significant producer of identical merchandise, data considerations weighed heavily in favor of selecting Bulgaria or Romania as the primary surrogate country.  These data considerations were largely ignored.

First, The *NREL Solar Cost Report* provided detailed information regarding the costs to produce solar cells and solar modules in Malaysia. Trina compared the NREL data to the Malaysia surrogate value data and those comparisons exposed the unreliability and inaccuracy of the Malaysia data upon which Commerce relied. See Trina Case Brief, at 18-22, and Enclosures 1-2, CD 464-463, PD 444. Yet, Commerce ignored this evidence and did not address it in its Final Results or IDM.  Second, while Hanwha QCells is a producer of identical merchandise, its financial statement is insufficiently detailed to calculate accurately the surrogate financial ratios. Third, Malaysia did not possess any surrogate value specific to solar glass.  Fourth, and as discussed above, the Malaysia AUV for silver paste is unreliable and aberrational.   For these reasons, supported in detail below, Commerce's selection of Malaysia as the primary surrogate

country was not supported by substantial evidence.

**1.    The NREL Solar Cost Report Demonstrates that the Malaysia Surrogate Value Information are not the Best Available Information.**

While Malaysia may be a producer of identical or comparable merchandise, the record data from Malaysia with which to value the factors of production is simply not the best available information.

Using the CONNUM with the highest number of U.S. sales in Trina's sale database, Trina provided a comparison of *NREL Solar Cost Report* module manufacturing costs from Table 23 of the report and the calculated manufacturing costs using Commerce's Preliminary Results calculations using Malaysia data and the import data submitted by Trina for Bulgaria and Romania to illustrate that the import data values for Malaysia are drastically out of line with the *NREL Solar Cost Report* and the values from Bulgaria and Romania are consistent with the *NREL Solar Cost Report*. See Trina Case Brief, at 18-22, and Enclosure 1, CD 464-463, PD 444. For ease of reference, Figure 23 is excerpted here:[17]

---

[17] Small font and figures in the *NREL Solar Cost Report* are more readable reviewing the submitted version.  See Trina's Rebuttal Surrogate Values (September 26, 2019), Exhibit 2, PD 244.



**Figure 23. Monocrystalline PERC module assembly costs by country**

As shown above, Figure 23 summarized cost for modules produced in the United States, China,

Taiwan, South Korea, Malaysia, the Philippines, and Germany. In Trina's Case Brief at

Enclosure 1, Trina summarized and compared the direct material, labor, and energy costs from

Figure 23 of the *NREL Solar Cost Report.* [18]  For example, Figure 23 indicates that in the United

States, the 2018 cost of manufacture[19] was $0.421 per watt of which $0.392 per watt came from

materials[20], $0.025 per watt for labor, and $0.004 per watt for energy costs. For Malaysia, the

---

[18] See Trina Surrogate Value Rebuttal Comments (September 26, 2019), Exhibit 2, page 35, Figure 23, PD 244.

[19] Material + Labor + Energy

[20] $0.293 (Blue-Cell Price) + $0.041 (Purple – Front Glass, etc) + $0.058 (Green – Backsheet, etc) = $0.392/watt material cost.

cost of manufacture was $0.297 per watt of which $0.290 per watt came from materials, $0.002 per watt for labor, and $0.005 per watt for energy costs.  See Trina Case Brief, Enclosure 1, CD 464-463, PD 444.  For comparison, Trina summarized the material, labor, and energy costs for the most significant product that Trina sold to the United States using the Bulgaria, Romania, and Malaysia surrogate values.  The table below is excerpted from Enclosure 1 to Trina's Case Brief and shows the dollar per watt cost of manufacture using the surrogate values applied to Trina's most significant module produced.

|              | Surrogate Country | | |
| --- | --- | --- | --- |
|              | Bulgaria | Malaysia | Romania |
| Material     | $     0.2961 | $     0.4837 | $     0.2415 |
| Labor        | $     0.0261 | $     0.0232 | $     0.0196 |
| Electricity  | $     0.0101 | $     0.0112 | $     0.0097 |
|              | $     **0.3323** | $     **0.5181** | $     **0.2708** |

This table was based on the Preliminary Results calculations so the Malaysia cost per watt was understated as it did not include silver paste.  **Attachment 2** to this brief contains an updated version of the Enclosure 1 of Trina's Case Brief to update the summary of the Malaysia material labor and energy costs based on those used in the Amended Final Results.

Using the updated calculation form the Amended Final Results, the surrogate values from Malaysia result in total material costs of $0.59897/watt, labor costs of $0.024107/watt, and energy costs of $0.012163/watt for a total surrogate cost of manufacture of $0.6352/watt.  See **Attachment 2**, citing, NREL Solar Cost Report, at page 34, PD 244; Trina Case Brief, at Enclosure 2 (March 13, 2020), CD 464-463, PD 444; and Amended Final Analysis Memorandum-Trina, at SAS Output, page 173, (Dec. 2, 2020), CD 494-496, PD 502.

However, according to the NREL Solar Cost Report, the total cost of manufacture

(material, labor, and energy) in Malaysia is only $0.297 per watt.  <u>See</u> **Attachment 2**, <u>see also</u>, Trina Case Brief, at Enclosure 2, CD 464-463, PD 444.  Thus, by selecting Malaysia as the primary surrogate country, Commerce calculated a surrogate cost of manufacture that is **2.14** times higher than the actual cost of manufacture in Malaysia as determined by NREL.

The Malaysia surrogate cost of manufacture is not only starkly out of line  with the actual Malaysia cost of manufacture, but it is also contradicted by the cost of manufacture in all of the countries examined by NREL.  The NREL data show that the average costs for all direct materials (cells, backsheet, junction box, front glass, ribbons, bus bar assembly, etc), labor, and electricity ranges from $0.286 to $0.467 per watt. <u>See</u> Trina Case Brief, at Enclosure 2, CD 464-463, PD 444. The mean production costs according to the NREL data is $0.348 per watt. <u>Id.</u>  A comparison of the NREL cost of production data to the materials, labor, energy portion of the normal value reveals highly distortive surrogate values for Malaysia.  More specifically, the Malaysian cost of manufacture using the <u>Amended Final Results</u> calculation is nearly double, **1.82** times greater (0.6352 / 0.348), the average production cost of all NREL production data. <u>Id.</u>, <u>see also</u>, **Attachment 2**.  Trina also presented the non-China average cost of manufacture from the NREL data of $0.364 per watt.  <u>Id.</u>  Both as presented in the Trina Case Brief and using the <u>Amended Final Results</u> calculation, the Malaysia surrogate cost of manufacture is unreasonably higher than the non-China average cost of manufacture.  The Malaysia surrogate cost of manufacture is **1.74** times greater (0.6352 / 0.364), than the average production cost of all non-China NREL production data.  <u>See</u> **Attachment 2**.

Thus, the U.S. Department of Energy calculates that solar modules manufacturing cost (material, labor, and energy) in Malaysia is about $0.297 per watt, but Commerce's <u>Amended Final Results</u> calculated manufacturing costs **2.14 times greater** than the NREL cost in

Malaysia,  **1.82 times greater** than world average cost of manufacturing, and **1.74 times greater** than non-China average cost of manufacturing.

At the same time, the Bulgaria and Romania costs of manufacture are in line with the NREL data.  The cost of manufacture using Bulgarian import data, $0.332 per watt, is very close to the mean of the NREL data and is higher than the Philippines, Malaysia, Taiwan, and China. The Romanian cost of manufacture, $0.2708 per watt, is generally in line with the NREL costs and within 9 percent of the NREL cost of manufacture reported for Malaysia.  See **Attachment 2**.

These manufacturing cost comparisons between the NREL data and the Malaysian surrogate value data demonstrate that the quality of the Malaysia import data are insufficient to calculate an accurate normal value or an accurate antidumping duty margin.  While all of the possible surrogate countries (Brazil, Malaysia, Romania, and Bulgaria) meet Commerce's criteria for economic comparability and production of either identical or comparable merchandise, only Romania and Bulgaria offer quality data needed to calculate a normal value that is aligned with real manufacturing costs from countries with significant production of solar products.  This additional evidence further demonstrates that Commerce should disregard Malaysia as possible surrogate countries.   A reasonable mind could not conclude that the Malaysia surrogate data are the best available information when the independent and highly qualified *NREL Solar Cost Report* establish that solar manufacturing costs <u>outside of China</u> in 2018 were $0.364  per watt and the Malaysia solar manufacturing costs were $0.297 per watt, but the Malaysia surrogate data results in a per watt manufacturing cost of $0.6352 per watt.

Trina raised these facts and arguments in its case brief before the agency, but Commerce did not summarize those arguments nor did Commerce address them in the Final Results.  See

Trina Case Brief, at 18-22, compared to IDM, Comment 4, at 27-34. In order to hold a basis in substantial evidence, Commerce's determinations must consider the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, the substantial evidence standard requires more than a mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) (citations omitted). Commerce's failure to evaluate the reliability and accuracy of the Malaysia surrogate value data in light of the record evidence that it conflicted significantly with the *NREL Solar Cost Report* renders its surrogate country selection decision lacking a basis in substantial evidence.

      **2.**   **The availability of the Hanwha QCells financial statement does not support selecting Malaysia as the primary surrogate country.**

In its case and rebuttal briefs, Trina acknowledged that Hanwha QCells is a producer of solar cells and solar modules, merchandise identical to the subject merchandise, but that the financial statements themselves were insufficiently detailed calculate accurately the surrogate financial ratios . See Trina Case Brief, at 8-9, PD 444, see also, Trina Rebuttal Brief, at 7-10, CD 470, PD 454.

The key deficiency of all the Hanwha financial statement is that it does not break out an energy line item.[21] Commerce's practice is to not rely on statements where the statement is not sufficiently detailed such that energy expense is expressed separately. In the fourth administrative review of this antidumping order, Commerce concluded,

---

[21] See  Risen's 2nd SV Submission, Exhibit SV2-8, PD 365.

we have not used Hana's financial statements in these final results because energy
costs are not separately listed in the financial statements. This decision is
consistent with recent determinations where Commerce disregarded financial
statements that did not separately identify energy costs.[22]

As in the fourth review of this order with respect to Hana, the Hanwha financial

statement does not provide sufficient detail to identify energy costs and this is a sufficient

basis to disregard it and select Bulgaria or Romania as the primary surrogate country.

The Hanwha financial statement does not contain a complete and correct itemization of

all elements of costs and expenses and there, therefore, is no way to assign costs to the proper

cost categories.  Trina Rebuttal Brief, at 7-10, PD 454.  Because of the inherent unreliability of

financial ratios that are based on incomplete information, Commerce has a long-standing practice

not to use financial statements that lack the requisite detail to calculate financial ratios

accurately.[23]   When vital information is missing from financial statements, when it is not

possible to separate unidentified costs into their component categories, and when certain cost

---

[22] Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the
People's Republic of China: Final Results of Antidumping Duty  Administrative Review and
Final Determination of No Shipments; 2015-2016, 83 Fed. Reg. 35,616 (Dep't Commerce, July
27, 2018), Issues and Decision Memorandum, Comment 10, page 47, citing, Steel Wire Garment
Hangers from the People's Republic of China: Final Results of Antidumping Duty
Administrative Review, 2014-2015, 82 Fed. Reg. 18115 (April 17, 2017) and accompanying
IDM at Comment 2; see also Certain New Pneumatic Off-the-Road Tires from the People's
Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014, 81
Fed. Reg. 23272 (April 20, 2016) and accompanying IDM at Comment 8.


[23] See e.g., Steel Wire Garment Hangers From the People's Republic of China, 78 Fed. Reg.
28,803 (May 16, 2013), Issues and Decision Memorandum, Comment I.D (Department declined
to use certain financial statements because they "lacked sufficient detail to value the reported
energy FOPs and labor…as energy and labor are not specifically broken out in detail to avoid
double-counting"); see also Folding Metal Tables and Chairs From the People's Republic of
China: Preliminary Results of Antidumping Duty Administrative Review, 77 Fed. Reg. 13539,
13543, (March 7, 2012) (Department declined to use financial statements that did not provide
sufficient detail to allocate expenses accurately).

elements are commingled in one line item of financial data (thus making impossible the segregation of direct materials and overhead materials), any surrogate ratios derived from such information will necessarily be both inaccurate and unreliable.

Trina explained that Hanwha's financial ratios were arbitrarily calculated by assigning an amount for "Cost of Sales Remaining."  See Trina Rebuttal Brief, at 9-10, citing Risen's 2nd SV Submission, Exhibit SV2-8, Jan 2, 2020, PD 365. These unidentified items can only be arbitrarily assigned to either Cost of Manufacture (i.e., Material, Labor, and Energy), Overhead, or SG&A and the amounts unidentified are significant.  Trina explained that of all the expenses in the Hanwha income statement, 80% were unidentified and, thus, arbitrarily assigned.  Id.

In the Final Results, Commerce responded to this concern stating that the Hanwha financial statement identifies "RM 1,648 million of the costs of sales as inventory costs and we were able to conclude that the remaining costs are overhead costs."  IDM, Comment 4, at 33, see also Comment 11, at 47-49.  But for the reasons discussed below, Commerce's calculation of the Hanwha financial ratios remains arbitrary.

The Hanwha income statement (i.e., the Statements of comprehensive income) listed a single "Cost of sales" amount of 2,003,400 RM'000.  See Risen's 2nd SV Submission, Exhibit SV2-8, Hanwha Financial Statement, page 11, Jan 2, 2020, PD 365.  The income statement listed only 7 notes (Notes 4-9 and 12).  Id.  The income statement also indicated that the "accompanying accounting policies and explanatory notes form an integral part of the financial statements."  Id.  The information that Commerce used to generate a value amount to represent Hanwha's material, labor, and energy costs for 2018 was from Note 17, a Note to the "Inventories" line-item on the Hanwha balance sheet, i.e., the asset accounts.  Id., at page 12 and 51.  For ease of reference, note 17 is copied here:

## 17. Inventories

| | Group | | Group/Company | |
| | 2018 RM'000 | 2017 RM'000 | 2018 RM'000 | 2017 RM'000 |
| --- | --- | --- | --- | --- |
| **Cost** | | | | |
| Raw materials | 126,752 | 140,188 | 126,752 | 140,188 |
| Work-in-progress | 16,871 | 19,055 | 16,871 | 19,055 |
| Finished goods | 48,683 | 56,511 | 48,683 | 56,450 |
| Spare parts | 37,951 | 33,299 | 37,951 | 33,299 |
| | 230,257 | 249,053 | 230,257 | 248,992 |
| **Net realisable value** | | | | |
| Work-in-progress | 3,493 | - | 3,493 | - |
| Finished goods | 7,455 | 1,444 | 7,455 | 1,444 |
| | 241,205 | 250,497 | 241,205 | 250,436 |

During the year, the amount of inventories recognised as an expense in cost of sales of the Group and of the Company were RM1,648 million (2017: RM2,142 million).

First, this note relates to balances of inventory assets at the end of 2018 that supports the balance sheet, not current expenses for 2018 used on the income statement.  In any event, the note does not specify amounts for labor or energy.  The statement that the RM 1,648 million amount of inventories were recognized as expense in cost of sales for 2018 is not a sufficient description for Commerce to use this amount to attempt a rough estimation of the 2018 material, labor, and energy expenses for Hanwha.  Again, inventories are assets, not expenses.  But further complicating the reliability of using this note to try to reverse engineer amounts for materials, labor, and energy is that these amounts seem to also include adjustments for net-realizable value. The financial statements explain that "Net realisable value is the estimated selling price in the ordinary course of business less estimated costs of completion and the estimated costs necessary to make the sale." Id., at Note 2.12, page 29.  So, these inventory amounts that Commerce used to engineer amounts for Hanwha's material, labor, and energy costs do not appear to be actual costs, but are the lesser of actual costs or a market value.  Uncertainties such as these support

Commerce's practice to rely on itemized information in a surrogate's financial statement and not try to go behind the financial statement of the surrogate company to determine whether and how to breakdown grouped expenses.  See Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part, 84 Fed. Reg. 56,761 (Oct. 23, 2019), and accompanying IDM, Comment 6, citing, Wooden Bedroom Furniture from the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729 (August 11, 2011), and accompanying IDM at 35 (citing Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 40,485 (July 15, 2008), and accompanying IDM at Comment 18A).

Thus, Commerce's calculation of the surrogate financial ratios for Hanwha was arbitrary. That being the case, Hanwha's status as a producer of solar cells and solar modules should not have weighed in favor of selecting Malaysia as the surrogate country considering that the surrogate financial ratios derived from Hanwha's income statement was arbitrarily determined.

### 3.  The specificity of the surrogate value information for solar glass weighed heavily in favor of selecting Bulgaria or Romania as the primary surrogate country.

In its case brief, Trina argued that Malaysia should not be selected as the primary surrogate country because Bulgaria and Romania possessed surrogate value information specific to solar glass while the Malaysia value for tempered glass used in the Preliminary Results was not specific to Trina's coated glass and tempered glass (again, collectively "solar glass"). See Trina's Case Brief, at 13-16, PD 444.   Furthermore, Trina argued that solar glass is the most important factor of production to accurately value because it comprises by far the largest quantity of all materials that go into making Trina's solar modules. Id., citing, Trina's Pre-Prelim

Comment, at 2-3 and Attachment 1 (Jan. 3, 2020), CD 414, PD 377.   Trina's Pre-Prelim

Comment contained the factor of production data for SEQ 32, CONNUM

21058010905061505010 from Trina's FOP database.[24]  This CONNUM represents the largest

CONNUM by U.S. sale quantity for the period of review.

     As shown in Attachment 1, the COATEDGLASS and TEMPEREDGLASS consumed

represents **66 percen**t of the weight of all direct materials to produce the solar module.  In other

words, the total kilogram of direct materials to produce one watt of the largest US CONNUM is

about 0.07 kilograms and the solar glass comprises about 0.05 kilograms of that total.  As a

percentage of all the overhead materials and the direct materials combined, the solar glass

represents **52 percent** of the total weight of all of the materials consumed to produce the module.

So, under either comparison, the kilograms of solar glass alone consumed is greater than the

weight of all other materials consumed combined.  Clearly, solar glass is the most important

factor of production and thus the specificity of the available data from the potential surrogate

countries should be the leading consideration as Commerce considers which is the best available

information.

     Commerce seems to have addressed Trina's arguments regarding the importance of the

solar glass surrogate value to the selection of the primary surrogate country by (1) ignoring the

relative importance of solar glass to the overall calculation of normal value and (2) departing

from its primary surrogate country, Malaysia, to value solar glass using imports into Romania.

While noting that it used Romanian data value solar glass because it was more specific,

Commerce dismissed the importance of solar glass by characterizing it as "only one of

---

[24] Trina's 1st Pre-Prelim Comment, at 2-3 (January 3, 2020), citing, Trina Section D, FOP
Database Exhibit D-8 (July 1, 2019)

approximately 200 inputs." <u>IDM</u>, Comment 4, at 31.  By failing to distinguish the solar glass

material that alone accounted for more of the weight than all of the other 200 inputs combined,

Commerce either ignored or misunderstood the record and should have factored the specificity of

available solar glass data into its surrogate country selection decision.

4. **The unreliability of the silver paste surrogate value in Malaysia was not considered when selecting the primary surrogate country.**

In its case brief, Trina argued that the Malaysia import value for silver paste is aberrant

and unreliable and that this factor weighed heavily against selecting Malaysia as the primary

surrogate country. <u>See</u> Trina's Case Brief, at 17, PD 444.   As discussed above, Commerce

continued to rely on the unreliable Malaysia AUV for silver paste in the <u>Final Results</u> and the

<u>Amended Final Results</u>.   The unreliability and aberrant nature of this important factor of

production weighed heavily against selecting Malaysia as the primary surrogate country when

Bulgaria provides a reliable surrogate value for this input that is in range with the other surrogate

country import prices for this POR and the historical prices relied upon by Commerce for this

input. <u>See</u> Trina's Case Brief, at 17, PD 444.  Commerce's reluctance to acknowledge the

aberrant and unreliable nature of the Malaysia AUV for silver paste widens the already

significant gap between the total cost of manufacturing using the Malaysia surrogate values and

the actual costs of manufacturing reported in Malaysia in the *NREL Solar Cost Report*.   <u>See</u>

**Attachment 2**, <u>citing</u>, *NREL Solar Cost Report*, at page 34, PD 244.  Thus, the unreliability of

the silver paste surrogate value undermines the selection of Malaysia as the surrogate country

and weighs in favor of selecting Bulgaria as the surrogate country.

D. **COMMERCE'S CALCULATION OF THE SURROGATE FINANCIAL RATIOS FOR HANWHA WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

Trina incorporates by reference the arguments by Plaintiff, Risen, explaining why

Commerce's calculation of the Hanwha financial ratios was not supported by substantial evidence.

## IV.   CONCLUSION

For the reasons set forth above, the Final Results and Amended Final Results issued by Commerce in the administrative review involving Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China are not supported by substantial evidence.  Plaintiffs respectfully request that this Court reverse and remand this case to Commerce with instructions to recalculate Trina's margin after making changes necessary (1) determine the factors of production for Trina's unaffiliated solar cell and solar module suppliers without using an adverse inference in selecting the facts available; (2) to use the Mexican import value for silver paste considering the unreliability of the Malaysia AUV for silver paste; (3) to select Bulgaria or Romania as the primary surrogate country; and (4) if Malaysia remains the primary surrogate country, to recalculate the surrogate financial ratios for the surrogate company, Hanwha QCells.

> Respectfully submitted,
>
> /s/ Jonathan M. Freed
> Robert G. Gosselink
> Jonathan M. Freed
>
> **TRADE PACIFIC PLLC**
> 700 Pennsylvania Avenue, SE, Suite 500
> Washington, D.C.  20003
> (202) 223-3760
>
> Counsel to Consolidated-Plaintiffs, Trina et al.

Dated:  April 29, 2021

**Attachment 1**

THE MARGIN CALCULATION PROGRAM (ADJUST CALC) FROM FINAL (V7 RELEASE 30NOV2018)

AR6 Amended Final Glass Only - FOR RESPONDENT TRINA (A-570-979)

SUMMARY OF CASH DEPOSIT RATES

| AD VALOREM WEIGHTED AVERAGE MARGIN RATE (PERCENT) STANDARD METHOD | AD VALOREM WEIGHTED AVERAGE MARGIN RATE (PERCENT) MIXED ALTERNATIVE METHOD | AD VALOREM WEIGHTED AVERAGE MARGIN RATE (PERCENT) A-to-T ALTERNATIVE METHOD |
|---|---|---|
| 44.55 | 44.55 | 44.55 |

WEDNESDAY, APRIL 28, 2021 - 3:05 PM

**Attachment 2**

**Trina Solar: AR6**
**Comparison of Materials, Labor, and Energy with NREL Data**

| | | National Renewable Energy Laboratory Data* | | | | | | | | | Surrogate Country | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | United States | Urban China | Lowest Cost China | Taiwan | South Korea | Malaysia | Philippines | Germany | | Bulgaria** | Malaysia*** | Romania** |
| Direct Materials | Material | $ 0.392 | $ 0.304 | $ 0.281 | $ 0.317 | $ 0.355 | $ 0.290 | $ 0.302 | $ 0.428 | | $ 0.2961 | $ 0.59897 | $ 0.2415 |
| Labor | Labor | $ 0.025 | $ 0.003 | $ 0.001 | $ 0.001 | $ 0.015 | $ 0.002 | $ 0.002 | $ 0.029 | | $ 0.0261 | $ 0.024107 | $ 0.0196 |
| Energy | Electricity | $ 0.004 | $ 0.007 | $ 0.004 | $ 0.007 | $ 0.001 | $ 0.005 | $ 0.001 | $ 0.010 | | $ 0.0101 | $ 0.012163 | $ 0.0097 |
| **Total** | | **$ 0.421** | **$ 0.314** | **$ 0.286** | **$ 0.325** | **$ 0.371** | **$ 0.297** | **$ 0.305** | **$ 0.467** | | **$ 0.3323** | **$ 0.6352** | **$ 0.2708** |
| | | | | | | | | | | | | | |
| min | | | $ 0.286 | | NonChina | Min | | $ 0.297 | | | | $ 0.2708 | | |
| max | | | $ 0.467 | | NonChina | Max | | $ 0.467 | | | | $ 0.6352 | | |
| mean | | | $ 0.348 | | **NonChina** | **Mean** | | **$ 0.364** | | | | $ 0.4128 | | |

*See Letter from Trade Pacific to Secretary of Commerce, <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Rebuttal to Petitioner's Comments on Selection of Surrogate Values</u> (September 26, 2019), Exhibit 2, page 35, PD 244.

**See Trina Case Brief, at Enclosure 2 (March 13, 2020), CD 464-463, PD 444 (Worksheet titled "Materials Labor and Energy").

*** Amended Final Analysis Memorandum-Trina, at SAS Output, page 173, (Dec. 2, 2020), CD 494-496, PD 502.