IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |  |
|---|---|---|
| RISEN ENERGY CO. LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| TRINA SOLAR ENERGY CO., LTD., *et al*., | ) | |
| | ) | Consol. Court No. 20-03743 |
| Consolidated Plaintiffs, and | ) | |
| | ) | **PUBLIC VERSION** |
| SHANGHAI BYD CO., LTD., *et al.*, | ) | |
| | ) | Business Proprietary Information |
| Plaintiff-Intervenors, | ) | (BPI) Denoted by Brackets [ ] on |
| | ) | Pages 46 and 47. |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2**
**MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                JOSHUA E. KURLAND
LESLIE M. LEWIS                            Trial Attorney
Attorney                                   U.S. Department of Justice
Office of the Chief Counsel                Civil Division
for Trade Enforcement and Compliance       Commercial Litigation Branch
U.S. Department of Commerce                P.O. Box 480
Washington, D.C.                           Ben Franklin Station
                                           Washington, D.C. 20044
                                           Tel: (202) 616-0477
                                           Email: Joshua.E.Kurland@usdoj.gov

September 24, 2021                         *Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ..........................................................................2

    I.      Administrative Determination Under Review ...........................................................2

    II.    Issues Presented For Review ...................................................................................2

STATEMENT OF FACTS ................................................................................................3

SUMMARY OF THE ARGUMENT .................................................................................6

ARGUMENT .....................................................................................................................7

I.     Standard Of Review ...........................................................................................................7

II.    Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Supported
     By Substantial Evidence And Otherwise Lawful .........................................................10

    A.    Legal Framework .......................................................................................10

    B.    Commerce's Selection Of Malaysia As The Primary Surrogate Country Is
          Supported By Substantial Evidence And Lawful Because Malaysia Was At
          The Same Level Of Economic Development As China .......................................12

    C.    Commerce Lawfully Declined To Select Bulgaria As The Primary Surrogate
          Country Because Bulgaria's GNI Is Not Economically Comparable To China....14

    D.    Commerce Reasonably Selected Malaysia Over Bulgaria And Romania As
          The Primary Surrogate Country Because The Malaysian Data Are Superior .......19

III.   Commerce's Selection Among Malaysian HTS Subheadings To Value Backsheet
     And EVA Film Is Supported By Substantial Evidence And Otherwise Lawful ..............27

    A.    Commerce's Selection Of Malaysian HTS 3920.62.1000 As The Surrogate
          Value For Backsheet Is Supported By Substantial Evidence And Lawful ............28

    B.    Commerce's Selection Of Malaysian HTS 3920.10.1900 As The Surrogate
          Value For EVA Film Is Supported By Substantial Evidence And Lawful ............30

IV.   Commerce's Surrogate Valuation For Silver Paste Using The Average Unit Value
     For Malaysian HTS 7115.90.10 Is Supported By Substantial Evidence And Lawful.......33

V.    Commerce's Surrogate Financial Ratios Calculation Is Supported By Substantial
     Evidence And Lawful ........................................................................................................39

VI.    Commerce's Application Of Partial Adverse Facts Available To Value Unreported
Factors Of Production Is Supported By Substantial Evidence And Lawful .....................44

      A.    Legal Standard ........................................................................................45

      B.    Commerce Lawfully Applied Partial AFA Because Risen And Trina Failed
To Cooperate Pursuant To 19 U.S.C. § 1677e(b) ...................................46

      C.    Commerce's Determination To Apply Partial AFA To Value Unreported
Factors Of Production Is Consistent With Mueller ................................53

VII.    Commerce Lawfully Calculated The Rates For Separate Rate Respondents ...................59

CONCLUSION ...................................................................................................59

## TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
618 F.3d 1316 (Fed. Cir. 2010)................................................................. 23

*An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States*,
203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017)............................................ 26

*An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States*,
287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018)............................................ 58

*Atl. Sugar, Ltd., v. United States*,
744 F.2d 1556 (Fed. Cir. 1984).................................................................. 8

*Baoding Yude Chem. Indus. v. United States*,
170 F. Supp. 2d 1335 (Ct. Int'l Trade 2001)............................................ 15

*Calgon Carbon Corp. v. United States*,
443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020)............................................ 37

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*,
929 F. Supp. 2d 1352 (Ct. Int'l Trade 2013)............................................ 26

*Canadian Solar Inc. v. United States*,
No. 19-00178, 2021 WL 4026868 (Ct. Int'l Trade Sept. 3, 2021) ........... 37

*Canadian Solar v. United States*,
378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019)............................................ 52

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................................................. 9

*Clearon Corp. v. United States*,
No. 08-00364, 2013 WL 646390 (Ct. Int'l Trade Feb. 20, 2013)............. 33

*Clearon Corp. v. United States*,
No. 13-00073, 2014 WL 3643332 (Ct. Int'l Trade July 24, 2014) ........... 12

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007).................................................................. 8

*Conn. Steel Corp. v. United States*,
462 F. Supp. 2d 1322 (Ct. Int'l Trade 2006)............................................ 35

*Consol. Edison Co. of N.Y. v. NLRB,*
 305 U.S. 197 (1938) ................................................................................ 8

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966) ................................................................................ 8

*Dongguan Sunrise Furniture Co., Ltd. v. United States,*
 865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) ........................................ 16

*Dorbest Ltd. v. United States,*
 604 F.3d 1363 (Fed. Cir. 2010) ............................................................ 23

*Dorbest Ltd. v. United States,*
 755 F. Supp. 2d 1291 (Ct. Int'l Trade 2011) ........................................ 16

*DuPont Teijin Films China Ltd. v. United States,*
 7 F. Supp. 3d 1327 (Ct. Int'l Trade 2015) ............................................ 44

*Essar Steel Ltd. v United States,*
 678 F.3d 1268 (Fed. Cir. 2012) ...................................................... 45, 53

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
 216 F.3d 1027 (Fed. Cir. 2000) ............................................................ 58

*Fujitsu Gen. Ltd. v. United States,*
 88 F.3d 1034 (Fed. Cir. 1996) ...................................................... 8, 9, 11

*Goldlink Indus. Co. v. United States,*
 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................... 8

*Holmes Products Corp. v. United States,*
 795 F. Supp. 1205 (Ct. Int'l Trade 1992) ............................................ 44

*Home Meridian Int'l, Inc. v. United States,*
 772 F.3d 1289 (Fed. Cir. 2014) ............................................................ 12

*Hyundai Steel Co. v. United States,*
 279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ........................................ 42

*INS v. Elias-Zacarias,*
 502 U.S. 478 (1992) ................................................................................ 8

*Jacobi Carbons AB v. United States,*
 313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ........................................ 37

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ......................................................................... 9, 40

*Jiaxing Bro. Fastener Co. v. United States,*
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ............................................... 33, 34, 39

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
    822 F.3d 1289 (Fed. Cir. 2016) ..................................................................... *passim*

*Jinan Yipin Corp. v. United States,*
    800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011) .................................................... 21

*KYD, Inc. v. United States,*
    607 F.3d 760 (Fed. Cir. 2010) .............................................................. 46, 55, 56, 58

*Micron Tech, Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997) ............................................................................ 40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................................... 19, 24

*Mueller Comercial de Mexico v. United States,*
    753 F.3d 1227 (Fed. Cir. 2014) .............................................................. 46, 54, 55, 58

*Nation Ford Chem. Co. v. United States,*
    166 F.3d 1373 (Fed. Cir. 1999) ..................................................................... *passim*

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ..................................................................... *passim*

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) .............................................................................. 8

*NMB Singapore Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009) ............................................................................ 24

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014) ...................................................... 21, 29, 32, 33

*Risen Energy Co. v. United States,*
    477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) .................................................... 58

*SeAH Steel Vina Corp. v. United States,*
    269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) .................................................... 37

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017)............................................................... 8

*SolarWorld Americas, Inc. v. United States*,
  910 F.3d 1216 (Fed. Cir. 2018)..................................................................... 39, 44

*SolarWorld Americas, Inc. v. United States*,
  273 F. Supp. 3d 1254 (Ct. Int'l Trade 2017)...................................................... 48, 56

*Taian Ziyang Food Co. v. United States*,
  783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)........................................................... 21

*Taian Ziyang Food Co., Ltd. v. United States*,
  918 F. Supp. 2d 1345 (Ct. Int'l Trade 2013)........................................................... 11

*Tianjin Magnesium Int'l Co. v. United States*,
  844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012)........................................................... 45

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004)......................................................................... 9

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995)......................................................................... 9

*Tri Union Frozen Prod., Inc. v. United States*,
  163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016).................................................... 13, 28

*Trust Chem. Co. v. United States*,
  791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011)........................................................... 34

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009)................................................................................... 9

*Zhaoqing Tifo New Fibre Co. v. United States*,
  60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015)........................................................... 43

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011)............................................................... 11, 12, 20

**Statutes**

19 U.S.C. § 1677(9)................................................................................... 53

19 U.S.C. § 1677(18).................................................................................. 10

19 U.S.C. § 1677b(c) ....................................................................... *passim*

19 U.S.C. § 1677e(a) .............................................................. 45, 47, 53

19 U.S.C. § 1677e(b) .......................................................... 44, 45, 46, 52

19 U.S.C. § 1677b(c) .............................................................. 10, 26, 39

19 U.S.C. § 1677m(d) ...................................................................... 45

**Regulations**

19 C.F.R. § 351.301(c) ..................................................................... 37

19 C.F.R. § 351.408(c) ...................................................... 23, 27, 33, 39

**Administrative Determminations**

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ..................... 34

*Certain Activated Carbon From China,*
    85 Fed. Reg. 23,947 (Dep't of Commerce Apr. 30, 2020) ..................... 42

*Certain Frozen Fish Fillets from Vietnam,*
    78 Fed. Reg. 39,708 (Dep't of Commerce July 2, 2013) ..................... 17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,*
    77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) ..................... 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,*
    81 Fed. Reg. 39,905 (Dep't of Commerce June 20, 2016) ................. 3, 48

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,*
    82 Fed. Reg. 29,033 (Dep't of Commerce June 27, 2017) ..................... 3-4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,*
    83 Fed. Reg. 35,616 (Dep't of Commerce July 27, 2018) ..................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China,*
    84 Fed. Reg. 36,886 (Dep't of Commerce July 30, 2019) ..................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China,*
    85 Fed. Reg. 7,531 (Dep't of Commerce Feb. 10, 2020) ..................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
 85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020) ............................................................2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
 85 Fed. Reg. 79,165 (Dep't of Commerce Dec. 9, 2020) .......................................................2, 6

*Definition of Factual Information and Time Limits for Submission of Factual Information,*
 78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013)........................................................37

*Fresh Garlic from China,*
 85 Fed. Reg. 2,400 (Dep't of Commerce Jan. 15, 2020) .........................................................18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019).........................................................3

*Notice of Proposed Rulemaking and Request for Public Comments: Antidumping Duties; Countervailing Duties,*
 61 Fed. Reg. 7,308 (Dep't of Commerce Feb. 27, 1996)....................................................21, 24

*Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates,*
 72 Fed. Reg. 13,246  (Dep't of Commerce Mar. 21, 2007).........................................13, 14, 16

## Other Authorities

Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process"
 (Dep't of Commerce 2004)...................................................................................11, 12, 28, 33

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
 H.R. Doc. 103-316(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................................... 46

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| RISEN ENERGY CO. LTD.,  )<br><br>Plaintiff,  )<br><br>TRINA SOLAR ENERGY CO., LTD., *et al*.,  )<br><br>Consolidated Plaintiffs, and  )<br><br>SHANGHAI BYD CO., LTD., *et al.*,  )<br><br>Plaintiff-Intervenors,  )<br><br>v.  )<br><br>UNITED STATES,  )<br><br>Defendant.  ) | Consol. Court No. 20-03743<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information (BPI) Denoted by Brackets [ ] on Pages 46 and 47. |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the

motions for judgment on the agency record filed by plaintiff, Risen Energy Co., Ltd. (Risen),

consolidated plaintiffs, Trina Solar Co., Ltd., *et al.* (Trina), JA Solar Technology Yangzhou Co.,

Ltd. *et al*. (JA Solar), and plaintiff-intervenors, Wuxi Tianran Photovoltaic Co., Ltd. (Wuxi),

Anji DaSol Co., Ltd. (Anji DaSol), Shenzen Sungold Solar Co., Ltd. (Shenzhen Sungold),

Canadian Solar International Ltd. *et al.* (Canadian Solar), and Shanghai BYD Co., Ltd. *et al.*

(Shanghai BYD).  Plaintiffs challenge the Department of Commerce's (Commerce's) final

results of its sixth administrative review of the antidumping duty order covering crystalline

silicon photovoltaic cells, whether or not assembled into modules, from China.  We demonstrate

below that the Court should deny plaintiffs' motions and enter judgment for the Government.

**STATEMENT PURSUANT TO RULE 56.2**

## I.    Administrative Determination Under Review

The administrative determination under review is Commerce's sixth administrative review of the antidumping duty order covering solar cells from China, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020) (P.R. 478) (Final Results), and accompanying Issues and Decision Memorandum (P.R. 468) (IDM), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 79,165 (Dep't of Commerce Dec. 9, 2020) (P.R. 508) (Amended Final Results).[1]  The period of review is December 1, 2017, through November 30, 2018.

## II.    Issues Presented For Review

1.    Whether Commerce's selection of Malaysia as the primary surrogate country for the review is supported by substantial evidence and otherwise lawful.

2.    Whether Commerce's surrogate valuations for backsheet and ethyl vinyl acetate (EVA) film using certain Malaysian Harmonized Tariff Schedule (HTS) data are supported by substantial evidence and otherwise lawful.

3.    Whether Commerce's surrogate valuation for silver paste using the average unit value of Malaysian imports for HTS 7115.90.10 from Global Trade Atlas (GTA) data is supported by substantial evidence and otherwise lawful.

4.    Whether Commerce's calculation of the surrogate financial ratios is supported by substantial evidence and otherwise lawful.

---

[1] "P.R. __" and "C.R. __" refer to documents in the public and confidential records, respectively.

5.      Whether Commerce lawfully applied partial adverse facts available (AFA) to value the respondents' unreported factors of production based on its finding that Risen and Trina, in addition to their suppliers, failed to cooperate to the best of their abilities.

6.      Whether Commerce must revise the antidumping duty rates for separate rate companies that are based on the rates calculated for the mandatory respondents.

## STATEMENT OF FACTS

In December 2018, Commerce issued a notice of opportunity to request an administrative review for the period from December 2017 to November 2018.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 83 Fed. Reg. 62,294 (Dep't of Commerce Dec. 3, 2018).  At the request of interested parties, including plaintiffs Risen and Trina, Commerce initiated a review of 54 companies, and subsequently selected Risen and Trina as mandatory respondents because they were the two largest Chinese exporters.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019); Respondent Selection Memorandum (May 6, 2019) (P.R. 101; C.R. 31); Risen Request for Review (Dec. 28, 2018) (P.R. 5); Trina Request for Review (Dec. 31, 2018) (P.R. 8).

Risen and Trina had participated as respondents in previous administrative reviews of Commerce's order.  As two of the largest Chinese producers/exporters, Risen and Trina were respondents in the 2011 antidumping duty investigation and four of six previous administrative reviews, including both being mandatory respondents in the previous review.  IDM at 11.[2]

---

[2] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (*Solar Investigation*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 81 Fed. Reg. 39,905 (Dep't of Commerce June 20, 2016) (*Solar AR2*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 82 Fed. Reg. 29,033 (Dep't of Commerce

In July 2019, Commerce issued a list of potential surrogate countries "at the same level of economic development as China" based on 2017 per capita gross national income (GNI), including Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia.  Surrogate Country List (July 31, 2019) (P.R. 166) (containing memorandum on surrogate countries for antidumping investigations and reviews for merchandise from China).  Commerce invited comment and submission of surrogate value data.  *Id*.

In August 2019, Risen commented on surrogate country issues, but did not object to use of the 2017 GNI data.  Risen Surrogate Country List Cmts. (Aug. 12, 2019) (P.R. 172); Risen Surrogate Country Selection Cmts. (Aug. 26, 2019) (P.R. 180).  In September 2019, Trina and Risen submitted surrogate value data.  Risen Surrogate Value Submission (Sept. 19, 2019) (P.R. 213-19) (Risen SV Submission); Trina Surrogate Value Submission (Sept. 19, 2019) (P.R. 220-237) (Trina SV Submission).  Trina's submission included 2018 GNI data "which was not available when Commerce issued its surrogate country memorandum{.}"  Trina SV Submission at 2, Ex. 16 (P.R. 220, 235).

In February 2020, Commerce published the preliminary results.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 85 Fed. Reg. 7,531 (Dep't of Commerce Feb. 10, 2020) (Preliminary Results), and accompanying Preliminary Decision Memorandum (P.R. 408) (PDM).  Commerce preliminarily assigned antidumping duty rates of 75.23 percent and 46.64 percent to Risen and Trina, respectively, and of 60.94 percent to separate rate companies, including Wuxi, Anji DaSol, Shenzhen Sungold, Canadian Solar, Shanghai BYD, and JA Solar.  Preliminary Results, 85 Fed. Reg. at 7,533-34.

---

June 27, 2017) (*Solar AR3*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 83 Fed. Reg. 35,616 (Dep't of Commerce July 27, 2018) (*Solar AR4*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 84 Fed. Reg. 36,886 (Dep't of Commerce July 30, 2019) (*Solar AR5*).

In the preliminary results, Commerce selected Malaysia as the primary surrogate country. PDM at 18.  Commerce preliminarily determined that Malaysia's data quality surpassed that of other countries because "not only solar module assemblers, but also solar cell manufacturers are located in Malaysia."  PDM at 17.  Commerce also preliminarily determined that Malaysian data were superior because "it is more likely {Malaysian data} are specific to the inputs that {Commerce is} valuing given there is a manufacturer in {Malaysia} that could be importing inputs actually used in the production of solar cells."  PDM at 18.  Commerce thus relied on Malaysian Global Trade Atlas (GTA) import data as the surrogate values for the respondents' inputs of silver paste, junction boxes, backsheet, and EVA film.  *Id.* at 23; Factor Valuation Memorandum for Preliminary Results at 1 (Jan. 31, 2020) (P.R. 419) (Preliminary SV Memo).  Commerce likewise selected financial statements from Malaysian solar cell and module producer Hanwha QCells to calculate the surrogate financial ratios.  PDM at 27-28; Risen Final SV Submission at Ex. SV2-8 (Jan. 2, 2020) (P.R. 365) (Hanwha QCells financial statement).

Commerce further preliminarily determined to apply partial adverse facts available (AFA) to value certain factors of production.  PDM at 12-13; Memorandum re: Unreported Factors of Production: Risen Energy Co. (Jan. 31, 2020) (Risen FOP Memo) (P.R. 438; C.R. 460); Memorandum re: Unreported Factors of Production: Trina Solar Co. (Jan. 31, 2020) (Trina FOP Memo) (P.R. 437; C.R. 459).

In October 2020, after considering the parties' administrative case briefs, Commerce issued its final results.  Commerce continued to select Malaysia as the primary surrogate country using 2017 GNI data.  IDM at 31.  Notwithstanding Risen's and Trina's claims that Commerce should instead select Bulgaria as the primary surrogate country, Commerce explained that Bulgaria was not economically comparable to China and thus not on the surrogate country list.

*Id*. at 33; *see also* PDM at 15-16.  Commerce further determined that, even if Bulgaria were economically comparable to China, Bulgaria's data quality does not match Malaysia's because Bulgaria did not produce solar cells and the available Bulgarian financial statements are from a producer of non-comparable merchandise.  IDM at 32, 33-34.  Although Commerce revised its final surrogate values for respondents' inputs of solar glass using Romanian import data, Commerce continued to rely on Malaysian import data for silver paste, backsheet, junction boxes, and EVA film using HTS subheadings from the preliminary results.  IDM at 17-24, 44-46.  Commerce continued to rely on the Malaysian solar cell and module producer Hanwha QCells' financial statement to calculate the financial ratios.  IDM at 38-40.  Commerce also continued to apply partial AFA to calculate Risen's and Trina's margins.  IDM at 5-17.

After correcting ministerial errors in the amended final results, Commerce assigned antidumping duties of 100.79 and 92.52 percent to Risen and Trina, respectively, and of 95.50 percent to separate rate respondents.  Amended Final Results, 85 Fed. Reg. at 79,166; *see also* Ministerial Error Memorandum (Nov. 2, 2020) (P.R. 501).

## <u>SUMMARY OF THE ARGUMENT</u>

Commerce's determinations should be sustained because they are supported by substantial evidence and otherwise lawful.

First, Commerce selected Malaysia as the primary surrogate country for this review because Malaysia was at the same level of economic development as China based on 2017 GNI data and presented the best data to value the respondents' factors of production for solar cells and modules.  The Malaysian GTA import data and Malaysian financial statements are more specific to solar cell and module production, unmatched by the alternatives.

Second, Commerce reasonably selected HTS 3920.62.1000 (covering polyethylene sheet) to value backsheet, and HTS 3920.10.1900 (covering ethylene polymer sheet: other than rigid) to value EVA film, because both HTS categories best correspond to the inputs used in solar cell production, as described by the respondents.

Third, Commerce's valuation of the respondents' silver paste consumption using the average unit value of Malaysian HTS 7115.90.10 (covering articles of precious metal including silver) should be sustained because it best corresponds to the respondents' input description, is not aberrant or unreliable, and is from the primary surrogate country, Malaysia.

Fourth, Commerce properly calculated the surrogate financial ratios by allocating material, labor, and energy (MLE) identified by Hanwha QCells' financial statement to the denominator and attributing the remaining "cost of sales" to the numerator as manufacturing overhead expenses.  Although RM257,063 of the total "cost of sales" of RM2.003 million was unidentified in the financial statement, Commerce reasonably determined that this remainder reflects manufacturing overhead, and not MLE expenses, because the financial statement specifically identifies MLE expenses within "inventories" totaling RM1.648 million.

Lastly, Commerce's application of partial AFA is lawful because the record demonstrates that the mandatory respondents failed to provide necessary factor of production data, and thus failed to cooperate, as a result of their decisions to continue doing business with suppliers that would not cooperate, while not taking reasonable steps to ensure that they would be able to comply with known reporting requirements if selected for individual examination in the review.

## **ARGUMENT**

### I.    **Standard Of Review**

The Court sustains any determination, finding, or conclusion by Commerce unless it is

unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce's in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent.  *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.  Then, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).  The "whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Id.* (citation omitted); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "{w}hen a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests."  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable."  *Id.*  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

II.     **Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Supported By Substantial Evidence And Otherwise Lawful**

Consistent with the statute and Commerce's surrogate selection criteria, Commerce selected Malaysia as the primary surrogate country because record evidence demonstrates that Malaysia was at the same level of economic development as China and that Malaysia has the best data to value factors of production for solar cells and modules, which include approximately 200 inputs.  *See* IDM at 27-34; PDM at 14-18; *see also* 19 U.S.C. §§ 1677b(c)(1), (4).  Plaintiffs' arguments that Commerce instead should have selected Bulgaria or Romania as the primary surrogate country lack merit.  *See* Trina Br. 25-38; Risen Br. 35-40; Shanghai BYD Br. 11-12.

A.      **Legal Framework**

Because this administrative review involves a nonmarket economy, China, Commerce must determine the subject merchandise's "normal value" based on factors of production, and not on sales in China, because "sales of {the product} in {an NME} country do not reflect the fair value."  19 U.S.C. § 1677(18)(A); *see also* 19 U.S.C. § 1677b(a)(1)(A)-(C).  The Tariff Act of 1930, as amended, directs Commerce to use the "best available information" from a market economy surrogate country that Commerce considers appropriate to derive surrogate values for the nonmarket economy's factors of production.  19 U.S.C. § 1677b(c)(1).  Factors of production include raw materials, labor, and utilities.  *Id.*  Factors to produce solar cells and modules, distinct from those to *assemble* solar cells and modules, are large in number and include hundreds of inputs, such as silver paste, solar glass, backsheet, EVA film, and others.  *See* IDM at 31.  Commerce adds to these factors "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c).

Commerce has broad discretion in selecting the appropriate surrogate country, but must use, to the extent possible, one or more market economy countries "at a level of economic

development comparable to that of the {NME} country" and that is "a significant producer{ } of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)-(B); *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines."); *Taian Ziyang Food Co., Ltd. v. United States*, 918 F. Supp. 2d 1345, 1355 (Ct. Int'l Trade 2013) (same; citations omitted). Thus, economic comparability to China and significant production of comparable merchandise constitute statutory thresholds for selection of the primary surrogate country.

The statute neither defines "comparable" level of economic development, nor requires Commerce to use a particular method for determining comparability. *See Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293-94 (Fed. Cir. 2016). Therefore, Commerce has broad discretion in determining an implementing methodology. *See Nation Ford*, 166 F.3d at 1377; *Fujitsu*, 88 F.3d at 1039 (recognizing "tremendous deference" to Commerce's exercise of "technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute"). Likewise, because the statute is silent regarding what constitutes the "best available information," Commerce has broad discretion in deciding what record evidence meets that criterion. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted).

Commerce's preference is to value all factors in a single surrogate country. 19 C.F.R. § 351.408(c)(2). If more than one market economy country is economically comparable and a significant producer of comparable merchandise, Commerce selects the country with the best data quality. *See Jiaxing*, 822 F.3d at 1293-94; Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process," (Dep't of Commerce 2004), http://enforcement.trade.

gov/policy/bull04-1.html (visited August 13, 2021).  Commerce evaluates data quality based on: (1) public availability; (2) contemporaneity with the period of review; (3) representativeness of broad market averages; (4) input specificity; and (5) tax and duty exclusivity.  *See id.*

The data Commerce utilizes need not be perfect.  *See Jiaxing*, 822 F.3d at 1301 (quoting *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor is Commerce required to duplicate the non-market economy manufacturer's experience.  *See Nation Ford*, 166 F.3d at 1377.  Instead, Commerce seeks to rely on record data that "most accurately represents the fair market value" of the relevant factors.  *Id.*  Ultimately, given Commerce's discretion and the fact-specific nature of this inquiry, the question for the Court is "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."  *Jiaxing*, 822 F.3d at 1300-01 (citing *Zhejiang DunAn*, 652 F.3d at 1341).

**B.    Commerce's Selection Of Malaysia As The Primary Surrogate Country Is Supported By Substantial Evidence And Lawful Because Malaysia Was At The Same Level Of Economic Development As China**

Commerce reasonably determined that Malaysia was economically comparable to China because it established that the two countries were at the same level of economic development.

Applying its surrogate country selection methodology, Commerce's Office of Policy compiled a list of potential surrogate countries.  *See* PDM at 14; Surrogate Country List at 1 (P.R. 166); *see also* Policy Bulletin 04.1; *Clearon Corp. v. United States*, No. 13-00073, 2014 WL 3643332, at *8 (Ct. Int'l Trade July 24, 2014) (describing selection methodology).  The list includes Malaysia and five other countries whose *per capita* GNI indicated that they were at the same level of economic development as China.  *See* Surrogate Country List at Att. I (P.R. 166).  Commerce used GNI, as reported by the World Bank's annual *World Development Report*, to

establish economic comparability because "GNI is reported across almost all countries by an authoritative source (the World Bank), and because Commerce finds that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development."  PDM at 16 n.59 (quoting *Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13,246 n.2 (Dep't of Commerce Mar. 21, 2007) (*AD NME Methodologies*)).  Commerce used 2017 GNI World Bank data because they were the "most current annual issue."  PDM at 15-16.

Commerce listed six potential surrogate countries with 2017 GNI corresponding to China's GNI of $8,690:  Romania, $9,970; Malaysia, $9,650; Russia, $9,232; Mexico, $8,610; Brazil, $8,580; and Kazakhstan, $7,890.  *See* Surrogate Country List at Att. I (P.R. 166).  The countries are not ranked and are considered equivalent in terms of economic comparability to China.  *See* PDM at 16.  As Commerce explained, each of the listed countries meets the statute's economic comparability criterion because they were "at the same level of economic development as China."  *Id.*  Further, Commerce determined that each of the potential surrogate countries was likely to have "good data availability and quality" needed for surrogate valuation.  *Id.*

This Court has previously sustained Commerce's use of *per capita* GNI to determine economic comparability.  *See Clearon*, 2014 WL 3643332, at \*9-10; *Tri Union Frozen Prod., Inc. v. United States*, 163 F. Supp. 3d 1255, 1268 n.8 (Ct. Int'l Trade 2016) (recognizing *Clearon*).  Consequently, Commerce reasonably determined that Malaysia satisfies the economic comparability threshold because it was at the same level of economic development as China.

Further, as we discuss below, Commerce also determined that Malaysia was superior to the other potential surrogate countries for which parties had submitted data because Malaysia was the only country among them that produces both solar cells and solar modules, as well as the

only country for which Commerce had financial statements from a solar cell and solar module producer. *See* IDM at 31. As Commerce explained, given that the surrogate financial ratios account for more than 30 percent of total normal value, only by selecting Malaysia as the surrogate country, could Commerce base these highly important surrogate financial ratios on a solar cell and module producer. *Id.*

### C.  Commerce Lawfully Declined To Select Bulgaria As The Primary Surrogate Country Because Bulgaria's GNI Is Not Economically Comparable To China

Risen and Shanghai BYD allege that Commerce's selection of Malaysia over Bulgaria is unsupported because, like Malaysia, Bulgaria was economically comparable to China. *See* Risen Br. 35-37; Shanghai BYD Br. 12; *see also* Trina Br. 31 (stating without support that Bulgaria is economically comparable to China). The record refutes this claim because Bulgaria's 2017 GNI falls *outside* the range of economically comparable countries for this review. *See* PDM at 16; IDM at 33; Surrogate Country List at Att. I (P.R. 166). Commerce normally selects the primary surrogate country from the surrogate country list, unless none of the listed countries can be relied upon as the primary surrogate country. *See* PDM at 16. That is not the case in this review.[3]

Commerce established economic comparability for the review consistent with its standard method. *See* PDM at 14-16; *see also AD NME Methodologies,* 72 Fed. Reg. at 13246. As we established above, the statute neither defines economic comparability nor requires Commerce to use a particular methodology to determine which countries are economically comparable. *See* 19 U.S.C. § 1677b(c)(4); *Jiaxing*, 822 F.3d at 1289 (in such circumstances, "Commerce may perform its duties in the way it believes most suitable") (citation omitted). Commerce thus

---

[3] Moreover, given Commerce's additional findings that Bulgaria did not produce either solar cells or solar modules, it is not clear that Bulgaria would satisfy the criterion to be a "significant producer{ } of comparable merchandise," under 19 U.S.C. § 1677b(c)(4)(A)-(B), even if it were considered economically comparable to China. *See* IDM at 31-32.

compiled a list of potential surrogate countries using the most current GNI data available at that time. *See* PDM at 15-16.  Based on the *World Development Report*, Bulgaria's 2017 *per capita* GNI was $7,760. *See* Surrogate Country List at Att. I (P.R. 166).  Commerce's selection of potential surrogate countries implies a GNI range of economic comparability to China between $9,970 (Romania) and $7,890 (Kazakhstan). *See id*.  In its surrogate country list, Commerce explained that countries at the same level of economic development as China, *i.e.*, potential surrogate countries, should be given equal consideration for primary surrogate selection. *See id*. Countries not at the same level of economic development as China, but still at a comparable level of economic development, should be selected "only to the extent that data considerations outweigh the difference in levels of economic development." *Id.*  With a GNI of $7,760, Bulgaria was not "at the same level of economic development as China" because it fell outside the GNI range that Commerce identified as being at the same level. *See id*.; PDM at 15-16.

Plaintiffs contend that Bulgaria would be considered to be at the same level of economic comparability if Commerce had applied the GNI range equally above and below China's 2017 GNI. *See* Risen Br. 35-26; Shanghai BYD Br. 12.  They assert that, "there is no logical reason why a country with a GNI difference of $1,280 above China {*i.e.*, Romania} is economically comparable but a country with a GNI difference of $930 below China {*i.e.*, Bulgaria} is not." Risen Br. 35-36.  In making economic comparability determinations, however, Commerce must exercise its sound discretion to draw lines of demarcation, and it did so in this case by issuing a list of countries at the same level of economic development as China. *See Baoding Yude Chem. Indus. v. United States*, 170 F. Supp. 2d 1335, 1343 (Ct. Int'l Trade 2001) (holding that such line-drawing "is precisely the type of discretion left within the agency's domain").

As a practical matter, GNI ranking is based on small numerical differences between countries—the lower the GNI, the smaller those differences.  For example, the World Bank's *2017 World Development Report* identifies four bands of economic statuses based on GNI:  high income ($12,056 - $82,650); upper middle income ($3,896 - $12,055); lower middle income ($996 - $3,895); and lower income ($0 - $995).  *See* Surrogate Country List at Att. I (P.R. 166).  Around China's 2017 GNI of $8,690, the range for this review spans $9,970 (Romania) to $7,890 (Kazakhstan).  *See id.*  Six economically comparable countries fall above, and four economically comparable countries fall below China.  *See id.*; *Dongguan Sunrise Furniture Co., Ltd. v. United States*, 865 F. Supp. 2d 1216, 1238 (Ct. Int'l Trade 2012) (sustaining Commerce's selection of GNI range of twenty-seven countries below and twenty-five countries above China and declining to require range centered on relative GNI differences); *AD NME Methodologies*, 72 Fed. Reg. at 13,246-47 (describing Commerce's method of selecting manageable set of countries, *e.g.*, "approximately five," with similar levels of economic development to NME).

Although Commerce did not apply the mathematical comparison that plaintiffs prefer, Commerce reasonably exercised its discretion to draw the lines of economic comparability around China's GNI.  Importantly, economic comparability to China, not arithmetic, is the focus of Commerce's GNI range.  As this Court has acknowledged, "Commerce does not have to achieve mathematical perfection in its choice of countries to act as bookends for its initial {GNI range} selection{.}"  *Dorbest Ltd. v. United States*, 755 F. Supp. 2d 1291, 1298 (Ct. Int'l Trade 2011).  That application of Commerce's method did not encompass Bulgaria as an economically comparable country, and that plaintiffs prefer an alternative method, fail to render Commerce's economic comparability determination unreasonable.

Plaintiffs next contend that Commerce should have considered a 2018 GNI dataset indicating that Bulgaria was economically comparable to China, and that failing to do so was arbitrary.  *See* Risen Br. 36.  Contrary to this claim, the 2018 GNI data were not on the record when Commerce issued its surrogate country list, and Commerce's reliance on the 2017 data is consistent with its practice.  *See* PDM at 15-16; Surrogate Country List at 1 (P.R. 166); *see also*, *e.g., Certain Frozen Fish Fillets from Vietnam*, 78 Fed. Reg. 39,708 (Dep't of Commerce July 2, 2013) (new shipper review), and IDM at 4-5 (explaining Commerce's practice and declining to rely upon more recent GNI data because it was not available on record when Commerce issued its list).  Commerce established economic comparability to China based on the "most current annual issue" of the *World Development Report* at the time, which reported the 2017 data.  PDM at 15-16.  Issuance of the surrogate country list put parties on notice of Commerce's economic comparability methodology and invited comment and submission of surrogate value data.  *See* PDM at 14; Surrogate Country List at 1-2 (P.R. 166).  In the cover letter, Commerce explained:

> Because it is Commerce's practice to determine economic comparability *early in a proceeding*, we are providing interested parties an opportunity to comment on the list as a starting point for surrogate country selection pursuant to {19 U.S.C. § 1677b(c)(4),} and to propose for consideration other countries that are at a level of economic development comparable to China.

Surrogate Country List at 1 (P.R. 166) (emphasis added).

Commerce specified that comments on the list itself and submission of information to rebut, clarify, or correct the list were due on August 12, 2019.  *See id.*  No party at that time submitted alternative GNI data or commented that Commerce should consider different GNI data for identifying potential surrogate countries.  Risen instead submitted comments asserting that Commerce should consider two countries with 2017 GNI outside the GNI range, Bulgaria and Thailand, as economically comparable to China.  *See* Risen Surrogate Country List Cmts. at 1-2

(P.R. 172); Risen Surrogate Country Selection Cmts. at 1-2 (P.R. 180).  Commerce reasonably refrained from considering Bulgaria or Thailand because it had acceptable countries on its list that *did* fall within the relevant GNI range.  *See* PDM at 16.  In fact, parties had placed complete and reliable data to value "nearly all of the inputs used by Risen and Trina" from Malaysia, Brazil, and Romania—all potential surrogate countries within the GNI range.  *See id.* at 17.

Plaintiffs further contend that Commerce's refusal to consider Bulgaria as a potential surrogate country based on the 2018 GNI data (once they became available) is arbitrary because Commerce did so in a review of *Fresh Garlic from China*.  *See* Risen Br. 36 (discussing *Fresh Garlic from China*, 85 Fed. Reg. 2,400 (Dep't of Commerce Jan. 15, 2020) (prelim. admin. review), and PDM at 27-28).  Plaintiffs however, overlook a key difference between the two proceedings:  In *Fresh Garlic*, Commerce issued its potential surrogate country list using 2018 GNI data on August 28, 2019, nearly a month after Commerce issued the list using 2017 GNI data in this case.  *Compare* PDM at 15-16 *with Fresh Garlic* PDM at 4 & n.26.  During this time, the 2018 GNI data became available, and Commerce's Office of Policy assembled a new potential surrogate country list.  In other words, not only was the surrogate country list in *Fresh Garlic* issued later, after the 2018 GNI data became available, but Commerce was then able to seek comments consistent with its normal practice for both the 2017 and 2018 data.  *See Fresh Garlic* PDM at 4 & n.26.  Indeed, in contrast to this case, Commerce in *Fresh Garlic* issued the list based on 2018 data *first*, while then also inviting comments on the countries from the 2017 list.  *See id.*  Again, the 2018 list was not available on the record at the time Commerce invited comment on potential surrogate countries in this case, and no party placed the 2018 list on the record or challenged use of the 2017 list in its comments.

18

Trina for the first time placed 2018 GNI data on the record on September 19, 2019, nearly two months after Commerce issued the surrogate country list. *See* Trina SV Submission at 2 (P.R. 220) (stating that 2018 GNI data were "not available when Commerce issued its surrogate country memorandum"). Importantly, this was also after parties had already submitted their surrogate country list and surrogate country selection comments. *See* Surrogate Country List at 1-2 (P.R. 166) (setting deadlines for comments). That Commerce refrained from using the 2018 GNI data under these circumstances is not arbitrary; it is consistent with Commerce's practice and with Commerce's statutory and regulatory obligations, which, because of distinct factual circumstances, did not impede a different approach in *Fresh Garlic*. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency determination is arbitrary when it relies on factors not intended by Congress, entirely fails to consider important aspect of the problem, or offers unsupported or wholly implausible explanation for its decision).

### D.     Commerce Reasonably Selected Malaysia Over Bulgaria And Romania As The Primary Surrogate Country Because The Malaysian Data Are Superior

Irrespective of the economic comparability issue, the Court should sustain Commerce's selection of Malaysia as primary surrogate country because Commerce reasonably determined that the Malaysian data are superior and thus constitute the "best available information" to value factors used by Chinese solar cell and module producers. *See* IDM at 31-34; PDM at 17-18.[4] The record contains complete, contemporaneous, and publicly available Malaysian GTA import data to value factors specific to solar cell and module production, covering approximately 200 inputs. *See* IDM at 31. The record also contains reliable and contemporaneous financial statements from Malaysian solar cell and module producer Hanwha QCells. *See id.* Importantly,

---

[4] Commerce stated that, even though Bulgaria was not on the surrogate country list, Commerce considered Bulgaria and concluded that the record did not support selecting it. *See* IDM at 33.

unlike other potential surrogate countries, Malaysia produced solar cells and modules during the review period, and is the only country for which the record contains financial statements from a producer of this subject merchandise. *See id*. That is particularly important because the surrogate financial ratios in this case account for more than 30 percent of the total normal value. *See id*. Thus, Commerce lawfully concluded that Malaysian data are the best information available to value the factors of production. *See Zhejiang DunAn*, 652 F.3d at 1341 (recognizing Commerce's broad discretion regarding what constitutes "best available information").

Nonetheless, plaintiffs contend that Commerce's selection of Malaysia is unsupported by substantial evidence because Romania and Bulgaria allegedly have better factor of production data. *See* Risen Br. 37-40; Trina Br. 26-38; Shanghai BYD Br. 11-12. The record does not support this contention. Commerce found that Malaysia, Bulgaria, and Romania each have comparable import data in terms of public availability, contemporaneity, tax and duty exclusivity, and representativeness of broad market averages. *See* PDM at 17-18; IDM at 31-33. However, Commerce determined that the Malaysian import data are product-specific to solar cell and module production because the record contains Hanwha QCells' financial statement, as well as evidence of solar cell production in Malaysia generally. *See id*. By contrast, the record evidence indicates that there was no such solar cell or solar module production in Bulgaria or Romania. *See* PDM at 18; IDM at 32, 33-34. In the preliminary results, Commerce explained:

> The fact that we have evidence that there is a Malaysian producer of both solar cells and solar modules also supports finding the Malaysian import data to be of higher quality than import data from the other potential surrogate countries for {surrogate value} purposes because it is more likely these data are specific to the inputs that we are valuing given that there is a manufacturer in this country that could be importing inputs actually used in the production of solar cells.

PDM at 18. Similarly, in the final results, Commerce's explained that:

> The importance we place on the fact that Malaysia produces solar cells and panels, *and no other surrogate country does so*, is that the surrogate data provided by Malaysia will consist of actual inputs used in producing subject merchandise, as opposed to the data of the other surrogate countries which have no reason to import inputs used specifically to produce solar cells and panels. . . . Further, the surrogate financial ratios account for over 30 percent of total normal value.  Only by selecting Malaysia as the surrogate country, can we base these highly important surrogate financial ratios on an actual solar cell and panel producer, Hanwha QCells.

IDM at 31 (emphasis added); *see also Notice of Proposed Rulemaking and Request for Public Comments: Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308 (Dep't of Commerce Feb. 27, 1996) (*AD/CVD Notice*) ("{Commerce} will attempt to obtain {financial} data that is as specific as possible to the subject merchandise.").

Commerce's consideration of product specificity is lawful.  This Court has deemed product specificity a "foremost consideration" in determining the best available information for surrogate value selection.  *Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226, 1304 (Ct. Int'l Trade 2011); *see also Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011).  If a dataset is not sufficiently product specific, it lacks relevance whether or not it satisfies Commerce's other surrogate selection criteria.  *See id*.  Likewise, the Court of Appeals for the Federal Circuit has found Commerce's surrogate value selection justified when Commerce considered product specificity to be a key factor.  *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  Thus, Commerce reasonably found the Malaysian import data superior to Bulgaria and Romania because they are specific to solar cell and module production, whereas the Bulgaria and Romania data are not.  *See* IDM at 34.

Plaintiffs further contend that Bulgaria also produces solar cells, making Commerce's selection of Malaysia based on the lack of solar cell production in Bulgaria misplaced.  *See* Risen Br. 37; Trina Br. 31.  The record does not support plaintiffs' contention.  Commerce examined

United Nations Comtrade export data and determined that Malaysia exported comparable or

identical merchandise during the review period.  *See* PDM at 16-17, 17-18.  Commerce also

found that Malaysia had solar module manufacturers, at least one of which *both assembled and*

*produced* solar cells.  *See id.*; IDM at 31-32; *see also* Risen Final SV Submission at Ex. SV2-8

(P.R. 365) (Hanwha QCells financial statement) ("The principal activities of the Company are

those relating to design, development and manufacture of silicon photovoltaic wafers, cells and

modules.").  Record evidence involving survey data from the International Energy Agency (IEA)

demonstrates that Malaysia accounted for "seven percent of global 2017 photovoltaic cell

production and six percent of global solar module production."  IDM at 32 (citing Petitioner

Surrogate Country Cmts. at Ex. 5 (Aug. 26, 2019) (P.R. 181)).  By contrast, the survey data on

the record does not identify Bulgaria or Romania as producing solar cells or modules.  *See id.*

Correspondingly, of the financial statements submitted by the parties, only the Malaysian

financial statement from Hanwha QCells reflects solar cell and module production.  *See* IDM at

31-32; Risen Final SV Submission at Ex. SV2-8 (P.R. 365).  Commerce explained that the

financial statement from Bulgarian company New Energy Systems (NES) were not specific to

solar cell production:

> NES's financial statements, the only documents on the record
> concerning the company, state that its main business lines
> involve water heaters, boilers, collectors, and trade in heating
> goods.  These financial statements, the English version of which is
> incomplete, make no mention of anything related to solar cells.
> . . . While a small amount of NES' revenue involved "photovoltaic
> plants" there is no evidence that NES produced solar cells or solar
> modules in generating that revenue and we do not consider water
> heaters, boilers, collectors, and trade in heating goods to be
> comparable to solar cells and modules.

IDM at 32 (discussing Trina SV Submission at Ex. 14 (P.R. 232-34)).  Although Risen argues

that NES's webpage states that the company produces "solar thermal products," Risen does not

explain how production of these "heated products {} related to solar products" is specific to solar cells and modules.  *See* Risen Br. 37.  Given this evidence, Commerce reasonably found that Bulgaria did not produce solar cells and modules during the review period.  *See* IDM at 33-34.

Commerce also found that the Malaysian financial statement itself is superior to those from Romania and Bulgaria.  *See* IDM at 33, 39-40.  In addition to using surrogate values to value factors of production, "Commerce values certain factors of production, such as selling, general, and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010) (citations omitted); *see also* 19 C.F.R. 351.408(c)(4).  "Commerce considers the quality and specificity of the statements, as well as whether the statements are contemporaneous with the data used to calculate production factors." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1374 (Fed. Cir. 2010).  As we explained above, in this case, the surrogate financial ratios account for more than 30 percent of the total normal value.  *See* IDM at 31.

The record contains a reliable financial statement from a Malaysian solar cell and module producer, Hanwha QCells.  *See* PDM at 27-28; IDM at 31-32.  Commerce determined that the Hanwha QCells' financial statement does not evidence any countervailable subsidies, shows a profit, is contemporaneous with the review period, and is audited.  *See* PDM at 27-28.  Further, Hanwha QCells' sole business line is solar cell and module production.  *See* IDM at 31-32.  In contrast, the record lacks financial information from any solar cell or module producer from Bulgaria or Romania.  *See* IDM at 31, 33.  NES's financial statement from Bulgaria makes no mention of anything related to the production of solar cells or similar merchandise, and in fact, indicates NES's main business lines involve water heaters, boilers, collectors, and trade in

heating goods.  *See* IDM at 32.  Given Commerce's consideration of product specificity as a key consideration for choosing surrogate financial data, Commerce reasonably found the Malaysian financial statement to be superior.  *See* IDM at 32, 40; *see also AD/CVD Notice*, 61 Fed. Reg. 7,308 (discussing practice of obtaining financial data specific to subject merchandise).

Still, plaintiffs contend that general data considerations weigh against the selection of Malaysia over Bulgaria and Romania and that Commerce ignored these considerations.  *See* Risen Br. 37-40; Trina Br. 25-27.  Trina argues, for example, that its proposed benchmark, the Department of Energy (DOE) National Renewable Energy Laboratory (NREL) cost survey, demonstrates that the Malaysian surrogate value data are not the best available information because the benchmark exposes their unreliability and inaccuracy.  *See* Trina Br. 27-32; Trina SV Rebuttal Cmts. at Ex. 2 (Sept. 26, 2019) (P.R. 244) (NREL survey).  This argument appears derivative of plaintiffs' challenges to the Malaysian data for specific surrogate values, which does not require Commerce to choose a different country.  *See* IDM at 18 (listing plaintiffs' assertion that surrogate value for silver paste accounted for almost half of cost of manufacturing in Commerce's calculations).  Moreover, contrary to Trina's assertion that "Commerce ignored this evidence and did not address it," Commerce stated in its surrogate country analysis that it was "unconvinced by Risen's and Trina's other contentions that the data of Bulgaria or Romania are of higher quality for determining the normal value of solar cell producers," while also citing the NREL survey.  *See* IDM at 32-33 & n.152; *see also id.* at 23 (Commerce "{did} not find {the NREL} survey useful for the purposes of determining the reasonableness of the Malaysia AUV" for silver paste); *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (explaining that "while {Commerce's} explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable" (citing *State Farm*, 463 U.S. at 43)).

Despite not being persuasive for benchmarking purposes, the NREL survey confirms that Malaysia produced solar cells, while Bulgaria and Romania did not. *See* IDM at 32. That the Bulgaria and Romania value data are consistent with the NREL survey does not support plaintiffs' argument that Bulgaria and Romania provide better data to value solar cell production inputs when the NREL survey does not identify Bulgaria and Romania as countries that actually produce solar cells or modules. *See id.* Consequently, the NREL survey weighs in favor of Commerce's selection of Malaysia based on data quality.

Plaintiffs also argue that Hanwha QCells' financial statement does not support selecting Malaysia because it is unreliable and too insufficiently detailed to accurately calculate surrogate financial ratios based on the fact that it "does not break out an energy line item." Trina Br. 32-36 (citing Risen Final SV Submission at Ex. SV2-8 (P.R. 365)). To the contrary, Commerce explained that the Hanwha QCells financial statement identifies RM1.648 million out of a total cost of sales of RM2.003 million as inventory costs, including labor and energy, enabling Commerce to conclude that the remainder are overhead expenses. *See* IDM at 33; 47-48 (observing that financial statement recognizes "inventories" of RM1.648 million inclusive of material, labor, and energy (MLE) expenses; Ministerial Error Memo at 4-5 (P.R. 501) (further discussing issue). Commerce specifically explained that inventory costs include MLE expenses in accordance with the financial statement's definition of "inventories" as "costs of direct materials and {labor} and a proportion of manufacturing overheads based on normal operating capacity." IDM at 47 (quoting Risen Final SV Submission at Ex. SV2-8, pg. 29 (P.R. 365)). By contrast, the English version of the Bulgarian company NES's financial statement is incomplete. *See* IDM at 32, 33. Thus, plaintiffs' argument that Hanwha QCells' financial statement is unreliable because it lacks a separate energy line item is contrary to the record.

Plaintiffs next erroneously assert that the specificity of the surrogate value data for solar glass should weigh heavily in favor of selecting Bulgaria or Romania over Malaysia, and that Commerce ignored the relative importance of solar glass in selecting Malaysia.  *See* Trina Br. 36-38.  Commerce, however, specifically addressed the absence of a Malaysian surrogate value specific to solar glass by selecting the more specific Romanian HTS 7007.19.80, which covers tempered glass used in solar panels and the specific type of glass used by solar panel producers. *See* IDM at 24-27.  Commerce's determination that the Malaysian solar glass data is less specific than the data from Bulgaria or Romania does not require Commerce to abandon Malaysia as the primary surrogate country, especially given that Malaysia meets the statutory thresholds for surrogate selection and Commerce found the Malaysian data reliable for nearly all of the other approximately 200 inputs.  *See* IDM at 27 (selecting Romanian data to value solar glass because Romanian and Bulgarian data are more specific, but Romania appears on surrogate country list).

Even though Commerce prefers to value all factors of production in a single surrogate country, that preference must yield to reason and permit sourcing particular surrogate values from outside the primary surrogate country to select the "best available information."  *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 929 F. Supp. 2d 1352, 1355 (Ct. Int'l Trade 2013).  Moreover, Commerce has statutory authority to rely on value data from multiple surrogate countries.  *See id.*; 19 U.S.C. § 1677b(c)(1).  Thus, Commerce prioritized input specificity and reasonably departed from its primary surrogate country for a more specific value for solar glass.  *See* IDM at 27, 31; *cf. An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1283 (Ct. Int'l Trade 2017) ("Nothing in the statute or in Commerce's practice requires Commerce to select data from a primary surrogate country where it concludes such data is not the best available information to value respondent's FOPs.").  This

choice, however, does not weigh against Commerce's selection of Malaysia as the primary

surrogate country because solar glass is only "one of approximately 200 inputs consumed by

each of the mandatory respondents."  IDM at 31.

Although Trina argues that Commerce should have prioritized solar glass in its surrogate

country selection because it "alone accounted for more of the weight than all of the other 200

inputs combined," Trina fails to cite authority for this principle.  *See* Trina Br. 38.  Commerce

specifically explained that "{b}y any reasonable measurement, polysilicon is the most important

input used in solar modules."  IDM at 33.  Nevertheless, Commerce departed from Malaysia,

using international prices to value polysilicon because "they are specific to the solar-grade

polysilicon in the wafers used by Risen and Trina."  PDM at 24.  Even with Commerce's

departure on solar glass and polysilicon, the Malaysian data are simply better to value the

respondents' factors compared to the Romanian and Bulgarian alternatives.  *See* IDM at 33-34;

PDM at 17-18.  Thus, Trina's weight-based argument lacks merit.

## III. Commerce's Selection Among Malaysian HTS Subheadings To Value Backsheet And EVA Film Is Supported By Substantial Evidence And Otherwise Lawful

Consistent with the governing statute and regulations, Commerce selected surrogate

values for backsheet[5] and EVA film from certain Malaysian HTS import subheadings.  *See* IDM

at 45-46; 19 U.S.C. § 1677b(c); 19 C.F.R. § 351.408(c).  Substantial evidence supports

Commerce's selections because Commerce reasonably considered the inputs, the respondents'

descriptions, and the available HTS subheadings to select the best available information.

Plaintiffs' contrary arguments improperly ask this Court to reweigh the evidence, when "{i}n

reviewing Commerce's determination of what constitutes the best available information with

respect to a particular {factor of production}, it is not for the court to reweigh the evidence, . . .

---

[5] "Backsheet" is a factor of production that serves to protect solar cells in a module.  IDM at 46.

but rather, to determine if the evidence relied upon by Commerce was sufficient to support its determination while considering detracting evidence." *Tri Union*, 163 F. Supp. 3d at 1269 (citations omitted).  Because Commerce relied upon substantial evidence and considered detracting evidence for both inputs, the Court should affirm Commerce's surrogate valuations as reasonable exercises of Commerce's wide discretion to select the best information.[6]

A.     **Commerce's Selection Of Malaysian HTS 3920.62.1000 As The Surrogate Value For Backsheet Is Supported By Substantial Evidence And Lawful**

To value backsheet, Commerce selected between Malaysian HTS 3920.62.1000 ("Of Poly(Ethylene Terephtalate): Plates and Sheets"), proposed by petitioners, and Malaysian HTS 3920.62.9000 ("Of Poly(Ethylene Terephtalate): Other than Plates and Sheets"), proposed by Risen.  *See* IDM at 45.  Commerce evaluated the subheading descriptions, the purpose of the backsheet in solar cells, and Risen's description of the input.  *See id*. at 45-46.  Commerce ultimately determined that the backsheet best corresponds to Malaysian HTS 3920.62.1000 covering "plates and sheets" because "{a} backsheet serves to protect solar cells in a solar module," so a lighter, less rigid product such as those covered by Risen's preferred HTS code "would not serve as a protective backsheet."  *Id.* at 46.  In doing so, Commerce cited Risen's description of the backsheet at issue as being "used for protecting solar cells."  Risen Supp. Section D Questionnaire Response at Ex. S2-1, Malaysia, pg. 1 of 11 (Oct. 17, 2019) (P.R. 251)

---

[6] Additionally, Shanghai BYD and Canadian Solar argue that Commerce used the AUV of Malaysian imports under HTS 3290.62.1000 and HTS 3290.10.1900 to value Risen's backsheet and EVA film "despite substantial evidence that these AUVs are unreliable and not the best available information."  Shanghai BYD Br. 4.  This argument is conclusory and points to no supporting evidence.  In fact, the record demonstrates that the Malaysian import statistics on which Commerce based the AUVs for both HTS subheadings are reliable.  Commerce obtained the data from the authoritative Global Trade Atlas, and the data satisfy Commerce's criteria as publicly available, contemporaneous, input specific, and tax and duty exclusive.  *See* PDM at 23; Preliminary SV Memo at 1-2 (Jan. 31, 2020) (P.R. 419); Policy Bulletin 04.1. Plaintiffs' argument is unsupported by evidence and undeveloped, and thus, this Court should reject it.

(Risen SDQR).  Thus, notwithstanding plaintiffs' arguments regarding the sheets' thickness and flexibility, Commerce reasonably grounded its analysis in the record evidence.

Nonetheless, plaintiffs contend that Commerce's selection of Malaysia HTS 3920.62.1000 to value backsheet is incorrect because Commerce allegedly drew conclusions unsupported by the record and contrary to its past classifications of the input.  *See* Risen Br. 32-34; Shanghai BYD Br. 3-4; Anji DaSol Br. 1; JA Solar Br. 2; Wuxi Br. 2.  Plaintiffs argue that the correct HTS subheading is HTS 3920.62.9000 for "polyethylene terephthalate: *other than* plates or sheets," similar to one used in past reviews.  *See* Risen Br. 32-34 (emphasis added).  Plaintiffs further contend that Commerce's sole basis for classifying backsheet under the Malaysian HTS subheading for plates and sheets is an "unsubstantiated difference between the flexibility of a 'film' or a 'sheet.'"  Risen Br. 32.  These arguments are misplaced, and essentially ask this Court to reweigh the evidence.  *See* IDM at 46 ("Risen's reference to a prior SV selection does not outweigh the record evidence showing the input is sheet.").

First, Commerce's surrogate value selection in a prior review does not supplant the record of this review, which indicates backsheet is properly valued under the Malaysian HTS for plates and sheets.  *See* IDM at 46.  Indeed, each administrative review stands on its own factual record, which may require a different result.  *See Qingdao Sea-Line*, 766 F.3d at 1387 ("each administrative record is a separate exercise of Commerce's authority that allows for different conclusions based on different {record} facts").  In prior China solar cells reviews, Commerce selected from Thai data, rather than the Malaysian data used in this review.  Moreover, Commerce primarily based its surrogate valuation for backsheet in those prior reviews on the material composition of the plastic product, rather than the more specific distinction between a product that is sheet versus "other than sheet."  *See*, *e.g.*, *Solar AR3*, 82 Fed. Reg. 29,033, at

IDM Cmt. 11 (selection based on "the type of plastic sheet which most closely corresponds to the composition of the backsheets").

Second, Commerce based its determination that the Malaysian HTS category for plates and sheets is the best surrogate value for backsheet on the record as a whole (and not simply on the input's name, as plaintiffs suggest). *See* IDM at 46. Commerce considered record evidence, such as the protective purpose of backsheet, Risen's description of backsheet as being used for protection, and the available HTS subheadings. *See id.* Record evidence shows that "the input is sheet," as opposed to film that would be a "lighter, less rigid product" and "would not serve as a protective backsheet." *Id.* Accordingly, Commerce reasonably selected HTS 3920.62.1000 covering polyethylene terephthalate sheets to value Risen's backsheet, while declining to select the subheading reserved for "other than plates and sheets," as the best available information. *Id.* That plaintiffs prefer a different selection or interpret the record differently fails to render Commerce's selection unreasonable when Commerce has considered all of the evidence for and against its selection and provided a reasoned basis for its determination.

### B. Commerce's Selection Of Malaysian HTS 3920.10.1900 As The Surrogate Value For EVA Film Is Supported By Substantial Evidence And Lawful

To value this input, Commerce considered the EVA itself, Risen's description of the EVA "film" used in solar cell production, and the available HTS subheadings. The subheadings included petitioner's submission of Malaysian HTS 3920.10.1900 ("Polymers of Ethylene: Plates and Sheets: Other Than Rigid"), and Risen's submission of Malaysian HTS 3920.10.9000 ("Polymers of Ethylene: Other Than Plates and Sheets"). IDM at 46. Commerce ultimately selected HTS 3920.10.1900 ("Polymers of Ethylene: Plates and Sheets: Other Than Rigid") based on Risen's description of the EVA as ethylene vinyl acetate sheet, as well as the film's thickness of over 0.5mm. *See id.* Risen's descriptions and the physical characteristics of EVA

signaled to Commerce that EVA "is a sheet, rather than film."  IDM at 46; Risen SDQR at Ex.

S2-1, Malaysia, pg. 1 of 11 (P.R. 251).  Thus, Commerce valued EVA using the HTS subheading

for sheet, rather than the basket category for "other than plates and sheets."  IDM at 46.

Plaintiffs contend that Commerce's selection of Malaysian HTS 3920.10.1900 to value

EVA film is unsupported by substantial evidence.  *See* Risen Br. 34-35; Shanghai BYD Br. 4;

Anji DaSol Br. 1; JA Solar Br. 2; Wuxi Br. 2.  First, they argue that Commerce's classification

of EVA as a sheet and not a film because of EVA's thickness greater than 0.5mm is unsupported.

*See* Risen Br. 34.  Second, plaintiffs argue that "the name of the product purchased by Risen is

specifically described as 'EVA <u>film</u>,'" so the input must be valued under the HTS subheading

covering "'other' than sheets or plates."  *Id.* at 35.  Third, plaintiffs contend that Commerce's

past reliance on an HTS subheading for "other" to value EVA directs Commerce's determination

in this review.  *See id*.  Each of these arguments is meritless.

First, plaintiffs overstate the weight Commerce placed on the EVA's thickness in its

determination that the EVA is sheet.  Commerce stated that "Risen's description of the EVA as

over 0.5mm thick  . . . *indicates* it is sheet, rather than film."  IDM at 46 (emphasis added).

Nowhere did Commerce contend that the 0.5mm thickness is dispositive of whether the input is

sheet or film, or define that thickness as the dividing line between the two.  Rather, Commerce

explained that the input's relative thickness along with other record evidence—such as Risen's

affirmative description of EVA as "Ethylene Vinyl Acetate Sheet"—contributed to Commerce's

determination that EVA film is sheet.  *Id.* (citing Risen SDQR at Ex. S2-1, Malaysia, pg. 1 of 11

(P.R. 251)).  Further, that EVA is "flexible" does not mean Commerce must consider it "film"

under an HTS subheading other than for "plates and sheets."  Risen Br. 34.  Indeed, Commerce

selected the HTS subheading for ethylene polymer sheet "other than rigid."  IDM at 46.

Second, regarding plaintiffs' argument that EVA is a film and not a sheet because "{t}he name of the product purchased by Risen is specifically described as 'EVA <u>film</u>,'" Risen Br. 35, Commerce (appropriately) did not rely primarily on the name for either backsheet or EVA film. Rather, Commerce assessed the record evidence regarding matters such as Risen's description of the inputs and their relevant characteristics. *See* IDM at 45-46. Moreover, plaintiffs' challenges to Commerce's backsheet and EVA surrogate value selections based on name and thickness are inconsistent. In challenging Commerce's backsheet selection, plaintiffs argue that Commerce misclassified backsheet as sheet "{b}ecause the input is called back<u>sheet</u>" and argue that it should be treated as film because its thickness is less than 0.5mm. Risen Br. 33; *but see* IDM at 46 (lacking reference to name of backsheet as reason for Commerce's selection). At the same time, plaintiffs claim that EVA should be treated as film based on its name, and regardless of its relative thickness at more than 0.5mm. *See* Risen Br. 34-35. The inconsistency of plaintiffs' arguments demonstrates their weakness because Commerce neither relied solely on input name nor thickness to make its selections. Instead, Commerce considered the record as a whole.

Lastly, Commerce's past reliance on a different HTS subheading than the one it selected for this review does not dictate that Commerce's selection is unreasonable. *See* IDM at 46. As we explained above, each review is built upon its own factual record, which may lead to different results. *See Qingdao Sea-Line*, 766 F.3d at 1387. In this review, Commerce selected surrogate values from Malaysian data, not Thai data as in past reviews. Further, Commerce considered the factual information on the record and explained its reading of the facts. That plaintiffs prefer Commerce select the subheading for "other than plates and sheets" fails to render Commerce's determination unreasonable, when it is based on a reasonable reading of substantial record evidence that EVA is sheet. Accordingly, the Court should sustain Commerce's selection.

**IV.    Commerce's Surrogate Valuation For Silver Paste Using The Average Unit Value For Malaysian HTS 7115.90.10 Is Supported By Substantial Evidence And Lawful**

Commerce's surrogate valuation of silver paste using the average unit value (AUV) for Malaysian imports under HTS 7115.90.10 (articles of precious metals) should be sustained because it is supported by substantial evidence and lawful.  *See* IDM at 17-24.  As we describe above, Commerce assesses surrogate value information on a case-by-case basis, and pursuant to 19 U.S.C. § 1677b(c), selects the best available information from an appropriate surrogate country.  *See* IDM at 20; *Qingdao Sea-Line*, 766 F.3d at 1386; *Nation Ford*, 166 F.3d at 1377.

Commerce prefers to rely upon the primary surrogate country for all surrogate values, and only resorts "to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014), *aff'd*, 822 F.3d 1289 (Fed. Cir. 2016); *see also* IDM at 20; 19 C.F.R. § 351.408(c)(2).  "{D}eriving the surrogate data from one surrogate country limits the amount of distortion introduced into {Commerce's} calculations."  *Clearon Corp. v. United States*, No. 08-00364, 2013 WL 646390, at *6 (Ct. Int'l Trade Feb. 20, 2013)

Commerce found that the Malaysian import data for HTS 7115.90.10—which covers articles of precious metals including silver—obtained through the GTA, satisfies Commerce's criteria for contemporaneity, public availability, product specificity, broad market average representation, and tax and duty exclusivity.  *See* IDM at 21; Policy Bulletin 04.1.  Commerce also found that the Malaysian GTA data is not aberrant, and the HTS category corresponds to the respondents' input descriptions for silver paste.  *See* IDM at 20-22; Preliminary SV Memo at 1-2, Att. II, VI (P.R. 419, 425, 427); *see also* Risen SDQR at Ex. S2-1, Malaysia, pg. 1 of 11 (P.R. 251) ("silver paste with 80-90% silver" classified under HTS "7115901000"); Trina Surrogate Value Submission at Exs. 3, 16 Cell 42;F (Jan. 2, 2020) (P.R. 352, 355) (assigning silver paste

input to HTS "711590").  Commerce's selection of the Malaysian AUV for silver paste is thus consistent with Commerce's strong preference to use data from a single, primary surrogate country, and Commerce reasonably refrained from resorting to a secondary surrogate country because the Malaysian import data, though high, were neither unreliable nor unavailable.  *See* IDM at 21-24; *Jiaxing*, 11 F. Supp. 3d at 1332-33.

Plaintiffs contend that Commerce's selection of the Malaysian HTS 7115.90.10 data is unsupported by the record because the data is aberrational and unreliable.  *See* Risen Br. 8-28; Trina Br. 18-25; Shanghai BYD Br. 3.  Although Commerce's practice is to avoid using aberrational surrogate values, plaintiffs' arguments are misplaced.  *See generally Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't of Commerce May 19, 1997).

To determine whether a surrogate value is aberrational, Commerce's practice is to compare that value to the GTA average unit values for the same period in other potential surrogate countries and to examine data from the same HTS category for the surrogate country over multiple years.  *See* IDM at 21 (citations omitted).  Commerce typically considers import data aberrational if the data are many times higher than those from other countries.  *See id.* However, that a value is higher than others is not sufficient grounds to exclude it as aberrational. *See id.*; *Trust Chem. Co. v. United States*, 791 F. Supp. 2d 1257, 1264 (Ct. Int'l Trade 2011) (recognizing that more is required to show that data are aberrational).

Commerce in this case found the AUV for Malaysian imports under HTS 7115.90.10 comparable to the AUV from another economically comparable potential surrogate country, Russia.  *See* IDM at 21.  The Malaysian AUV is $8,217 per kilogram, while the Russian AUV is $5,969 per kilogram.  *Id*.  Commerce also found that the Malaysian AUV for this review period was not atypical when compared to historical Malaysian AUVs for HTS 7115.90.10.  *See id.* at

21-22.  In fact, the Malaysian AUV for the review period is *slightly less* than Malaysian AUVs

from the years 2015 to 2017.  *See id*. ("Between 2015 and 2017, Malaysia AUVs for this HTS

category ranged between $9,058 and $10,094 per kilogram."); Preliminary SV Memo at Att. I,

Worksheet "711590" (P.R. 426) (indicating that Commerce's silver paste surrogate value is

33,168 MYR/Kg, compared to historical Malaysian AUVs including 33,638 MYR/Kg in 2015;

42,243.19 MYR/Kg in 2016; and 43,306.11 MYR/Kg in 2017).  Commerce additionally

explained that, although the Malaysian AUV is higher than other surrogate countries:

> the Malaysia POR quantity is the second highest POR import
> quantity among the countries on the surrogate country list.  The
> Malaysia POR import quantity is also comparable to the silver
> paste import quantities from Malaysia for previous years.

IDM at 22.  As a result, Commerce concluded that the record "indicates that the

{Malaysian} AUV is not based on outlier transactions."  *Id*.  Commerce elaborated:

> {T}he POR import quantity of Malaysia for the HTS category
> related to silver paste is 8 percent of the total POR import quantity
> of comparable HTS categories for other countries on the surrogate
> country list.  The significant size of these data supports finding that
> an AUV in the $8,000 range is not unrepresentative for this HTS
> category.  *Id*.

Commerce thus determined that the Malaysian AUV for HTS 7115.90.10 is not

aberrational because it is comparable to Russia, represents a commercial quantity, is less than

historical Malaysian AUVs for the same HTS subheading, is from the primary surrogate country,

and is not unreliable.  *See* IDM at 23-24.  Considering the discretion Commerce receives in

evaluating data, Commerce's determination is reasonable and supported by substantial evidence.

*See Conn. Steel Corp. v. United States*, 462 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2006)

("Determining whether certain data are aberrational is a factual line-drawing exercise

particularly well-suited for the expertise of an agency . . . rather than the courts.").

Plaintiffs contend that the Malaysian AUV is unreliable because it is inconsistent with plaintiffs' preferred benchmark data. *See* Risen Br. 10-11, 18-19, 20-25; Trina Br. 20-25; Shanghai BYD Br. 3. During the review, the respondents submitted (1) Trina's market economy purchases of silver paste; (2) a DOE-sponsored solar panel world cost survey conducted by the National Renewable Energy Laboratory (NREL); and (3) Thai, Bulgarian, and Turkish import data. *See* IDM at 22-23. However, Commerce found Trina's market economy purchases inappropriate for benchmarking the Malaysian AUV because "{i}ndividual prices such as the market purchases submitted by Trina suffer from potential biases when compared with published prices that are widely available." IDM at 22. Commerce further explained:

> {I}ndividual prices are not representative of a broad market average. Commerce has also consistently found market purchase prices unsuitable as benchmarks because these prices are proprietary information of the respective companies and are not representative of industry-wide prices available to other producers.

*Id.* at 22-23 (citations omitted).

Commerce also explained that it could not rely on the NREL survey for benchmarking the Malaysian AUV because it "does not specify the cost of silver paste, but instead groups the silver paste costs with many other costs." IDM at 23. Therefore, Commerce did not find the survey useful for the purposes of determining the reasonableness of the Malaysiam AUV. *Id.* Although Risen contends that "{t}his reasoning is wholly ungrounded and against basic logic" because Commerce can make certain assumptions about the data, Commerce reasonably declined to do so and focused on its normal practice in evaluating the Malaysian data. *See* Risen Br. 14-15; Trina Br. 21-25; IDM at 23-24.

Commerce also found the Thai, Bulgarian, and Turkish import data unpersuasive because the countries' per capita GNI for 2017 are outside the range of the countries on the surrogate

country list.  *See* IDM at 23.  Moreover, for the Thai data, Risen placed only the overall AUV of Thai imports on the record, but not the underlying Thai import data.  *See* IDM at 23 n.98.  The statute requires that Commerce value factors of production, to the extent possible, in a surrogate country that is at a level of economic development comparable to the country examined and that is a significant producer of comparable merchandise.  *See* 19 U.S.C. § 1677b(c)(4)(A)-(B).  In light of the substantial evidence on which Commerce based its evaluation of the Malaysian AUV data, Commerce reasonably declined to rely on additional data from countries not economically comparable to China.  *See* IDM at 23.[7]  More generally, it is improper for plaintiffs to criticize the Malaysian data in reference to proffered benchmarks when those benchmarks are unreliable.

Plaintiffs next contend that it was improper for Commerce to place historical Malaysian import data for silver paste on the record.  *See* Risen Br. 18-20; Shanghai BYD Br. 3.  However, Commerce may, at any time, place factual information on the record of a proceeding.  *See* 19 C.F.R. § 351.301(c)(4); *Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246, 21,250 (Dep't of Commerce Apr. 10, 2013) ("Given the time constraints imposed by the Act, at any point in the proceeding when {Commerce} finds that the administrative record is lacking factual information, {Commerce} may appropriately place factual information on the record to ensure that its determination is supported by

---

[7] We recognize that Risen cites case law in which the Court rejected Commerce's determination to dismiss benchmark data for lack of economic comparability.  *See* Risen's Br. 21 (citing, *inter alia*, *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1365 (Ct. Int'l Trade 2018)). However, the Court has also sustained Commerce's practice of focusing on economically comparable countries as reasonable, and has distinguished *Jacobi* when Commerce relied on economically comparable country data.  *See SeAH Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1346 (Ct. Int'l Trade 2017) (sustaining Commerce's practice of relying on benchmark data from economically comparable countries); *Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334, 1347 (Ct. Int'l Trade 2020) (sustaining Commerce's reliance on comparison data from economically comparable countries); *cf. Canadian Solar Inc. v. United States*, No. 19-00178, 2021 WL 4026868, at *6-7 (Ct. Int'l Trade Sept. 3, 2021) (sustaining Commerce's rejection of CVD benchmark based in part on lack of economic comparability).

substantial evidence.").  Plaintiffs had the opportunity to comment on the data in their

administrative case briefs.  *See* IDM 23; *see also* Preliminary SV Memo at Att. I, Worksheet

"711590" (P.R. 426).  Thus, Commerce lawfully placed the historical Malaysian import data for

silver paste on the record of the review.

Plaintiffs also argue that Commerce "improperly failed to consider the commercial reality

of solar cell and panel manufacturing" in relying on Malaysian HTS 7115.90.10 to value silver

paste consumption.  Risen Br. 9-15.  However, in selecting surrogate values, Commerce is not

required to perfectly match a respondent's production experience.  *See Nation Ford*, 166 F.3d at

1377.  Instead, Commerce's seeks to select a surrogate value as analogous as possible to the

nonmarket economy.  *See id.*  In selecting the AUV of Malaysian HTS 7115.90.10, Commerce

did precisely that because Malaysia is at the same level of economic development as China, and

the AUV is comparable to that of another potential surrogate country, represents a commercial

quantity, and is less than historical Malaysian AUVs for the same HTS subheading.  IDM at 24.

Risen argues that HTS 7115.90.10 is not specific to silver paste, but acknowledges that

Commerce has relied upon the same HTS subheading in prior reviews.  *See* Risen Br. 25-26.

Although Commerce's determinations in prior reviews are not dispositive of this case, the HTS

code is consistent with past valuations of silver paste in which Commerce found it sufficiently

specific and the best available information to value the input.  The record of this review supports

the same finding.  *See* IDM at 21, 23-24.  Further, Risen fails to identify a more specific HTS

subheading on the record of this review with which Commerce could value silver paste.

Plaintiffs contend that Mexico and Bulgaria provide reliable surrogate values for silver

paste.  *See* Risen Br. 27-28, 37-38.  Neither one is the primary surrogate country, so Commerce

reasonably refrained from selecting Mexican or Bulgarian data to value silver paste when the

primary surrogate country, Malaysia, provided a reliable and available value.  *See* IDM at 23; *see also Jiaxing*, 11 F. Supp. 3d 1332-33; 19 C.F.R. § 351.408(c)(2) (stating Commerce's preference to value all factors of production in primary surrogate country).  In this case, Commerce found no reason to depart from the primary surrogate country.  *See* IDM at 23-24.   Moreover, the statute requires that Commerce value factors of production, to the extent possible, in a surrogate country that is at a level of economic development comparable to the nonmarket economy.  19 U.S.C. § 1677b(c)(4).  As discussed above, Bulgaria's 2017 *per capita* GNI was outside the range of economic comparability for this review.  *See* IDM at 23.  Bulgaria's surrogate value data for silver paste is not appropriate because Bulgaria did not satisfy the statutory threshold for surrogate value selection and other data from an economically comparable country, Malaysia, are on the record.  *See id.*  Thus, Commerce reasonably declined to use Bulgarian silver paste data.

## V.   Commerce's Surrogate Financial Ratios Calculation Is Supported By Substantial Evidence And Lawful

Commerce properly calculated the surrogate financial ratios using the financial statement of Malaysian solar cell producer, Hanwha QCells.  *See* IDM at 47-49.  Plaintiffs challenge Commerce's financial ratios calculation, arguing that Commerce should have applied a different method with respect to the allocation of the remainder of "cost of sales."  Risen Br. 28-32; *see also* Trina Br. 38-39; Shanghai BYD Br. 12-13; JA Solar Br. 8; Wuxi Br. 2; Anji DaSol Br. 1.  Plaintiffs' challenge is baseless.  The statute is silent on the methodology Commerce must apply to calculate surrogate financial ratios.  *See* 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(c)(4); *Nation Ford*, 166 F.3d at 1377 (explaining that statute accords Commerce "wide discretion" in applying guidelines to value factors of production).  Commerce reviewed the record and made a well-reasoned calculation based on the lawful exercise of its discretion to select an appropriate methodology.  *See SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir.

2018) ("{t}he decision to select a particular methodology rests solely within Commerce's sound

discretion" (quoting *Micron Tech, Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)));

*see also JBF RAK*, 790 F.3d at 1364 (holding that, when Congress is silent, Commerce "may

perform its duties in the way it believes most suitable") (citation omitted).

Commerce cogently explained its reasoning for the surrogate financial ratio calculation.

*See* IDM at 47-49; Ministerial Error Memo at 4-5 (P.R. 501).  Specifically, Commerce explained

that it revised its overhead ratio calculation based on information in Hanwha QCells' financial

statement.  *See* IDM at 47.  Commerce considered information contained in Notes 17 and 2.12 of

the statement stating that Hanwha QCells' total 2018 "cost of sales" included "inventories" of

RM1.648 million, and that the "inventories" constitute "costs of direct materials and {labor} and

a proportion of manufacturing overheads based on normal operating capacity."  *Id*.; *see* Risen

Final SV Submission at Ex. SV2-8, pp. 29, 51 (P.R. 365).  Given this information, Commerce

"determined that labor and energy, as well as material costs, were included in the {'inventories'}

category{.}"  Ministerial Error Memo at 4 (P.R. 501).  Commerce explained:

> We believed the 'proportion of manufacturing overheads based on
> normal operating capacity' to be a reference largely to energy
> costs. . . . Because we concluded that *labor and energy* were
> included in 'inventories,' in calculating the surrogate financial
> ratios, we treated the 'inventories' expense as materials, labor, and
> energy {MLE} expenses which we included in the denominator of
> the surrogate financial ratios.

*Id*. at 4-5 (emphasis added).  Commerce thus found the specifically identified direct product

costs of RM1.648 million to be a more appropriate reflection of Hanwha QCells' MLE costs than

the constructed MLE used in the preliminary results.  *Id*.  Commerce's finding that materials,

labor, and energy were *all* included in the "inventories" category also renders inaccurate Risen's

core contention that Commerce allocated no items to labor and energy.  *See* Risen Br. 30; Final

Results Surrogate Value Memorandum at 2 (Sept. 28, 2020) (P.R. 473) (Final SV Memo) (highlighting calculation of MLE using information explicitly identified in financial statement).

At the same time, Commerce reasonably declined to treat the remaining, unidentified "cost of sales" as MLE expenses when the financial statement already accounts for MLE, and the unidentified "cost of sales" constitutes a remainder.  *See* IDM at 47-48; Ministerial Error Memo at 4-5 (P.R. 501); Final SV Memo at 2 (P.R. 473) (explaining that Commerce "treated the difference between the total manufacturing costs and MLE as overhead costs").  Commerce relatedly explained that the financial statement explicitly identifies sales, general, administrative, and interest costs as separate line items, making it appropriate to treat the remaining cost of sales as overhead.  *See* IDM at 48.  Risen contends that this is improper because the MLE denominator "has no energy or labor costs allocated to it."  Risen Br. 30.  Commerce explained, however, that the "inventories" of RM1.648 million it used as the MLE denominator *include labor and energy* because Note 2.12 of Hanwha QCells' financial statement states that "inventories" encompass both labor costs and "a proportion of manufacturing overheads based on normal operating capacity," which Commerce understands to include energy.  IDM at 47-48; Ministerial Error Memo at 4-5 (P.R. 501); Risen Final SV Submission at Ex. SV2-8, pp. 29, 51 (P.R. 365).

Commerce thus calculated the financial ratios for the final results using RM1.648 million as the total MLE value ("H").  *See* IDM at 48.  Commerce further treated the difference between total manufacturing costs, *i.e.*, RM2.003 million, and MLE, *i.e.*, RM1.648 million, as overhead costs ("I").  *Id*.  Therefore, Commerce properly calculated the overhead ratio ("I/H") as 21.70 percent, the SGA ratio ("M/(H+G+I)") as 9.73 percent, and the profit ratio ("N/(G+H+L+M)") as 3.48 percent using these identified values.  *See* IDM at 48-49; Final SV Memo at 2 (P.R. 473).

Plaintiffs nonetheless contend that Commerce's financial ratio calculation methodology was contrary to agency practice and to the record.  *See* Risen Br. 28-32.  With respect to agency practice, as Commerce explained in the final results, "Commerce is unaware of any such practice {to classify unidentified costs of sales as MLE.}"  IDM at 49.  Risen's assertion is particularly misplaced in the context of construing a financial statement, which necessarily depends on the specific facts.  *Cf. Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)).  Indeed, the cases that Risen cites differ from this one because Hanwha QCells' financial statement specifies that MLE costs are included in the "inventories" portion of the "cost of sales," so Commerce reasonably determined that the remaining, unidentified costs of sales were not MLE but rather overhead.  *See* IDM at 47.  The proceedings Risen cites did not involve financial statements that broke out MLE costs in this way.  *See*, *e.g.*, *Certain Activated Carbon From China*, 85 Fed. Reg. 23,947 (Dep't of Commerce Apr. 30, 2020), at PDM at 16 (noting that "none of the {selected financial statements} have separate line items breaking down the cost of raw material, labor and energy"); *cf.* Ministerial Error Memo at 5 (P.R. 501) ("None of the cases to which Risen cited indicate that the surrogate financial statements used by Commerce in those cases specified that energy and/or labor were included in a specific line item in the financial statements.").

Plaintiffs also assert that "cost of sales" typically includes mostly MLE, so the remaining amount of "cost of sales" should be allocated to MLE expenses.  *See* Risen Br. 28-30.  Under the methodology that Commerce used, however, the "cost of sales" *does* include mostly MLE (RM1.648 million out of RM2.003 million).  Commerce appropriately declined to *also* allocate the remaining "cost of sales" to MLE because doing so would be contrary to the record.  IDM at

47-48.  Ultimately, out of the total RM2.003 million "cost of sales," Commerce determined that

only RM357,156 constitute overhead expenses, of which RM100,093 are specifically identified

as property depreciation, leaving RM257,063 as unidentified expenses.  *See id.*

Plaintiffs contend, alternatively, that Commerce double-counted energy and labor

expenses in calculating the financial ratio.  *See* Risen Br. 30-32.  This contention is similarly

unfounded because it, again, relies on the inaccurate assertion that Commerce did not otherwise

allocate labor and energy costs to the MLE denominator.  *See* Risen Br. 30 (alleging double

counting "{w}hen energy or manufacturing labor expenses are not specifically broken out in the

financial ratios and assigned to the MLE denominator"); *id.* at 32 (same).  As we demonstrated

above, Commerce *did* break out material, labor, and energy costs from the total "cost of sales,"

in accordance with Notes 17 and 2.12, and allocated these costs to the MLE denominator in the

overhead ratio.  *See* IDM at 47; Ministerial Error Memo at 4-5 (P.R. 501).  These amounts need

not be separately itemized because the denominator in the overhead ratio includes all of the MLE

expenses.  *See* IDM at 48-49 (setting forth Commerce's calculation, including MLE expenses

designated as "H").  Because MLE expenses were broken-out and included in the denominator—

and not in the numerator as plaintiffs erroneously claim—plaintiffs identify no evidence or place

where energy and labor costs have been double-counted.  Thus, plaintiffs' contention that

Commerce double-counted energy and labor expenses should be rejected.

Further, none of the cases plaintiffs rely upon demonstrate a "consistent practice" of

excluding energy and labor expenses from the factors of production under these circumstances.

*See Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1339, 1361-63 (Ct. Int'l

Trade 2015) (explaining that financial statement "*does not break out energy* {costs}" and

remanding for Commerce to explain why some energy costs were excluded and others were not);

*DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1327, 1347 (Ct. Int'l Trade 2015) (finding double counting when Commerce included surrogate values for both new and recycled versions of input without applying byproduct offset); *Holmes Products Corp. v. United States*, 795 F. Supp. 1205, 1207-08 (Ct. Int'l Trade 1992) (remanding when Government conceded that double counting occurred because reported prices for finished products included raw material costs, but Commerce did not deduct labor and scrap costs from final value). Likewise, the administrative proceedings that plaintiffs cite indicate that double counting would be a potential concern when—unlike in this case—Commerce is unable to break-out MLE costs from the overall cost of sales. *See* Risen Br. 30-32.

Consequently, Commerce lawfully exercised its broad discretion in selecting a method to calculate the surrogate financial ratios. *See SolarWorld*, 910 F.3d at 1226 (discussing Commerce's methodological discretion). Plaintiffs' contentions both rely on an inaccurate characterization of Commerce's findings and improperly invite the Court to reweigh the evidence when Commerce provided a well-reasoned explanation for its treatment of the unidentified sales costs, and they should thus be rejected.

## VI.    Commerce's Application Of Partial Adverse Facts Available To Value Unreported Factors Of Production Is Supported By Substantial Evidence And Lawful

Commerce lawfully applied partial AFA to value unreported factors of production in calculating the dumping margins because Risen and Trina failed to cooperate by reporting factors of production in accordance with 19 U.S.C. § 1677e(b). *See* IDM at 5-17. Further, even if the respondents had not failed to cooperate, Commerce's application of AFA is lawful because Commerce fulfilled important policy objectives consistent with the *Mueller* decision. *See id.*

A.    **Legal Standard**

Commerce applies facts available to fill informational gaps when necessary information

is unavailable or when an interested party withholds information requested by Commerce, fails

to provide the information by the deadline, significantly impedes the proceeding, or provides

information that cannot be verified.  *See* 19 U.S.C. § 1677e(a).  Before applying facts available,

Commerce must inform a respondent of the deficiency and allow the respondent an opportunity

to explain or to remedy the deficiency.  *See* 19 U.S.C. §§ 1677e(a)(2), 1677m(d).

Commerce may apply an adverse inference in its selection of facts otherwise available, if

it further finds that a respondent has "failed to cooperate by not acting to the best of its ability to

comply with a request for information."  19 U.S.C. § 1677e(b).  A respondent's failure to

cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put

forth its maximum effort to provide Commerce with full and complete answers to all inquiries."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Thus, the statutory

trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's

ability, regardless of motivation or intent."  *Id.* at 1383.  To determine whether an adverse

inference is warranted, Commerce examines a "respondent's actions and assesses the extent of

respondent's abilities, efforts, and cooperation in responding to Commerce's requests for

information."  *Id.* at 1382. "Commerce enjoys broad discretion when considering whether to

apply adverse facts available in antidumping proceedings."  *Tianjin Magnesium Int'l Co. v.

United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

The AFA statute is meant to "provide respondents with an incentive to cooperate" with

Commerce's investigation.  *Essar Steel Ltd. v United States*, 678 F.3d 1268, 1276 (Fed. Cir.

2012) (citation omitted).  Hence, in applying AFA, Commerce considers the extent to which a

party may benefit from its lack of cooperation.  Specifically, the Statement of Administrative

Action explains that Commerce may use an adverse inference in selecting among available facts

"to ensure that the party does not obtain a more favorable result by failing to cooperate than if it

had cooperated fully."  Statement of Administrative Action accompanying the Uruguay Round

Agreements Act, H.R. Doc. 103-316, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.

Additionally, Commerce may rely on AFA in determining a cooperative respondent's

dumping margin to induce cooperation by other interested parties.  *See Mueller Comericial de*

*Mexico v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014).  Thus, Commerce may apply a

remedy that collaterally affects a cooperative respondent in certain circumstances.  *See KYD, Inc.*

*v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010).

### B.     Commerce Lawfully Applied Partial AFA Because Risen And Trina Failed To Cooperate Pursuant To 19 U.S.C. § 1677e(b)

Plaintiffs contend that Risen and Trina cooperated with Commerce's request for

information.  *See* Risen Br. 42; Trina Br. 5.  However, the record shows that, by choosing to do

business with uncooperative suppliers and subsequently failing to report factor of production

information in response to Commerce's antidumping questionnaire, Risen and Trina withheld

necessary information, and thus, failed to cooperate.  *See* IDM at 10-13.

Plaintiffs do not dispute that necessary information is missing from the record.  *See* Risen

Br. 41; Trina Br. 6-7.  Commerce determined that the record was "missing a significant quantity

of FOPs for both respondents."  IDM at 10.   Risen failed to provide factor of production

information from any of its [    ] unaffiliated solar cell and [    ] unaffiliated solar module

suppliers.  *See* Risen FOP Memo at 2 (P.R. 438; C.R. 460).  Trina failed to provide information

from [              ] unaffiliated solar cell suppliers and all [  ] of its unaffiliated solar module

suppliers.  *See* Trina FOP Memo at 2 (P.R. 437; C.R. 459).  Commerce is missing factor of

production figures for [      ] percent of Risen's total period of review quantity of produced, tolled, and purchased solar cells, and [      ] percent of its total quantity of produced, tolled, and purchased solar modules. *See* Risen FOP Memo at 5 (P.R. 438; C.R. 460). Commerce likewise is missing factor of production figures for [      ] percent of Trina's total quantity of produced, tolled, and purchased solar cells and [      ] percent of Trina's total quantity of produced, tolled, and purchased solar modules. *See* Trina FOP Memo at 5-6 (P.R. 437; C.R. 459). As a result, Commerce explained that it was "missing a material amount of data required to calculate normal value, and normal value constitutes half of the antidumping margin calculation." IDM at 10; *see also* PDM at 13; Trina FOP Memo at 5 (P.R. 437; C.R. 459); Risen FOP Memo at 5 (P.R. 438; C.R. 460). Commerce provided Risen, Trina, and their suppliers multiple opportunities to respond. *See* PDM at 2; Trina FOP Memo at 2 (P.R. 437; C.R. 459); Risen FOP Memo at 2 (P.R. 438; C.R. 460). Thus, Commerce discharged its responsibility to pursue deficiencies and lawfully resorted to the facts otherwise available to fill-in the gaps in the record pursuant to 19 U.S.C. §§ 1677e(a)(1) and (2)(A)-(B). *See* IDM at 10.

Commerce also reasonably determined that Risen and Trina did not act to the best of their ability with respect to the unreported data and applied partial AFA for their failure to cooperate. *See* IDM at 10-13. Risen and Trina reported in questionnaire responses that they had requested factor of production information from their unaffiliated solar cell and module suppliers, but were unable to obtain data from any, except for [      ]. *See* Risen FOP Memo at 2 (P.R. 438; C.R. 460); Risen Section D App'x XII Response at 14-18 (July 2, 219) (P.R. 160; C.R. 134); Trina FOP Memo at 2 (P.R. 437; C.R. 459); Trina Section D App'x XII Response at 12-15 (July 1, 2019) (P.R. 157; C.R. 112). Accordingly, Commerce concluded that certain of Risen's and Trina's unaffiliated suppliers failed to cooperate by refusing to provide the information. *See*

IDM at 10.  However, in evaluating whether to apply AFA, Commerce *also examined* Risen's and Trina's actions and the extent of their abilities, efforts, and cooperation in responding to Commerce's requests.  *See* IDM 10-13; *Nippon Steel*, 337 F.3d at 1382.

Specifically, Risen and Trina chose to do business with unaffiliated non-cooperative suppliers knowing that they would be subject to Commerce's reporting requirements and that their past efforts to obtain factor of production information were unsuccessful.  *See* IDM at 11-12.  Commerce acknowledged that, during the review, Risen and Trina contacted their suppliers to request information.  *See id.* at 11.  Commerce explained, however, that although "Risen and Trina provided correspondence with their uncooperative suppliers in which they requested the FOP data, this minimal action does not absolve them of their reporting responsibility."  *Id*. Indeed, respondents must exert "maximum effort to provide Commerce with full and complete answers to all inquiries{.}"  *Nippon Steel*, 337 F.3d at 1382.  Substantial record evidence shows that Risen and Trina did not fulfill this statutory mandate*.*

Risen and Trina are knowledgeable respondents with extensive experience in this proceeding.  *See* IDM at 11.  Both are well-aware of the necessity of factors of production data in calculating dumping margins, and of Commerce's practice for dealing with missing information, because these issues have been addressed repeatedly in prior reviews.  *See id*.  Commerce has applied AFA in calculating the weighted-average margin for respondents based on their failure to provide factors of production for their unaffiliated suppliers since the second period of review. *Id*. (citing *Solar AR2*, 81 Fed. Reg. 39,905, at Cmt. 19, *sustained in relevant part by SolarWorld Ams., Inc. v. United States*, 273 F. Supp. 3d 1254, 1276-78 (Ct. Int'l Trade 2017)).  Thus, prior to doing business with suppliers during the review period for this case, Risen and Trina knew that factors data would be required and the potential consequences of failing to provide it.  As

Commerce explained, "{g}iven the history of this proceeding, and Risen's and Trina's own extensive involvement, they should have understood their responsibility, that if {they} were chosen as {the} mandatory respondents, they must provide complete FOP data." *Id.* Additionally, Risen and Trina could have predicted that they would be chosen as mandatory respondents subject to the reporting requirements because, not only were they respondents in the majority of the prior administrative reviews, they are also two of the largest exporters/producers of subject merchandise. *See* IDM at 11; Respondent Selection Memorandum at 4-5 (P.R. 101; C.R. 31). Indeed, and importantly, Risen and Trina requested this review. *See*; Risen Request for Review (P.R. 5); Trina Request for Review (P.R. 8).

Further, Risen and Trina "could have predicted that {their} suppliers would ultimately refuse to cooperate" with Commerce's requests. IDM at 11. Commerce noted record evidence indicating that these were existing supplier relationships. *See id.* at 12 (citing Trina Section D App'x XII Response at Exs. DA-11, DA-36 (P.R. 158; C.R. 131); Risen Section D App'x XII Response at 17, 20 & Exs. D-26, D-30 (P.R. 160; C.R. 134, 178, 181)). Commerce further explained that "the record contains information demonstrating that Trina has not ended relationships with suppliers due to a failure to provide FOPs, and Risen has not cited to any evidence that it actually followed through with its threats and severed ties with any of its many suppliers." *Id.* Thus, Risen and Trina elected to do business with uncooperative suppliers, rather than select suppliers contingent on their cooperation in providing necessary information. *Id.* Because unaffiliated suppliers' failure to report factors data has been a hallmark of reviews under this order, the fact that Risen and Trina continued to work with uncooperative suppliers makes it reasonable for Commerce to determine that Risen and Trina could have predicted that the record would lack necessary information absent additional effort on their part. *Id.*

Under these circumstances, as Commerce explained, "it is not unreasonable for {Commerce} to expect a respondent in Risen and Trina's situation to take a number of steps to ensure that it could obtain the FOP information{.}" IDM at 12.  Yet, the record lacks evidence that Risen and Trina took steps to mitigate these issues and ensure their ability to comply with Commerce's information requests.  Commerce elaborated that a knowledgeable and experienced respondent like Risen or Trina could act "to the best of its ability" by taking steps such as

> securing the cooperation of the supplier, or obtaining the requested information, at the time Risen and Trina agreed to purchase the solar cells and solar panels; removing that supplier from its list of suppliers for failing to provide the requested information; and/or increasing its production of subject merchandise inputs, to avoid the issue of obtaining the suppliers' COP information.

*Id.* ("Risen and Trina could have . . . made their purchases contingent on cooperation should the FOPs be required for reporting to Commerce."); *see also id.* at 11-12 (same).  Considering Risen's and Trina's extensive knowledge and experience, Commerce reasonably determined that their efforts to obtain factors data from their unaffiliated suppliers fell short of the "maximum effort" that the AFA standard requires.  *See* IDM at 10-12.  Although Risen and Trina provided records of correspondence requesting data, "this correspondence was not effective; and the result was that neither Risen nor Trina were able to obtain a large amount of FOP data." *Id.* at 12.

By choosing to do business with suppliers without taking reasonable steps to secure their ability to provide necessary information to Commerce, Risen and Trina did not do the maximum they are able to do to comply.  That after four administrative reviews Risen and Trina chose to place themselves in a position where they were unable to comply with Commerce's requests for necessary factors of production information, and were further unable to show that they made a maximum effort to secure their ability to comply, does not evidence cooperation to the "best of ability" standard.  *Nippon Steel*, 337 F.3d at 1382.  Rather, substantial evidence supports

Commerce's finding of Risen's and Trina's non-cooperation. *See* IDM at 10-12. As Commerce explained, the missing factor of production data is significant in size and Commerce has no way of knowing what the factors for of these solar cells and panels were. *See* IDM at 13. Thus, "{u}nless Commerce applies partial AFA in valuing the missing FOP data, {Risen and Trina} will simply continue to do business with {suppliers} that refuse to provide FOPs, knowing that there will be no penalty for doing so." *Id.*

In challenging Commerce's determination, Risen and Trina incorrectly suggest that Commerce applied partial AFA based on their suppliers' non-cooperation and that Commerce improperly imputed their suppliers' non-cooperation to them. *See* Trina Br. 11-12; Risen Br. 42 ("The Department has not identified any shortcoming in Risen's efforts to comply with the Department's requests for information, and the Department did not overtly apply an adverse inference against Risen.").[8] Commerce, however, did not impute the suppliers' non-cooperation to Risen or Trina. Rather, in addition to finding that certain suppliers failed to cooperate, Commerce found that *Risen and Trina also failed to cooperate* based on their own actions and efforts (or lack thereof). *See* IDM at 10-12. Commerce stated that "{b}y choosing to do business with suppliers that would not cooperate, Risen and Trina have withheld the missing FOP data from Commerce and failed to cooperate to the best of {their} ability in responding to a request for information." IDM at 12. Plaintiffs' arguments thus mischaracterize Commerce's reasoning. *See* Trina Br. 11-13; Risen Br. 42-43. Rather than imputing others' actions to Risen and Trina, Commerce reasonably declined to ignore Risen's and Trina's own role in creating their inability to comply with Commerce's informational requests.

---

[8] Based on this inaccurate characterization, Risen's arguments challenging Commerce's determination focus on whether Commerce lawfully applied AFA to an allegedly cooperative respondent under *Mueller*. *See* Risen Br. 42-47. We address that issue below.

Trina further asserts that it "fully cooperated" with Commerce's efforts to obtain factor of production data by requesting that its suppliers respond to Commerce's requests.  Trina Br. 5; *see also id.* at 12 (discussing  alleged cooperation).  Trina's assertion misapplies the law and fails to support that Trina made maximum efforts.  Because the burden lies with respondents to report needed information and to put forth maximum effort, *Nippon Steel*, 337 F.3d at 1382, Commerce assessed whether *Trina* exerted maximum effort to obtain and to report requested information— not whether Trina cooperated with *Commerce's efforts* to obtain the information that Trina had a responsibility to report.  That Trina supported Commerce's efforts to obtain the unreported data from Trina's suppliers fails to show that Trina did the maximum it was able to do to fulfill its reporting responsibility.  Indeed, Commerce identified additional steps that Risen and Trina could have taken to ensure that they obtained the information.  *See* IDM at 11-12, 12.

Trina further argues that if Commerce could not reasonably apply AFA to a respondent based on the idea that the respondent could have induced supplier cooperation without leverage, then Commerce cannot reasonably conclude that Trina failed to cooperate by "failing to induce its suppliers' cooperation or otherwise ensuring that it purchased only from suppliers that it knew agreed to cooperate with Commerce's requests."  Trina Br. 13 (referencing *Canadian Solar v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019)).  In *Canadian Solar*, this Court held that Commerce's AFA determination in calculating the dumping margin for a fully cooperating respondent was unlawful under section 19 U.S.C. § 1677e(b).  *See* 378 F. Supp. 3d at 1319-20. In this review, by contrast, Commerce determined to apply partial AFA under section 1677e(b) based on the actions of *uncooperative* respondents Risen and Trina.  *See* IDM at 10, 12-13.

Overall, Commerce's application of partial AFA against Risen and Trina is consistent with the purpose of 19 U.S.C. § 1677e(b), which, in part, is "to provide respondents with an

incentive to cooperate" with Commerce's efforts to seek information. *See Essar Steel*, 678 F.3d at 1276 (citation omitted). Commerce acted reasonably by requesting key information, issuing deficiency questionnaires, and using available record information in applying partial AFA to account for the gap in the record created by Risen's and Trina's failure to provide necessary factors data as a result of their decisions to continue doing business with suppliers that would not cooperate and to not take reasonable steps to ensure that they would be able to comply with known reporting requirements if selected for individual examination in an administrative review that they themselves requested. Commerce's determination should therefore be sustained.

### C. Commerce's Determination To Apply Partial AFA To Value Unreported Factors Of Production Is Consistent With *Mueller*

Even if the Court were to find that Risen and Trina did cooperate, however, Commerce lawfully incorporated an adverse inference in selecting from among facts available to value the unreported factors data because Commerce determined that doing so yielded an accurate rate, promoted cooperation, and thwarted duty evasion consistent with *Mueller* and section 19 U.S.C. § 1677e(a) of the statute. *See* IDM at 13-16. Plaintiffs raise several challenges to Commerce's application of partial AFA, none of which have merit. *See* Risen Br. 42-47; Trina Br. 14-17.

Commerce acted lawfully because it reasonably applied the statutory framework and the Federal Circuit's guidance in *Mueller*. Commerce first explained that the uncooperative suppliers are interested parties to the proceeding under 19 U.S.C. § 1677(9)(A) because they produce subject merchandise that would be subject to duties if they exported it directly to the United States. *See* IDM at 13. Consistent with *Mueller*, Commerce next examined whether, in selecting among the facts available to fill the gaps in the record, the record supports using AFA in calculating Risen's and Trina's dumping margin. *See id.* at 13-16.

Regarding the first policy consideration discussed in *Mueller*—duty evasion—Commerce found that there was a real possibility that the uncooperative suppliers (as interested parties) could obtain a more favorable result by not cooperating because their consumption rates could be even higher than the respondents' rates.  *See* IDM at 13.  Commerce elaborated that, absent their own separate rate or selling through Risen and Trina, the uncooperative solar cell and module suppliers would be subject to the 238.95 percent China-wide rate.  *Id*. at 13-14.  By not reporting their consumption rates—which it is reasonable to infer from their refusal to report are likely higher than Risen's and Trina's rates—the uncooperative suppliers, who are producers subject to the *Solar Cells China* order, can take advantage of Risen's and Trina's separate rates.  *Id*. at 14. They can avoid the dumping margins that should apply to the subject merchandise they produce by refusing to cooperate, similar to the concerns identified in *Mueller*.  *Id*.  Indeed, Risen's and Trina's dumping margins were assessed on merchandise encompassing uncooperative suppliers' products, so the suppliers' merchandise is directly affected by Commerce's determination.  *Id*.

For the second *Mueller* consideration—deterrence of non-cooperation—Commerce examined whether Risen and Trina could and should have induced the suppliers' cooperation. *See* IDM at 14-15.  Importantly, Commerce distinguished Risen's and Trina's relationship with their suppliers from one in which "the cooperating entity has *no control* over the noncooperating suppliers."  *Id.* (quoting *Mueller*, 753 F.3d at 1235 (emphasis in IDM)).  Commerce explained that both Risen and Trina (1) are major producers in the solar market with significant sales during the review period, (2) are the largest two exporters of subject merchandise to the United States during the relevant period, and (3) have purchased a substantial quantity of solar cells and solar modules from suppliers.  *Id.* at 14.  Further, as we discussed above, Commerce referenced record evidence indicating that these were ongoing relationships—including evidence that Trina

reported supplier relationships spanning many years.  *See id.* at 12 (citing Trina Section D App'x XII Response at Exs. DA-11, DA-36 (P.R. 158; C.R. 131); Risen Section D App'x XII Response at 17, 20 & Exs. D-26, D-30 (P.R. 160; C.R. 134, 178, 181); *cf.* Risen Br. 45 (suggesting relationships "over the course of several reviews").  Addressing an analogous issue in *KYD*, the Federal Circuit reasoned that "importers' exposure to enhanced antidumping duties seems likely to have the effect of either directly inducing cooperation from the exporters with whom the importers deal or doing so indirectly, by leaving uncooperative exporters without importing partners who are willing to deal in their products."  607 F.3d at 768.  Commerce found that this reasoning applies equally to this case.  *See* IDM at 14.

Thus, Commerce found that Risen's and Trina's exposure to enhanced antidumping duties and the relationship between Risen and Trina and the unaffiliated suppliers could *potentially* induce the cooperation of the suppliers.  IDM at 14 (citing standard articulated in *Mueller*, 753 F.3d at 1235).  As Commerce elaborated, "the existence of a plausible threat of refusing to purchase subject merchandise from suppliers refusing to provide FOPs when asked provides Risen and Trina with leverage to ensure that their suppliers cooperate."  *Id.* at 14-15.  Commerce further explained that resorting to partial AFA incentivizes Risen and Trina to source from and conduct business with cooperative suppliers, so that uncooperative suppliers are affected by their own non-cooperation.  *Id*. at 14.  Additionally, limiting the application of AFA to transactions between the company and its uncooperative suppliers makes the transactions less attractive to Risen and Trina, thereby incentivizing them not to purchase from suppliers that refuse to cooperate.  *Id*.; *see also id.* at 16 ("Neither Risen nor Trina have cited to one instance where they stopped doing business because parties refused to provide them with FOPs.").

Importantly, Commerce also considered the "predominant interest in accuracy." IDM at 15. Commerce limited its application of partial AFA to account for only the factor of production data that the uncooperative suppliers withheld. Commerce explained that, by applying AFA precisely to and commensurate with the suppliers' non-cooperation, it calibrated the remedy so that only purchases from uncooperative suppliers led to increased duties. *See id.*; *SolarWorld*, 273 F. Supp. 3d at 1277 (sustaining AFA under *Mueller* that was "precisely proportional to the missing information"). At the same time, Commerce relied on Risen's and Trina's own factors of production, which promotes accuracy because the information is tied to their own reporting and its magnitude is commensurate with the scale of the non-cooperation. *Id.* If anything, as Commerce explained, it is reasonable to infer from the suppliers' refusal to cooperate that their consumption rates are likely higher than Risen's and Trina's rates. *Id.* at 14; *cf. KYD*, 607 F.3d at 766 (permitting a "common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less" (citations omitted)).

Ultimately, although Commerce cannot know what Risen's and Trina's margins would be given the significant amount of data withheld, Commerce explained that the only feasible way to consistently obtain more accurate information is through application of AFA. *Id.* "Otherwise, parties will continue to ignore Commerce's request for FOPs when it is inconvenient or possibly beneficial for parties not to provide the information." *Id.* Hence, in addition to promoting accuracy, Commerce articulated a clear message regarding the actions that will and will not cause increased dumping duties (*i.e.*, not reporting necessary factor of production data or purchasing from uncooperative parties, versus reporting the data and purchasing from parties that are cooperative). *Id.* at 15-16.

Contrary to plaintiffs' claims, the foregoing demonstrates that Commerce's determination was "reasonable in light of the particular facts of the case" and that Commerce clearly did seek to balance the need for avoiding evasion and incentivizing deterrence with the overall interest in accuracy. *See* Risen Br. 43; Trina Br. 14. Risen attempts to undermine Commerce's assessment of the possibility for duty evasion by claiming that its uncooperative suppliers do not know the ultimate destination of their solar cells and modules, *see id.* at 44-45, but this ignores that Risen reported that the United States was the *only* export destination for its modules during the review period. *See* Risen Section A Response at 23 (June 10, 2019) (P.R.; 130; C.R. 54) ("During the POR, Risen only sold solar modules to the U.S."). Likewise, Risen emphasizes than none of its solar cell and module suppliers made independent sales to the United States, Risen Br. 44, but this merely underscores that the suppliers are accessing the United States market while avoiding antidumping scrutiny of their solar merchandise by selling through Risen and not cooperating with information requests. *See* IDM at 13-14. Risen additionally claims that its unsuccessful efforts to obtain its suppliers' cooperation demonstrate that it lacks leverage justifying Commerce's resort to AFA (*see* Risen Br. 45-46); however, Commerce grounded its determination in record evidence that these were ongoing relationships and that Risen had *not* declined to do business with any supplier based on the supplier's non-cooperation. *See* IDM at 12, 16; Risen Br, 45 (suggesting relationships existed over several reviews).

Trina, for its part, similarly asserts that Commerce lacked evidence supporting its determination and "failed to consider any indicia of Trina's relationship with its suppliers to support its implicit assumption that Trina must have leverage over those suppliers and the ability to require compliance as a condition of that supply." Trina Br. 14-16. This ignores the fact that Commerce cited evidence, not only of Trina's significant purchases of solar cells and modules

(that would otherwise constitute subject merchandise if imported into the United States directly), but also that Trina had long-term relationships with its uncooperative suppliers spanning years. *See* IDM at 12 (discussing Trina Section D App'x XII Response at Exs. DA-11, DA-36 (P.R. 158; C.R. 131), detailing both the size and the length of Trina's supplier relationships).  It also ignores that Commerce cited evidence indicating that Trina had continued to do business with uncooperative suppliers, while declining either to cease doing business with any supplier based on non-cooperation or to make its purchases contingent upon an agreement to cooperate.  *See id.* at 12, 16 (citing *An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1373-74 (Ct. Int'l Trade 2018) (sustaining partial AFA against exporter when tollers failed to cooperate)).  This evidence is consistent with *Mueller*, which held that an "existing relationship" between cooperating and non-cooperating parties provided a mechanism for the respondent to induce its supplier's cooperation.  753 F.3d at 1235 (also citing *KYD*, 607 F.3d at 768, for this proposition).  Further, consistent with Commerce's assessment of accuracy considerations and its use of Trina's own highest consumption rates as partial AFA, Trina acknowledges the principle that an AFA rate is intended as "a reasonably accurate estimate of the respondent's actual rate, *albeit with some built-in increase intended as a deterrent to non-compliance.*"  Trina Br. 14 (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (emphasis added)); *cf. KYD*, 607 F.3d at 766 (permitting "common sense inference" that highest prior margin is probative).

Finally, Risen and Trina highlight that this Court has previously remanded Commerce's AFA determinations in *Canadian Solar* and in *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020).  *See*, *e.g.*, Risen Br. 46-47; Trina Br. 10, 16-17.  Although we disagree with these decisions, with which Commerce complied under respectful protest, each

review stands on its own record.  In this case, Commerce not only cited the factors creating a real possibility of evasion and the leverage stemming from Risen's and Trina's significant business, but also highlighted evidence that these were ongoing relationships that the respondents had chosen to continue despite the lack of previous cooperation.  *See* IDM at 12.  Moreover, with each successive review, the policy concerns that Commerce articulated become more prevalent, as the leverage stemming from the length of supplier relationships grows and parties nonetheless fail to take steps to ensure cooperation.  *See* IDM at 15 n.57 (discussing Commerce's monitoring of cooperation in successive reviews).

Thus, given Commerce's analysis and adherence to *Mueller*, if the Court were to find that Risen and Trina cooperated, Commerce's partial AFA determination would remain supported by substantial evidence and lawful, and should be sustained.

## VII.    Commerce Lawfully Calculated The Rates For Separate Rate Respondents

Because Commerce lawfully calculated the rates for the mandatory respondents, Risen and Trina, Commerce also lawfully calculated the rates for separate rate companies, including Wuxi, Anji DaSol, Shenzhen Sungold, Canadian Solar, Shanghai BYD, and JA Solar.  *See*, *e.g.*, Shanghai BYD Br. 13 (challenging Commerce's calculation of separate rate based on alleged errors in mandatory respondent rates).  The Court should thus sustain the separate rates as well.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment and sustain Commerce's final results.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

</div>

JEANNE E. DAVIDSON
Director

/s/ Reginald T. Blades, jr.
REGINALD T. BLADES, JR.
Assistant Director

/s/ Joshua E. Kurland
OF COUNSEL:                                    JOSHUA E. KURLAND
LESLIE M. LEWIS                                Trial Attorney
Attorney                                       U.S. Department of Justice
Office of the Chief Counsel                    Civil Division
for Trade Enforcement and Compliance           Commercial Litigation Branch
U.S. Department of Commerce                     P.O. Box 480
Washington, D.C.                               Ben Franklin Station
                                               Washington, D.C. 20044
                                               Tel: (202) 616-0477
                                               Email: Joshua.E.Kurland@usdoj.gov

September 24, 2021                             *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1), as modified by the Court's order of September 22, 2021, and contains approximately 18,693 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland