PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD.<br>　　　　　Plaintiff,<br><br>TRINA SOLAR ENERGY CO., LTD., JA SOLAR<br>TECHNOLOGY YANGZHOU CO., LTD., ET<br>AL.,<br>　　　　　Consolidated Plaintiffs,<br><br>　　and<br><br>SHANGHAI BYD CO., LTD., ET AL.,<br>　　　　　Plaintiff-Intervenors,<br>　　v.<br><br>UNITED STATES,<br>　　　　　Defendant,<br><br>　　and<br><br>SUNPOWER MANUFACTURING<br>OREGON, LLC,<br>　　　　　Defendant-Intervenor. | **PUBLIC VERSION**<br><br>Consol. Court No. 20-3743 |

## <u>PLAINTIFF'S REPLY BRIEF</u>

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: November 5, 2021

PUBLIC VERSION

## TABLE OF CONTENTS

I.    Introduction ............................................................................................ 1

II.   The Department's Reliance Upon the Malaysian Silver Paste Import Value Is Not
      Supported by Substantial Evidence. .......................................................... 2

      A.    The United States Continues to Unlawfully Dismiss Record Evidence. ....... 4

      B.    The United States' Reliance on the Russian Import Price & Historical
            Malaysian Data is Not Persuasive. ..................................................... 8

III.  The Department's Selection of Malaysia as the Primary Surrogate Country is Not
      Supported by Substantial Evidence .......................................................... 13

IV.   The Department's Surrogate Financial Ratio Calculation was Not Supported by
      Substantial Evidence ........................................................................... 15

V.    The Department's HTS Classifications for Risen's Backsheet and EVA Film
      Inputs Are Not Supported by Substantial Evidence .................................... 19

VI.   The Department's Application of Adverse Facts Available to Risen's Unreported
      FOPs is Not Supported by Substantial Evidence ........................................ 21

VII.  Conclusion ........................................................................................ 23

<div align="center">

**TABLE OF AUTHORITIES**

</div>

**CASES**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)..............................................3

*Bowen v. American Hospital Asso.*, 476 U.S. 610 (1986) ............................................................23

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ......................................................4

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327-28 (Ct. Int'l Trade 2016) ...........................................................................................................................................2

*Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp. 2d 1352, 1355, (Ct. Int'l Trade 2013)....................................................................................................2

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (2003)........................................................ 10-11

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (Ct. Int'l Trade April 19, 2018) .........3

*Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) ......11

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ................. 21-22

*Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (Ct. Int'l Trade 2011) ...........................................................................................................................................3

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020) .................. 21-22

**STATUTES & REGULATIONS**

19 U.S.C. § 1677b(c) ..................................................................................................................2

**ADMINISTRATIVE DECISIONS**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2018-2019, 86 Fed. Reg. 58,871 (October 25, 2021)........1

**OTHER AUTHORITIES**

Adolph Matz & Milton F. Usry, Cost Accounting Planning & Control, 19-21 (7th ed. 1980)......16

Cost of Goods Sold Statement, <https://learn.financestrategists.com/explanation/cost-accounting/cost-of-goods-sold/cost-of-goods-sold-statement>....................................................16

PUBLIC VERSION

## I.     INTRODUCTION

Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files its reply brief to Defendant United States' response brief.  *See* U.S. Br. (September 24, 2021); ECF 79.  As explained in Risen's opening brief, in this review, the silver paste surrogate value became the most critical issue affecting its POR margin.  Silver paste has not been a driver of the margin in past reviews and not the main raw material cost in the respondents' own production experience, or according to an authoritative solar industry report.  Only the very high import price under HTS 7115.90.10.00 (an HTS that includes silver paste as well as other silver and gold articles) in Malaysia had an enormous impact on the margin.  Risen and Trina were both mandatory respondents in prior reviews and received low single digit margins historically.  In the subsequent review, the seventh administrative review, the Department relied on an alternative import value for silver paste from Turkey, and Risen and Jinko (the second mandatory respondent in that review) both received zero percent margins*.  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2018-2019, 86 Fed. Reg. 58,871 (October 25, 2021).  This review stands in stark contrast, with Risen assigned a weighted average dumping margin of 100.79% *ad valorem* in the Final Results.  Nothing in Risen's own pricing or the fair market pricing of raw materials has changed so dramatically from one review to the next to offer any commercially reasonable justification for such drastic change in margins for this one review.  Rather, this drastically higher margin is driven by an unreasonable surrogate value for silver paste.

I.       **The Department's Reliance Upon the Malaysian Silver Paste Import Value Is Not Supported by Substantial Evidence.**

Risen explained the unique situation of this review that made this input so critical to Risen's high margin and wrote over twenty-pages on this single issue in its moving brief.  Jinko likewise wrote substantially on this issue.  Yet, the United States responded in only six pages, merely reciting the Department's own deficient explanation.  The United States defends the Department's unlawful dismissal of substantial information on the record undermining its selection of the Malaysian silver paste value.  Critically, the United States also fails to appreciate the interrelated specificity argument made with respect to this input.  The Department's reliance on the Malaysian silver paste value remains unsupported by substantial evidence on this record.

The United States asserts its preference to rely upon the primary surrogate country unless a surrogate value is "unavailable or unreliable."  U.S. Br. at 33.  The standard is not merely that data should not be unreliable; the Department is directed to rely upon the best available information in calculating the most accurate dumping margins possible.  19 U.S.C. § 1677b(c). The Court has found the Department's preference to rely upon all surrogate values from one single country is not a justification on its own; rather, that preference is tempered by the mandate to calculate margins as accurately as possible.  *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327-28 (Ct. Int'l Trade 2016) ("Commerce, by relying on its single surrogate country preference and nothing more, improperly rejected other SVs ... This 'preference'. . . carries the day only when it is used to 'support a choice of data as the best available information where the other available data 'upon fair comparison, are otherwise seen to be fairly equal'"); *see also Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp. 2d 1352, 1355, (Ct. Int'l Trade 2013) ("it is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate

country may not provide the best available information for a particular FOP").

From there, the United States repeats the Department's two justifications that the Malaysian import data is not aberrant because the 1) Russian import price was also high and 2) Malaysia historically had a similar import price in recent years.  U.S. Br. at 34-35.  At the same time, the United States rejects the other substantial record information raised by Risen and Trina that undermines the reliability of Malaysia merely because it is not the type of information the Department prefers to rely upon when determining whether a surrogate value is aberrant. However, the Department must consider all record information, including that which detracts from its determination.  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Moreover, to the extent that the United States dismisses various benchmarks because it is sourced from non-economically comparable countries, this too has been rejected by the Court. *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1365 (Ct. Int'l Trade April 19, 2018) ("[T]he court has regularly rejected Commerce's conclusory dismissal of benchmarking data for lack of economic comparability.*"); Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1372 (2011) (rejecting the Government's argument that U.S. data was unhelpful for benchmarking purposes and noting that it corroborated information from economically comparable countries that also suggested the selected value was  aberrational).

Particularly given how dramatically higher the import price into Malaysia is than all other benchmark information, it is hard to imagine how being sourced from countries that are less economically comparable (though not all benchmark data proffered by Risen was from non-economically comparable countries) would render all such data completely useless as benchmarks.  Yet, the Department has taken that approach, refusing to consider substantial

information on the record.  The Court has rejected such positions in the past, and this Court must do the same and instruct the Department to actually support its decision based on the <u>full</u> record.

      **A.**      **The United States Continues to Unlawfully Dismiss Record Evidence.**

Risen and Trina both argued that Malaysian HTS 7115.90.10 is not a reasonable surrogate value for silver paste based on the other surrogate country import values for HTS 7115.90, the National Renewable Energy Laboratory ("NREL") report on solar panel costs, Trina's market economy purchases of solar grade silver paste, and the historical surrogate values the Department has relied upon for this input.  Rather than addressing the full record of evidence, the United States merely echoes the Department's summary dismissal of each of these metrics of data.

Most critically, the United States defends that Commerce could not consider the NREL report.  U.S. Br. at 36.  In response to seven pages of argumentation and explanation on the clearly explained cost of producing solar modules in this official U.S. government industry report and how the Department's surrogate value for silver paste is contrary to this commercial reality, the United States responded in three short sentences that Commerce declined to make assumptions about this data, and "focused on its normal practice in evaluating the Malaysian data." U.S. Br. at 36.  This clearly does not meet the substantial evidence standard.  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (The agency must "articulate any rational connection between the facts found and the choice made.").  Moreover, no "assumptions" are required to consider the NREL report.

The U.S. Department of Energy put out a report on Crystalline Silicon Photovoltaic Module Manufacturing Costs based on POR contemporaneous costs.  *See* Trina Rebuttal SVs (September 26, 2019) at Exhibit 2; **PR244**.  The report includes module cost analysis of five

different solar modules.  *Id.* at 37.  The report did not list the cost of silver paste alone, but did list the cost of metallization pastes together, which the report also clearly described as silver and aluminum paste costs.  *Id.* at 24 & 26.  Silver and aluminum pastes are both used in the production of solar cells, and Risen uses both.  For the five modules, this U.S. Energy report benchmarked that metallization pastes accounted for only 3.76%-5.07% of the cost.  *Id.* at pg 37; *see also* Risen R56.2 Br. at 12-13 (describing and providing excerpts from the report).  Risen demonstrated from the Department's own calculation of Risen's cost of production both that the surrogate value selected in POR 6 by Commerce for 1) silver paste alone and also 2) metallization pastes (silver and aluminum paste together, exactly as in the NREL report) present substantially higher percentages than this report indicates are remotely reasonable.  The Malaysian silver paste import value alone represents [      ]% of the total cost of manufacturing and [      ]% of Risen's direct material costs.  *See* R56.2 Br. at Attachment 1 (analysis of silver paste and Risen's normal value).  Accounting for the total metallization paste costs in the Department's Final Results (aluminum paste and silver paste surrogate values) slightly raises these figures with metallization pastes together accounting for [      ]% of Risen's total cost of manufacturing and [      ]% of Risen's direct material costs.  *Id.*

There are no "assumptions" to be made in analyzing this comparison.  The report did not specifically give a price/cost ratio for silver paste, but it did for silver paste and aluminum paste together.  It is not an "assumption" to recognize that the Department's surrogate value price for silver paste alone is dramatically higher than the U.S. Energy's Department's benchmarking for both of silver paste and aluminum paste.  If the U.S. Energy Department reports that silver paste and aluminum paste together should represent 3.76%-5.07% of the cost of production for the modules, then it is clear if the cost of silver paste alone in the Department's final analysis for

Risen represented [       ]% of its module cost of production it defies the commercial reality presented by this U.S. governmental industry report.  Further, Risen also demonstrated this obviously remains true when using the same metric as the NREL report (i.e. using the Department's surrogate value price for silver paste and aluminum paste).  The Department's silver paste cost (viewed independently or in combination with aluminum paste) is thus completely out of sync with U.S. expert assessments of those *relative* costs.  The Department's refusal to confront this highly relevant and authoritative data is unsupportable.

**The NREL report alone, even without the additional evidence discussed below, would serve as irrefutable evidence that the silver paste value selected by the Department is aberrational and unreliable.  The Department failed to rebut this in the final determination, and failed to rebut it before this Court.**

In addition, the United States says it cannot consider Trina's market economy purchases as a benchmark because they suffer from "potential biases" when compared with published prices that are widely available.  U.S. Br. at 36.  Risen understands the Department's general policy not to rely upon a respondent's market economy pricing as a surrogate value or even as a benchmark, but the particular circumstances of this case must also be considered before fully rejecting this data.  First, Trina's market economy purchases of silver paste are not the only benchmark in consideration.  Trina's purchase price is one of several metrics put forward by the parties, therefore any "potential biases" are surely neutralized by other public prices that corroborate the same price range as Trina's purchases.  Second, how probative these purchases are to the Malaysian surrogate value must be considered.  Trina purchased actual silver paste during the POR from the *same country* that was the source of 90% of the import quantity into Malaysia under HTS 7115.90.10 during the POR.  Therefore, how much higher the Malaysian

import value for HTS 7115.90.10 (which includes both gold and silver articles) from this same country during the same period than Trina's purchase price of silver paste is particularly probative of whether HTS 7115.90.10 is aberrant, or is not silver paste at all, or is not remotely priced similarly to the actual input consumed by Trina and Risen: silver paste.  The complete dismissal of this metric is unreasonable and decoupled from the record and context in which the data was submitted.

Lastly, the United States dismisses the Thai, Bulgarian, and Turkish import data as benchmarks because the countries are not on the Department's 2017 GNI surrogate country list. U.S. Br. at 36.  As already argued in the opening brief, at a minimum Bulgaria, if not Bulgaria and Turkey, should both be considered at the same level of economic development as China. Risen R56.2 Br. at 36-37.  Both Bulgaria and Turkey were on the Department's 2018 GNI list, which overlaps with even more of the POR.  Moreover, as already explained above, this Court has rejected the Department's dismissal of benchmark data from non-economically comparable countries.  With respect to the Thai data, Risen placed on the record the Department's surrogate values for silver paste relied upon in the final results of the past five administrative reviews.  The United States notes that Risen did not place the underlying Thai import data on the record, though fails to actually say why such underlying data would be needed.  U.S. Br. at 37.  No party to this litigation could or would dare to contest the accuracy of Commerce's own final results in past reviews.  This data was provided to demonstrate that the Department's historical understanding of the appropriate pricing for this input was dramatically different than the price in this review.  The Malaysian import value was **1,322% higher** than the average historical surrogate values that the Department has relied upon to value this input.  *See* R56.2 Br. at 22.

No record evidence suggests that the market price for silver paste has dramatically increased as to explain or justify the higher Malaysian import value.

Ultimately, the United States merely reiterates Commerce's hollow dismissal of substantial record information detracting from its determination that the Malaysian HTS 7115.90.10 is the best available information to value silver paste. The Court should remand with instructions that the Department examine the full record evidence.

**B.      The United States' Reliance on the Russian Import Price & Historical Malaysian Data is Not Persuasive.**

The Department's reliance on the Russian prices and historical Malaysian data is misplaced. The import value into Malaysia was 8,465.31 USD/KG under HTS 7115.90 and 8,216.60 USD/KG under HTS 7115.90.10. The United States is correct that the Russian value at $5,968.82 under HTS 7115.90 was also high. However, the United States completely ignores a real consideration of all of the potential surrogate countries' import prices, which afterall, is its preferred metric for determining aberrancy. *See* U.S. Br. at 34 (explaining the Department will consider the AUVs of the potential surrogate countries for aberrancy). The other potential surrogate countries values were significantly lower:

PUBLIC VERSION

| 711590 - UN Comtrade Import Data | | | |
|---|---|---|---|
| Country | Trade Value | total Import Qty | AUV (USD/KG) |
| Mexico | $       42,909,979.00 | 320,755 | $         133.78 |
| Malaysia | $     478,950,097.00 | 56,578 | $       8,465.31 |
| Brazil | $           336,519.00 | 6,179 | $           54.46 |
| Kazakhstan | $             76,862.00 | 347 | $         221.50 |
| Russia | $           632,695.00 | 106 | $       5,968.82 |
| Romania | | no import quantity | |
| total listed SC excluding Malaysia | $       43,956,055.00 | $       327,387.00 | $         134.26 |
| | | | |
| Additional 2018 GNI List countries: | | | |
| Bulgaria | $         3,966,308.00 | 10,163 | $         390.27 |
| Turkey | $         4,540,978.00 | 21,144 | $         214.76 |
| total of all excluding Malaysia | $       52,463,341.00 | $       358,694.00 | $         146.26 |

The Malaysian import price was **6,305% higher** than the weighted average import price into the other listed surrogate countries.  The import prices for HTS 7115.90 into Bulgaria and Turkey, both countries on the Department's surrogate country list for 2018 which overlaps with the majority of this POR, also further corroborate the aberrancy of the Malaysian and Russian import values.  Russia imported a mere 106 kilograms during the entire POR, many of which were shipments of merely 1 kg.  These could not have been commercial quantities of the input consumed by respondents in the review.  *See* Risen R56.2 Br. at 16 (discussing this further).

The presence of one other country with an aberrant import value simply does not indicate that the Malaysian import value is not aberrant considering the other record information and the small quantity of the Russian imports.  Indeed, the Department has found that more than one country had aberrant import values for a particular HTS.  *See* Risen R56.2 Br. at 16-17 (citing examples of this practice).  The high Russian import with a very small quantity simply does not justify the Department's reliance on the Malaysian import value.

The United States also argues that the Malaysian import value is corroborated by the historical prices for the same HTS into Malaysia.  This argument fails to consider the fact that an

import value can be aberrant into a country for several years.  Indeed, the Department found the import value for nitrogen into Thailand was aberrant for multiple reviews in a row.  *See* Risen R56.2 Br. at 18.  The presence of historical data with a high AUV does not entail that the AUV is not aberrant—particularly when, as in this case, other evidence overwhelmingly demonstrates the aberrancy of the Malaysian import value as a surrogate value for silver paste.  Further, both the Department's consideration of the Russian price and the historical Malaysia import data fails to consider the implications of Risen's specificity argument.

The Malaysian HTS 7115.90.10 covers other articles or catalysts of gold or silver.  *See* Risen R56.2 Br. at 25-26 (explaining the tariff schedule definitions).  The HTS is not specific to silver paste.  This Malaysian import value is for a broader category of products of gold or silver. While this HTS may include silver paste and may have been an appropriate HTS in other countries to value silver paste in the past, all of the benchmark data discussed above is substantial evidence that the Malaysian import price is not a reasonable surrogate value for silver paste now, i.e. for POR 6.  The dramatic difference in the import price into Malaysia for this broader HTS compared to prior surrogate values for this input, other POR country import prices, Trina's ME purchases of silver paste, the NREL report analysis, and Risen's own commercial experience establish that whatever is being imported under HTS 7115.90.10 into Malaysia is not comparable to silver paste.  In other words, even if the Court agrees that the Malaysian import value for HTS 7115.90.10 may not be aberrant for HTS 7115.90.10, the Court should still find this HTS into Malaysia is not the best available information to value Risen's silver paste input.

For all these reasons, a reasonable mind cannot conclude that the Malaysian import value for silver paste is a usable surrogate value for this input, much less the best available information.  *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) (the

PUBLIC VERSION

statutory objective to rely upon the best available information "is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents."). The United States unlawfully dismisses a substantial body of evidence that the Malaysian import value for HTS 7115.90.10 cannot reasonably be relied upon to value silver paste, and instead points to two isolated tidbits of data from the record as support. The Court should find that the Department's selection of HTS 7115.90.10 is not supported by the record and direct the Department to select from among the other proposed alternative sources and values. Risen has proposed several alternative surrogate values for this input, the reliance on the Mexican surrogate value being most consistent with the Department's past practice. *See* Risen R56.2 Br. at 27-28.

Lastly, Risen again raises to this Court's attention the procedural unfairness of the Department's approach to this input. Petitioner alone argued for Malaysia, while Respondents argued for Bulgaria. The only information that Petitioner placed on the record with regard to silver paste was the Malaysian POR import value for HTS 7115.90. Petitioner provided no rebuttal data to Risen's data indicating that HTS 7115.90 was aberrant; Petitioner provided no supporting data for Malaysian HTS 7115.90 at all. Yet, the Department took it upon itself to place the historical Malaysian import data on the record in support of Petitioner's suggested value. The Department has unfairly assumed Petitioner's burden in bolstering the Malaysian record with this information. *Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (Ct. Int'l Trade 2017) ("It is the parties to a proceeding that bear the burden of building an adequate record.").

Moreover, the Department chose to do so in conjunction with the Preliminary Results, when the record had already closed per regulations and practice. The Department set earlier

PUBLIC VERSION

surrogate value deadlines where the parties provided surrogate data, rebuttal surrogate data, and were able to fairly see the data and surrogate issues being raised by each party prior to the closing of the record.  But Risen was denied this opportunity by the Department when it chose to take up the support of Malaysia and the support of the Malaysian silver paste surrogate value of its own accord after the record closed.  The "opportunity to comment on the data in their administrative case briefs," is clearly not the same as the procedural rights Risen would have had to file surrogate value data in various predictable rounds of filings per normal administrative practice had the Department met the very standards and deadlines it set for the parties.  *Cf.* U.S. Br. at 38.  If such information had been placed on the record by Petitioner (and thereby by the appropriate deadlines), or even placed by the Department prior to the closing of the record, Risen would have been on notice that the aberrancy information Risen had already provided (the surrogate country list import data) was going to be contested.  Risen would have been on notice, for example, to provide additional silver paste surrogate value data or data on the price of gold and silver articles to bolster its arguments.  While Risen maintains the record as it stands still clearly supports a finding that the Malaysian value is not the best available information to value silver paste, the total lack of equity in the Department's gamesmanship approach to this input deserves the Court's consideration.  If the Court does not direct the Department to disregard the Malaysian import value for silver paste on remand, Risen asks that the Court order the Department to open the record on remand for an opportunity for all parties to place additional information and benchmarks concerning silver paste on the record to address the Department's "after the last minute" supplement to the record in support of its intended selection for the surrogate value.

**II.    The Department's Selection of Malaysia as the Primary Surrogate Country is Not Supported by Substantial Evidence.**

The United States argues the Department's selection of Malaysia as the primary surrogate country is reasonable because Malaysia is a producer of solar modules and provides a financial statement from a producer of solar cells and modules.  However, the Bulgarian financial statement on the record demonstrates that Bulgaria has production of solar modules.  Moreover, Bulgaria provides superior data for silver paste and solar glass.  The Department failed to consider the superior data for these inputs in Bulgaria in determining to rely on Malaysia as the primary surrogate country.

The United States rejects that the Bulgarian company, New Energy Systems ("NES"), produces solar modules, but this conclusion is not supported by the full record.  U.S. Br. at 22-23.  The company lists "photovoltaic plant" and "photovoltaic systems" among its products.  Trina Prelim. SVs at Exhibit 14; **PR220**.  NES's webpage materials make clear that the company produces "solar thermal products" and is a market leader in Bulgaria for this industry.  Trina Prelim. SVs at Exhibit 14; **PR220**.  And most critically, NES operates using the Burnit Sunsystem name and its webpage lists two solar panels among its products.  *Id*.  The record establishes that NES does produce subject merchandise, and therefore Bulgaria produces subject merchandise and should be considered alongside Malaysia as a potential surrogate country.

The United States also still maintains that it was proper not to consider Bulgaria at the same level of economic development.  As explained in its opening brief, Bulgaria should be considered economically comparable with China based both on the 2017 and 2018 GNI lists.  In this review, the Department issued a surrogate country list based on 2017 per capita GNI.  The list is merely a selection of countries with a per capita GNI close to China that the Department claims, *without explanation*, are economically comparable and that the Department purports,

*without further explanation*, are most likely to have good data and availability.  The list is not exclusive but suggestive.  Bulgaria was not on the 2017 list, yet its GNI fell in the range of per capita GNI on the list.  The list had a country with a per capita GNI difference of $1280, but Bulgaria had a difference of only $930 with China.  The United States provides no explanation why such a determination would be reasonable, but merely says Commerce is not required to "apply the mathematical comparison that plaintiffs prefer."  U.S. Br. at 16.  However, the Department must still articulate a rational explanation for its determination.  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (The agency must "articulate any rational connection between the facts found and the choice made.").

Risen also cited to the 2017-2018 review of *Fresh Garlic from China* where the Department found that countries on both the 2017 and 2018 surrogate country lists are economically comparable to China.  The United States argues that review was different because the Department issued the 2018 surrogate country list in that case, so the 2017 surrogate country list existed at the time parties commented on the surrogate country list.  First, that does not undermine the Department's general conclusion in that case that countries with per capita GNI that are at the same level of economic development as China *during the POR* (i.e. 2017 and 2018) are fair game for consideration.  Second, Risen argued from the original GNI list comment deadline and the surrogate country deadline that Bulgaria should be considered as at the same economic development as China.  Therefore, the country was always in consideration on the timely submitted and argued record of this review, and no party was disadvantaged by consideration of Bulgaria.  Ultimately, no reasonable explanation exists why Bulgaria is not at the same level of economic comparability as China in the time span covered by this review.

In light of the foregoing, Bulgaria must also be considered alongside Malaysia as a potential surrogate country.  The Department generally relies upon the surrogate country that provides the best available information overall to value respondents' inputs.  Bulgaria provides a suitable financial statement but also superior surrogate data for two critical inputs: silver paste and solar glass.  As explained above, the Malaysia silver paste import value is not reliable.  In contrast, Bulgaria's silver paste import value is corroborated by the various benchmarks and other prices on this record.  *See* Risen 56.2 Br. at 27.  For solar glass, the Department has already found that Bulgaria and Romania provide the best available information to value this input.  IDM at 26.  The Department found Bulgaria and Romania HTS 7007.19.80 was both more specific to the solar glass used by respondents than the Malaysia HTS, but also was reported in the same quantity metric used by respondents.  *Id*. at 27.  Therefore, the Department already agrees that Bulgaria provides superior data for this critical input than Malaysia.  Risen submits that several other less critical inputs are more specific in Bulgaria as well.  *See* Risen R56.2 Br. at 38-39.

Bulgaria must be considered as a potential surrogate country in this review, it is economically comparable and produces identical merchandise.  The Department did not reasonably consider Bulgaria's economic comparability or fully address the quality of data in Bulgaria, requiring remand.

**III.    The Department's Surrogate Financial Ratio Calculation was Not Supported by Substantial Evidence.**

In the Final Results, the Department adjusted its calculation of Hanwha's financial ratios. As presented in its opening brief, as is common in calculating financial ratios, the Department had to allocate a remaining cost of goods sold ("COGS") to a certain type of expense.  The Department took the COGS line item, subtracted the "Cost of Raw Materials" line item (allocated to the raw materials column) and subtracted two depreciation cost line items (allocated

to the overhead column) and was left with 257,063 RM as the remaining COGS.  Risen R56.2

Br. at 29 (explaining this calculation in more detail).  Rather than allocating this to the MLE

denominator, with the assumption it covered energy or labor expenses nowhere else enumerated,

the Department allocated that remainder to overhead in the numerator.

The United States argues this was an appropriate calculation because the figure in the

"Cost of Raw Materials" line item includes the cost of raw materials, labor, and energy (but not

overhead).  U.S. Br. at 40-42.  However, this is contrary to the evidence in Hanwha's financial

statement and contrary to basic accounting.  The line item that the Department entitled "Cost of

Raw Materials" in its financial ratio calculation is from note 17, where the statement reads:

"during the year, the amount of inventories recognized as an expense in cost of sales of the

Group and of the Company were RM 1,648 million."  The reliance on this note is misplaced.

This figure in the inventories note does not allow the Department to bifurcate the

materials, labor, and energy ("MLE") costs from overhead costs.  The United States argument is

completely contrary to accounting understanding of COGS and inventory.  The standard

calculation of cost of goods sold for a manufacturing company is as follows:

- Direct materials + Direct labor + Factory overhead (which includes energy costs)
  = Total Manufacturing Costs

- Total Manufacturing Costs - Change in work in process inventory (WIP)
  (beginning WIP inventory – ending WIP inventory) - Change in finished goods
  inventory (beginning finished goods inventory – ending finished goods inventory)
  = Cost of goods sold

*See* Adolph Matz & Milton F. Usry, <u>Cost Accounting Planning & Control</u>, 19-21 (7th ed. 1980);

*see also* <u>Cost of Goods Sold Statement</u>, <https://learn.financestrategists.com/explanation/cost-

accounting/cost-of-goods-sold/cost-of-goods-sold-statement>.

Based upon this standard calculation of cost of goods sold, the reference in note 17 to "the amount of inventories recognized as an expense in cost of sales" can only refer to raw material inventories.  By definition, WIP and finished goods inventories are not "recognized as an expense in cost of sales."  Rather, the WIP and finished goods inventories are precisely those items that are not sold during the period and the change in these inventories is factored out of the COGS calculation (per above bullets).

Furthermore, the raw materials inventories clearly would not contain labor and manufacturing overhead costs (including energy).  Rather, as note 2.12 to the Hanwha financial statements expressly states, raw materials are based on "purchase costs."  The labor and manufacturing overheads are only taken into consideration in the valuation of work in process and finished goods inventories (i.e. not for all inventories).[1]  *Id*.

Moreover, the very fact that this inventories expense item of RM 1,648 million is not the same as the COGS total of RM 2,003 million demonstrates this fact on the record.  If this inventories figure included all of the costs to produce goods during the year, it would match the COGS total.  The difference between the 2,003,400,000 RM COGS reported in the Hanwha financial statements and the 1,648,000,000 RM raw material costs referenced in note 17 is not due to some mysterious, unnamed overhead as claimed by the Department.  Rather, the difference is attributable to the normal elements that make up COGS such as direct labor, energy and other factory overhead.  The only "numerator" factory overhead clearly identified in the

---

[1] Risen also notes that the United States bases its argument on note 2.12 where it states that finished goods and WIP inventories includes "costs of direct materials and labour and a proportion of manufacturing overheads."  First, this note only refers to finished goods and WIP.  Second, it also clearly states that "manufacturing overheads" are included in this inventory expenses.  Even if this note meant something closer to what the United States has argued, it still absolutely does not allow the Department to separate out MLE from overhead costs.

PUBLIC VERSION

Hanwha financial statements is depreciation and only this amount should be deducted from the COGS when determining the proper amount for MLE.

In sum, the inventories line item does not allow the Department to segregate out MLE expenses from overhead expenses in the COGS.  Accordingly, Risen submits that this line item should not be used in the ratio calculation at all because nothing can be gleaned about the type of expenses in COGS from this item.  The Hanwha statement does not allow the Department to segregate out any more costs (other than depreciation) from the remaining COGS (i.e. RM 1,903,307).

Thus, Risen submits the only logical calculation, consistent with Department practice, is to assign the remaining COGS to the MLE denominator.  The vast majority of COGS is material, labor, and energy costs.  Further, the majority of the costs that are generally allocated to Overhead are the depreciation of property, plant, and equipment, which have *already* been clearly delineated and allocated to the overhead ratio by the Department, which no party disputes.  For example, among the other four Malaysian financial statements on the record, the manufacturing depreciation costs represented 96% of the overhead costs.  *See* **Attachment 1** (analyzing the overhead costs in the record Malaysian statements).  But the Department's calculation of Hanwha's statement presumes that depreciation is only 28.03% of the total overhead costs.  *Id*.  Therefore, the record only supports Risen's argument that the majority of the overhead costs have already been assigned to the overhead numerator and thus the remaining COGS is primarily MLE expenses.[2]  Indeed, recognizing that MLE expenses are the

---

[2] In the alternative, the Department could apply reasonable facts available by determining that Hanwha's manufacturing overhead costs (100,093 RM) represent 96% of the manufacturing overhead costs.  The Department could then calculate 100% of the manufacturing overhead costs would be 104,263.54 RM, and the remaining COGS (1,899,136.46 RM) would be in the MLE denominator.

overwhelming majority of the "Cost of Sales," in less detailed financial statements likes this where raw materials, labor, and energy are not separately delineated, the Department normally allocates any remaining "Cost of Sales" costs to the MLE denominator.  *See* Risen R56.2 Br. at 29 (providing two examples of this common practice); *see also* **Attachment 2** (examples of Department ratio calculations).  The United States does not successfully distinguish these examples by reliance on Note 2.12 and 17 because, as explained, it presents costs on a different basis than the way COGS were calculated in Hanwha's financial statement.  As such, Note 2.12 and 17 do not permit a reasonable further parsing of the COGS figure.  This Court should remand to the Department to recalculate the ratios without reliance on the inventories expense note.

## IV.     The Department's HTS Classifications for Risen's Backsheet and EVA Film Inputs Are Not Supported by Substantial Evidence.

The Department relied upon the incorrect Malaysian HTS classifications to value Risen's backsheet and EVA film input.  The Department's basis for its classification of both of these inputs is an unsubstantiated difference between the flexibility of a "film" or a "sheet."  For each of these inputs, the Department made a conclusion based on its own idea of the input, rather than Risen's certified statements concerning the nature of its input.  In its response brief, the United States continually says it relied on the record as a whole, or relied on other information than Risen's preferred record evidence, yet fails to actually point to *any* record information.  U.S. Br. at 28-32.  The United States' arguments are conclusory and must be rejected.

For backsheet, the United States merely restates the Department's unsubstantiated conclusion that because the purpose of the backsheet is to protect the solar cells in the solar module, it cannot be a lighter, less rigid product as Risen proposes.  U.S. Br. at 28.  However, the record itself establishes that Risen's backsheet is a flexible, thin film that still protects the cells.

Risen's specifications for its backsheet show it is sold in rolls, demonstrating it is flexible.  Risen

Section D at Exhibit D-36; **PR160 CR134**.  The specification sheets also shows the thickness is

only [      ] mm.  *Id*.  Moreover, in the past the Department found that a backsheet, while still

protective, could be classified as a film under HTS 3920.62.90.  *See* Risen R56.2 Br. at 33-34

(discussing past classifications of this input).  The United States claims this is not relevant

because in the past the Department relied upon Thai data, not Malaysian data as in this review.

Malaysia and Thailand indeed use the same ASEAN tariff schedule, and the HTS relied upon in

the past have the same definition as Risen's suggested Malaysia HTS 3920.62.90.00.  Therefore,

the Department's sudden finding in this review, with no new information, that a backsheet for

solar cells could not be a flexible film is arbitrary and unsupported by the record.

For Risen's EVA input, the United States claims that Risen's arguments are weak

because "Commerce neither relied solely on the input name nor thickness to make its selections."

U.S. Br. at 42.  However, Risen was merely addressing the Department's own justification that

the input was called EVA sheet and it had a thickness over 0.5mm, which the Department itself

reasoned to mean it was a sheet, not a flexible film.  IDM at Comment 11.  The United States

primarily criticized Risen's definitions and evidence of its classification, while not providing

alternative evidence.  The only record citation made by the United States was the citation to

Risen's description of its input in a supplemental D questionnaire.  U.S. Br. at 31 citing Risen

Supp. Qre at Exhibit S2-1; **PR251**.  In this exhibit, Risen defines its EVA input as "ethylene-

vinyl acetate sheet, semitransparent, non-rigid, not plate or sheet, with thickness over 0.5mm."

*Id*.  While the description of it as "ethylene-vinyl acetate sheet" and "not plate or sheet" in the

same sentence may be confusing, it certainly does not justify that this input must be sheet within

the meaning of the HTS.  Yet, this is the only record "evidence" that the United States cites to support its HTS choice.

In contrast, the HTS description that Risen has maintained best matches this input is closer to this description: HTS 3920.10.90 covers "other" than sheets or plates.  Risen has also provided the specification sheets of Risen's EVA purchases to demonstrate that the EVA is not a plate or sheet, but is purchased in flexible films.  *See* Risen Final SVs Part II at Exhibit SV2-12 (EVA specifications); **CR412 PR374**.  The name of the product purchased by Risen is specifically described as "EVA <u>film</u>." *Id*.  Despite repeating the phrase that it relied on the record as a whole, the United States has not in fact relied on the record as a whole.  The United States has adopted positions without record support and overlooked record evidence that significantly detracts from its suppositions.  The Court should find that the Department's classifications for these two inputs is not supported by substantial evidence.

## V.      The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence.

The Department's application of adverse facts available for certain FOPs from unaffiliated solar cell and module suppliers to Risen is not supported by the record.  The United States maintains that Risen did not cooperate to the best of its ability to obtain these FOPs and that per *Mueller*, it is appropriate to apply AFA.  U.S. Br. at 46-58.

As explained in Risen's opening brief, Risen documented several attempts to obtain this data from its suppliers, including threatening to stop purchasing from the suppliers.  Despite these attempts to induce cooperation from completely unaffiliated suppliers, the United States holds this was not adequate.  The United States' position is essentially that Risen should have ensured in advance that it could get this information from its suppliers or should have refused to purchase from them.  Such a standard is wholly unreasonable, as this Court has previously found

on several occasions. *See*, e.g., *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020). Risen has no control over these unaffiliated suppliers in a large competitive market where Risen is not in a particular situation to leverage cooperation. The large variety of suppliers, each providing only a small amount of Risen's production data, that Risen must rely upon to meet its supply needs is not one where the purchasers have the leverage. And Risen's extensive but largely unsuccessful attempts to garner cost data from different suppliers in multiple reviews only indicates that even if Risen terminates its business with its suppliers, Risen will have no better luck inducing cooperation with the next suppliers. Critically, the Court has emphasized that it is unfair and contrary to law for the Department to employ an adverse inference when the cooperating party has no control over the non-cooperating supplier. *See* Risen R56.2 Br. at 45-46 (discussing caselaw on this precise issue in multiple solar appeals).

Likewise, the United States' reliance on *Mueller* is misplaced. Risen has already addressed the United States' attempts to argue that Risen's situation is similar to the policy interests in *Mueller*. Each of these arguments fails, as this Court has previously found. *Risen Energy* at 1343-44 (addressing how *Mueller*'s policy interests are not applicable to Risen's situation). Unlike *Mueller*, none of Risen's suppliers export to the United States, and no legitimate concerns of duty evasion exist. Unlike *Mueller*, the application of AFA to Risen has no legitimate effect to incentivize these suppliers to cooperate. Lastly, *Mueller*'s accuracy interests are certainly not met by using the highest FOP consumption rates. The United States hypothesizes that because the suppliers will not provide their FOP data, their consumption rates are presumably higher and therefore its application of AFA is accurate. U.S. Br. at 56. This completely misconstrues business reality. These suppliers have not cooperated because they simply do not have to. They are not dependent on Risen for their business. Unfounded

PUBLIC VERSION

speculation is not substantial evidence on this record. *Bowen v. American Hospital Asso.*, 476

U.S. 610, 626 (1986) ("Agency deference has not come so far" that agency action is upheld

"whenever it is possible to 'conceive a basis' for administrative action.")

In sum, as the Court has found in several cases now, the Department's application of

AFA for the FOPs of uncooperative cell providers is contrary to law as well as unsupported by

substantial evidence in light of the specific context of the unaffiliated suppliers in this review.

## VI.     Conclusion

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court

remand this case for redetermination of the issues presented in Risen's moving brief and this

reply brief.

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
                *Counsel to Plaintiff*

</div>

Date: November 5, 2021

<div style="margin-left: 40%;">

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar
members pursuant to D.C. Bar Rule 49(c)(8).

</div>

PUBLIC VERSION

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,994** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Attachment 1

**Analysis of Malaysian Financial Statements**

| Company | Manufacturing Overhead | Depreciation in MOH | | depreciation % of MOH |
|---|---|---|---|---|
| Globetronics | 37,299 | 34,620 | | 92.82% |
| MPI | 184,020 | 180,676 | | 98.18% |
| Unisem | 60,484 | 60,484 | | 100.00% |
| Inari | 67,943 | 64,094 | | 94.33% |
| | | | | |
| Hanwha Q Cells Final Ratio Calculation | 357,156 | 100,093 | | 28.03% |

*See* Petitioner Prelim. SVs (September 19, 2019) at Exhibit 11 (containing the above four Malaysian financial statements and ratios); **PD203**

Attachment 2

Barcode:3851179-01 A-570-086 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-086
Investigation
POI:  10/1/2017 - 03/31/2018
**Public Version**
E&C AD/CVD OIII:  LRL/SB

June 17, 2019

**MEMORANDUM TO**:      The File

THROUGH:                Brendan Quinn
                        Program Manager, Office III
                        Enforcement and Compliance

FROM:                   Laurel LaCivita
                        Senior International Trade Analyst, Office III
                        Enforcement and Compliance

                        Stephanie Berger
                        International Trade Analyst, Office III
                        Enforcement and Compliance

**SUBJECT**:            Analysis Memorandum for the Final Determination of the
                        Antidumping Duty Investigation of Steel Propane Cylinders from
                        the People's Republic of China:  Shandong Huanri Group Co., Ltd.

This memorandum describes changes to the margin calculations since the preliminary
determination for Shandong Huanri Group Co., Ltd. (Huanri) in connection with the
antidumping duty investigation of steel propane cylinders from the People's Republic of China
(China).

**Final Margin Statistics**

Total Amount of Dumping:     $ [          ][1]
Total U.S. Sales Value:      $ [          ][2]
Weighted-average margin:        25.52 Percent[3]

---

[1] *See* Attachment 3 at page 299.
[2] *Id.*
[3] *Id.*, at page 304.



**List of Attachments**

1. List of Surrogate Values (*Business-Proprietary Information Not Subject to Public Summary*)

2. SAS Margin Calculations - Log (*Business-Proprietary Information Not Subject to Public Summary*)

3. SAS Margin Calculations - Output (*Business-Proprietary Information Not Subject to Public Summary*)

4. Revised OPD Weight Calculation (*Business-Proprietary Information Not Subject to Public Summary*)

Barcode:3851179-01 A-570-086 INV - Investigation  -

# ATTACHMENT 1

## *(Business-Proprietary Information Not Subject To Public Summary)*

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

SOURCE: KKB 2017

| Items | Schedule | Income Statement Amounts | Category | Raw Material (RM) | Labor | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | |
| interest income | P&L | 209,297,976.00 | Exclude | | | | | | | | 209,297,976.00 |
| other income | P&L | 3,078,919.00 | SGA | | | | | | (3,078,919.00) | | |
| | P&L | 5,344,796.00 | | | | | | | | | |
| - Dividend income from short term funds | | 1,676,772.00 | Exclude | | | | | | | | 1,676,772.00 |
| - Fair value changes in short term funds | | 1,736,570.00 | SGA | | | | | | (1,736,570.00) | | |
| - Gain on Disposal of property, plant, and equipment | | 162.00 | Profit | | | | | | | (162.00) | |
| - Insurance Compensation | | 350.00 | SGA | | | | | | (350.00) | | |
| - Miscellaneous Income | | 1,254,765.00 | SGA | | | | | | (1,254,765.00) | | |
| - Realized foreign exchange Gain | | 207,678.00 | SGA | | | | | | (207,678.00) | | |
| - Unrealized foreign exchange gain | | 5,197.00 | SGA | | | | | | (5,197.00) | | |
| - Rental income | | 347,900.00 | SGA | | | | | | (347,900.00) | | |
| - Reversal of bad debts written off | | 115,402.00 | SGA | | | | | | (115,402.00) | | |
| **Total Income** | | **212,376,895.00** | | **a** | - | - | - | - | - | **(6,746,781.00)** | **(162.00)** | **210,974,748.00** |
| **EXPENSE:** | | | | | | | | | | | |
| *Cost of Sales* | P&L | 196,862,365.00 | | | | | | | | | |
| *Cost of Sales remaining* | | 154,147,411.00 | energy | | | 154,147,411.00 | | | | | |
| Beginning Inventory - Raw Materials | 15.00 | 21,075,120.00 | RM | 21,075,120.00 | | | | | | | |
| Ending Inventory - Raw Materials | 15.00 | (26,600,789.00) | RM | (26,600,789.00) | | | | | | | |
| Beginning Inventory - WIP | 15.00 | 2,258,236.00 | RM | 2,258,236.00 | | | | | | | |
| Ending Inventory - WIP | 15.00 | (4,401,852.00) | RM | (4,401,852.00) | | | | | | | |
| Beginning Inventory - finished goods | 15.00 | 3,042,351.00 | TFG | | | | | 3,042,351.00 | | | |
| Ending Inventory - finished goods | 15.00 | (3,202,565.00) | TFG | | | | | (3,202,565.00) | | | |
| Beginning Inventory - consumables | 15.00 | 770,402.00 | RM | 770,402.00 | | | | | | | |
| Ending Inventory - consumables | 15.00 | (643,021.00) | RM | (643,021.00) | | | | | | | |
| Beginning Inventory - other | 15.00 | 176,838.00 | RM | 176,838.00 | | | | | | | |
| Ending Inventory - other | 15.00 | (165,778.00) | RM | (165,778.00) | | | | | | | |
| depreciation | 8.00 | 12,544,205.00 | MOH | | | | 12,544,205.00 | | | | |
| employee benefits | 8.00 | 36,803,457.00 | labor | | 36,803,457.00 | | | | | | |
| rental expense | 8.00 | 1,058,350.00 | MOH | | | | 1,058,350.00 | | | | |
| *administrative expenses* | P&L | 14,867,542.00 | SGA | | | | | | 14,867,542.00 | | |
| *distribution expenses* | P&L | 635,940.00 | SGA | | | | | | 635,940.00 | | |
| *other expenses* | P&L | 1,191,448.00 | SGA | | | | | | 1,191,448.00 | | |
| *share of results of associates* | P&L | (2,729,464.00) | SGA | | | | | | (2,729,464.00) | | |
| Financial Expenses: | P&L | 520,115.00 | SGA | | | | | | 520,115.00 | | |
| Calculate Sub Totals | | 211,347,946.00 | | b | (7,530,844.00) | 36,803,457.00 | 154,147,411.00 | 13,602,555.00 | (160,214.00) | 14,485,581.00 | - | |
| *Profit from Income Statement (Input)* | | 6,373,745.00 | Profit | c | | | | | | | 6,373,745.00 | |
| | | | Total For Calculations | d = b + c - a | (7,530,844.00) | 36,803,457.00 | 154,147,411.00 | 13,602,555.00 | (160,214.00) | 7,738,800.00 | 6,373,583.00 | |
| Calculate (Revenue - Expenditures - Profit = zero) | Check Total | | | - | d1 | d2 | d3 | d4 | d5 | d6 | d7 | |

e = d1+d2+d3 | 183,420,024.00

Total Material, Labor, and Energy
Overhead as % of Material, Labor & Energy | =d4/e | 7.42%

f = d4+d5+e | 196,862,365.00

Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods
SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | =d6/f | 3.93%

g=d6+f | 204,601,165.00

Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest
Profit as % of Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | =d7/g | 3.12%

Barcode:3840937-01 A-570-093 INV - Investigation

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-093
Investigation
Public Document
AD/CVD I:  TES/AP

May 28, 2019

MEMORANDUM FOR:      The File

THROUGH:      Dana S. Mermelstein
Program Manager
AD/CVD Operations, Office I

FROM:      Thomas Schauer
Senior International Trade Compliance Analyst
AD/CVD Operations, Office I

Aimee Phelan
International Trade Compliance Analyst
AD/CVD Operations, Office I

SUBJECT:      Refillable Stainless Steel Kegs from the People's Republic of
China:  Surrogate Values for the Preliminary Affirmative
Determination of Sales at Less Than Fair Value

---

## I.      Introduction and Methodology

This memorandum explains the factor valuations used in the preliminary determination of the
antidumping duty investigation of refillable stainless steel kegs (kegs) from the People's
Republic of China (China).  The period of investigation (POI) is January 1, 2018, through June
30, 2018.

The Department of Commerce (Commerce) selected Malaysia as the primary surrogate country
for valuing the individually investigated respondent's factors of production (FOPs).  The
petitioner in this investigation is the American Keg Company, LLC (the petitioner).  The
individually investigated respondent is Ningbo Master International Trade Co., Ltd. (Ningbo
Master).  Commerce identified values from publicly available sources relating to Malaysia to
value FOPs.  In selecting the surrogate values (SVs) detailed below, Commerce reviewed and
evaluated the comments received from interested parties.[1]

---

[1] *See* the petitioner's Letters, "Refillable Stainless Steel Kegs from the People's Republic of China: Comments on
Selection of the Primary Surrogate Country," dated December 10, 2018 (Petitioner SC Comments), "Refillable
Stainless Steel Kegs from the People's Republic of China: Surrogate Value Information," dated February 19, 2019
(Petitioner SV Comments), "Refillable Stainless Steel Kegs from the People's Republic of China: Rebuttal and
Other Surrogate Value Information," dated March 1, 2019 (Petitioner SV Rebuttal Comments) and "Refillable
Stainless Steel Kegs from the People's Republic of China: Rebuttal Surrogate Value Information," dated May 6,
2019 (Petitioner SV Rebuttal Comments 2); Ningbo Master's Letters, "Refillable Stainless Steel Kegs from the
People's Republic of China - Comments on the Surrogate Country List," dated November 6, 2018 (Ningbo Master



**Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit**

SOURCE: IHS Heng Seng 2018

| Items | Schedule | Income Statement Amounts | Breakout | Category | Materials, Labor, Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | |
| other income | P&L | 12,740,859 | | Exclude | | | | | | 12,740,859 |
| | P&L | 13,433 | | SGA | | | | 13,433 | | |
| Total Income | | 12,754,292 | | | a     - | - | - | - | - | 12,740,859 |
| **EXPENSE:** | | | | | | | | | | |
| *Cost of Sales* | P&L | 10,763,898 | | MLE | 10,763,898 | | | | | |
| Beginning FG | Note 7 | | 439,758 | TFG | (439,758) | | 439,758 | | | |
| Ending FG | Note 7 | | 717,963 | TFG | 717,963 | | (717,963) | | | |
| Amort of Leasehold Land | Note 5 | | 5,670 | MOH | | 5,670 | | | | |
| Depreciation of Factory Building | Note 5 | | 7,850 | MOH | | 7,850 | | | | |
| Depreciation of Plant and Machinery | Note 5 | | 360,713 | MOH | | 360,713 | | | | |
| Factory Rental | Note 20 | | 75,000 | MOH | | 75,000 | | | | |
| Total of MOH Items Above (remove from MLE denom) | | | 449,233 | | (449,233) | | | | | |
| administrative expenses | P&L | 1,181,592 | | SGA | | | | 1,181,592 | | |
| other operating expenses | P&L | 511,350 | | SGA | | | | 511,350 | | |
| **Financial Expenses:** | P&L | 98,513 | | SGA | | | | 98,513 | | |
| Calculate Sub Totals | | 12,555,353 | | b | 10,592,870 | | (278,205) | 1,791,455 | | - |
| *Profit from Income Statement (Input)* | | 198,939 | 198,939 | Profit | c | | | | 198,939 | |
| **Total For Calculations** | | 10,592,870 | | d = b + c - a | 10,592,870 | 449,233 | (278,205) | 1,778,022 | 198,939 | (12,740,859) |
| | | | | | d1 | d4 | d5 | d6 | d7 | d8 |
| | | | | | d2 | | | | | |
| | | | | | d3 | | | | | |

| | | |
|---|---|---|
| Total Material, Labor, and Energy | e = d1+d2-d3 | 10,592,870 |
| Overhead as % of Material, Labor & Energy | =d4/e | 4.24% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | f = d4+d5+e | 10,763,898 |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | =d6/f | 16.52% |
| Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | g=d6+f | 12,541,920 |
| Profit as % of Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | =d7/g | 1.59% |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-904
POR: 4/1/2018-3/31/2019
Public Document
E&C/VIII:  MJA

April 29, 2020

MEMORANDUM TO:   The File

THROUGH:              Kathleen Marksberry
                              Program Manager, Office VIII
                              Enforcement & Compliance

FROM:                   Jinny Ahn
                              International Trade Compliance Analyst, Office VIII
                              Enforcement & Compliance

RE:                        Twelfth Administrative Review of Certain Activated Carbon from the
                              People's Republic of China:   Surrogate Values for the Preliminary
                              Results

---

**SUMMARY**

The Department of Commerce (Commerce) is conducting an administrative review (AR) of
certain activated carbon (activated carbon) from the People's Republic of China (China).   This
memorandum outlines the methodology and selection of surrogate values (SVs) used in the
calculation of normal value (NV) and export price (EP) or constructed export price (CEP) for the
preliminary results of this proceeding.   Commerce has determined that Malaysia is the
appropriate primary surrogate country (SC) to use in this review.[1]   Consistent with recent
determinations involving non-market economy (NME) countries,[2]  we selected, where
appropriate, and to the extent possible, values from publicly available information from the
primary surrogate country to value the factors of production (FOPs).

Commerce has summarized the SV information for each FOP, packing material, financial ratios,
and U.S. sale adjustments in the attached worksheets.   See Attachment 1 to this memorandum.
In selecting the best available information for valuing the FOPs in accordance with section
773(c)(1) of the Tariff Act of 1930, as amended (the Act), Commerce selected, to the extent
practicable, SVs which are: 1) non-export average values, 2) representative of a range of prices

---

[1]  See Memorandum "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative
Review:   Certain Activated Carbon from the People's Republic of China; 2018-2019," dated April 29, 2020.
[2]  See, e.g., Certain Steel Threaded Rod from the People's Republic of China: Final Results of Antidumping Duty
Administrative Review; 2012-2013, 79 FR 71743 (December 3, 2014) and accompanying Issues and Decision
Memorandum (IDM) at Comment 1; and Aluminum Extrusions from the People's Republic of China: Final Results
of Antidumping Duty Administrative Review; 2012-2013, 79 FR 78784 (December 31, 2014) and accompanying
IDM at Comment 1A.

Barcode:3968724-02 A-570-904 REV - Admin Review 4/1/18 - 3/31/19

## ATTACHMENT 1

Surrogate Values

*See* Attached Electronic Excel Spreadsheets

SOURCE: Century Chemical Works Serdlan Birhad – Financial Statements for the period ending 12/31/2017 (Preliminary November 12, 2019 SV submission)

Manufacturing Overhead, SG&A and Profit Ratio Calculation

| Income and Expense Items From the P&L Statement and Accompanying Schedules | Schedule | P&L (Income)/ Statement Amounts | Brackets per Notes to Financial Statements | Raw Materials (M) | Labor (L) | Energy (E) | Mfg Overhead (OH) | Traded/Finished Goods (TF) & Change in Finished Goods | SG&A and Interest (SGA) | Profit (P) and Adjustments to Profit | Excluded (X) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | | | | |
| Sales Revenue | Note 20 | (68,334,165) | | | | | | | | | (68,334,165) |
| Rental Income | Note 20 | (1,076,760) | | | | | | | (1,076,760) | | |
| | | (69,410,925) | | - | - | - | | - | (1,076,760) | - | (68,334,165) |
| **Expenditures:** | | | | | | | | | | | |
| Cost of Sales | IS | 47,736,521 | | 47,736,521 | | | | | | | |
| Factory Fittings and Equipment | Note 6 | | 126,792 | | | | 126,792 | | | | |
| Long Term Leasehold Land and Buildings | Note 6 | | 167,578 | | | | 167,578 | | | | |
| Plant and Machinery | Note 6 | | 1,456,349 | | | | 1,456,349 | | | | |
| Beginning Finished Goods Inventory | Note 12 | | 13,410,479 | | | | | 13,410,479 | | | |
| Ending Finished Goods Inventory | Note 12 | | (10,277,193) | | | | | (10,277,193) | | | |
| Adjustment to Cost of Sales | Calculated | | (4,884,005) | (4,884,005) | | | | | | | |
| | | | 4,884,005 | | | | | | | | |
| Administrative Expense | IS | 10,940,139 | | | | | | | 10,940,139 | | |
| Other Operating Income | IS | (4,868,295) | | | | | | | (4,868,295) | | |
| **Total Expenditure** | | 53,808,365 | | 42,852,516 | - | - | 1,750,719 | 3,133,286 | 6,071,844 | - | - |
| **Profit** (Note: Enter the profit before tax from the I/S) | | (15,602,560) | | | | | | | | 15,602,560 | |
| **Total Expenditures less Revenue** | | (15,602,560) | | 42,852,516 | - | - | 1,750,719 | 3,133,286 | 4,995,084 | 15,602,560 | (68,334,165) |

53,808,365 [B]

(15,602,560) [A÷B]

SB zero

| | |
|---|---|
| Profit Check (X zero (Revenue less Expenditures less Profit)) | - |
| Total Material, Direct Labor, and Energy Inputs | 42,852,516 |
| **Manufacturing Overhead as % of Raw Materials, Direct Labor & Energy** | **4.09%** |
| Total Material, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | |
| SG&A as % of Raw Materials, Energy, Mfg Overhead, Traded/Finished Goods, & Traded/Finished Goods | 47,736,521 |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A and Interest | **18.46%** |
| | 53,731,608 |
| Profit as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest) | **29.59%** |

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

SOURCE: Tan Meng Keong FS 2017 (Petitioners' November 12, 2019 SV submission)

| Income and Expense Items From the P&L Statement and Accompanying Schedules | Schedule | P&L (Income) Statement Amounts | Breakouts per Notes to Financial Statements | Raw Materials (M) | Labor (L) | Energy (E) | Mfg Overhead (OH) | Traded/Finished Goods (TF) & Change in Finished Goods | SG&A and Interest (SGA) | Profit (P and Adjustments to Profit) | Excluded (X) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | | | | | |
| Sales Revenue | IS | (2,665,786) | | | | | | | | | (2,665,786) | |
| **Total Revenue** | | (2,665,786) | | - | - | | - | - | - | | (2,665,786) | |
| **Expenditures:** | | | | | | | | | | | | |
| Cost of Sales | IS | 2,016,457 | | 2,016,457 | | | | | | | | |
| Depreciation-Factory Buildings | Note 4 | | 14,610 | | | | 14,610 | | | | | |
| Depreciation-Plant and Machinery | Note 4 | | 55,046 | | | | 55,046 | | | | | |
| Depreciation-Kongsi House | Note 4 | | 3,197 | | | | 3,197 | | | | | |
| Depreciation-Fixtures | Note 4 | | 52 | | | | 52 | | | | | |
| Depreciation-Factory Equipment | Note 4 | | 4,607 | | | | 4,607 | | | | | |
| Depreciation-Laboratory Extension | Note 4 | | 412 | | | | 412 | | | | | |
| Depreciation-Electrical Installation | Note 4 | | 6,601 | | | | 6,601 | | | | | |
| Beginning Finished Goods Inventory | Note 6 | | 1,457,715 | | | | | 1,457,715 | | | | |
| Ending Finished Goods Inventory | Note 6 | | (1,393,239) | | | | | (1,393,239) | | | | |
| Adjustment to Cost of Sales | Calculated | | 149,001 | (149,001) | | | | | | | | |
| Other Income | IS | (24,993) | | | | | | | (24,993) | | | |
| Administrative Expense | IS | 306,538 | | | | | | | 306,538 | | | |
| Staff Costs | IS | 211,204 | | | | | | | 211,204 | | | |
| Finance Costs | IS | 144,817 | | | | | | | 144,817 | | | |
| **Total Expenditure THB** | | 2,654,023 | | 1,867,456 | | | 84,525 | 64,476 | 637,566 | - | 2,654,023 | B |
| **Profit** (Note: Enter the profit before tax from the I/S) | | (11,763) | | | | | | | | 11,763 | (11,763) | A=B |
| | | - | | 1,867,456 | - | - | 84,525 | 64,476 | 637,566 | 11,763 | (2,665,786) | SB |
| | | | | | | | | | | | | - zero |

**Profit Check: (b zero (Revenue less Expenditures less Profit))**

| | | |
|---|---|---|
| Total Material, Direct Labor, and Energy Inputs | | 1,867,456 |
| Manufacturing Overhead as % of Raw Materials, Direct Labor & Energy | 1,867,456 | 4.53% |
| Total Material, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | | 2,016,457 |
| SG&A as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | 2,016,457 | 31.62% |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A and Interest | | 2,654,023 |
| Profit as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest | 2,654,023 | 0.44% |

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit
SOURCE: Bravo Green FS 2017 (Petitioner November 22, 2019 SV submission)

| Income and Expense Items From the P&L Statement and Accompanying Schedules | Schedule | P&L (Income) Statement Amounts | Breakouts per Notes to Financial Statements | Raw Materials (M) | Labor (L) | Energy (E) | Mfg Overhead (OH) | Traded/Finished Goods (TF) & Change in Finished Goods | SG&A and Interest (SGA) | Profit (P) and Adjustments to Profit | Excluded (X) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income: | | | | | | | | | | | | |
| Sales Revenue | IS | (1,515,121) | | | | | | | | | (1,515,121) | |
| **Total Revenue THB** | | (1,515,121) | | - | - | - | - | - | - | - | (1,515,121) | -1,515,121 |
| Expenditures: | | | | | | | | | | | | |
| Cost of Sales | IS | 981,733 | | 981,733 | | | | | | | | |
| Other Income | IS | (15,898) | | | | | | | (15,898) | | | |
| Operating Expenses | IS | 325,725 | | | | | | | 325,725 | | | |
| Depreciation | IS | 94,387 | | | | | | | | | | |
| Depreciation-Factory Building & Renovation | Note 5 | 22,007 | 22,007 | | | | 22,007 | | | | | |
| Depreciation-Tools & Equipment, Plant & Machinery | Note 5 | 3,707 | 3,707 | | | | 3,707 | | | | | |
| SG&A-Depreciation: Furniture, Fittings, Equipment | Note 5 | 68,673 | 68,673 | | | | | | 68,673 | | | |
| Finance Cost | IS | 7,064 | | | | | | | 7,064 | | | |
| **Total Expenditure** | | 1,393,011 | | 981,733 | - | - | 25,714 | 0 | 385,564 | - | - | 1,393,011 B |
| Profit | | | | | | | | | | | | |
| (Note: Enter the profit before tax from the IS) | | (122,110) | | | | | | | | 122,110 | | (122,110) A×B |
| **Total Expenditure less Revenue** | | - | | 981,733 | - | - | 25,714 | - | 385,564 | 122,110 | (1,515,121) | SB zero |
| Profit Check wh zero (Revenue less Expenditures less Profit) | | | | | | | | | | | | - zero |
| Total Material, Direct Labor and Energy Inputs | | | | 981,733 | | | | | | | | |
| Manufacturing Overhead as % of Raw Materials, Direct Labor & Energy | | | | 2.62% | | | | | | | | |
| Total Material, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | | | | 1,007,447 | | | | | | | | |
| SG&A as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | | | | 38.27% | | | | | | | | |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A and Interest | | | | 1,393,011 | | | | | | | | |
| Profit as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest | | | | 8.77% | | | | | | | | |

Barcode:3938463-01 A-570-051 REV - Admin Review 6/23/17 - 12/31/18 Approved ...

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-051
POR:   6/23/2017-12/31/2018
**Public Document**
E&C/V:   KJA

January 31, 2020

MEMORANDUM TO:    The File

THROUGH:    Emily Halle
    Acting Program Manager, Office V
    Enforcement & Compliance

FROM:    Kabir Archuletta
    Senior International Trade Analyst, Office V
    Enforcement & Compliance

RE:    Certain Hardwood Plywood Products from the People's Republic of
    China:   Preliminary Surrogate Value Memorandum

---

## SUMMARY

The Department of Commerce (Commerce) is conducting an administrative review of certain hardwood plywood products from the People's Republic of China (China).   This memorandum outlines the methodology and selection of surrogate values (SVs) used in the calculation of normal value (NV) and export price (EP) for the preliminary results of this review.   Commerce has determined that Malaysia is the appropriate surrogate country to use for the preliminary results in this review.[1]   For an explanation of the decision to select Malaysia as the primary surrogate country for the preliminary results, *see* the Preliminary Decision Memorandum.   In selecting the SVs detailed below, Commerce reviewed and evaluated the comments received from the petitioner and mandatory respondent, Linyi Chengen Import and Export Co., Ltd (Chengen).[2]

The period of investigation (POI) is July 1, 2018, through December 31, 2018.

---

[1]   *See* Memorandum, "Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Certain Hardwood Plywood Products from the People's Republic of China; 2017-2018," dated January 31, 2020 (Preliminary Decision Memorandum).

[2]   Petitioner's Letter, "Comments on Surrogate Country Selection," dated August 23, 2019 (Petitioner SC Comments); Chengen Letter, "Comments on the Surrogate Country List & Primary Surrogate Country," dated August 23, 2019 (Chengen SC Comments); Petitioner's Letter, "Submission of Surrogate Values," dated September 13, 2019 (Petitioner SV Comments); Chengen Letter, "Preliminary Surrogate Value Submission," dated September 13, 2019 (Chengen SV Comments); Chengen Letter, "Rebuttal Surrogate Value Submission," dated September 23, 2019 (Chengen Rebuttal SV Comments); Petitioner's Letter, "Final Surrogate Value Submission," dated January 2, 2020 (Petitioner Pre-Prelim SV Comments); and Chengen Letter, "Final Surrogate Value Submission," dated January 2, 2020 (Chengen Pre-Prelim SV Comments).

Barcode:3938463-01 A-570-051 REV - Admin Review 6/23/17 - 12/31/18 Plywood AR1

Attachment List
*Contained in the accompanying electronic file*

Attachment 1:              Summary Spreadsheet
Attachment 2:              Significant Production
Attachment 3a-f:           GTA Data
Attachment 4:              Scrap SV
Attachment 5:              Water
Attachment 6:              Electricity
Attachment 7:              Natural Gas – Steam
Attachment 8:              Movement Expenses
Attachment 9:              Labor
Attachment 10:             Financial Ratios

Financial Ratios

| | OH | SGA | Profit |
|---|---|---|---|
| Focus Lumber Berhad | 3.75% | 8.44% | 27.60% |
| Fu Yee Corporation | 0.66% | 12.22% | 0.23% |
| Megamas Plywood Sdn. Bhd. | 4.02% | 1.21% | 1.79% |
| Ta Ann Plywood Sdn. Bhd. | 0.02% | 9.95% | 4.82% |
| Average | 2.11% | 7.96% | 8.61% |

Source:          Petitioner's September 13, 2019, SV Comments at Exhibit M-10.
                 Chengen's January 2, 2020, Pre-Prelim SV Comments at Exhibits 2, 3, 5, 6, 7, 8, a

Barcode:3890410-04 A-570-051 REV - Admin Review 6/23/17 - 12/31/18

## Focus Lumber Berhad 2018 Annual Report

| | | Amount | MLE | FOH | Trading Goods | SG&A | Interest | Profit | Excluded |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue from contracts with customers** | | | | | | | | | |
| Sale of veneer, plywood and LVL | Income Statement | **203,427,552** | | | | | | | 203,427,552 |
| | Note 4 | **191,719,081** | | | | | | | 191,719,081 |
| Freight income | Note 4 | **11,187,753** | (11,187,753) | | | | | | |
| Sale of electricity | Note 4 | **520,718** | (520,718) | | | | | | |
| | | | | | | | | | |
| Cost of sales | Income Statement | **-159,877,585** | 159,877,585 | | | | | | |
| | | | | | | | | | |
| Depreciation: | | | | | | | | | |
| Motor vehicles, Heavy equipment, plant and machinery | Note 12 | 4,748,601 | (4,748,601) | 4,748,601 | | | | | |
| Factory and Office buildings | Note 12 | 229,845 | (229,845) | 229,845 | | | | | |
| | | | | | | | | | |
| Inventory Changes | | | | | | | | | |
| Raw materials Beginning | Note 17 | 437,350 | 437,350 | | | | | | |
| Raw materials Ending | Note 17 | **5,850,332** | (5,850,332) | | | | | | |
| Work-in-progress Beginning | Note 17 | 3,885,508 | 3,885,508 | | | | | | |
| Work-in-progress Ending | Note 17 | **8,908,786** | (8,908,786) | | | | | | |
| Finished goods Beginning | Note 17 | 11,173,110 | | | 11,173,110 | | | | |
| Finished goods Ending | Note 17 | **22,769,272** | | | (22,769,272) | | | | |
| | | | | | | | | | |
| **Gross profit** | Income Statement | **43,549,967** | | | | | | | 43,549,967 |
| **Other items of income** | Income Statement | | | | | | | | |
| Interest income | Income Statement | **545,201** | | | | | | | 545,201 |
| Fixed deposits | Note 5 | 13,890 | | | | | (13,890) | | |
| Foreign currency account | Note 5 | 213,678 | | | | | (213,678) | | |
| Current account | Note 5 | 317,633 | | | | | (317,633) | | |
| **Other income** | Income Statement | **4,306,735** | | | | | | | 4,306,735 |
| Distribution income from equity instruments | Note 6 | 1,758,864 | | | | | | | 1,758,864 |
| Net gain on foreign exchange realized | Note 6 | 1,229,734 | | | | | (1,229,734) | | |
| Net fair value gain on equity instruments | Note 6 | 668,344 | | | | | | | 668,344 |
| Rental income from | Note 6 | | | | | | | | |
| - land | Note 6 | 14,151 | | | | | | | 14,151 |
| - investment properties | Note 6 | 252,000 | | | | | | | 252,000 |
| - car park lot | Note 6 | 8,640 | | | | | | | 8,640 |
| Sundry income | Note 6 | 375,002 | | | | | | | 375,002 |
| | | | | | | | | | |
| **Other items of expense** | Income Statement | | | | | | | | |
| Administrative expenses | Income Statement | **-8,380,184** | | | | 8,380,184 | | | |
| Other expenses | Income Statement | **-2,271,925** | | | | 2,271,925 | | | |
| **Profit before tax** | Income Statement | **37,749,794** | | | | | | 37,749,794 | |
| | | | 132,754,408 | 4,978,446 | (11,596,162) | 10,652,109 | (1,774,935) | 37,749,794 | 446,625,537 |

| | | |
|---|---|---|
| FOH | 4,978,446 | 132,754,408 | 3.75% |
| SG&A | 10,652,109 | 126,136,692 | 8.44% |
| Profit | 37,749,794 | 136,788,801 | 27.60% |

Filed By: tbrightbill@wileyrein.com, Filed Date: 9/13/19 4:45 PM, Submission Status: Approved

000125

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

SOURCE: *Fu Yee YE 2016-12-31*

| Items | Schedule | Income Statement Amounts | Category | Raw Material (RM) | Labor | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE: | | | | | | | | | | | |
| REVENUE: | P&L | 64,595,527 | Exclude | | | | | | | | 64,595,527.00 |
| Total Income | | 64,595,527 | *a* | | | | | | | | 64,595,527 |
| EXPENSE: | | | | | | | | | | | |
| Cost of Sales | P&L | 57,078,721 | | | | | | | | | |
| Cost of Sales remaining | | 47,739,055 | RM | 47,739,055.00 | | | | | | | |
| staff costs | 7 | 9,303,152 | labor | | 9,303,152.00 | | | | | | |
| auditors remuneration | 7 | 20,000 | SGA | | | | | | 20,000.00 | | |
| depreciation of property, plant, and equipment | 7 | 397,395 | MOH | | | | 397,395.00 | | | | |
| director's remuneration | 7 | 465,437 | SGA | | | | | | 465,437.00 | | |
| loss on foreign exchange | 7 | 73,116 | SGA | | | | | | 73,116.00 | | |
| property, plant, and equipment written off | 7 | - | SGA | | | | | - | | | |
| retail income | 7 | (19,434) | MOH | | | | (19,434.00) | | | | |
| | | 10,259,666.00 | | | | | | | | | |
| other income | P&L | (19,434) | SGA | | | | | | (19,434.00) | | |
| selling and marketing expenses | P&L | 4,574,457 | SGA | | | | | | 4,574,457.00 | | |
| administrative expenses | P&L | 1,901,541 | SGA | | | | | | 1,901,541.00 | | |
| interest income | P&L | (22,114) | SGA | | | | | | (22,114.00) | | |
| financial costs | P&L | 36,145 | SGA | | | | | | 36,145.00 | | |
| Calculate Sub Totals | | 64,449,316 | | | | | | | | | |
| Profit from Income Statement (Input) | | 146,211 | Profit | | | | | | | 146,211.00 | - |
| Calculate (Revenue - Expenditure - Profit = zero) Check Total | | Total For Calculations $d = b + c - a$ | | $d1$ | $d2$ | $d3$ | $d4$ | $d5$ | $d6$ | $d7$ | $d8$ |
| | | | | 47,739,055.00 | 9,303,152.00 | - | 377,961.00 | - | 7,015,117.00 | 146,211.00 | (64,595,527.00) |

| | | | |
|---|---|---|---|
| Total Material, Labor, and Energy | $e = d1+d2+d3$ | | 57,042,207 |
| Overhead as % of Material, Labor & Energy | $=d4/e$ | | 0.66% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | $f = d4+d5+e$ | | 57,420,168 |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | $=d6/f$ | | 12.22% |
| Total Material, Labor, Energy, Mfg Overhead, SG&A/Interest, and Traded & Finished Goods | $g=d6+f$ | 64,435,285 | |
| Profit as % of Material, Labor, Energy, Mfg Overhead, SG&A/Interest, and Traded & Finished Goods | $=d7/g$ | | 0.23% |

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

SOURCE: Megamas YE 2018-12-31

| Items | Schedule | Income Statement Amounts | Category | Raw Material (RM) | Labor | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | |
| REVENUE: | P&L | 24,919,514 | Exclude | | | | | | | | 24,919,514.00 |
| Total Income | | 24,919,514 | a | | | | | | | | 24,919,514.00 |
| **EXPENSE:** | | | | | | | | | | | |
| *Cost of Sales* | P&L | 24,061,888 | | | | | | | | | |
| *Cost of Sales remaining* | | 23,042,529 | RM | 23,042,529.00 | | | | | | | |
| auditors remuneration | 15 | 10,000 | SGA | | | | | | 10,000.00 | | |
| depreciation of property, plant, and equipment | 15 | 320,559 | MOH | | | | 320,559.00 | | | | |
| directors remuneration | 15 | 84,000 | SGA | | | | | | 84,000.00 | | |
| retail expenses | 15 | 604,800 | MOH | | | | 604,800.00 | | | | |
| | | 1,019,359.00 | | | | | | | | | |
| *other income* | P&L | (488) | SGA | | | | | | (488.00) | | |
| *distribution cost* | P&L | 41,579 | SGA | | | | | | 41,579.00 | | |
| *administrative expenses* | P&L | 155,203 | SGA | | | | | | 155,203.00 | | |
| *other expenses* | P&L | 226,012 | SGA | | | | | | 226,012.00 | | |
| *financial costs* | P&L | - | SGA | | | | | - | - | | |
| **Calculate Sub Totals** | | 24,484,194 | b | 23,042,529.00 | | | 925,359.00 | | 290,294.00 | | |
| *Profit from Income Statement (Input)* | | 435,320 | Profit | | | | | | | 435,320.00 | |
| **Total For Calculations** d = b + c = a | Check Total | - | | 23,042,529.00 | | | 925,359.00 | | 290,294.00 | 435,320.00 | (24,919,514.00) |
| | | | | d1 | d2 | d3 | d4 | d5 | d6 | d7 | d8 |

Calculate (Revenue - Expenditures - Profit = zero) Check Total | -

e = d1+d2+d3 | 23,042,529
=d4/e | 4.02%

Total Material, Labor, and Energy | 23,042,529
Overhead as % of Material, Labor & Energy | 4.02%

f = d4+d5+e | 23,967,888
=d6/f | 1.21%
Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | 23,967,888
SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | 1.21%

g=d6+f | 24,258,182
=d7/g | 1.79%
Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | 24,258,182
Profit as % of Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | 1.79%

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

SOURCE: Ta Ann Plywood YE 2018-12-31

| Items | Schedule | Income Statement Amounts | Category | Raw Material (RM) | Labor | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SG&A) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | |
| REVENUE: | P&L | 369,865,529 | Exclude | | | | | | | | 369,865,529.00 |
| Total Income | | 369,865,529 | | a | | | | | | | 369,865,529.00 |
| **EXPENSE:** | | | | | | | | | | | |
| *Cost of Sales* | P&L | 317,356,402 | | | | | | | | | |
| *Cost of Sales remaining* | P&L | 265,578,269 | RM | 265,578,269.00 | | | | | | | |
| auditors remuneration | 20 | 123,000 | SGA | | | | | | 123,000.00 | | |
| foreign exchange loss | 20 | 327,476 | SGA | | | | | | 327,476.00 | | |
| personnel expenses - contribution | 20 | 2,148,691 | labor | | 2,148,691.00 | | | | | | |
| personnel expenses - benefit | 20 | 1,520,649 | labor | | 1,520,649.00 | | | | | | |
| personnel expenses - wages | 20 | 53,640,548 | labor | | 53,640,548.00 | | | | | | |
| property, plant, equipment written off | 20 | 60,727 | MOH | | | | 60,727.00 | | | | |
| foreign exchange gain | 20 | (3,812,610) | SGA | | | | | | (3,812,610.00) | | |
| gain on disposal of property, plant, and equipment | 20 | (289) | MOH | | | | (289.00) | | | | |
| gain/loss on foreign exchange | 20 | (230,059) | SGA | | | | | | (230,059.00) | | |
| | | 53,778,133.00 | | | | | | | | | |
| *other income* | P&L | (14,830,117) | SGA | | | | | | (14,830,117.00) | | |
| *selling and distribution expenses* | P&L | 29,003,540 | SGA | | | | | | 29,003,540.00 | | |
| *administrative expenses* | P&L | 14,202,372 | SGA | | | | | | 14,202,372.00 | | |
| *other expenses* | P&L | 3,644,467 | SGA | | | | | | 3,644,467.00 | | |
| *change in value sell of biological assets* | P&L | 3,608,196 | SGA | | | | | | 3,608,196.00 | | |
| *financial income* | P&L | (115,271) | SGA | | | | | | (115,271.00) | | |
| **Calculate Sub Totals** | | 352,869,589 | b | 263,578,269.00 | 57,309,888.00 | - | 60,438.00 | - | 31,920,994.00 | - | |
| *Profit from Income Statement* | | 16,993,940 | Profit | | | | | | | 16,993,940.00 | |
| **Total For Calculations** | | | d = b + c - a | 263,578,269.00 | 57,309,888.00 | - | 60,438.00 | - | 31,920,994.00 | 16,993,940.00 | (369,865,529.00) |
| Calculate (Revenue - Expenditures - Profit = zero) Check Total | | - | | d1 | d2 | e = d1+d2+d3 / d3 | d4 | d5 | d6 | d7 | d8 |

| | | |
|---|---|---|
| Total Material, Labor, and Energy | =d/e | 320,888,157 |
| Overhead as % of Material, Labor & Energy | =d4/e | 0.02% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | f = d4+d5+e =d6/f | 320,948,595 |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | g=d6+f | 9.95% |
| Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | =d7/g | 352,869,589 |
| Profit as % of Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and Traded & Finished Goods | =d7/g | 4.82% |

Barcode:3861158-01 A-570-848 REV - Admin Review 9/1/17 - 8/31/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-848
AR: 09/01/2017-08/31/2018
Public Document
AD/CVD I:  JK

DATE:   July 11, 2019

MEMORANDUM TO:   The File

THROUGH:   Minoo Hatten
Program Manager
AD/CVD Operations, Office I

FROM:   JLK

Jacob Keller
International Trade Compliance Analyst
AD/CVD Operations, Office I

SUBJECT:   Freshwater Crawfish Tail Meat from the People's Republic of China:  Surrogate-Value Memorandum

---

This memorandum covers the calculations of each of the factor valuations used by the Department of Commerce (Commerce) in the preliminary results of the administrative review of the antidumping duty order on freshwater crawfish tail meat from the People's Republic of China (China) for the period of review (POR) September 1, 2017, through August 31, 2018.

**ITEM-BY-ITEM FACTOR-VALUATION ANALYSIS**

On February 27, 2019, we identified six countries as being at the same level of economic development to that of China for the POR, and we also invited interested parties to submit comments on the selection of a surrogate country and to submit publicly available information for purposes of calculating normal value.[1]

On April 11, 2019, we received comments from Nanjing Gemsen International Trade Co., Ltd. and Hubei Qianjiang Huashan Aquatic Food and Product Co., Ltd. (the respondents), requesting that Commerce select Malaysia as the primary surrogate country and Spanish import data of whole crawfish for the valuation of live crawfish, consistent with past segments of this proceeding.[2]

On April 26, 2019, we received comments from the respondents providing surrogate value information and requesting that Commerce consider using the data provided to value the

---

[1] See Commerce's Letter, "Freshwater Crawfish Tail Meat from the People's Republic of China: Request for Surrogate Country and Surrogate Value Comments and Information," dated February 27, 2019 (Request for Surrogate Country and Value Information Letter).

[2] See the respondents' Letter, "Freshwater Crawfish Tail Meat from the People's Republic of China: Comments on Surrogate Country Selection," dated April 11, 2019, at 2 and 3.



INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:3861158-01 A-570-848 REV - Admin Review 9/1/17 - 8/31/18

List of Attachments

The following attachments are included in the preliminary results surrogate value Microsoft Excel spreadsheet "SV01" separately uploaded into Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System:

1.      Selected Values
2.      CPI or PPI
3.      Inflator Factors
4.      Whole Crawfish
5.      Shell By-Product
6.      Water
7A.     Financial Ratios
7B.     CCK Consolidated Holdings Berhad
8.      Inland Freight
9.      Refrigerated Freight
10.     Brokerage & Handling
11A.    Labor – ILO Wage Data
11C.    Labor – Inflated
12.     Carton
13.     Plastic Bags
14.     Tape
15.     Coal
16.     Electricity

Freshwater Crawfish Tail Meat from the People's Republic of China
A-570-848
Public Document
AR: 09/01/2017-08/31/2018

ATTACHMENT 7B

**Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit**

**CCK Consolidated Holding Berhad, Covering the Period January 1, 2017, through December 1, 2017**
Source: Nanjing Gemsen's April 26, 2019 submission, Exhibit SV-9

| Income and Expense Items From the P&L Statement and Accompanying Schedules | Schedule | P&L (Income) Statement Amounts | Breakouts per Notes to Financial Statements | Raw Materials (M) | Labor (L) | Energy (E) | Mfg Overhead (OH) | Traded/Finished Goods (TF) & Change in Finished Goods | SG&A and Interest (SG&A) | Profit (P) and Adjustments to Profit | Excluded (X) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | | | | |
| Sales Revenue | IS | (615,789,116) | | | | | | | | | (615,789,116) |
| | | | | | | | | | | | |
| **Total Revenue Baht** | | (615,789,116) | | | | | | | | | (615,789,116) |
| **Expenditures:** | | | | | | | | | | | |
| Cost of Sales | IS | 498,085,031 | | 498,085,031 | | | | | | | |
| | | | | | | | | | | | |
| Depreciation | Note 7 | | 18,403,718 | | | | 18,403,718 | | | | |
| Staff Costs | Note 26 | | 47,526,427 | | 47,526,427 | | | | | | |
| Hiring of Plants and Equipment | Note 26 | | 10,010 | | | | 10,010 | | | | |
| Beginning Trading Goods Inventory | Note 11 | | 47,973,836 | | | | | 47,973,836 | | | |
| Ending Finished Goods Inventory | Note 11 | | (58,308,986) | | | | | (58,308,986) | | | |
| Adjustment to Cost of Sales | Calculated | 55,605,005 | 55,605,005 | (55,605,005) | | | | | | | |
| | | | | | | | | | | | |
| Other Income | IS | (2,384,802) | | | | | | | (2,384,802) | | |
| Selling and Distribution Expenses | IS | 19,140,282 | | | | | | | 19,140,282 | | |
| Administrative Expenses | IS | 25,258,273 | | | | | | | 25,258,273 | | |
| Other Operating Expenses | IS | 38,308,553 | | | | | | | 38,308,553 | | |
| Finance Costs | IS | 3,276,995 | | | | | | | 3,276,995 | | |
| Share of Result in Associate, Net of Tax | IS | (4,632,199) | | | | | | | | | (4,632,199) |
| | | | | | | | | | | | |
| | | | | | | | | | | ' | ' |
| | | | | | | | | | ' | ' | ' |
| | | | | | | | | | | ' | ' |
| | | | | | | | | | | ' | ' |
| | | | | | | | | | | | |
| **Total Expenditure Baht** | | 577,152,133 | | 442,480,026 | 47,526,427 | 0 | 18,413,728 | (10,335,150) | 83,699,301 | 0 | (4,632,199) |
| **Profit** | | | | | | | | | | | |
| **(Note: Enter the profit before tax from the I/S)** | | 38,636,983 | | | | | | | | 38,636,983 | |
| **Total Expenditure less Revenue** | | (38,636,983) | | 442,480,026 | 47,526,427 | - | 18,413,728 | (10,335,150) | 83,699,301 | 38,636,983 | (620,421,315) |
| **Profit Check s/b zero (Revenue less Expenditures less Profit)** | | - | | | | | | | | | |
| Total Material, Direct Labor, and Energy Inputs | | | | | | | 490,006,453 | | | | |
| Manufacturing Overhead as % of Raw Materials, Direct Labor & Energy | | | | | | | 3.76% | | | | |
| Total Material, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | | | | | | | | | | | |
| SG&A as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods | | | | | | | | | 498,085,031 | | |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest | | | | | | | | | 16.80% | | |
| Profit as % of: Raw Materials, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest) | | | | | | | | | | 581,784,332 | |
| | | | | | | | | | | 6.64% | |

Barcode:3842094-01 A-570-092 INV - Investigation -

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-092
Investigation
01/01/2018 – 06/30/2018
**Public Document**
ITA/E&C/Office IV:  JDH

May 28, 2019

MEMORANDUM TO:       The File

THROUGH                      Robert Bolling
                                      Program Manager
                                      AD/CVD Operations, Office IV
                                      Enforcement and Compliance

FROM:                           Jonathan Hill
                                      International Trade Compliance Analyst
                                      AD/CVD Operations, Office IV
                                      Enforcement and Compliance

REGARDING:                 Preliminary Determination of the Antidumping Duty Investigation
                                      of Mattresses from the People's Republic of China: Surrogate Value
                                      Memorandum

---

This memorandum identifies the data sources used to value, and the values assigned to, the factors of production (FOP) and movement services reported in the above-referenced investigation.   The period of investigation (POI) is January 1, 2018, through June 30, 2018.  The Department of Commerce (Commerce) calculated normal values based on FOPs for each mandatory respondent, Healthcare Co., Ltd. (Healthcare) and Zinus (Xiamen) Inc. (Zinus) (collectively, "respondents"). Based on the criteria set forth in 19 CFR 351.408(b), Commerce selected the Malaysia as the primary surrogate country.

## DATA SOURCES

### A.  Malaysian Import Statistics Published by Global Trade Atlas

Unless indicated otherwise, we valued direct and packing materials purchased from non-market economy (NME) suppliers with Chinese *renminbi* (RMB) using Malaysian import prices for the period of POI.  Malaysian import data are published by the Global Trade Atlas (GTA).  GTA data are available through the Global Trade Information Services, Inc. website.[1]  We adjusted surrogate

---

[1] *See*, http://www.gtis.com/gta

Barcode:3842094-01 A-570-092 INV - Investigation  -

## LIST OF ATTACHMENTS

Attachment I:  SV Summary Sheet for Healthcare

Attachment II:  SV Summary Sheet for Zinus

Filed By: Lilit Astvatsatrian, Filed Date: 5/31/19 11:22 AM, Submission Status: Approved

**Calculation of Surrogate Financial Ratios: Overhead, SG&A and Profit**

**Mattresses from China**

**Luxury Sleep Products Sdn. Bhd. Year Ended 30 June 2018**

| Items | Schedule | Category | Income Statement Amounts | breakout to F/S | MLE | Manufacturing Overhead (MOH) | Traded/Finished Goods Inventory (TF) | SG&A and Interest (SG&A) | Profit (P) | Excluded (EX) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *Value in RM* | | | | | |
| **Income** | | | | | | | | | | |
| Revenue | I/S | EX | 20,980,833 | | - | - | | - | | 20,980,833 |
| Other Operating Income | I/S | SG&A | 373,624 | | - | - | | 373,624 | | |
| **Total Revenue RM** | | | 21,354,457 | | - | - | - | 373,624 | - | (20,980,833) |
| **Expenditures** | | | | | | | | | | |
| Cost of Sales | I/S | MLE | 16,019,519 | 16,019,519 | 16,019,519 | | | | | |
| Finished Goods Opening | Note 6 | TF | | 981,957 | (981,957) | | 981,957 | | | |
| Finished Goods Closing | Note 6 | TF | | (1,698,180) | 1,698,180 | | (1,698,180) | | | |
| Depreciation and Amortization | | | | | | | | | | |
| Factory Equipment and Fittings | Note 4 | MOH | | 39,873 | | 39,873 | | | | |
| Forklift | Note 4 | MOH | | 36,612 | | 36,612 | | | | |
| Plant and Machinery | Note 4 | MOH | | 613,785 | | 613,785 | | | | |
| Renovation | Note 4 | MOH | | 59,368 | | 59,368 | | | | |
| Rental of Factory | Note 18 | MOH | | 377,889 | | 377,889 | | | | |
| Total of MLE Items Above (Remove from MLE Denominator) | | MLE | | 1,127,527 | (1,127,527) | 1,127,527 | | | | |
| Administration Expenses | I/S | SG&A | 2,297,294 | | | | | 2,297,294 | | |
| Distribution Costs | I/S | SG&A | 2,497,190 | | | | | 2,497,190 | | |
| Finance Costs | I/S | SG&A | 113,222 | | | | | 113,222 | | |
| **Total Expenditure RM** | | | 20,927,225 | | 15,608,215 | 1,127,527 | (716,223) | 4,907,706 | | - |
| Profit | Income | P | 427,232 | 427,232 | | | | | 427,232 | |
| **Total Expenditure Less Revenue RM** | | | 427,232 | | 15,608,215 | 1,127,527 | (716,223) | 4,534,082 | 427,232 | (20,980,833) |
| Total Material, Direct Labor, and Energy | | | | | | 15,608,215 | | | | |
| Manufacturing Overhead as Percentage of Raw Materials, Direct Labor, and Energy | | | | | | 7.22% | | | | |
| Total Material, Direct Labor, Energy, Manufacturing Overhead, & Traded/Finished Goods | | | | | | 16,019,519 | | | | |
| SG&A as Percentage of Raw Materials, Direct Labor, Energy, Manufacturing Overhead, & Traded/Finished Goods | | | | | | | | 28.30% | | |
| Total Material, Direct Labor, Energy, Manufacturing Overhead, Traded/Finished Goods, SG&A and Interest | | | | | | | | | 20,553,601 | |
| Profit as Percentage of Raw Materials, Direct Labor, Energy, Manufacturing Overhead, Traded/Finished Goods, SG&A & Interest | | | | | | | | | 2.08% | |

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

<div align="right">

A-570-084
Investigation
POI: 10/1/2017 – 3/31/2018
**Public Document**
E&C AD/CVD OII:  BAL

</div>

November 13, 2018

| | |
|---|---|
| MEMORANDUM TO: | The File |
| THROUGH: | Shawn Thompson |
| | Program Manager |
| | AD/CVD Operations, Office II |
| FROM: | Benjamin Luberda |
| | Program Analyst |
| | AD/CVD Operations, Office II |
| RE: | Less-Than-Fair-Value Investigation of Certain Quartz Surface Products from the People's Republic of China |
| TITLE: | Surrogate Value Memorandum for the Preliminary Determination |

---

## SUMMARY

The Department of Commerce (Commerce) is conducting a less-than-fair-value investigation of certain quartz surface products (QSP) from the People's Republic of China (China).  The period of investigation (POI) is October 1, 2017, through March 31, 2018.  This memorandum outlines the methodology and selection of surrogate values (SVs) used in the calculation of normal value (NV) and export price (EP) or constructed export price (CEP), as applicable, for the preliminary determination of this investigation.  Commerce has determined that Mexico is the appropriate surrogate country to use in this investigation.[1]  Consistent with recent determinations involving non-market economy (NME) countries,[2] we selected, where appropriate, and to the extent possible, values from publicly-available information from the surrogate country to value the factors of production (FOPs).

---

[1] *See* Memorandum "Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Quartz Surface Products from the People's Republic of China," dated concurrently with this memorandum (PDM) at 8-12.  *See also* the "Surrogate Country" section below.

[2] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 83 FR 35616 (July 27, 2018).

Barcode:3774686-01 A-570-084 INV - Investigation  -

**Exhibit 13**

Grupo Lamosa S.A.B. de C.V.– for year ending December 31, 2017

Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit

Certain Quartz Surface Products from the PRC  ***  A-570-084  ***  POI: 10/1/2017 - 3/31/2018

| Income and Expense Items From the P&L Statement and Accompanying Schedules (In thousands of Mexican Pesos) | Schedule | Cat. See FN1 | P&L (Income) Statement Amounts | Raw Materials (RM) | Labor (L) | Energy (E) | Mfg Overhead (MOH) | Traded/Finished Goods (TF) | SG&A and Interest (SG&A) | Profit (P) | Excluded (X) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | |
| Net Sales (note 24) | X | | 17,970,966 | | | | | | | | 17,970,966 | |
| **Total Revenue** | | | **17,970,966** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **17,970,966** | A |
| **Expenditures** | | | | | | | | | | | | |
| Cost of sales (note 24) | X | | 11,008,643 | | | | | | | | | |
| Depreciation (note 12) - Buildings and Construction | MOH | | 116,161 | | | | 116,161 | | | | | |
| Depreciation (note 12) - Machinery and Equipment | MOH | | 390,814 | | | | 390,814 | | | | | |
| Finished Goods at beginning of year | TF | | 1,616,903 | | | | | 1,616,903 | | | | |
| Finished Goods at end of year | TF | | (1,377,400) | | | | | (1,377,400) | | | | |
| Materials, Labor, Energy (calculated) | MLE | | 10,262,165 | 10,262,165 | | | | | | | | |
| Selling Expenses | SG&A | | 2,884,717 | | | | | | 2,884,717 | | | |
| General and Administrative Expenses | SG&A | | 1,189,148 | | | | | | 1,189,148 | | | |
| Other Operating Costs | SG&A | | 84,528 | | | | | | 84,528 | | | |
| Finance Costs | SG&A | | 455,071 | | | | | | 455,071 | | | |
| **Total Expenditure** | | | **15,622,107** | **10,262,165** | **-** | **-** | **506,975** | **239,503** | **4,613,464** | | **-** | B |
| **Profit** (Note: Enter the profit before tax from the I/S) | | P | **2,348,859** | | | | | | | 2,348,859 | | A-B |
| **Total Expenditure less Revenue** | | | | 10,262,165 | **-** | **-** | **506,975** | **239,503** | **4,613,464** | 2,348,859 | (17,970,966) | SB zero |
| Profit Check <b>zero (Revenue less Expenditures less Profit) | | | **-** | | | | | | | 15,622,107 | | |

Total Material, Direct Labor, and Energy Inputs · 10,262,165

Manufacturing Overhead as % of Raw Materials, Direct Labor & Energy · 4.94%

Total Material, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods · 11,008,643

SG&A as % of Raw Materials, Direct Labor, Energy, Mfg Overhead, & Traded/Finished Goods · 41.91%

Profit as % of: Raw Materials, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, SG&A & Interest · 15.04%

[1] When you enter any one of the below items in this column the columns to the left of the "P&L Amounts" column will be updated for the amount entered in the "P&L Amounts" field, see examples above, where we entered information for sales, raw material and profit.

"RM," "L," "E," "MOH," "TF," "SG&A," "P," and "X."