Slip Op. 22-33

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **RISEN ENERGY CO., LTD.,** | |
|     **Plaintiff,** | |
| **and** | |
| **TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
|     **Consolidated Plaintiffs,** | |
| **and** | |
| **SHANGHAI BYD CO., LTD. ET AL.,** | **Before: Claire R. Kelly, Judge** |
|     **Plaintiff-Intervenors,** | **Consol. Court No. 20-03743** |
| **v.** | **PUBLIC VERSION** |
| **UNITED STATES,** | |
|     **Defendant,** | |
| **and** | |
| **SUNPOWER MANUFACTURING OREGON, LLC,** | |
|     **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the 2017-2018 antidumping administrative review of crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: April 4, 2022

Gregory S. Menegaz and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington, D.C., argued for plaintiff Risen Energy Co., Ltd. Also on the brief were J. Kevin Horgan and Judith L. Holdsworth.

Ronald M. Wisla, Lizbeth R. Levinson, and Brittney R. Powell, Fox Rothschild LLP, of Washington, D.C. for plaintiff-intervenor Anji DaSol Solar Energy Science & Technology Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, and Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, D.C. for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd.

Jonathan M. Freed, Trade Pacific PLLC, of Washington, D.C. argued for consolidated plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd. Also on the brief was Robert G. Gosselink.

William E. Perry and Adams C. Lee, Harris Bricken Sliwoski, LLP, of Seattle, WA for consolidated plaintiffs Shenzhen Sungold Solar Co., Ltd. and Wuxi Tianran Photovoltaic Co., Ltd.

Craig A. Lewis, Hogan Lovells US LLP, of Washington, D.C. argued for consolidated plaintiff and plaintiff-intervenor Shanghai BYD Co., Ltd. and plaintiff-intervenors Canadian Solar Inc., Canadian Solar International Limited, Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., and Canadian Solar (USA) Inc. Also on the brief were Jonathan T. Stoel and Lindsay K. Brown.

Joshua E. Kurland, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C. argued for defendant United States. Also on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director and Reginald T. Blades, Jr., Assistant Director. Of counsel was Leslie M. Lewis, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington D.C.

**PUBLIC VERSION**

    Kelly, Judge:  Before the court are several Rule 56.2 motions for judgment on

the agency record challenging various aspects of the U.S. Department of Commerce's

("Commerce") final determination in its 2017-2018 administrative review of the

antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells,

whether or not assembled into modules, from the People's Republic of China ("China")

("Solar Cells from China").  Pl.'s Mot. For J. on Agency R., Apr. 29, 2021, ECF No. 62

("Risen's[1] R. 56.2 Mot.") and accompanying Pl.'s R. 56.2 Memo. in Supp. of Mot. for J.

Upon Agency R., Apr. 29, 2021, ECF Nos. 63, 64 ("Risen's Br."); Pl.-Intervenor's 56.2

Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 65 ("Anji DaSol's R. 56.2 Mot."); R.

56.2 Mot. for J. on Agency R. of Consol. Pls. & Pl.-Intervenors JA Solar Technology

Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and Jingao Solar Co.,

---

[1] Commerce selected Risen Energy Co., Ltd. as a mandatory respondent, Memo. Re: Resp't Selection, PD 101 bar code 3830533-01, (May 6, 2019) ("Resp't Selection Memo."), and subsequently determined that Risen (Wuhai) New Energy Co., Ltd.; Zhejiang Twinsel Electronic Technology Co., Ltd.; Risen (Luoyang) New Energy Co., Ltd.; Jiujiang Shengchao Xinye Technology Co., Ltd.; Jiujiang Shengzhao Xinye Trade Co., Ltd. Ruichang Branch; Risen Energy (Hong Kong) Co., Ltd.; and Risen Energy Co., Ltd. (the "Risen Entities") were affiliated and treated the entities as a single collapsed entity for the purpose of the dumping margin calculation.  Affiliation and Single Entity Status of [the Risen Entities] PD 411 bar code 3938677-01 (Jan. 31, 2020).  Commerce refers to the Risen Entities collectively as "Risen" in the preliminary and final decision memoranda, but issued questionnaires to, and received responses from, Risen Energy Co., Ltd., which Commerce applied to all the Risen Entities.  <u>See, e.g.,</u> Request for Information, [ADD] Admin. Review, Risen Energy Co., Ltd. [Solar Cells from China], PD 103 bar code 3830975-01 (May 7, 2019); Letter Re: [Solar Cells from China] Risen Case Br., PD 446 CD 464 bar codes 3954395-01, 3954393-01 ("Risen's Admin. Br.").  Risen Energy Co., Ltd. ("Risen") challenges Commerce's final determination independently.  Compl., Oct. 28, 2020, ECF No. 7.

Ltd. (collectively, "JA Solar"), Apr. 29, 2021, ECF No. 66 ("JA Solar's R. 56.2 Mot.")

and accompanying Memo. of Points and Authorities in Supp. of R. 56.2 Mot. for J. on

Agency R. of Consol. Pls. & Pl.-Intervenors [JA Solar], Apr. 29, 2021, ECF No. 67 ("JA

Solar's Br."); Consol. Pls.' R. 56.2 Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 68

("Trina's[2] R. 56.2 Mot.") and accompanying Memo. in Supp. Mot. of Trina for J. on

Agency R., Apr. 29, 2021, ECF Nos. 69, 70 ("Trina's Br."); Consol. Pls.' 56.2 Mot. for

J. on Agency R., Apr. 29, 2021, ECF No. 71 ("Shenzen and Wuxi's R. 56.2 Mot.");

Consol. Pl. and Pl.-Intervenors Shanghai BYD. Co., Ltd. ("Shanghai") and Canadian

Solar, et al.'s[3] R. 56.2 Mot. for J. on Agency R., Apr. 29, 2021, ECF No. 72 ("Shanghai's

and Canadian Solar's R. 56.2 Mot.") and accompanying Consol. Pl. and Pl.-

Intervenors [Shanghai] and [Canadian Solar's] Memo. in Supp. of R. 56.2 Mot. for J.

on Agency R., Apr. 29, 2021, ECF No. 72-2 ("Shanghai's and Canadian Solar's Br.");

see generally [Solar Cells from China], 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2,

2020) (final results of [ADD] admin. review and final deter. of no shipments; 2017-

---

[2] Commerce determined that Trina Solar Co., Ltd.; Trina Solar (Changzhou) Science
& Technology Co., Ltd.; Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd.;
Turpan Trina Solar Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; Trina Solar
(Hefei) Science & Technology Co., Ltd.; and Changzhou Trina Hezhong Photoelectric
Co., Ltd. (collectively, "Trina") were affiliated and treated the entities as a single
collapsed entity for the purposes of Commerce's dumping margin calculation. Memo.
Re: Affiliation and Single Entity Status of [Trina] PD 410, bar code 3938672-01 (Jan.
31, 2020).
[3] Canadian Solar Inc., Canadian Solar International Limited; Canadian Solar
Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; CSI
Cells Co., Ltd.; and Canadian Solar (USA) Inc. are collectively identified as "Canadian
Solar."

**PUBLIC VERSION**

2018) ("<u>Final Results</u>") and accompanying Issues and Decision Memo., A-570-979,

Sept. 28, 2020, ECF No. 49-5 ("Final Decision Memo."); Order on Consent Mot. to

Consol. Cases, Dec. 16, 2020, ECF No. 44 (consolidating Ct. Nos. 20-03757, 20-03761,

20-03797, 20-03802, 20-03804 and 20-03743).

      Plaintiff, consolidated plaintiffs, and plaintiff-intervenors (collectively,

"Plaintiffs") challenge Commerce's selection of Malaysia as the primary surrogate

country, certain surrogate values for inputs, the surrogate financial ratio

calculations, and the partial application of adverse facts available as unsupported by

substantial evidence and contrary to law.  <u>See</u> Risen's Br.; JA Solar's Br.;[4] Trina's Br.;

Anji DaSol's R. 56.2 Mot.;[5] Shenzen and Wuxi's R. 56.2 Mot.;[6] Shanghai's and

Canadian Solar's Br. at 11–13.[7] Shanghai, Canadian Solar, Shenzen, Wuxi, JA Solar,

and Anji DaSol also challenge Commerce's calculation of the separate rate as

unsupported by substantial evidence and contrary to law.  Shanghai's and Canadian

Solar's Br. at 5, 13; <u>see</u> Shenzen and Wuxi's R. 56.2 Mot.; Anji DaSol's R. 56.2 Mot.;

JA Solar's Br. at 8.  For the following reasons, Commerce's selection of Malaysia as

---

[4] Incorporating the arguments contained in Risen's and Trina's briefs.

[5] Incorporating the arguments contained in JA Solar's Br. and arguments from other consolidated plaintiffs common to the claims raised in Shanghai's complaint.

[6] Incorporating the arguments contained in Risen's Br., Trina's Br., JA Solar's Br., and Shanghai's and Canadian Solar's Br. and arguments from other consolidated plaintiffs common to the claims raised in Risen's, Trina's, Canadian Solar's and Shanghai's complaints.

[7] Incorporating the arguments contained in Risen's and Trina's briefs challenging the rates received as mandatory respondents.

the primary surrogate country and its calculation of the surrogate financial ratios are

sustained.   Commerce's decision to value silver paste using the Malaysian import

value, its valuation of Risen's EVA and backsheet, its use of partial facts available

with an adverse inference to value the missing factor of production information, and

its separate rate calculation are remanded for reconsideration or additional

explanation consistent with this opinion.

## BACKGROUND

On March 14, 2019, Commerce initiated an administrative review of the ADD

order covering Solar Cells from China for a period of review covering December 1,

2017 through November 30, 2018.   Initiation of [ADD] and Countervailing Duty

Admin. Reviews, 84 Fed. Reg. 9,297, 9,299 (Dep't Commerce Mar. 14, 2019)

("Initiation Notice"); see also [Solar Cells from China], 85 Fed. Reg. 7,531 (Dep't

Commerce Feb. 10, 2020) (prelim. results of [ADD] admin. review and prelim. deter.

of no shipments; 2017-2018) ("Prelim. Results") and accompanying Prelim. Decision

Memo at 1, A-570-979, Jan. 31, 2020, PD 409 bar code 3938660-01 ("Prelim. Decision

Memo.").[8]   Commerce limited its individual examination to two mandatory

---

[8] On January 8, 2021, Commerce filed indices to the public and confidential
administrative records underlying Commerce's Final Results.   These indices are
located on the docket at ECF Nos. 49-2 and 49-3.  All references to documents from
the public and confidential record are identified by the numbers assigned by
Commerce in the January 1st indices, see ECF Nos. 49-2 & 49-3, and preceded by "PD"
or "CD" to denote public or confidential documents, respectively.

**PUBLIC VERSION**

respondents, Trina and Risen.  Prelim. Decision Memo. at 1–2, 4–5; <u>see also</u> Resp't

Selection Memo. at 4–5.

Commerce published the <u>Final Results</u> on October 2, 2020, selecting Malaysia

as the primary surrogate country, explaining that Malaysia is economically

comparable to China, a significant producer of comparable merchandise, and has the

best information to value the respondents' factors of production.  Final Decision

Memo. at 31; <u>Final Results</u>.  Commerce calculated the overhead, general and

administrative expenses, and profit ratios using non-proprietary financial statements

from Hanwha Q Cells ("Hanwha"), because Hanwha's financial statements identify

it as a producer of subject merchandise during the period of review, do not show

evidence of countervailable subsidies, and have been audited.  Prelim. Decision

Memo. at 27–28; Final Decision Memo. at 31, 39.  Between the <u>Preliminary Results</u>

and the <u>Final Results</u>, Commerce adjusted its surrogate financial ratios to reflect

certain financial statement notes.  Final Decision Memo. at 47; Memo Re: Allegations

of Ministerial Errors in the Final Results at 5, PD 501 bar code 4060860-01 (Nov. 2,

2020) ("Ministerial Error Memo.").

Despite Trina's and Risen's responses to numerous supplemental

questionnaires, the record was still missing factor of production information from

Trina's and Risen's unaffiliated suppliers.  Final Decision Memo. at 10.  No party

disputes that the factor of production information from the non-cooperative,

unaffiliated suppliers is missing from the record.  <u>Id.</u>  Commerce concluded that the

**PUBLIC VERSION**

non-cooperative unaffiliated suppliers, Trina, and Risen failed to cooperate to the best of their abilities, warranting the use of partial adverse facts available to fill in the missing factor of production data.  Id.  Between April 29, 2021 and November 19, 2021 parties fully briefed the issues.[9]  On January 19, 2022 the court heard oral argument.  See Order, Dec. 3, 2021, ECF No. 93; Closed Remote Oral Argument, Jan. 19, 2022, ECF No. 109.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,[10] 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[9] Def.'s Opp. To Pls.' R. 56.2 Mots. For J. Upon Agency R., Sept. 24, 2021, ECF Nos. 79, 80 ("Def.'s Br."); Pl.'s Reply Br., Nov. 5, 2021, ECF Nos. 83, 84; Reply Br. of Consol. Pls. and Pl. Intervenors [JA Solar] in Supp. of R. 56.2 Mot. for J. on Agency R., Nov. 5, 2021, ECF No. 85; Pl-Intervenor's Reply Br., Nov. 5, 2021, ECF No. 86; Reply Br. of Consol. Pl. and Pl.-Intervenor [Shanghai and Canadian Solar], Nov. 5, 2021, ECF No. 87; Pl. Trina's Reply to Def.'s Resp. to Trina's Mot. for J. on Agency R., Nov. 5, 2021, ECF No. 88; Joint Appendix, Nov. 19, 2021, ECF Nos. 89, 90.

[10] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

**PUBLIC VERSION**

## DISCUSSION

## I.    **Selection of Malaysia as the Surrogate Country**

Commerce reasonably chose Malaysia as the primary surrogate country to use in calculating normal value as record evidence supports its determination that Malaysia is economically comparable, a significant producer of comparable merchandise, and has the best data with which to value the factors of production. Commerce addresses Plaintiffs' arguments that Bulgaria is economically comparable to China and a significant producer of comparable merchandise, Romania is a significant producer of comparable merchandise, and the record evidence detracting from its determination.

When Commerce determines whether and to what extent merchandise "is being, or is likely to be sold in the United States at less than fair value," Commerce compares the "normal value" of the merchandise to the U.S. price.   19 U.S.C. § 1677b(a).   Normal value is the price for which a producer or exporter sells the subject merchandise in the ordinary course of trade in its home country or, in certain circumstances, a third country.  Id. § 1677b(a)(1).  In a non-market economy ("NME"), Commerce bases normal value not on sales, but on "the value of the factors of production utilized in producing the merchandise . . . [together with] an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  Id. § 1677b(c)(1).  Commerce shall value the factors of production "based on the best available information regarding the values of such factors in a market

economy country or countries considered to be appropriate by the administering

authority." Id.  Moreover, to the extent possible, Commerce shall use "the prices or

costs of factors of production in one or more market economy countries that are—(A)

at a level of economic development comparable to that of the [NME] country, and (B)

significant producers of comparable merchandise." Id. § 1677b(c)(4).

Commerce prefers to "value all factors in a single surrogate country." 19 C.F.R.

§ 351.408(c)(2).  In selecting a primary surrogate country, Commerce considers (1)

the potential surrogate countries' economic comparability with the NME country, (2)

whether the potential surrogate countries produce comparable merchandise, (3)

whether the potential surrogate countries that produce comparable merchandise are

significant producers of comparable merchandise, and (4) the quality and availability

of the factor of production data for the countries.  Import Admin., U.S. Dep't

Commerce, [NME] Surrogate Country Selection Process, Import Administration

Policy     Bulletin     04.1     (Mar.     1,     2004),     available     at

https://enforcement.trade.gov/policy/bull04-1.html  (last  visited  Mar.  30,  2022)

("Policy Bulletin").  Economic comparability is determined by the Office of Policy

Enforcement and Compliance ("Office of Policy") which assembles a list of countries

that are economically comparable.  Policy Bulletin at 2; see also Memo Re: Request

for Economic Development, Surrogate Country and Surrogate Value Comments and

Information at 1, PD 166 bar code 3872206-01 (July 31, 2019) ("Surrogate Value

Memo.");  Prelim.  Decision  Memo.  at  15–16;  Antidumping  Methodologies  in

Proceedings Involving [NME] Countries, 72 Fed. Reg. 13,246, 13,246–247 (Dep't Commerce Mar. 30, 2017) (surrogate country selection and separate rates).  The statute does not define what a "significant" or "comparable" producer of subject merchandise is, but Commerce's practice is to "determine whether merchandise is comparable on a case-by-case basis" "and evaluate whether production is significant based on characteristics of, and trade in comparable merchandise."  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2–3.

A country qualifies as a producer of comparable merchandise if identical merchandise is produced in the country.  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2.  Where there is no evidence that a country produces identical merchandise, Commerce evaluates whether merchandise is comparable by examining the "similarities in physical form and the extent of processing or on the basis of production factors (physical and non-physical) and factor intensities."  Prelim. Decision Memo. at 16; see also Policy Bulletin at 2–3.  If more than one country is a significant producer of merchandise comparable to the subject merchandise and is economically comparable to the NME, Commerce selects "the country with the best factors data" as the surrogate country.[11]  Policy Bulletin at 4; see also Prelim. Decision Memo. at 14.  Commerce may also consider other countries on the record that are not

---

[11] In assessing the factors data Commerce's practice is to use "review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of . . . review, and publicly available data."  Policy Bulletin at 4.

economically comparable "that are significant producers of comparable merchandise if the record provides [Commerce] with adequate information to evaluate them." Surrogate Value Memo. at Att. I p. 2.

Commerce's surrogate country selection must be supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Id. at 488. In providing its explanation, Commerce must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). The court will "uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp. v. Ark.-Best Freight Sys., 419 U.S. 281, 286 (1974). An agency's decision is arbitrary when, inter alia, it deviates from an established practice followed in similar circumstances and does not provide a reasonable explanation for the deviation. See Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003); see also SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Commerce selects Malaysia as the primary surrogate country because Malaysia is economically comparable to China, a significant producer of identical merchandise, and has the best factors data. Final Decision Memo. at 31. The Office

of Policy identified Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia as

countries economically comparable to China based on per capita GNI data from the

2017 World Development Report.   Prelim. Decision Memo. 15–16; Surrogate Value

Memo. at Att. I.  Commerce determined that Malaysia, Brazil, Kazakhstan, Mexico,

Romania, and Russia are significant producers of comparable merchandise and

Malaysia as a significant producer of identical merchandise based on export data

from UN Comtrade.   Prelim. Decision Memo. at 16–17.   Commerce reasonably

explains that Malaysia has the best factors data because Malaysia is the only country

on the record that produces both solar cells and solar modules and has a complete

financial statement from a producer of both solar cells and solar modules.   Final

Decision Memo. at 31.   After examining the import data submitted by the parties,

Commerce determined that the import data for Malaysia, Brazil, Bulgaria and

Romania are publicly available, contemporaneous with the review period, represent

broad-market averages, tax- and duty-exclusive, and input specific.  Prelim. Decision

Memo. at 17.  In support of its selection of Malaysia as the primary surrogate country,

Commerce emphasizes that the surrogate data from Malaysia will contain imports of

inputs from Hanwha[12] for the purpose of the production of subject merchandise.   See

Final Decision Memo. at 31.  Furthermore, Commerce explains that the quality of the

financial statement is a significant consideration in the selection of the surrogate

---

[12] Hanwha is a large Malaysian company whose sole line of business is the production
of solar cells and solar modules.  Final Decision Memo. at 31–32.

country because Commerce relies on the financial statement to calculate the

surrogate financial ratios accounting "for over 30 percent of total normal value." Id.

Although Risen proposes an alternative, it fails to show why Commerce's

decisions are unreasonable.   Commerce declined to find Bulgaria economically

comparable to China explaining Bulgaria's 2017 per capita GNI was $7,760, falling

outside of the per capita GNI range of economically comparable countries.[13]  Prelim.

Decision Memo. at 15–16; see Surrogate Value Memo. at Att. I.  Commerce published

the Surrogate Value Memo. on July 31, 2019 and invited interested parties to

comment on the surrogate country list and submit information to rebut, clarify, or

correct the list before August 12, 2019, explaining that the surrogate country would

be announced in the preliminary results.  Surrogate Value Memo. at 1.  No party

submitted the 2018 GNI data because it was not available at the time.  See Resp. to

Request for Surrogate Value Information at 2, Ex. 16, PD 220, bar codes 3891946-01,

-16 (Sept. 19, 2019) ("Trina's SV Submission") (placing the 2018 GNI data on the

record.  In Fresh Garlic from [China], 85 Fed. Reg. 2,400 (Dep't Commerce Jan. 15,

2020) (prelim. results, prelim. rescission and final rescission, in part, of the 24th

---

[13] Risen argues that Commerce should have considered Bulgaria economically
comparable because the Office of Policy issued a new surrogate country list based on
the 2018 GNI data containing Bulgaria and a majority of the review period occurred
in 2018.  Risen's Br. at 36.  Risen points to no law or practice requiring that Commerce
change the surrogate country upon receipt of a new surrogate country list from the
Office of Policy.

[ADD] Admin. Review; 2017-2018) ("Fresh Garlic") and accompanying Issue and
Decision Memo. A-570-831, Jan. 8, 2020 bar code 3928012-01 ("Fresh Garlic Prelim."),
Commerce requested information and comment from parties on the potential
surrogate countries using the 2017 and 2018 GNI data on August 24, 2019 and
September 9, 2019.[14]   Fresh Garlic Prelim. at 4.   Commerce's decision to determine
economically comparable countries using the 2017 and 2018 GNI data in Fresh Garlic
is distinguishable from this review because in this review the 2018 GNI data was not
available until after the period to submit information and comments on the surrogate
country list had already closed.   Compare Surrogate Value Memo. at 1 ("Comments
on the [surrogate country] list itself and information to rebut, clarify or correct it are
due by 5:00 pm EST on August 12, 2019") with Fresh Garlic Prelim. at 4, 4 n. 26 ("On
August 28 and September 9, 2019, Commerce requested information and comments
from interested parties relating to the selection of a surrogate country" in Fresh
Garlic, placing the 2018 GNI data on the record on August 28, 2019).   Therefore,
Commerce's decision to find Bulgaria economically comparable to China in this
review is not arbitrary.

 Commerce reasonably rejects Risen's and Trina's arguments that Bulgaria is
a significant producer of subject merchandise.   Commerce explains that evidence

---

[14] In Fresh Garlic, the Office of Policy provided a list of economically comparable
countries based on the 2017 and 2018 GNI data and Commerce relied on both the
2017 and 2018 GNI data to select a surrogate country.   Fresh Garlic Prelim. at 4, 28.
The 2018 GNI list contained Bulgaria.   Id.

showing Malaysia produced both solar cells and solar modules is vital to its selection of Malaysia as the surrogate country. Final Decision Memo. at 31–32. The record evidence shows that Bulgaria is not a significant producer of solar cells or solar modules. See id. at 32. Commerce points to surveys on the record from the International Energy Agency and the U.S. Department of Energy which did not identify Bulgaria as a producer of solar cells or solar modules. Id. Furthermore, Commerce points to the financial statements for New Energy Systems[15] indicating that its "main business lines involve water heaters, boilers, collectors and trade in heating goods" which Commerce does not consider to be comparable to solar cells and solar modules. Id. Therefore, Commerce's determination that Bulgaria could not be the primary surrogate country, because it is not a significant producer of comparable merchandise, is supported by substantial evidence.

Commerce reasonably concludes that Romania is not a significant producer of comparable merchandise. Although Commerce determined that Romania was a significant producer of comparable merchandise in the Prelim. Results based on export data from UN Comtrade, see Prelim. Decision Memo. at 16–17, it explains in the Final Decision Memo. that record evidence indicates that Romania does not produce solar cells or modules. Final Decision Memo. at 32–33 (Romania was not

---

[15] New Energy Systems is a Bulgarian company which Risen and Trina argue produce subject merchandise. Final Decision Memo. at 31–32; see Trina's Surrogate Value Submission at Ex. 14, PDs 232–234 bar codes 3891946-13–15 (Sept. 19, 2019).

identified as a solar cell or solar module producer in surveys by the International

Energy Association and the U.S. Department of Energy).   It is apparent from

Commerce's explanation that, to the extent possible, it preferred to select a primary

surrogate country that produced both solar cells and modules, rather than a surrogate

country that exported them.  See id. at 31.  Plaintiffs fail to explain why Commerce's

preference is unreasonable. Furthermore, despite determining that Bulgaria and

Romania were not significant producers of comparable merchandise, Commerce

reviewed available financial statements from Bulgaria and Romania on the record.

Id. at 31–32.  Commerce found that data for both countries was missing or incomplete;

therefore, the information for those countries could not constitute the best available

data.[16]  See id. at 31–33.

Although Commerce's reasoning could be clearer, it is reasonably discernible

that Commerce considered and addressed the National Renewable Energy

Laboratory's Crystalline Silicon Photovoltaic Module Manufacturing Costs and

Sustainable Pricing: 1H 2018 Benchmark and Cost Reduction Map ("NREL Report")

placed on the record by Trina.  See Final Decision Memo. at 22–23, 31, 33; see also

Trina's Rebuttal to Petitioner's Comments on the Selection of Surrogate Values at

---

[16] Commerce notes that there is no Romanian financial information on the record and
one Bulgarian financial statement from New Energy Systems.  Final Decision Memo.
at 31–33.  Commerce reviewed the Bulgarian financial statement and determined
that the English translation is incomplete and does not mention solar cells.  Id. at
31–32.

Ex. 2, PD 244, bar code 3894536-01 (Sept. 26, 2021) ("NREL Report"). Plaintiffs

contend that Commerce failed to address the NREL Report demonstrating that

Malaysian surrogate values are not the best available information because their use

results in production costs much higher than costs reported by the NREL Report both

globally and in Malaysia. Trina's Br. at 26–32; Risen's Br. at 8–14. Explaining its

decision to rely on the Malaysian import value for silver paste, Commerce states that

it "evaluated the respondents' benchmark comparisons and finds them

unpersuasive." Final Decision Memo. at 22. Commerce elaborates by addressing

each benchmark placed on the record, one of which is the NREL Report. Id. at 23.

Commerce again references the NREL Report in its explanation regarding the quality

of the available data. Id. at 32 ("we are similarly unconvinced by Risen's and Trina's

other contentions that the data of Bulgaria or Romania are of higher quality"

explaining that the NREL Report emphasizes the importance of polysilicon as an

input). It is discernible from Commerce's explanation that it reviewed and considered

the NREL Report, yet when viewing the record as a whole, selected Malaysia because

it had the best available data.

The alleged unreliability of the Malaysian import value for silver paste does

not render Commerce's selection of Malaysia as the primary surrogate country

unreasonable. Trina argues that the value for silver paste is unreliable, a factor

weighing against selecting Malaysia as the primary surrogate country. Trina's Br.

at 38. Commerce explains that there are over 200 inputs involved in the production

of the subject merchandise and the Malaysian data was superior to other data on the

record.   See Final Decision Memo. at 31.   It is reasonably discernable from

Commerce's explanation that Commerce bases its primary surrogate country

selection on the overall quality and availability of the data, rather than data for an

individual input.   See id.

The statute and Commerce's regulation support its selection of Malaysia

despite the alleged unreliability of silver paste.   Both allow Commerce to select a

primary surrogate country that is appropriate for most of the inputs and select

additional surrogate countries if data from the primary surrogate country is

unreliable or unavailable.   See 19 U.S.C. § 1677b(c)(2)(B); 19 C.F.R. § 351.408(c)(1).

Although the Malaysian import value for silver paste may be unreliable, all parties

agree that silver paste is a relatively minor input for the subject merchandise.   Final

Decision Memo. at 31; Trina's Br. at 20–21; Risen's Br. at 10.   Therefore, in this case,

it would not be unreasonable for Commerce to select a primary surrogate country and

select another surrogate country for silver paste.   See SolarWorld Americas, Inc. v.

United States, 962 F.3d 1351 (Fed. Cir. 2020) (upholding Commerce's primary

surrogate country selection but remanding due to the aberrancy of one input).

Indeed, Commerce reasonably relies on a secondary surrogate country to value solar

**PUBLIC VERSION**

glass, explaining that Romania's HTS classification was more specific than Malaysia's HTS classification.[17]  Final Decision Memo. at 26–27.

## II.    Surrogate Values

Plaintiffs challenge Commerce's surrogate value for silver paste, EVA and backsheet.  Plaintiffs argue that the Malaysian import value for silver paste is not the best available information to value silver paste because it is unreliable.  Trina's Br. at 18–25; Risen's Br. at 8–28.  Risen argues that Commerce's Malaysia HTS valuation of its EVA and backsheet are not supported by substantial evidence and arbitrary.  Risen's Br. at 32–35.  Defendant argues that the Malaysian import value for silver paste is the best available information to value silver paste because Commerce values factors of production from a single surrogate country unless the data is unavailable or unreliable and the Malaysian value is not aberrant or unreliable.  Def.'s Br. at 33–39. Defendant argues that Commerce's valuation of EVA and backsheet is not arbitrary and is supported by substantial evidence.  Id. at 27–30.  For the following reasons, the court remands Commerce's surrogate values for silver paste, backsheet, and EVA for reconsideration or further explanation consistent with this opinion.

---

[17] Plaintiffs argue that Bulgaria should have been selected as the primary surrogate country because it has the best input data for solar glass.  Trina's Br. at 36; Risen's Br. at 38.  Commerce explains that Bulgaria is not economically comparable, does not have a producer of subject merchandise, and the financial statement on the record is incomplete.  Final Decision Memo. at 31–32.

###   A.   Silver Paste

Plaintiffs challenge Commerce's decision to rely on the Malaysian import value for silver paste arguing the import value is unreliable because it is aberrant, does not reflect the commercial reality of solar cell and module production in China, and the Malaysia HTS classification is not specific to silver paste.  See Risen's Br. at 8–28; Trina's Br. at 18–25.  Defendant argues that Commerce's choice of the Malaysian import value for silver paste is reasonable.  Def.'s Br. at 33–39.

Commerce values the factors of production from the primary surrogate country and resorts to a secondary surrogate country only if data from the primary surrogate country is unavailable or unreliable.   19 C.F.R. § 351.408(c)(1)–(2).   Commerce disregards aberrational data because it is unreliable.   Antidumping and Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997) (final rule) ("We agree that 'aberrational' surrogate input values should be disregarded," citing as an example Certain Cased Pencils from [China], 59 Fed. Reg. 55,625, 55,630 (Dep't Commerce Nov. 8, 1994) (final deter. of sales at less than fair value) (disregarding Indian input values because they were aberrational, valuing the inputs with Pakistani import statistics)).   In determining whether an input's surrogate value is aberrational, Commerce "typically compares the prices for an input from all countries found to be at a level of economic development comparable to the NME whose products are under review from the [period of review] and prior years." Final Decision Memo. at 21.  Commerce disregards "small-quantity import data . . .

**PUBLIC VERSION**

when the per-unit value is substantially different from the per-unit values of larger

quantity imports of that product from different countries." SolarWorld, 962 F.3d at

1358.

Commerce fails to provide a sufficient justification for its conclusion that the

Malaysian import value for silver paste is reliable in light of detracting evidence that

the value is aberrant.  UN Comtrade Import Data for HTS 711590 for each of the

economically comparable potential surrogate countries identified by Commerce is

reproduced below.  See Risen Rebuttal Surrogate Values at SVR-2, PDs 242–243 bar

codes 3894478-01, -02 (Sept. 26, 2019) ("Risen's SV Rebuttal"); Risen's Br. at 13; Final

Decision Memo. at 22 n.91 ("Percentage of Total Quantity" and "Total" calculated by

the court).

| Country | Trade Value (USD) | Total Import Quantity (KG) | Average Import Value (USD/KG) | % of Total Quantity |
|---|---|---|---|---|
| Mexico | 42,909,979.00 | 320,755 | 133.78 | 83.54% |
| Malaysia | 478,950,097.00 | 56,578 | 8,645.31 | 14.73% |
| Brazil | 336,519.00 | 6,179 | 54.46 | 1.61% |
| Kazakhstan | 76,862.00 | 347 | 221.50 | 0.09% |
| Russia | 632,695.00 | 106 | 5,968.82 | 0.03% |

| Romania | No import quantity | | | |
|---------|--------------|--------|--|------|
| Total | 522,906,152.00 | 383,965 | | 100% |

Commerce explains that although the Malaysian import value for silver paste is higher than other countries on the record, it is not aberrant because it is comparable to the Russian import value of silver paste. Final Decision Memo. at 21. However, the Russian data is the smallest quantity of import data on the record (.03%) and its per-unit value ($5,968.82/KG) is substantially higher than the per-unit value of three other countries with larger import quantities (Mexico, Brazil, and Kazakhstan). Commerce cannot rely upon the Russian import value for silver paste as that value itself represents a small-quantity, large per-unit seemingly aberrational value. See SolarWorld, 962 F.3d at 1358. Nor can Commerce rely on the Malaysian historical import value data it placed the record to support its determination because it failed to provide parties an opportunity to submit factual information in response to that data. See 19 C.F.R. § 351.301(c)(4). Although Defendant correctly asserts that Commerce may place information on the record at any time, Def.'s Br. at 37, Commerce is required to provide parties with an "opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the

Consol. Court No. 20-03743                                                      Page 24
**PUBLIC VERSION**

proceeding by [Commerce] by a date specified by the Secretary."[18] 19 C.F.R.

§ 351.301(c)(4).  Commerce placed the historical import value data on the record after

the record closed and did not reopen the record, denying the parties an opportunity

to submit information to rebut, clarify, or correct the information.[19]   See id.

§ 351.302(d) (explaining Commerce will reject untimely filed information); Id.

Appendix IV to Part 351.  If Commerce wishes to continue using the historical import

value data on remand, it can reopen the record for parties to place additional

information on the record rebutting, clarifying, or correcting the historical import

---

[18] Risen argues it was improper for Commerce to place the historical import value data on the record.  Risen's Br. at 19–20.  Risen is incorrect. See 19 C.F.R. § 351.301(c)(4).

[19] 19 C.F.R. Appendix IV to Part 351 provides the approximate deadlines for parties in antidumping administrative reviews; however, the actual deadline for a review segment may be set by the Secretary.  19 C.F.R. Appendix IV to Part 351 at n.1. Commerce required parties to place surrogate value information on the record for consideration in the Preliminary Results by September 9, 2019 and rebuttal comments by September 16, 2019.  Surrogate Value Memo. at 2.  Commerce placed the historical Malaysian silver paste import values on the record in conjunction with the Preliminary Results on January 31, 2020 and did not reopen the record for the submission of additional factual information. See Factor Valuation Memo. at Att. I, PR 426 bar code 3939852-01 (Jan. 31, 2020).  Contrary to Defendant's argument, in this case, the interested parties could not have adequately responded to the historical Malaysian import value data placed on the record by Commerce in their agency briefs unless Commerce reopened the record and allowed parties to place rebuttal information on the record to aid in their response.

**PUBLIC VERSION**

value data placed on the record by Commerce, consistent with its regulation.[20]   Id.

§ 351.301(c)(4).

Commerce also fails to provide a sufficient justification for its conclusion that

the Malaysian import value for silver paste is reliable in light of detracting evidence

that the value is not reflective of the commercial reality of solar cell and module

production. Commerce's "surrogate value must be as representative of the situation

in the NME country as is feasible" and result in a dumping margin as accurate as

possible. Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir.

1999) (quoting Nation Ford Chem. Co. v. United States, 21 C.I.T. 1371, 1375–76

(1997). Plaintiffs placed several benchmark metrics on the record which they argue

demonstrate that the Malaysian import value for silver paste is inconsistent with

import values from other market economies. See Trina's Section D Questionnaire

Appendix XII Resp. at Ex. D-6, PD 157–158 CD 112–132 bar codes 3855927-01,-02,

3855903-01–17, 3856027-01–04 (July 1, 2019) ("Trina's DQR") (providing information

on Trina's market economy purchases of silver paste during the period of review);[21]

NREL Report at 37; Risen's SV Rebuttal at Ex. SVR-2 (the Turkish import value for

---

[20] In relying on the Malaysian historical import value for silver paste, Commerce also
fails to address the possibility that when compared to other countries, the Malaysian
import value for silver paste is regularly aberrant. On remand, if Commerce wishes
to continue to rely on the Malaysian import value to value silver paste, it should
explain why the historical and present Malaysian import value data are not regularly
aberrant when compared to other countries on the record.

[21] Trina purchased [[          ]] KG of silver paste at a price of [[          ]] USD/KG.
Trina's DQR at Ex. D-6.

the period of review is $214.76 USD/KG and the Bulgarian import value for the period of review is $390.27 USD/KG) (collectively, "Benchmark Data").  Commerce explains why it declines to value silver paste using each of the benchmark data sets on the record but it does not explain why, when considered collectively, these benchmark data sets do not indicate the Malaysian import value for silver paste is unreliable.[22] See Final Decision Memo. at 22–23.

Furthermore, Commerce's rationale for rejecting the NREL Report benchmark data for silver paste is not supported by substantial evidence.  The NREL Report demonstrates that the screen-printing of silver and aluminum paste ("metallization") cost for monocrystalline PERC cell fabrication in urban China accounts for 24% of the total cost for cell conversion, or $0.015 ± $0.002/watt.  Id.  Metallization costs range from $0.013 and $0.049 across all solar cells studied by the NREL Report.  Id. at 37.  The silver paste costs using Malaysian data are multiples higher than the combined metallization costs reflected in the NREL report.[23]  Commerce explains it declined to rely on the NREL Report to assess the reasonableness of the Malaysian import value

---

[22] Excluding the Malaysian and Russian import values for silver paste, the remaining import values of silver paste on the record range from $54.56 (Brazil) to $792.84 (Thailand).  Benchmark Data; Final Decision Memo. at 22 n.91.

[23] Using the Malaysian import value for silver paste, Commerce calculated Risen's and Trina's silver paste costs at [[          ]] and [[          ]] per watt respectively.  Risen's Br. at 13; Trina's Br. at 22; see also Amended Final Analysis Memorandum-Trina, PD 502 CD 494–496 bar code (Dec. 2, 2020).  The silver paste cost accounts for [[          ]] of Risen's manufacturing costs and [[          ]] of Trina's material costs.  Risen's Br. at 13; Trina's Br. at 24.

for silver paste because the NREL Report "groups the silver paste costs with many other costs." Final Decision Memo. at 23. However, the NREL Report combines the cost of silver paste with one other cost: the cost of aluminum paste.[24] NREL Report at 26. Combining the cost of silver and aluminum paste leads to a cost greater than the cost of silver paste alone, resulting in an overestimation of the cost of silver paste in the NREL Report. See Oral Argument at 32:30–35:45; see also Risen's Br. at 11–15; NREL Report at 5–6 (explaining variable costs are calculated based on standard accounting practices). The court cannot discern why Commerce believed that it was reasonable to disregard the NREL Report's metallization cost as a benchmark if the benchmark overestimates the value of silver paste, and the values used by Commerce are multiples higher than the NREL Report's value.

Finally, Commerce fails to address Risen's argument that its reliance on Malaysia HTS 7115.90.10.00 covering other articles or catalysts of gold or silver is improper because it is not specific to silver paste. In its agency brief, Risen argued that Malaysia HTS 7115.90.10.00 is not a reasonable classification for silver paste because it is too broad. Risen's Admin. Br. at 3. Commerce does not address this argument in the Final Decision Memo. On remand, if Commerce wishes to continue

---

[24] The NREL Report and record evidence show that silver paste accounts for a majority of the combined cost of silver and aluminum pastes. See NREL Report at 26 (77% of the metallization costs for monocrystalline PERC cell fabrication in urban China is due to silver paste and 23% is due to aluminum paste); see also Risen's Admin Br. at 14–15; Risen's Br. at 13–14.

to rely on the Malaysian import value for silver paste, Commerce should explain why its decision to do so is reasonable in light of Risen's specificity argument.

### B.    Backsheet and Ethyl Vinyl Acetate

Risen argues that Commerce's choice of Malaysia HTS classifications to value its backsheet and EVA inputs are not supported by substantial evidence because Commerce based its choice in both instances on an "unsubstantiated difference between the flexibility of a 'film' or a 'sheet.'" Risen's Br. at 32–35.  Risen also argues that these determinations are arbitrary because they deviate from Commerce's prior treatment of identical inputs without an adequate explanation.  Id.  Defendant argues that Commerce's determinations are supported by substantial evidence and not arbitrary because Commerce based its determinations on the inputs, Risen's descriptions, and the available HTS subheadings.  Def.'s Br. at 27–28.  For the following reasons, Commerce's valuations for backsheet and EVA are remanded for reconsideration or additional explanation consistent with this opinion.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp., 340 U.S. at 477 (quoting Consol. Edison Co., 305 U.S. at 229).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Id. at 488. In providing its explanation, Commerce must articulate a "rational connection between the facts found and the choice made."  Burlington, 371 U.S. at 168.  An agency's decision is arbitrary when, inter alia, it deviates from an established practice

followed in similar circumstances and does not provide a reasonable explanation for the deviation.  See Consol. Bearings Co., 348 F.3d at 1007; see also SKF USA Inc, 263 F.3d at 1382.

Commerce's use of Malaysia HTS 3920.62.1000 to value Risen's backsheet is arbitrary and not supported by substantial evidence.   Commerce values Risen's backsheet using Malaysia HTS 3920.62.1000 covering Poly(Ethylene Terephthalate): Plates And Sheets.   Final Decision Memo. at 46.   In support of its determination, Commerce explains that the purpose of backsheet is "to protect solar cells in a solar module."   Id.   Since film is a "lighter, less rigid product than plates and sheets" treating Risen's backsheet as a film is improper because film is not protective.   Id. Risen placed evidence on the record demonstrating that its backsheet input is thin and flexible.[25]  Risen's Section D Resp. at Ex. D-36, PD 160 CD 134 bar codes 3856982-01, 3856915-14 (July 3, 2019) ("Risen's Section D Resp.").   Commerce does not address the evidence placed on the record by Risen or explain why its determination is reasonable in light of the evidence showing that Risen's backsheet satisfies Commerce's definition of film.   To the extent that Commerce wishes to continue valuing Risen's backsheet using Malaysia HTS 3920.62.1000, Commerce should address the record evidence detracting from its determination.

---

[25] Risen's backsheet is [[          ]] mm thick and sold in rolls.  Risen's Section D Resp. at Ex. D-36, PD 160 CD 134 bar codes 3856982-01, 3856915-14 (July 3, 2019).

Commerce's determination is also arbitrary.  Risen proffered evidence that Commerce has historically valued backsheet under HTS classifications comparable to Malaysia HTS 3920.62.9000 covering Of Poly(Ethylene Terephthalate): Other Than Plates And Sheets and that Risen's backsheet is the same as the backsheet used by respondents in past reviews.  Risen Final Surrogate Value Submission–Part I at Ex. SV2-7, PD 365 bar code 3926048-03 (Jan. 1, 2020) ("Risen's Final SVs Part I").  Commerce addresses Risen's argument in passing, stating "Risen's reference to a prior SV selection does not outweigh the record evidence showing that the input is a sheet," Final Decision Memo. at 46, yet Commerce does not explain how the record as a whole supports its determination that backsheet is a sheet.  Absent an explanation for Commerce's deviation from its historical treatment of backsheet, Commerce's determination is arbitrary.  If Commerce wishes to continue valuing backsheet using Malaysia HTS 3920.62.1000 on remand, it should explain its departure from its historical treatment.

Commerce fails to support its valuation of Risen's EVA with substantial evidence.  Commerce values Risen's EVA input using Malaysia HTS 3920.10.1900 covering Polymers of Ethylene: Plates And Sheets: Other Than Rigid.  In support of this determination Commerce explains that it considers Risen's EVA a sheet rather than a film because it is over .5mm thick and sheets and plates are thicker and more rigid than film.  Id.  Commerce's explanation fails to address record evidence submitted by Risen demonstrating that the product is flexible and described as a film.

Risen Final Surrogate Value Submission–Part II at Ex. SV2-12 PD 374, CD 412
barcodes 3926074-01, 3926060-01 (Jan. 2, 2020) ("Risen's Final SVs Part II").   On
remand, if Commerce wishes to continue valuing Risen's EVA using Malaysia HTS
3920.10.1900, it should address the evidence detracting from its determination and
explain its departure from its historical treatment of EVA.[26]   See Risen Final SVs
Part I at Ex. SV 2-7.

### III.   Surrogate Financial Ratios

Although Commerce's reasoning could be clearer, its surrogate financial ratio
calculations are supported by substantial evidence, consistent with its practice, and
do not double count labor and energy costs.   Plaintiffs argue that the proportion of
Hanwha's cost of sales currently allocated to materials, labor, and energy ("MLE")
only includes costs for raw materials.   Risen's Br. at 28–30.   Therefore, Commerce's
allocation of the remaining cost of sales amount to overhead rather than to MLE costs
fails to allocate any line item costs for labor and energy to the MLE costs, inflating
overhead expenses and distorting the overhead ratio.   Id. at 30–32.   Plaintiffs argue
that Commerce's allocation to overhead is contrary to Commerce's practice and the
financial statement notes accompanying Hanwha's financial statement.   Id. Further
they argue, as a result of Commerce's allocations, Commerce double counts energy

---

[26] Defendant provides several reasons supporting Commerce's deviation from its
historical treatment of backsheet and EVA in its brief. Def.'s Br. at 30–32.   Those
reasons are absent from Commerce's Final Decision Memo., see Final Decision Memo.
at 46, and the court will not rely on them.

and labor costs by including labor and energy costs in both the numerator of the overhead ratio and as separate factors of production. Id. at 30–32. Defendant argues that Commerce's surrogate ratio calculations are consistent with the notes of the financial statement and that Commerce's MLE costs include both labor and energy costs. Def.'s Br. at 39–43. Defendant further contends that Commerce enjoys broad discretion to select its methodology to calculate surrogate financial ratios and Plaintiffs have failed to demonstrate that Commerce has a consistent practice of excluding energy and labor costs from the factors of production under these circumstances. Def.'s Br. at 43. For the following reasons, Commerce's surrogate ratio calculations are sustained.

In antidumping investigations and reviews involving NME countries Commerce determines "the normal value of subject merchandise on the basis of the value of the factors of production utilized in producing merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). "[T]he factors of production utilized in producing merchandise include, but are not limited to— (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." Id. § 1677b(c)(3). For the purpose of determining the normal value of subject merchandise, "the Secretary normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate

country" when calculating the manufacturing overhead, general expenses, and profit

amounts. 19 C.F.R. § 351.408(c)(4).

Here, Commerce uses solar cell and module producer Hanwha's financial

statement to value general expenses, profit, and representative capital costs using

surrogate financial ratios. See Final Decision Memo. at 47–49. Commerce uses

manufacturing, labor, and energy ("MLE") costs as part of the denominator in its

calculation of the overhead ratio, the sales, general, and administrative costs

("SG&A") ratio, and the profit ratio.[27]  Id. Commerce explains that it is relying on

the total inventories cost identified in Note 17 of the financial statement to calculate

MLE. Id. Note 17 identifies the total inventories cost as "RM 1.648 million (2017:

RM2,142 million)."[28]  See Risen Final Surrogate Value Submission–Part I at Ex. SV2-

8 at 51, PD 365 bar code 3926048-03 (Jan. 1, 2020) ("Hanwha Financial Statement");

Final Decision Memo. at 47–48. Commerce points to the language in Note 2.12

explaining that it relied in part on the valuation of finished inventory and work-in-

progress inventory as evidence that labor and energy costs are included in the

---

[27] Commerce calculates the overhead ratio as overhead costs/(MLE + change in
inventory). It calculates the SG&A ratio as total SG&A/(total MLE-traded goods +
manufacturing overhead). Final Decision Memo. at 49. The profit ratio is
profit/(MLE + manufacturing overhead – change in finished goods + SG&A). Id.
[28] In the preliminary results, Commerce constructed Hanwha's MLE cost by reducing
the entire amount of the cost of sales line of Hanwha's Financial Statement by the
deductions listed in Note 9 of Hanwha's financial statements to arrive at a raw
materials cost. Final Decision Memo. at 47. Commerce then added labor and energy
costs. Id. Commerce explains that its preliminary MLE cost failed to take Note 2.12
and Note 17 from Hanwha's financial statement into account. Id.

valuation of these inventories.  Id. at 47; Ministerial Error Memo. at 5.  Commerce's

reliance is reasonable because Hanwha's financial statement indicates that it is

prepared in accordance with International Financial Reporting Standards ("IFRS").[29]

See Hanwha Financial Statement at 16 ("The financial statements . . . have been

prepared in accordance with Malaysian Financial Reporting Standards ("MFRS"),

[IFRS] and the Companies Act 2016 in Malaysia").  IFRS Standard IAS 2[30] requires

that IFRS-compliant financial statements expense all variable costs in the cost of

inventory.   International   Financial   Reporting   Standards   Foundation,   IAS   2

Inventories,   About,   https://www.ifrs.org/issued-standards/list-of-standards/ias-2-

inventories/ (last accessed Mar. 30, 2022).[31]  Thus, the court can reasonably discern

from Commerce's citation to both Notes 2.12 and 17 that Commerce believes that

because Hanwha's financial statement is compliant with IFRS, it must include labor

---

[29] IFRS "is a not-for-profit international organization responsible for developing a single set of high-quality accounting and sustainability disclosure standards" ("IFRS Standards" or "IFRS Standard") to promote transparency, accountability and efficiency in global financial markets.  International Financial Reporting Standards Foundation, About Us, https://www.ifrs.org/about-us/ (last accessed Mar. 30, 2022).

[30] "IAS 2 provides guidance for determining the cost of inventories and the subsequent recognition of the cost as an expense. . . . The cost of inventories includes all costs of purchase, costs of conversion (direct labour and production overhead) and other costs incurred in bringing the inventories to their present location and condition." International Financial Reporting Standards Foundation, IAS 2 Inventories, About, https://www.ifrs.org/issued-standards/list-of-standards/ias-2-inventories/        (last accessed Mar. 30, 2022).

[31] Commerce selected Hanwha's financial statement in part because it had been audited.  Prelim. Decision Memo. at 27–28.  The audit confirmed that Hanwha's financial statement complied with IFRS Standards.  Hanwha Financial Statement at 6.

and energy costs in inventories cost.[32]  IAS 2; <u>see</u> Final Decision Memo. at 47–48;

<u>compare</u> IAS 2 <u>with</u> Hanwha Financial Statement at 29 (significant linguistic

overlap).  After determining that the inventories cost included MLE costs, Commerce

reduced the inventories cost by the change in finished goods inventories, isolating the

MLE costs and included them as part of the denominator of the surrogate financial

ratios.[33]  Final Decision Memo. at 48.  Having accounted for MLE, depreciation, and

the change in finished goods balance, Commerce reasonably allocated the remaining

amount of the cost of sales balance to overhead.

Plaintiffs argue that Commerce double counts labor and energy costs by

including labor and energy costs in the overhead ratio's numerator and separately

valuing labor and energy as factors of production when calculating normal value.

Risen's Br. at 30–32.  Plaintiffs contend that when energy or labor costs are not

specifically broken out in the financial statement and assigned to the MLE

denominator, Commerce does not separately value labor and energy in the factors of

production because they are accounted for in the numerator of the overhead financial

---

[32] Note 2.12 further explains Hanwha's calculation of costs associated with "bringing the inventories to their current location or condition," includes labor and energy costs. Hanwha Financial Statement at 29.

[33] To isolate the MLE costs for inventories produced and sold in 2018, Commerce reduced the inventories costs included in the cost of sales by the decrease in finished goods balance.  <u>See</u> Final Decision Memo. at 48.  The decrease in finished goods balance is the difference between the finished goods beginning balance (valued at both cost and net realizable value) and the finished goods ending balance (valued at both cost and net realizable value).  <u>See</u> <u>id.</u>  No party disputes the downward adjustment for finished goods.

ratio.[34] Id. Yet Plaintiffs' argument assumes that Commerce did not isolate the labor

and energy costs and account for them in the MLE denominator when calculating the

surrogate financial ratios. However, Commerce explains that it isolates the labor and

energy costs using the notes in Hanwha's Financial Statement and includes those

costs in the surrogate ratios' denominator. Final Decision Memo. at 48; Ministerial

Error Memo. at 5. Since Commerce isolates and removes the MLE costs from

Hanwha's cost of sales before calculating the surrogate financial ratios, labor and

energy costs are not included in total overhead and thus are not included in the

---

[34] Hand Trucks and Certain Parts Thereof From [China], 80 Fed. Reg. 33,246 (Dep't Commerce June 11, 2015) (Final Results of [ADD] Admin. Review and Rescission of Review in Part; 2012-2013) and accompanying Issues and Decision Memo. at 8, A-570-891, June 4, 2015, bar code 3282119-01 ("it is the Department's recent practice to set energy factors of production inputs to zero if there is not a separate line item for energy factors on the financial statements"); [Solar Cells from China], 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of [ADD] admin. review and final deter. of no shipments; 2015–2016) and accompanying Issues and Decision Memo. at 47, A-570-979, July 11, 2018, bar code 3729972-01 ("if Commerce valued a respondent's FOPs, including energy, and calculated financial ratios using energy costs (because they could not be removed from the surrogate company's expenses), it would be double counting energy expenses."); 1,1,1,2-Tetrafluroethane From [China], 79 Fed. Reg. 30,817 (Dep't Commerce May 29, 2014) ([ADD] investigation, prelim. deter. of sales at less than fair value, affirmative prelim. deter. of critical circumstances, in part, and postponement of final deter.) and accompanying Issues and Decision Memo. at 22, A-570-998, May 21, 2014, bar code 3203506-01 ("Here, we will not disregard energy or labor in the normal value calculation because, except for depreciation, all of Thai-Japan's cost of sales is treated as material, labor and energy in the surrogate financial ratio calculation, therefore, we are not double counting these expenses when we include energy and labor in our normal value calculation").

numerator of the overhead ratio.[35]  Therefore, the inclusion of labor and energy costs in the factors of production does not double count the labor and energy costs and is consistent with the determinations cited by Plaintiffs.

## IV.   Application of Partial Adverse Facts Available

Commerce's use of facts available with an adverse inference is unsupported by substantial evidence.  Commerce fails to demonstrate that Risen and Trina did not cooperate to the best of their ability.  Commerce also fails to demonstrate that Risen and Trina have leverage to induce the cooperation of their non-cooperative unaffiliated suppliers; the non-cooperative unaffiliated suppliers are evading their own duties by exporting subject merchandise through Risen and Trina; or using the highest factor of production consumption rates on the record results in an accurate dumping margin.  Commerce's application of facts available with an adverse inference is remanded for reconsideration or additional explanation consistent with this opinion.

When Commerce is missing information necessary to make an ADD determination, it uses facts otherwise available to fill the gap in the record created

---

[35] Commerce calculates total overhead by subtracting total MLE costs from the cost of sales line from Hanwha's Financial Statement.  Final Decision Memo. at 48. Commerce calculates the overhead ratio by dividing total overhead by the sum of MLE and the change in inventory.  Id. at 49.  Overhead is a representative capital cost; thus, if Commerce could not isolate the MLE costs, those costs would be accounted for in both the factors of production for amounts of energy and other utilities consumed and representative capital cost.  See 19 U.S.C. § 1677b(c)(3); 19 C.F.R. § 351.408(c).

by the missing information.  See 19 U.S.C. § 1677e(a); Nippon Steel Corp. v. United States, 337 F.3d 1373, 1380–81 (Fed. Cir. 2003).  If a gap exists because a party failed to cooperate to the best of its ability, Commerce may use an adverse inference when selecting facts available to fill the gap.  19 U.S.C. § 1677e(b).  A party cooperates to the best of its ability when it does "the maximum it is able to do."  Nippon, 337 F.3d at 1380–81 (Fed. Cir. 2003).  However, under 19 U.S.C. § 1677e(a) Commerce may use adverse inferences against a cooperative respondent, if doing so will yield an accurate rate, promote cooperation, and thwart duty evasion.  Mueller Comercial De Mexico v. United States, 753 F.3d 1227, 1232–36 (Fed. Cir. 2014).  When using facts available with an adverse inference under Mueller, the predominant interest when determining the antidumping rate must be accuracy.  Id. at 1235.

Commerce fails to demonstrate that Trina and Risen did not put forth the maximum effort to provide full and complete responses to inquiries from Commerce. Risen placed evidence on the record demonstrating that it contacted each of its non-cooperative unaffiliated suppliers on at least two occasions asking them to provide the factor of production data and threatening to cease doing business with the suppliers if they failed to cooperate.  Risen's Section D Resp. at Ex. D-21.  Risen also sent the factor of production questionnaires issued by Commerce to the non-cooperative unaffiliated suppliers.  Id.  Further attempting to induce the cooperation of the non-cooperative unaffiliated suppliers, Risen offered to provide the non-cooperative unaffiliated suppliers access to Risen's legal and accounting teams.  Id.

Trina placed evidence on the record that it began making formal written requests to its non-cooperative unaffiliated suppliers requesting their cooperation in supplying the factor of production data in May 2019.  Trina's Section D Questionnaire Resp. at Ex. D-2, CD 112-132 bar code 3855903-01 (July 1, 2019) ("Trina's Section D. Resp.").  Trina subsequently made several additional requests for the non-affiliated suppliers' cooperation via letter and telephone.  Id.

Commerce fails to demonstrate that Trina and Risen did not cooperate to the best of their ability by continuing to do business with the non-cooperative unaffiliated suppliers.  Commerce argues that Trina's supplier relationships are longstanding and although it does not know the length of the relationships between Risen and its suppliers, it is unlikely that all the relationships are new.  Final Decision Memo. at 12.  Commerce further argues that there is no record evidence showing that Trina or Risen have followed through with threats to end relationships with unaffiliated suppliers who were uncooperative in prior reviews.[36]  Id.  Commerce's argument assumes, without evidence, that the non-cooperative unaffiliated suppliers in the

---

[36] Commerce states that "neither Trina or Risen have cited to one instance where they stopped doing business because parties refused to provide them with [factors of production]."  Final Decision Memo. at 16.  Yet, none of Commerce's questionnaires to Trina and Risen asked either respondent to provide such evidence.  The best of its ability standard requires a respondent to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon, 337 F.3d at 1382.  Commerce may not determine that a respondent failed to cooperate to the best of its ability because it did not provide information that Commerce did not request.

present review are the same suppliers who were uncooperative in prior reviews.  Id.

Commerce must support its determinations with substantial evidence on the record.

Commerce could have, but did not, issue questionnaires asking respondents to

provide Commerce with a list of non-cooperative unaffiliated suppliers from past

reviews and compared it to a list of current non-cooperative unaffiliated suppliers to

determine if there is any overlap.  See id. at 15 n.57.

Commerce also fails to show that Trina or Risen have sufficient leverage to

induce the cooperation of their non-cooperative unaffiliated suppliers and has not

shown that there is a threat of duty evasion by the non-cooperative unaffiliated

suppliers absent the use of facts available with an adverse inference.  Commerce

asserts that Trina and Risen had leverage over their non-cooperative unaffiliated

suppliers because they were large exporters to the U.S. and could threaten to cease

doing business with the non-cooperative unaffiliated suppliers in order to induce their

cooperation.  Id. at 14–15.  Indeed, record evidence shows that Trina and Risen did

make such threats and those threats did not induce the cooperation of the suppliers.

Risen's Section D Resp. at Ex. D-21 p. 14 ("if your company refuse [sic] to cooperate

by providing the requested data, Risen would be forced to refuse to purchase any

products from your company"); Trina's Section D Resp. at Ex. D-2 ("your cooperation

is significantly important both for our response to the antidumping duty

administrative review as well as our long-term business relationship").

Nor has Commerce shown a possibility of duty evasion by the non-cooperative unaffiliated suppliers.  Commerce speculates that the suppliers' consumption rates may be higher than Risen's and Trina's rates; therefore, by withholding information, the non-cooperative unaffiliated suppliers will not receive a separate rate and can sell their merchandise through Risen and Trina.  Final Decision Memo. at 13–14.  The record does not support Commerce's speculation.  None of the non-cooperative unaffiliated suppliers are mandatory respondents or named Chinese exporters of subject merchandise; therefore, there is no rate for the non-cooperative unaffiliated suppliers to evade.  Mueller, 753 F.3d at 1235 ("here is the possibility that Ternium could evade its own AFA rate of 48.33 percent by exporting its goods through Mueller if Mueller were assigned a favorable dumping rate.")  Compare Initiation Notice 84 Fed. Reg. at 9,299 (listing named Chinese exporters to be reviewed) with Risen's Section A Questionnaire Resp. at Exs. A-14 & A-15, PD 130 CD 54 bar code 3846332-01 (June 10, 2019) (listing unaffiliated solar cell and solar module suppliers); Trina's DQR at Ex. DA-36 (listing Trina's non-cooperative unaffiliated suppliers).  Finally, Commerce fails to explain why the use of the highest factor of production consumption rates result in a more accurate dumping margin.  Mueller, 753 F.3d at 1232–33.

On remand, if Commerce wishes to use facts available with an adverse inference, Commerce should address the evidence detracting from its determination that Trina and Risen have leverage over their non-cooperative suppliers and support

their speculation of duty evasion with substantial evidence from the record. Commerce should also explain how the adverse facts it selected lead to an accurate dumping margin.

## V.   Commerce's Separate Rate Calculation

Commerce's determination in the <u>Final Results</u> to apply the weighted-average antidumping margins calculated for Risen and Trina to the separate rate respondents is not supported by substantial evidence. The separate rate is "the weighted average of the estimated weighed average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C. § 1673d(c)(5)(a); <u>see also</u> <u>Final Results</u> at 62,278 n.6. Thus, because the separate rate is determined by, and derivative of, the rate calculated for Risen and Trina, and the court has found that those rates are not supported by substantial evidence, Commerce's separate rate calculation is also not supported by substantial evidence and is remanded for reconsideration consistent with this opinion.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determinations with respect to its selection of Malaysia as the primary surrogate country and its surrogate financial ratio calculations. Commerce's surrogate values for silver paste, EVA, and backsheet, its application of facts available with an adverse inference, and its separate rate calculation are remanded. In accordance with the foregoing, it is

Consol. Court No. 20-03743                                             Page 43
**PUBLIC VERSION**

  **ORDERED** that Commerce's <u>Final Results</u> are remanded for further explanation or reconsideration consistent with this opinion; and it is further

  **ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

  **ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

  **ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

  **ORDERED** that the parties shall file the Joint Appendix within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

  **ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.

<u>/s/  Claire R. Kelly </u>
Claire R. Kelly, Judge

Dated:  April 4, 2022
    New York, New York