## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

| | |
|---|---|
| RISEN ENERGY CO., LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| TRINA SOLAR CO., LTD. *ET AL.*, | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| SHANGHAI BYD CO., LTD. *ET AL.*, | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| SUNPOWER MANUFACTURING OREGON, LLC, | ) |
| | ) |
| Defendant-Intervenor and Consolidated Defendant-Intervenor. | ) |

Consol. Court No. 20-03743

## **ORDER**

Upon consideration of the parties' comments and responses regarding redetermination, and upon all other papers and proceedings herein, the Court

**ORDERS** that the remand redetermination is sustained; and further

**ORDERS** that final judgment be entered in favor of the United States.

**SO ORDERED**

Dated:_____, 2025          _____
New York, New York                              Claire R. Kelly, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

| | | |
|---|---|---|
| RISEN ENERGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRINA SOLAR CO., LTD. *ET AL.*, | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHANGHAI BYD CO., LTD. *ET AL.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 20-03743 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUNPOWER MANUFACTURING OREGON, LLC, | ) | |
| | ) | |
| Defendant-Intervenor and Consolidated Defendant-Intervenor. | ) | |

_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS', CONSOLIDATED PLAINTIFFS', AND PLAINTIFF INTERVENORS'
COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M.
MCCARTHY Director

OF COUNSEL
Jack Dunkelman
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

REGINALD T. BLADES, JR.
Assistant Director

TATE NATHAN WALKER
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0163
Fax: (202) 305-7643

September 30, 2025

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

BACKGROUND..................................................................................................2

PROCEEDINGS BEFORE THE COURT AND THE FEDERAL CIRCUIT..........................3

REMAND REDETERMINATION PROCEEDINGS..............................................6

ARGUMENT....................................................................................................8

I.     Standard Of Review........................................................................8

II.    Commerce's Financial Ratio Calculation Is Supported By Substantial Evidence...8

    A.  Commerce's Surrogate Financial Ratio Methodology.....................................8

    B.  Commerce's Remand Calculations Of Overhead Surrogate Financial Ratios Are Supported By Substantial Evidence ..............................................................9

    C.  Risen's Objections To Commerce's Approach And Interpretation Of The Financial Statement Notes Are No More Than Disagreement With Commerce's Well-Reasoned Explanation.................................................................13

        1.  Risen's Own Interpretative Methodology Using The IFRS Is Flawed......13

        2.  Risen's Reliance On Commerce's Past Practice Is Misplaced.................15

    D.  Risen's Interpretative Methodology Needlessly Constrains Commerce's Statutory Duty And Abrogates Reliance On The Record.............................................19

III.    Commerce's Fully Complied With The Remand Order......................................22

IV.    Commerce's Determination OF Manufacturing Overhead Is Supported By Substantial Evidence.................................................................................25

V.    Commerce's Did Not Overstate Overhead Costs................................................28

CONCLUSION................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    618 F.3d 1316 (Fed. Cir. 2010) ................................................................................. 9

*American Manufacturers of Multilayered Wood Flooring v. United States,*
    639 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) .......................................................... 17

*Carbon Activated Tianjin Co. v. United States,*
    586 F. Supp. 3d 1360 (Ct. Int'l Trade 2022) .......................................................... 22

*Hyundai Steel Co. v. United States,*
    279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) .............................................. 18, 19, 29f

*JBF RAK LLC United States,*
    790 F.3d 1358 (2015) ............................................................................................... 9

*MacLean-Fogg Co. v. United States,*
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ............................................................ 8

*Magnesium Corp. of America, et al., v. United States,*
    938 F. Supp. 885 (Ct. Int'l Trade 1996) ................................................................. 17

*Micron Tech, Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997) ................................................................................ 9

*Nation Ford Chem. Co., v. United States,*
    166 F.3d 1373 (1999) ................................................................................................ 8

*Risen Energy Co. Ltd. et al. v. United States,*
    611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ............................................................ 5

*Risen Energy Co., Ltd. v. United States,*
    122 F.4th 1348 (Fed. Cir. 2024) ..................................................................... passim

*Risen Energy, Co. v. United States,*
    569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) ........................................................ 3, 4

*Shanghai Foreign Trade Enters. Co. v. United States,*
    318 F. Supp. 2d 1339 (2004) .................................................................................. 20

*SolarWorld Americas, Inc. v. United States,*
    910 F.3d 1216 (Fed. Cir. 2018) ................................................................................ 9

**Statutes**

19 U.S.C. § 1677b(c)(1)..................................................................................................8

19 U.S.C. § 1677b(c)(1)(B)............................................................................................9

19 U.S.C. § 1677b(c)(4)..................................................................................................9

**Regulations**

19 C.F.R. § 351.408(c)(4)...............................................................................................8

**Other Authorities**

*Boltless Steel Shelving Units Prepackaged for Sale from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less-Than-Fair-Value*, 89 Fed. Reg. 28,743 (April 19, 2024)...........................................................................................................................16

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 4,852 (January 17, 2017).....14, 16, 17

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2022-2023, 89 Fed. Reg. 88,730 (November 8, 2024)..............................................................................................21

*Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review;* 2012-2013, 80 Fed. Reg. 13,833 (March 17, 2015)................21

*Manganese Metal from the People's Republic of China; Final Results of Second Antidumping Administrative Review,* 64 Fed. Reg. 49,447, 49,448 (Sept. 13, 1999..................................26

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

| | |
|---|---|
| RISEN ENERGY CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| TRINA SOLAR CO., LTD. *ET AL.*, ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| SHANGHAI BYD CO., LTD. *ET AL.*, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Consol. Court No. 20-03743 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| SUNPOWER MANUFACTURING ) | |
| OREGON, LLC, ) | |
| ) | |
| Defendant-Intervenor and ) | |
| Consolidated Defendant- ) | |
| Intervenor. ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S, CONSOLIDATED PLAINTIFFS', AND
PLAINTIFF INTERVENORS' COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to comments filed by

plaintiffs, Risen Energy Co., Ltd. (Risen), ECF No. 187 (Risen Br.), plaintiff-intervenors and

consolidated plaintiffs, Shanghai BYD Co., Ltd. (BYD), ECF No. 186, JA Solar Technology

Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and JingAo Solar Co., Ltd. (collectively, JA Solar), ECF No. 183, as well as plaintiff-intervenors, Canadian Solar, ECF No. 185, and Anji DaSol, ECF No. 188, concerning the Department of Commerce's remand redetermination filed in accordance with the Court's remand order. *Risen Energy Co., Ltd. v. United State*s, 122 F.4th 1348 (Fed. Cir. 2024) (remand order). *See* Final Results of Redetermination Pursuant to Court Remand, May 5, 2024 (Remand Results), ECF No. 179.[1]

Commerce's remand results comply with the remand order and are otherwise lawful and supported by substantial evidence. We, therefore, respectfully request that the Court sustain the remand results.

## BACKGROUND

In October of 2020, Commerce issued its final results of the 2017-2018 antidumping duty administrative review covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020), and accompanying Issues and Decision Memorandum (IDM) (Final Results), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 85 Fed. Reg. 79,165 (Dep't Commerce Dec. 9, 2020) (P.R. 508).[2] Pertinent to this litigation, in the final results, Commerce selected Malaysia as the primary surrogate country and relied on the 2018 audited financial statements of the Malaysian

---

[1] BYD, JA Solar, Canadian Solar, and Anji DaSol concurred with, and incorporated by reference, Risen's comments while additionally arguing that the matter should be remanded for Commerce to further recalculate a separate rate for each.

[2] Citations to the public record (P.R.) refer to the record of the underlying administrative review. Citations to the public record (P.R.R.) refer to the record underlying the remand redetermination.

company Hanwha Q Cells (Hanwha) to calculate surrogate financial ratios, including the ratio for manufacturing overhead.  Final Results.  In doing so, Commerce calculated the overhead surrogate ratio by subtracting the expense in cost of sales found in Note 17 of the financial statements from Hanwha's total reported cost of sales in its audited financial statements, supported by the definitions in those audited financial statements at Note 2.12, and recognized the difference as overhead, utilizing this as an additional overhead in the overhead ratio calculation.  Final Results at 47-49 (citing Risen's Final Surrogate Value Submission I (Risen SV Submission) at Exhibit SV2-8, "Hanwha Q Cells Financial Statement & Information," at p. 29 (Note 2.12) and p. 51 (Note 17) (Jan. 2, 2020) (P.R. 365)).

## PROCEEDINGS BEFORE THE COURT AND THE FEDERAL CIRCUIT

Plaintiffs challenged certain aspects of Commerce's final and amended final results. *Risen Energy, Co. v. United States*, 569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) (*Risen I*).  In *Risen I*, the Court sustained Commerce's surrogate financial ratio calculation and held that Commerce's methodology was reasonable and supported by substantial evidence.  *Id.* at 1338. The Court observed that Commerce's "surrogate financial ratio calculations are supported by substantial evidence, consistent with its practice."  *Id.* at 1332.  The Court found it could "reasonably discern from Commerce's citation to both Notes 2.12 and 17 that Commerce believes that because Hanwha's financial statement is compliant with IFRS {International Financial Reporting Standards}, it must include labor and energy costs in inventories cost."  *Id.* at 1334 (citations omitted).  The Court explained that Commerce,

> determin{ed} that the inventories cost included MLE {materials, labor, and energy}costs, Commerce {then} reduced the inventories cost by the change in finished goods inventories, isolating the MLE costs and included them as part of the denominator of the surrogate financial ratios.  Having accounted for MLE, depreciation, and the change in finished goods balance, Commerce

> reasonably allocated the remaining amount of the cost of sales
> balance to overhead.

*Id.* The Court rejected Risen's arguments that "Commerce double counts labor and energy costs by including labor and energy costs in the overhead ratio's numerator and separately valuing labor and energy as factors of production when calculating normal value." *Id.* Risen "contend{ed} that when energy or labor costs are not specifically broken out in the financial statement and assigned to the MLE denominator, Commerce does not separately value labor and energy in the factors of production because they are accounted for in the numerator of the overhead financial ratio.*" Id.* Rejecting Risen's argument, the Court found,

> Commerce isolates and removes the MLE costs from Hanwha's
> cost of sales before calculating the surrogate financial ratios, labor
> and energy costs are not included in total overhead and thus are not
> included in the numerator of the overhead ratio. Therefore, the
> inclusion of labor and energy costs in the factors of production
> does not double count the labor and energy costs and is consistent
> with the determinations cited by Plaintiffs.

*Id.* at 1335. Thus, the Court held that Commerce's citations to the notes in Hanwha's financial statement, as well as Commerce's past practice, indicate that Commerce had reasonably concluded that Hanwha included labor and energy costs in its inventory cost (consistent with IFRS), and thus Commerce had reasonably allocated the remainder of Hanwha's cost of sales to overhead. *Id.* at 1332-34.

Although the Court affirmed the surrogate values, the Court remanded to Commerce for further consideration its decision to apply partial adverse facts available to certain respondents, its selection of surrogates to value certain inputs, and its calculation of a separate rate. *Id.* at 1337-38. In its remand redetermination, Commerce revised, under respectful protest, the surrogate that it selected to value silver paste, did not apply an adverse inference in selecting from among the facts otherwise available in calculating respondents' dumping margins,

continued to value backsheets and ethylene vinyl acetate (EVA) as it had in the *Final Results*, and revised the weighted-average dumping margins appropriately. *See Risen Energy Co. Ltd. et al. v. United States*, 611 F. Supp. 3d 1384, 1389–94 (Ct. Int'l Trade 2022) (*Risen II*). In *Risen II*, the Court sustained Commerce's remand results. *Id.* at 1394.

Risen appealed the Court's decision sustaining Commerce's selection of surrogates to value backsheets and EVA and Commerce's overhead ratio calculation. The United States Court of Appeals for the Federal Circuit sustained the Court's affirmation of Commerce's surrogate value selections for backsheets and EVA, but it vacated the Court's decision sustaining Commerce's surrogate financial ratio calculation for overhead. *Risen Energy Co., Ltd. v. United States*, 122 F.4th 1348, 1359 (Fed. Cir. 2024) (*Risen III*).

The Federal Circuit found that Commerce's rationale for allocating unidentified costs to overhead was so "unclear that it {was} insufficient" and, thus, not based on substantial evidence. *Id.* at 1356-57. The Federal Circuit determined that Commerce had improperly assumed that a figure found in Note 17 of the financial statement for "inventories" fully accounted for materials, labor, and energy costs of inventory and that the difference between the figure at Note 17 and the cost of goods sold in the financial statements constituted overhead. *Id.* at 1358. The Federal Circuit explained that, in order to calculate the surrogate value ratios,

> Commerce began its analysis with Hanwha's costs of goods sold, which was 2,0003,400 Malaysian ringgits. *Id.* From that total, Commerce sought to identify what proportion of the costs of goods sold represented MLE. Note 17 to the financial statement explained that, of the total costs of goods sold, 1,648,000 ringgits are attributable to 'inventories.' Commerce considered these inventory costs to be roughly synonymous with Hanwha's total MLE costs, based on Note 2.12 of the financial statement.

*Id.* at 1357. Commerce did this relying on Note 2.12, which explained,

> Costs incurred in bringing the Inventories to their present location
> and condition are accounted for as follows: . . .
> Finished goods and work-in-progress: costs of direct materials and
> labour and a proportion of manufacturing overheads based on
> normal operating capacity.

*Id.* (citation omitted). "Commerce concluded that Note 2.12's reference to a 'proportion of manufacturing overheads based on normal operating capacity' was a reference largely to energy costs and not production overhead." *Id.* (citations and quotations omitted). The Federal Circuit rejected Commerce's explanation "that it was reasonable to understand the phrase 'a proportion of manufacturing overheads' in Notes 2.12 to be 'a reference largely to energy inputs' included in inventories," because "Commerce {failed to} provide{} an adequate explanation or, indeed, any explanation for why it drew this conclusion." *Id.* at 1358.

The Federal Circuit directed the Court to remand the matter regarding the overhead issue to Commerce for further proceedings consistent with its opinion. *Id.* at 1359. As instructed, the Court remanded this matter to Commerce. See *Order*, ECF No. 170 ("this case is remanded to Commerce for further proceedings in conformity with the Court of Appeals' opinion in *Risen*.").

## <u>REMAND REDETERMINATION PROCEEDINGS</u>

On April 22, 2025, Commerce released the draft results of redetermination to interested parties and provided them with an opportunity to make comments. Draft Remand Redetermination Results (Draft Remand Results) (P.R.R. 6). In its draft remand results, Commerce provided a well-reasoned explanation for why it considered the difference between the cost of sales expense for inventory, RM 1,648,000, at Note 17, and the listed cost of goods sold, RM 2,003,400, as representing overhead in Hanwha's financial statements. Draft Remand Results at 2-4. Commerce explained that Note 2.12 explained the definition of "cost of finished

products, which are the inventory costs included in the company's costs of goods sold" (the term, "cost of finished products" is used in Note 17 for the RM 1,648,000 figure) included "the costs of direct materials and labour and a proportion of manufacturing overheads based on normal operating capacity." Draft Remand Results at 4 (quoting Note 2.12). As a result, Commerce "used RM 1,648 million as the materials, labor, and energy costs, adjusted for changes in inventory, in the denominator of the overhead ratio, because Note 2.12 of Hanwha's financial statements explicitly indicates that the RM 1,648 million comprises direct materials, labor, and a proportion of manufacturing overhead costs." Draft Remand Results at 4. Commerce also recognized that "there may be additional overhead costs beyond energy in the RM 1,648 million." Draft Remand Results at 8.

On May 6, 2025, JA Solar and Risen commented on the draft remand results. JA Solar Comments on Draft Remand Redetermination (JA Solar Draft Remand Cmts) (P.R.R. 4); Risen Comments on Draft Remand Redetermination (Risen Draft Remand Cmts.) (P.R.R. 5). Risen argued that Commerce should disregard the figure at Note 17 entirely and instead calculate financial ratios according to Risen's own method set forth in a spreadsheet. Risen Draft Remand Cmts at 3, Attachment 1. Risen argued that use of Note 17 went against established Commerce practice and violates principles in the IFRS, as found by the Federal Circuit. *Id.* at 9-10. Risen argued that Commerce's "allocation of the remaining cost of sales as overhead results in an overstated and an illogical overhead" "in contrast" to "financial ratios on the record from prior reviews." *Id.* at 16. JA Solar concurred fully with those comments. JA Solar Draft Remand Cmts.

In Commerce's final remand results, Commerce provided a fulsome explanation of its practice for how it calculated the surrogate financial ratio for overhead. Remand Results at 3.

7

Commerce revised its remand result to no longer find that "the proportion of manufacturing overhead expenses in inventory costs that is referenced in Note 2.12 to Hanwha's financial statements is largely energy costs." Remand Results at 18. Instead, Commerce found that "only a portion of manufacturing overhead costs are included in the RM 2,003,400 million cost of sales." Remand Results at 18. This change however did not yield a change to "Commerce's calculation of the financial ratios for overhead expenses." Remand Results at 10. Risen challenges these findings.

## ARGUMENT

### I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

### II. Commerce's Financial Ratio Calculation Is Supported By Substantial Evidence

The Federal Circuit remanded this case to "give Commerce an opportunity to identify substantial evidence for its calculation." *Risen III,* 122 F.4th at 1349. Upon remand, Commerce identified the substantial evidence contained in the recored to support all aspects of its decision.

#### A. Commerce's Surrogate Financial Ratio Methodology

The statute is silent on the methodology that Commerce must apply to calculate surrogate financial ratios when calculating normal value, necessary in calculating the dumping margin for a non-market economy. *See* 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(c)(4); *Nation Ford Chem. Co., v. United States*, 166 F.3d 1373, 1377 (1999) (explaining that statute accords Commerce "wide discretion" in applying guidelines to value factors of production). Commerce

will make this normal value calculation by using surrogate values for the "factor of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, covering, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). In valuing the factors of production, Commerce relies upon prices or costs of the factors of production (also referred to as inputs) from a surrogate market economy country that is at a comparable level of economic development to that of the nonmarket economy country and is a significant producer of comparable merchandise. 19 U.S.C. § 1677b(c)(4).

Commerce will select the "best available information" regarding the values of inputs in an appropriate market economy country. 19 U.S.C. § 1677b(c)(1)(B). "Commerce values certain factors of production, such as selling, general administrative expenses, factor overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010).

Commerce reviewed the record and made a well-reasoned calculation based on the lawful exercise of its discretion to select an appropriate methodology. *See SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) ("{t}he decision to select a particular methodology rests solely within Commerce's sound discretion" (quoting *Micron Tech, Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)); *see also JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (2015) (holding that, when Congress is silent, Commerce "may perform its duties in the way it believes most suitable" (citation omitted)).

### B. Commerce's Remand Calculations Of Overhead Surrogate Financial Ratios Are Supported By Substantial Evidence

Commerce lawfully "calculated the surrogate financial ratio for overhead using information in Hanwha's . . . 2018 financial statements." Remand Results at 2. "Because

Hanwha's 2018 financial statements do not contain line items for the total overhead, materials, labor, and energy costs that it incurred" during the period of review, Commerce implemented its usual practice to "base the materials, labor and energy costs that it includes in the denominator of the surrogate financial overhead ratio on the surrogate company's cost of goods sold." *Id.* at 3-4 (citing *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 4,852 (January 17, 2017), and accompanying IDM at Comment 2 ("{i}n {Commerce's} calculation of these financial ratios . . . the denominator is an aggregate number for {materials, labor, and energy costs} calculated from the line item for cost of goods sold." (citation omitted)).

Hanwha's financial statements included two pertinent notes helping interpret the findings therein. Note 17 . . . explains that, for inventories, "'{d}uring the year, the amount of inventories recognized as an expense in costs of sales were {Malaysian ringgit (RM)} 1,648 million.'" Remand Results at 4 (quoting Note 17). An additional note, Note 2.12, also explains the meaning of "inventory" in these financial statements:

> *Inventories* are stated at the lower of cost and net realisable value. Costs incurred in bringing the inventories to their present location and condition are accounted for as follows: . . . Finished goods and work in progress: costs of direct materials and labour and a *proportion of manufacturing overheads* based on normal operating capacity.

Remand Results at 4 (quoting Note 2.12 (emphasis added)). Commerce then utilized its expertise and specialized knowledge to conclude that it should "use{} RM 1,648 million as the materials, labor, and energy costs, adjusted for changes in inventory, in the denominator of the overhead ratio since Note 2.12 . . . indicates that the RM 1,648 million comprises direct materials, labor, and a proportion of manufacturing overhead costs." *Id.* at 5.

The dispute at issue apparently originated from the fact that Hanwha listed its overall "costs of sales" as "RM 2,003 million, rather than the RM 1,648 million cost of the finished products that the company sold during the period." *Id.* at 5-6; *see also* Risen SV Submission at Ex. SV2-8 at p. 11 (recognizing in Hanwha's "{s}tatement of comprehensive income" that the cost of sales for 2018 was listed as RM 2,003,400). Commerce concluded that the difference between these two seemingly conflicting numbers for cost of goods sold[3] is *other overhead* because Note 2.12 did not explicitly indicate manufacturing overhead was completely included in the RM 1,648 figure but that only "a proportion" of it was. Remand Results at 5-6 (citing Note 2.12). This difference, RM 357,156 million,[4] was used as the numerator in Commerce's overhead calculation in dividing RM 357,156 million (other overhead) by RM 1,646,244 million (MLE) to reach the surrogate financial ratio. *Id.* at 5, 10; *see also* Remand Decision at 3 depicting the financial ratio for overhead equals manufacturing overhead costs/(materials + labor +energy (MLE))

In support of this conclusion, Commerce recognized that "Hanwha's financial statements do not contain line items for the total overhead, materials, labor, and energy costs that it incurred to manufacture silicon photovoltaic wafers, cells and modules." *Id.* at 6. Commerce further explained:

---

[3] Commerce treated costs of goods sold (COGS), the terms used in Commerce's calculations, and cost of sales, the terms used in the financial statements, collapsed largely together for this record, noting "total cost of inventories recognized as an expense in the cost of goods sold is RM 1,648 million, the total cost of goods sold on Hanwha's income statement is RM 2,003 million." Remands Results at 8. Risen did not dispute this finding. Risen Br. at 2 ("COGS and cost of sales are different terms for the same function in the financial statement"); *see also* at 5.

[4] Instead of using RM 1,648 million, Commerce "adjusted for changes in inventory" and used the difference between RM 1,646,244 million from Note 17 and RM 2,003,400 from the "statement of comprehensive income" to reach the difference of RM 357,156 million in other overhead costs. Remand Results at 5, 11.

> Notes 2.12 and 17 of Hanwha's financial statements, when taken
> together, indicate that the cost of inventoried products sold during
> 2018 were RM 1,648 million and that those costs include the 'costs
> of direct materials and labour and a proportion of manufacturing
> overheads based on normal operating capacity.' Based on the . . .
> *absence of any other expenses* in Hanwha's income statement that
> *could reasonably include* energy expenses that were incurred in
> manufacturing products

*Id.* at 6 (quoting Note 2.12) (emphasis added)). Accordingly, Commerce determined that the RM

1,648 million costs of products sold, adjusted for changes in inventory, comprised at least a

portion of the MLE—the costs that Commerce includes in the denominator of the surrogate

financial ratio calculation for overhead expenses. *Id.* at 6-7.

Commerce observed that the Federal Circuit held that, in Commerce's previous

conclusion, "the manufacturing overhead expenses in inventory costs are largely energy expense

to be unsupported by substantial evidence." *Id.* at 17 (citation omitted). As a result, Commerce

added extensive analysis to its prior determination and clarified that it was not stating "the

proportion of manufacturing overhead expenses in inventory costs that is referenced in Note 2.12

to Hanwha's financial statements is largely energy costs." *Id.* at 17-18. Instead, Commerce

found that "only a portion of *all* manufacturing overhead costs are included in the RM 1,648

million cost of products sold that was included in the RM 2,003,400 million costs of sales." *Id.*

at 18 (emphasis in original). Commerce also found that its position is "consistent with IFRS."

*Id.*

Commerce thus calculated the financial ratios for the final results using RM 1,648 million

as the total MLE value ("H"). *See* IDM at 48. Commerce further treated the difference between

total manufacturing costs, *i.e.*, RM 2,003 million, and MLE, *i.e.*, RM 1,648 million, as overhead

costs ("I"). *Id.* Therefore, Commerce properly calculated the overhead ratio ("I/H") as 21.70

percent, the selling, general, and administrative (SGA) ratio ("M/(H+G+I)") as 9.73 percent, and

the profit ratio ("N/(G+H+L+M)") as 3.48 percent using these identified values.  *See* IDM at 48-49; Final SV Memo at 2 (October 1, 2020) (P.R. 473).  Commerce's remand redetermination satisfies the requirements of the remand order by supplying further explanation and clarifying Commerce's reasonable approach.  The Court should uphold Commerce's approach.

### C.    Risen's Objections To Commerce's Approach And Interpretation Of The Financial Statement Notes Are No More Than Disagreements With Commerce's Well Reasoned Explanation

Risen disagrees with Commerce's cogent analysis and argues that Commerce's reliance on Note 17 is simple "guesswork" and not consistent with the financial statements or IFRS. Risen Br. at 1.  Risen contends that the IFRS requires all overhead to be included in inventories, that Commerce misread the term "proportion of manufacturing overheads," that the difference between inventories and cost of sales is "unidentified," that Commerce's method departs from normal practice, and that Note 17 should not be used to abrogate an income-statement line item. These arguments reflect mere disagreement with Commerce's findings and do not undermine Commerce's reasonable determination, which is grounded in Hanwha's financial statements, consistent with Commerce's practice, and fully explained in the remand results.

### 1.    Risen's Own Interpretive Methodology Using The IFRS Is Flawed

Risen disagrees with Commerce's reading of the record and disputes the application of IFRS to this matter. Risen Br. at 4-6.  Risen argues that IFRS requires that "manufacturing costs be included in the costs of inventories" so that the "a proportion" language must "mean the proportion of all manufacturing overhead related to the finished goods and WIP."  Risen Br. at 4. Risen's reliance on the IFRS is misplaced.

The IFRS, paragraph 10, provides that "{t}he cost of inventories shall comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their

present location and condition."  "IAS Inventories," IFRS 2022, available at

https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ias-

2-inventories.pdf?bypass=on (last accessed September 25, 2025).  Paragraph 37 of the IFRS

explains that "{w}hen inventories are sold, the carrying amount of those inventories shall be

recognized as an expense in the period in which the related revenue is recognized."  Risen Br. at

3; *see also* Order, ECF No. 121-2 (IAS 2 Inventories) (April 4, 2022).  In reliance upon this,

Risen argues that "a proportion" of manufacture overhead referenced in Note 2.12 must be read

to mean the proportion of all manufacturing overheads related to the finished goods and work-in-

progress.  *Id.*  Risen contends that because of the IFRS definition that "a proportion" cannot

mean that "some amount of manufacturing overhead is not reported in inventories" because the

statements need to be compliant with the IFRS.  Risen Br. at 5; *see* Risen SV Submission at

SV2-8 at p. 16 ("The financial statements of the Group and of the Company {Hanwha} have

been prepared in accordance with Malaysian Financial Reporting Standards ("MFRS"),

International Financial Reporting Standards ("IFRS") and the Companies Act 2016 in

Malaysia.").

     However, Risen misses the fact that Note 2.12 states that the costs sales (or the cost of

goods sold) includes the "cost of direct materials and labor and *a proportion of manufacturing

overhead* based on normal operating capacity."  Note 2.12 (emphasis added); Remand Results at

4.  Commerce's interpretation here does not contradict the IFRS or other accounting standards.

Commerce simply recognizes that a proportion is not the whole of something.  Remand Results

at 9 ("One definition of 'proportion' is a 'part of something when compared to the

whole.'"(quoting "Proportion," Cambridge Dictionary,

https://dictionary.cambridge.org/us/dictionary/english/proportion)).  With the financial note

14

saying that it *does not* contain the whole of something, Commerce reasonably found that those additional costs not specified were the difference between the cost of goods sold and the cost of sales at Note 17.

Although Risen argues there is no flexibility in the IFRS standard to designate something as a "proportion" of something, that adds to the IFRS standard's strictures.  Paragraph 39 of the IFRS explains that an entity may "adopt a format for profit or loss that results in amounts being disclosed other than the cost of inventories recognized as an expense during the period."  IAS Inventories.  An entity may then breakdown expenses for "raw materials and consumables, labour costs, and other costs."  IFRS, paragraph 39.  The IFRS standard is not a punctilious standard that cannot redefine cost of inventories as needed.  Remand Result at 18 (Commerce's approach "is entirely consist with IFRS.").  Regardless, IFRS is not the only standard governing the financial statements at issue.  Other accounting and financial standards appear more important than the IFRS standards with extensive references to the MFRS in the financial statements.  *See* Risen SV Submission at Exhibit SV2-8 at pp. 16-17.

## 2.    Risen's Reliance On Commerce's Past Practice Is Misplaced

Risen argues that Commerce's remand results contradict its standing practice of only using a clear categorization of costs in surrogacy ratio calculations.  Risen Br. at 5.  Instead, Risen argues that Note 17 "is not a note that the Department typically relies upon at all and is not a note that the Department must or should rely upon."  *Id*.  Risen contends that Commerce "only uses notes that actually allow for clear categorization of expenses in the cost of sales (or COGS) as overhead or material or labor or energy."  *Id*.  Risen contends that Commerce's use of the financial statement notes to categorize expenses is contrary to its practice because these are not specific line items for particular expenses in a financial statement that could be directly

categorized as material, labor, or overhead expenses.  Risen Br. at 5-7.  Risen asserts that

Commerce's practice is to use available classifications in surrogate financial statements to

determine the components of surrogate financial ratios, but the financial statement notes that

Commerce relied on are not classifications, because they do not separate material, labor, and

overhead costs from other costs.  Risen Br. at 5.

Commerce explained in its redetermination results that it has previously considered notes

to surrogate financial statements as information that can be used to accurately calculate surrogate

financial ratios.  Remand Results at 12 (citing *Certain Mobile Access Equipment and*

*Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty*

*Administrative Review*; 2022-2023, 89 Fed. Reg. 88,730 (November 8, 2024), and accompanying

IDM at Comment 2 ("Türkiye provides two sets of financial statements for producers of

merchandise comparable to MAE . . . we found that both sets of financial statements for Turkish

producers are detailed, comprehensive, and contain notes to the financial statements, permitting

an accurate calculation of financial ratios.").

Commerce explained that its reasoning is consistent with similar situations in past

administrative cases.  *Id.* at 7.  Specifically, in other non-market economy (NME) cases,

Commerce determined that manufacturing overhead expenses include energy expenses when

energy expenses are not separately listed in the surrogate financial statements.  *Id.*  Commerce

specifically cited *Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic*

*of China* and *Helical Spring Lock Washer from the People's Republic of China*, in which

Commerce likewise relied on available classifications in surrogate financial statements and, in

the absence of more detailed breakdowns, reasonably inferred the remaining costs within cost of

sales as manufacturing overhead.  *Id.* at 7 n.27 (citing *Boltless Steel Shelving Units Prepackaged*

*for Sale from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less-Than-Fair-Value*, 89 Fed. Reg. 28,743 (April 19, 2024), and accompanying IDM at Comment 3 ("Commerce found that Chitose International and Lion Metal's financial statements do not segregate energy costs from other manufacturing overhead reflected in those statements (*i.e.,* each statement contains a single line item for manufacturing overhead). Thus, we preliminarily found that the manufacturing overhead expense ratio includes production-related energy expenses."); *see also Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 13,833 (March 17, 2015), and accompanying IDM at Comment 6 ("{t}he Department agrees with Shakeproof that, for the final results, the energy-related expenses of Siam Anchor, System 3, and Bangkok Fastenings should be treated as manufacturing overhead.").

Commerce also observed that the Court has previously recognized that manufacturing overhead expenses *include energy expenses. Id.* at 7 (citing *American Manufacturers of Multilayered Wood Flooring v. United States*, 639 F. Supp. 3d 1216, 1228 (Ct. Int'l Trade 2023) (acknowledging that a common definition of manufacturing overhead includes "electricity and gas used in the manufacturing facilities." (citation and quotation marks omitted)). Furthermore, Commerce cited *Magnesium Corp. of America*, which holds that "{i}ncluded in factory overhead are costs such as depreciation, insurance, taxes, repairs and maintenance, supervisory salaries, manufacturing supplies, power, and indirect labor." *See* Remand Results at 8 (citing *Magnesium Corp. of America, et al., v. United States*, 938 F. Supp. 885, 896 (Ct. Int'l Trade 1996)).

Risen's reliance on past administrative proceedings is misplaced because every administrative proceeding stands on its own record and on its own fact pattern. Risen Br. at 6-7. With respect to what Risen calls agency practice, as Commerce explained in the final results,

"Commerce is unaware of any such practice {to classify unidentified cost of sales as MLE.}" IDM at 49. Risen's assertion is particularly misplaced in the context of construing a financial statement, which necessarily depends on the specific facts that control the interpretation. *Cf. Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)).

To be sure, Commerce acknowledged that its prior cases include instances when it "subtract{ed} line items for expenses other than materials, labor, and electricity expense from the cost of sales and then treat{ed} the remaining costs as materials, labor and electricity costs." Remand Results at 13. But Commerce explained that it was not in such an instance because it "had explicit information in financial statement Notes 17 and 2.12 regarding the total materials, labor, and a portion of manufacturing overhead costs included in the cost of sales." *Id.* Thus, Commerce properly relied upon the financial notes because it was able to provide for categorization of the various categories of materials, labor, and overhead. *Id.* at 13-14.

Commerce recognized that this was not an ideal situation, but the record dictated the result. Recognizing that the difference between the cost of sales and cost of products sold is not identified in Hanwha's financial statements, Commerce explains that, in such situations, its practice is to rely on available classifications in the surrogate financial statements, unless there is a good reason to determine those classifications are inaccurate. *Id.* at 8-9 and n.33 (citing Washers IDM at Comment 6 (". . . when assigning the various expenses to particular categories for our financial ratio calculations, we prefer to rely on the classification of expenses from the surrogate financial statements, unless there is good reason to believe the classification is not accurate.")).

Commerce further explains that the information that serves as the source for financial ratio calculations in NME cases is based on surrogate financial data from a company that is not a party to the proceeding. *Id.* Commerce is unable to "go behind" a surrogate financial statement to determine precisely what each item includes or to what activity it relates in such cases. Nonetheless, the best information on this record as to the materials, labor, and energy costs incurred by Hanwha is provided by looking to Notes 17 and 2.12. *Id.* at 8.

**D.    Risen's Interpretive Methodology Needlessly Constrains Commerce's Statutory Duty And Abrogates Reliance On The Record**

In response to Commerce's observation that "Hanwha's financial statements do not contain line items totals for overhead, materials, labor and energy costs that it incurred," Remand Results at 6, Risen proposes a methodology for calculating the manufacturing overhead ratio whereby it includes only the direct line-item expenses for "depreciation of property, plant, and equipment," "property, plant, and equipment written off," and "operating lease" in the numerator of the manufacturing overhead ratio. Risen Br. at 6-7. Risen posits that Commerce has a practice of consistently categorizing these expenses as overhead expenses and these specifically identified overhead costs should be the only ones included in the cost of sales. *Id.* Additionally, Risen contends that subtracting these expenses from the total cost of sales from the financial statements results in the appropriate denominator for the manufacturing overhead ratio unlike the RM 1,648 million figure that Commerce used. *Id.* at 7-8; Remand Results at 18.

Commerce explains that Risen's proposed methodology for calculating the manufacturing overhead ratio is not more accurate than Commerce's methodology for calculating that ratio for several reasons. Remand Results at 14-16.

First, Commerce included the same line-item expenses for depreciation in the numerator of its manufacturing overhead ratio as Risen suggests. *Id.* at 14; *see Risen III*, 122 F.4th at 1358

("Commerce's allocate{ed} {} the remaining 257,063 ringgits in unidentified costs to overhead."), *Risen III,* 122 F.4th 1363 fn.1 (dissent) ("The other costs subtracted from the cost of sales are RM6,767 for 'depreciation property' and RM93,326 for 'depreciation of plant and equipment.'" (citation omitted)). Additionally, by including these specific line-item expenses in the numerator of the manufacturing overhead ratio, contrary to Risen's arguments, Commerce has followed its practice. *Id.* at 14; *see Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339, 1341 (2004) (citing *Manganese Metal from the People's Republic of China; Final Results of Second Antidumping Administrative Review,* 64 Fed. Reg. 49,447, 49,448 (Sept. 13, 1999) ("For the manufacturing overhead ratio, Commerce typically divides total manufacturing overhead expenses by total direct manufacturing expenses.")).

Second, Risen errs because the cost of an operating lease, which included office space, was not all encompassing of manufacturing overhead. Remand Results at 15; *see also* Risen SV Submission Ex. SV2-8 at pp. 48 ("The building of the Company is constructed on a parcel of land owned by the Federal Government. The Group has entered into a lease arrangement with the Federal Government for the use of the said land."); *see also* line item at 41. Therefore, "part of the cost of the lease should be used to calculate the selling, general, and administrative expense ratio, not the manufacturing overhead ratio as Risen and JA Solar have done." Remand Results at 15. Risen does not dispute this finding.[5] Risen Br.

Third, Risen incorrectly asserts that the correct calculation for overhead surrogacy ratio can be obtained by simply "subtracting the specific line-item expenses that they treated as manufacturing overhead expenses" (without "property, plant, and equipment written off," expenses that Risen fails to include in its own calculations) "from the total cost of sales yields

_____

[5] Risen has only marginally modified its administrative comments in its brief before the Court. *Compare* Risen Br. *to* Risen Draft Remand Cmts.

the materials, labor, and energy costs that should be included in the denominator of the manufacturing overhead ratio" is.  Risen Br. at Attachment 1; Remand Results at 14-15; *Risen III,* 122 F.4th at 1362 (dissent) ("Risen prefers to allocate it to MLE – that is, materials, labor, and energy – which would put it in the denominator of the ratios.").

In contrast, Commerce explains that "Commerce relied on Notes 17 and 2.12 to Hanwha's financial statements that specifically state that the total of the materials, labor, and the portion of overhead costs included in inventory (which would include, in part, energy costs incurred in manufacturing products) is RM 1,648 million" and the "figure that Commerce used in the denominator of the manufacturing overhead ratio."  Remand Results at 15.  Commerce determined that the better approach is to rely on the financial statement notes concurrent with the financial statements than to "make assumptions in deriving those figures as Risen and JA Solar have done."  *Id.* at 15.  Risen's argument that the difference between the RM 2.003 million and the RM 1,648 million figure should simply be disregarded has already been rejected.  The Federal Circuit recognized the significance of the "difference between costs of goods sold and inventories in the Hanwha financial statement" and the need for the remand results to address it. *Risen III*, 122 F.4th at 1356 n.8.

Last, Commence explains that Risen's proposed methodology "results in an overhead expense of only RM 101,419 million while the additional costs at issue in the cost of sales are RM 357,156 million."  *Id.*  Because Notes 17 and 2.12 reveal that some type of additional overhead expenses exist, "Risen's . . . calculation methodology would exclude a significant amount of expenses from the overhead ratio calculation, understate normal value, and thus understate the margin of dumping."  *Id.* at 16.  Commerce rejected Risen's proposed method because it "ignores record information in Hanwha's financial statements that Commerce had

considered the best in the record to calculate the necessary overhead ratios." *Id.* at 16. This key failing demonstrates that substantial evidence supports Commerce's decision that made use of the full and complete record in its redetermination. Although Risen dismisses Commerce's using the complete record as "not logical," Risen Br. at 12, failing to adequately rely on the surrogate financial statements and their own internal explanations found in Notes 17 and 2.12 would be inappropriate and unsupported by the record. *See Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1367 (Ct. Int'l Trade 2022) ("the court has upheld Commerce's practice of requiring a party to establish on the record any claims for a particular surrogate value and establish on the record any argument that data are aberrational or unreliable." (citation omitted)). In the light of the data being found reliable and the best on the record, the Court should sustain Commerce's methodology and determination, which are supported by the record and was made within Commerce's discretion.

## III.    Commerce Fully Complied With The Remand Order

Contrary to Risen's claims, Commerce's reliance on the figure at Note 17 and its categorization of costs is explained in its remand determination and satisfies the standard required by the remand order. Risen Br. at 7-15.

Risen is incorrect that Commerce's explanation has already been rejected by the Federal Circuit. *Id.* at 7. In the remand order, the Federal Circuit explains,

> Commerce concluded that Note 2.12's reference to a 'proportion of manufacturing overheads based on normal operating capacity was 'a reference largely to energy costs' and not production overhead. . . . Based on this assumption, . . . Commerce determined that Hanwha's overhead expenses totaled essentially the difference between its costs of goods sold and inventory costs. … We are not persuaded by Commerce's argument that it was reasonable to understand the phrase 'a proportion of manufacturing overheads' in Note 2.12 to be *'a reference largely to energy costs' included in inventories. . . . At no point has Commerce provided an adequate*

*explanation* or, indeed, any explanation for why it drew this conclusion. Further, nothing in the Hanwha financial statement or the IFRS standard can be read to suggest that proportional 'production overheads' are coterminous with, or even largely made up by, a company's energy costs, as Commerce asks us to conclude.

Stated differently, Commerce found that because Hanwha's financial statement 'specifies that {materials, labor and energy} costs are included in the 'Inventories' portion of the '{c}ost of sales,' . . . the remaining, unidentified costs of sales were not {materials, labor and energy costs} but rather overhead.' Commerce's theory does not appear to be supported by the financial statement upon which it relies. The inclusion of MLE costs in "inventories" does not preclude the possibility that manufacturing overhead would also be included in inventory costs. In fact, it appears that this is precisely what occurred here, as stated in Note 2.12 to the financial statement.

*Risen III*, 122 F.4th at 1357-58 (emphasis added) (internal citations omitted).

In sum, the Federal Circuit held that Commerce's conclusion that the manufacturing overhead expenses in inventory costs are largely energy expenses was not supported by substantial evidence and that "the inclusion of MLE cost in inventories does not preclude the possibility that manufacturing overhead would also be included in inventory costs." *Id.* at 1358 These two aspects of the remand order have been fully addressed by Commerce.

First, Commerce addressed the Federal Circuit's remand admonition regarding its findings as to the other overhead constituting energy. The Federal Circuit explained that "manufacturing overhead expenses in inventory costs are largely energy expenses to be unsupported by substantial evidence." *Risen III*, 122 F.4th at 1357; Remand Results at 17. Commerce explains that,

in this remand, we have not taken the position that the proportion of manufacturing overhead expenses in inventory costs that is referenced in Note 2.12 to Hanwha's financial statements is largely energy costs. Rather, we have taken the position that only a portion of *all* manufacturing overhead costs are included in the RM

> 1,648 million cost of products sold that was included in the RM
> 2,003,400 million cost of sales.

Remand Results at 18 (emphasis in original). Risen's argument that Commerce "is still not justified in its understanding of 'proportion of manufacturing overhead' or how this would mean energy" must, therefore, fail. Risen Br. at 9.

Commerce determined that only a portion (less than the whole) of *all* manufacturing overhead costs are included in the RM 1,648 million cost of products sold that was included in the RM 2,003,400 cost of sales. Remand Results at 18. Risen asserts that by acknowledging in the final remand results that manufacturing overhead expenses in the cost of inventory may include more than energy expenses Commerce contradicted its analysis in the draft remand . Risen Br. at 11-12. Commerce elaborated in its final remand redetermination, with regard to its draft remand, that Commerce "interpreted the statement in Note 2.12 to Hanwha's financial statements that inventory cost includes a "'proportion of manufacturing overheads based on normal operating capacity' to mean that only a portion of *all* manufacturing overhead expenses have been allocated to inventory based on normal operating capacity." Remand Results at 18 n.54, 20 (quoting Note 2.12). In the final remand, Commerce clarified that the proportion of overhead in inventory may include more than just energy, and the phrase "manufacturing overheads" is not limited to one category of costs. Remand Results at 6-8. Commerce's explanations are not inconsistent, rather, they reflect the same underlying point that overhead was included in inventories but not disaggregated in the financial statement. Commerce's further explanation in its final remand redetermination therefore clarified Commerce's point and in no way can be construed as "back-peddling" as Risen suggests. Risen Br. at 11.

Second, as to Risen's argument that Commerce failed to address how "the inclusion of MLE cost in inventories does not preclude the possibility that manufacturing overhead would

also be included in inventory costs" *Risen III,* 122 F.4th at 1357, Risen squabbles with the definition of proportion as "a part of something when compared to a whole." Risen Br. at 9 (quoting Remand Results at 9). Risen asserts that Commerce ignored its very definition, and "presume{d} then that proportion means some types/categories of overhead costs are included in the inventories notes and other types/categories of costs are not included in the inventories note." Risen Br. at 9. Risen fails to grasp that the plain meaning of "*a* proportion" indicates that some other part of the whole exists. Note 17 (emphasis added). Commerce did not try to divine what category or type that was, instead Commerce simply observed that, if the RM 1,648 million in cost of products existed but a 2,003 million costs of goods also appeared in the same financial statements, that must mean that the difference was overhead because only "a portion" of overhead was included in the RM 1,648 million. Note 17. As we explained above, this does not violate IFRS. *See supra* 13-15.

## IV.    Commerce's Determination Of Manufacturing Overhead Is Supported By Substantial Evidence

Furthermore, Commerce explains that because only a portion of all manufacturing overhead expenses are in the cost of Hanwha's inventory, additional manufacturing overhead expenses are included elsewhere on Hanwha's financial statement. Remand Result at 19. Besides the cost of sales figure of RM 2,003,400 in Hanwha's income statement, the statement contains the following expenses: (1) Selling and Administrative Expenses; (2) Other Expenses; (3) Finance Costs; and (4) Income Tax Expense. *See* Risen SV Submission at Ex SV2-8 at p. 11. This very submission critically explains that "{t}he accompanying accounting policies and *explanatory notes* form an *integral part* of the financial statements." *Id.* Commerce reasoned that by the plain meaning of these expense descriptions, and based on Commerce's practice, manufacturing overhead expenses would not be included in selling and administrative expenses,

finance costs, or income tax expense. Remand Results at 19. Moreover, Commerce discussed that Hanwha's financial statements show each expense that makes up the Other Expenses, Finance Costs, and Income Tax Expense line items, and further, manufacturing overhead expenses are not listed in any of these notes—notes that are that "integral" to the financial statements. *Id.* at 19; Risen SV Submission at Ex SV2-8 at p. 11.

On the other hand, as recognized by Risen, the cost of sales has been defined on this record as including direct materials, direct labor, and factory (or manufacturing) overhead costs. Risen Br. at 14. Commerce therefore explains that the logical conclusion based on the record is that the remaining manufacturing overhead costs that were not allocated to the cost of inventory sold are part of the cost of sales. Remand Results at 21. As the cost of sales is RM 2,003,400 and the cost of inventory sold that is included in the cost of sales is RM 1,648 million, Commerce reasonably found that this indicates that the difference, namely the unidentified cost of RM 357,156 million, is a manufacturing overhead expense. *Id.*

Risen's contention that Commerce's conclusions are based on guesswork and speculation as to what various types of expenses could make up the difference between the RM 2,003,400 cost of sales and the RM 1,648 million cost of inventory sold. These contentions fail for several reasons.

Risen recognizes that the basic formula for the cost of goods sold is Cost of Goods Sold equals Beginning Inventory Value plus Value of Purchases minus Ending Inventory Value. Risen Br. at 14 (citing *Cost Accounting Planning & Control*, 19-21 (7th Ed. 1980). Risen then concludes that, after subtracting the RM 1,648 million cost of inventory sold from the 2,003,400 cost of sales, the difference could relate to the cost of purchased goods that Hanwha resold that were not included in the value of inventory (and thus not part of the 1,648 million cost of

inventory).  *Id.*  However, Commerce as explains, the applicable formula demonstrates that the value of products purchased for resale must be included in inventory values or the formula will not result in an accurate cost of goods sold.  Remand Results at 22.  For example, Commerce observed that the value of products purchased for resale that remains on hand at the end of a period because they have not been sold must be included in the value of ending inventory or they will be improperly counted as part of the cost of goods sold.  *Id.*

Therefore, Commerce explains that Risen's conclusion that the unidentified costs in the cost of sales relates to the cost of purchased goods that were not included in the value of the inventory that Hanwha sold is unsupported.  *Id.*  Commerce also explains that Risen contradicted its own conclusion because the  IFRS provides that "the cost of inventories shall comprise all costs of purchase" *Id.*; *see also* Risen Br. at 3.  Commerce correctly found that any cost of sales associated with purchasing and reselling finished products would be in the RM 1,648 million cost of inventory sold and that the difference between the RM 2,003,400 cost of sales and the RM 1,648 million cost of inventory sold could not be explained through intermediate purchases in inventory.  *Id.*

In further support of this conclusion,  Commerce found that Hanwha's financial statements failed to indicate that the company purchases and resells.  Commerce observed that Note 1 of Hanwha's financial statements indicates that "{t}he principal activities of the Company are those relating to design, development and manufacture of silicon photovoltaic wafers, cells and modules."  Remand Results at 22; Risen SV Submission at Exhibit SV2-8 at p. 16.  Citing the fact Hanwha makes products, and because there are no explicit references in the financial statements to Hanwha selling services during 2018, Commerce concluded that the unidentified expenses are product costs, and not period costs, which are typically classified as

administrative and selling expenses. *Id.* Commerce explains that, in line with its practice, product costs normally consist of direct materials, direct labor, and manufacturing overhead cost. *Id.* at 9. Accordingly, Commerce explains that the unidentified costs must relate to materials, labor, and/or manufacturing overhead costs. *Id.*

Second, Risen speculates that the unexplained difference between the RM 2,003,400 cost of sales and the RM 1,648 million cost of inventory sold could relate to the net realizable value of inventory. Risen Br. at 14-15; *see* IAS 2 Inventories ("Net realisable value is the estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale."). However, Commerce explained that Note 17 of Hanwha's financial statements indicates that "the amount of inventories recognized as an expense in cost of sales . . . were RM 1,648 million," and not some net realizable value at all. Final Results at 23. Commerce explains that the concept, net realizable value, related to "inventories," which was contradicted by them being recognized as an "expense" in Note 17. *Id.*

## V.    **Commerce's Did Not Overstate Overhead Costs**

Risen ends by marking various arguments that the "fact that the manufacturing overhead ratio calculated in the underlying review differs from the manufacturing overhead ratios calculated in two prior administrative reviews in this proceeding" differed widely meant that Commerce's decision was not supported by substantial evidence. Risen Br. at 16; Remand Results at 23. Risen speculates that selling and administrative expense of around RM 122,853 cannot be "a proportion" to some additional RM 257,063 of other amount of overhead. But this is pure conjecture and not based on the record evidence that Hanwha does not sell product at all, Risen's less than proportionate marketing selling and administrative expense is nonsensical.

On remand, Commerce explains that the fact that the manufacturing overhead ratio calculated in the underlying review differs from the manufacturing overhead ratios calculated in two prior administrative reviews in this proceeding does not undermine Commerce's determination. Remand Results at 23-24. Commerce observed that in the two administrative reviews relied upon by Risen, Commerce did not select the same surrogate country and surrogate companies that it selected in the underlying review. Risen Br. at 16-17. Commerce explains that the fact that other companies outside the country where Hanwha is located have different experiences with respect to overhead costs does not demonstrate that the manufacturing overhead ratio calculated from Hanwha's financial statements is distorted. Remand Results at 24. Furthermore, Commerce explains that the fact that depreciation expenses are a smaller percentage of manufacturing overhead expenses in Commerce's overhead ratio calculation in this case compared to other cases does not undermine Commerce's conclusions and may simply mean that depreciation expense was one of the few manufacturing overhead expenses that was identified in those cases. *Id.* Of course, each administrative review stands on its own merits. *Hyundai*, 279 F. Supp. 3d at 1372.

Lastly, although Risen argues that Commerce normally allocates any remaining cost of sales to the materials, labor, and energy denominator of the manufacturing overhead ratio, citing two calculations not in the record of this case. Risen Br. at 17-18. However, Commerce explains that the remand order rejected this argument in stating that "Risen's contention that the unidentified remaining costs should be considered additional {material, labor, and energy} is unsupported" by the IFRS standard. Remand Results at 24 (quoting *Risen III*, 122 F.4th at 1356 n.8). The only evidence that Risen provided to support this claim consists of cites to two surrogate value memoranda in other proceedings that are not on the record of this remand. Risen

Br. at 17-18.  Therefore, there is no evidence on the record of this remand to support Risen's

novel claim, nor would a past administrative proceeding be dispositive on this unique record

before the Court.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand

redetermination and enter judgment in favor of the United States.

<div style="margin-left: 50%;">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR
Assistant Director

/s/ Tate N. Walker
TATE N. WALKER
Trial Attorney
U.S. Dept. of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0163
E-mail: Tate.Walker@usdoj.gov

</div>

OF COUNSEL:
JACK DUNKELMAN
Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

September 30, 2025                    *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's response in this matter complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the response was prepared, this brief contains a total of 8,875 words.

<u>/s/ Tate N. Walker</u>

September 30, 2025

31